**FILE COPY**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

BANK OF MONTREAL,

              Plaintiff,

      v.

OPTIONABLE, INC., MF GLOBAL INC.,
KEVIN P. CASSIDY, EDWARD J.
O'CONNOR, MARK A. NORDLICHT,
RYAN B. WOODGATE, SCOTT
CONNOR and JOSEPH D. SAAB,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

No.

**COMPLAINT**

**Jury Trial Demanded**



        Plaintiff Bank of Montreal ("BMO"), by its undersigned attorneys, for its Complaint in this action, alleges as follows upon knowledge as to itself and its acts and as to all other matters upon information and belief:

## NATURE OF THE ACTION

        1.     David P. Lee was formerly the head natural gas options trader in the Commodity Derivatives Group of BMO. Lee conspired or colluded with two energy derivatives brokerage firms used by BMO, defendants Optionable, Inc. ("Optionable") and MF Global Inc. ("MF Global"), their officers and employees, and others to defraud BMO by concealing large losses caused by Lee's trading strategies. The defendants did so by (i) arranging for Optionable and MF Global to provide supposedly "independent" market price quotations to BMO that were actually fictitious quotes supplied by Lee to Optionable and MF Global; (ii) entering into or encouraging Lee to enter into a large number of trades known as "1x2" trades to disguise the risk in the natural gas options book; and (iii) causing BMO to enter into large, unprofitable natural gas options trades

known as "EOO" trades that Lee recorded in a manner that created the appearance of large profits, but that actually resulted in large losses for BMO.

2.      By these schemes, Optionable and MF Global benefited by receiving millions of dollars in commissions, fees, and other revenue in connection with Lee's transactions. These transactions also helped Optionable portray itself as a successful, growing business so that defendants Kevin P. Cassidy, Edward J. O'Connor, and Mark A. Nordlicht could sell nearly $29 million of their Optionable stock to the New York Mercantile Exchange ("NYMEX"). In addition to financially benefiting Optionable and MF Global, Lee received benefits from BMO, including millions of dollars in bonuses and other compensation. Lee also received gifts and other personal benefits from Optionable and certain of the other defendants. Further, upon information and belief, Lee received and/or was promised things of value by Optionable, Cassidy, and others in exchange for his involvement in the schemes. Lee's boss, Robert B. Moore, Jr., also received millions of dollars in bonuses and other compensation from BMO, while resisting efforts by BMO that would have led to an earlier discovery of the fraud. Moore, like Lee, received gifts and other personal benefits from Optionable and certain of the other defendants.

3.      As a result of the defendants' conduct, BMO has suffered millions of dollars in losses related to its natural gas options trading and in responding to government inquiries concerning the defendants' actions.

## PARTIES

4.      Plaintiff BMO is a bank chartered under the Bank Act (Canada), with its executive offices located at 1 First Canadian Place, 100 King Street West,

Toronto, Ontario M5X 1A1, Canada, and its head office located at 129 rue Saint Jacques, Montreal, Quebec H2Y 1L6, Canada. Through four operating groups – Personal and Commercial Banking Canada, Personal and Commercial Banking U.S., Private Client Group, and BMO Capital Markets – BMO serves a broad range of personal, commercial, corporate, and institutional customers. BMO Capital Markets is a trade name used by BMO for the wholesale banking and institutional broker-dealer businesses of various BMO companies. The Commodity Derivatives Group is a line of business within BMO Capital Markets.

5.      Defendant Optionable is a Delaware corporation with its principal place of business in New York, New York. Optionable provided energy derivatives brokerage services to financial institutions, energy traders, and hedge funds. As part of its services, it provided trading and brokerage services for energy futures and derivatives. It also provided voice and floor brokerage services at the NYMEX.

6.      Defendant MF Global, formerly known as Man Financial Inc., is a Delaware corporation with its principal place of business in New York, New York. MF Global is the U.S. operating subsidiary of MF Global Ltd., which describes itself as the leading broker of exchange-listed futures and options in the world.

7.      Defendant Kevin P. Cassidy resides in Bedford Hills, New York. Cassidy has a long criminal record which he did not disclose to BMO. Cassidy pled guilty in 1987 to one felony count of wire fraud in Massachusetts and pled guilty to another felony count of wire fraud in Connecticut. He pled guilty in 1993 in New York to one federal count of tax evasion. Cassidy pled guilty in 1996 in Florida to federal felony counts of trafficking in a counterfeit device and improper reporting of currency

transactions, and was sentenced to two and a half years in prison.  Despite Cassidy's criminal record, he served as Chief Executive Officer of Optionable from March 1, 2001 to March 31, 2004.  He continued to run Optionable's day-to-day operations from April 1, 2004 to October 15, 2005 with the title of "consultant," and then again served as Optionable's CEO from October 30, 2005 to May 12, 2007.  He also served as Vice-Chairman of the Board of Directors of Optionable until May 12, 2007.  Cassidy also is associated with Capital Energy Services, LLC ("Capital"), f/k/a Orion Energy Services, LLC ("Orion").

        8.        Defendant Edward J. O'Connor resides in Monroe, Connecticut. He served as Chief Executive Officer of Optionable from March 2004 to October 30, 2005, and again from about November 2007 to January 2009.  He also served as President of Optionable from March 2001 to January 2009 and has served as a director since March 2001.  From December 1996 to 2007, O'Connor served as a director, and periodically a managing director, at Capital.

        9.        Defendant Mark A. Nordlicht resides in New Rochelle, New York. He is Optionable's second largest shareholder, with 16% of its stock, and served as Chairman of the Board of Directors of Optionable from February 4, 2000 to May 1, 2007.

        10.       Defendant Ryan B. Woodgate resides in New York, New York. He was an Optionable employee from at least February 2003 to at least May 2005. Woodgate transacted business with BMO by sending, via electronic mail and instant messaging, supposedly independent – but in fact fraudulently collusive – price quotes to Lee and BMO, upon which BMO relied in allowing Lee to enter into and maintain certain loss-making positions.

768427.2

4

11.     Defendant Scott Connor resides in Rye, New York.  He was an Optionable employee from at least June 2005 to at least January 2007.  Connor transacted business with BMO by sending, via electronic mail and instant messaging, supposedly independent – but in fact fraudulently collusive – price quotes to Lee and BMO, upon which BMO relied in allowing Lee to enter into and maintain certain loss-making positions.

12.     Defendant Joseph D. Saab resides in Glen Ridge, New Jersey.  He was an MF Global employee from at least September 2004 to at least January 2007.  From MF Global's offices in New York City, Saab transacted business with BMO by sending, via electronic mail and instant messaging, supposedly independent – but in fact fraudulently collusive – price quotes to Lee and BMO, upon which BMO relied in allowing Lee to enter into and maintain certain loss-making positions.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, because plaintiff BMO is a citizen or subject of a foreign state and all of the defendants are citizens of U.S. states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

14.     This Court has personal jurisdiction over the defendants because during the time period at issue in this case they each (a) transacted business in New York or contracted to provide goods or services in New York; (b) committed a tortious act within New York; or (c) committed a tortious act outside New York causing injury to the plaintiff in New York, and regularly does or solicits business, or engages in another persistent course of conduct, or derives substantial revenue from goods used or consumed

or services rendered in New York. In addition, defendants Cassidy, O'Connor, Nordlicht, Woodgate, and Connor reside in New York, and defendants Optionable and MF Global are doing business in New York.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(2), because jurisdiction is founded only on diversity of citizenship, and a substantial part of the events or omissions giving rise to plaintiff's claims occurred in this district.

## STATEMENT OF FACTS

### *Commodity Derivatives Trading at BMO*

16.     A derivative is a financial instrument that derives its value from the value of an underlying asset. One of the most common derivatives is an option, which is the right to buy or sell an asset. Options come in two basic varieties: a "put" gives the holder the right to sell an asset, and a "call" gives the holder the right to buy an asset.

17.     A commodity futures contract is an agreement to buy or sell a commodity (like natural gas) at a predetermined price and date. A natural gas option gives the holder the right (but not the obligation) to buy or sell a natural gas futures contract at a specified "exercise price" on (or before) a specified expiration, or "exercise" date. Natural gas options, which derive their value from natural gas futures contracts, are one type of commodity derivative that BMO trades.

18.     A "long-dated" option has an exercise date that is more than a year in the future (*e.g.*, an option sold in July 2006 that expires in July 2010). An option is considered "out-of-the-money" if the holder of the option cannot profit by exercising it

today – for example, a call option whose exercise price is higher than the current market price of the underlying asset, or a put option whose exercise price is lower than the current market price of the underlying asset. Trading in long-dated and out-of-the-money options tends to be less active than in short-dated or close-to-the-money options.

19.     BMO provides clients with commodity derivatives trading services, including entering into derivatives contracts with them to allow them to hedge certain risks in the energy markets.

20.     Although BMO's Commodity Derivatives Group engages in client-driven trading, it also independently trades in the commodities markets in order to support or hedge the positions it takes with or on behalf of its clients.

21.     From approximately 1997 until May 4, 2007, Lee was a natural gas derivatives trader in BMO's Commodity Derivatives Group located in New York. He was responsible for placing trades, determining strategy, taking positions in the natural gas book, and valuing those positions daily.

22.     From 2000 until May 4, 2007, Moore was head of the Commodity Derivatives Group. He was responsible for overseeing commodities traders (including Lee), managing BMO's commodities trading strategy, and ensuring that commodities traders' books were correctly valued (or "marked to market") daily.

***Defendants' Manipulation of BMO's Commodity***
***Derivatives Valuation Procedures From 2003 Onward***

23.     In order to value the natural gas options book, BMO used an option pricing model. These models used inputs from various public sources, including but not limited to interest rates, spot prices of natural gas, and exchange settlement prices. When public data did not exist for some inputs required by the pricing models, such as

volatility or certain data related to options that were traded infrequently, Lee was supposed to input or adjust these data points according to his knowledge and judgment of the current market.

24.     At mid-month and at the end of the month, BMO's Market Risk department would value a representative sample of trades in the natural gas options book, independent of Lee's valuation, using data that BMO believed to be independent data from third parties, including prices from brokers.  This was known as the Independent Price Verification ("IPV") process.

25.     Optionable and MF Global provided brokerage services to BMO's commodity derivatives traders from at least 2003 until early May 2007.

26.     During that time, Optionable and MF Global provided BMO with supposedly independent prices to value some of its natural gas options as part of the IPV process.

27.     Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, Saab, Lee, and Moore all were aware that BMO relied on these price quotations to conduct the IPV process for its natural gas options book.

(a)     For example, on August 29, 2003, in an e-mail to MF Global, an employee of BMO referred to the "month end pricing check being sent to broker at Mann [Man Financial]."

(b)     On May 3, 2006, a person from BMO's Investment Banking Group Product Operations ("IBGPO") – to whose pricing unit Connor sent Optionable's quotations – e-mailed Connor, asking him if he could "confirm that the Nymex

Differential Vols [volatilities] for the El Paso, San Juan Pipeline is correct, as it's giving me quite a huge variance on my P/L [profit and loss] calculations."

(c)   On September 28, 2006, the director of Market Risk for BMO's commodity line of business e-mailed Steven Laker of Optionable "to request Optionable to provide us with independent market quotes as at the close of [the] September 28, 2006 trading day. . . .  It is understood that the quotes will be verifiable from IM [instant messaging] sheets on your archive . . . .  It is also understood that Bank of Montreal will not be a contributor to the quotes you collected upon this request."

28.   Cassidy and O'Connor formed personal friendships with Lee and Moore.  They socialized with Lee and Moore outside of work, took or discussed taking vacations with Lee and Moore, and assisted in finding a job at Optionable for Moore's son.

29.   Starting in 2003, Lee began communicating to Optionable the price quotes he wanted Optionable to provide to BMO as "independent" prices.  Lee created a spreadsheet and a short memorandum reflecting his desired prices and e-mailed these documents to an Optionable employee.  The Optionable employee then e-mailed those documents, unchanged or virtually unchanged, to BMO employees who conducted the natural gas options IPV process, under the guise of sending independent prices.  The BMO employees incorporated the Optionable quotations into spreadsheets in which they compared those quotations to the prices Lee had previously recorded in BMO's records.

30.   In particular, at month-end, Lee sent Optionable the pricing information he wanted to appear in Optionable's supposedly independent quotes.  Lee

768427.2                                9

took the word-processing document and spreadsheets that Optionable had transmitted to

BMO by e-mail at the end of the preceding month and revised them to include the marks

Lee wanted "verified" for the current month.  He then e-mailed those computer files to

Cassidy, O'Connor, Woodgate, or Connor.  Later the same day, Optionable e-mailed

those quotes back to BMO either unchanged or virtually unchanged.  First, they e-mailed

the quotes to Lee alone for his approval.  Once they obtained Lee's approval, the quotes

were e-mailed to people in BMO's IPV group, with a copy to Lee.

   31. The following examples show how the defendants perpetrated this

price-quotation fraud.  On August 31, 2006 at 9:09 a.m., Lee e-mailed to Connor a word-

processing file that read, in part, as follows:

> 08/31/06
> To Whom It May Concern:
>
> Pipeline Volatility, stated as a differential to Nymex; are as follows:

| Region | Pipeline | Nymex Differential (vols) |
|---|---|---|
| Appalachia: | Columbia Appalachia | -1/+3 |
| | CNG Appalachia | -1/+3 |
| | | |
| Mid-West: | Chicago City-gate | -2/+2.5 |
| | N.N. Gas Demarcation | -1/+2.5 |
| | Northern Ventura | -2/+2.5 |

   32. Later on August 31, at 3:04 p.m., Lee e-mailed to Cassidy at his

personal e-mail address, energyorion@cs.com, a spreadsheet file that read, in part, as

follows:[1]

---

[1] Months were represented by letter codes, as follows: F = January, G = February,
H = March, J = April, K = May, M = June, N = July, Q = August, U = September,
V = October, X = November, Z = December.

Market Quotes

| Strip | Strike | Cross | Bid | Offer |
|---|---|---|---|---|
| v06 | 5.5 | 6.08 | 0.065 | 0.09 |
| v06 | 7 | 6.08 | 0.22 | 0.255 |
| v06 | 10 | 6.08 | 0.01 | 0.035 |
| v06 | 4.5 | 6.08 | 0.01 | 0.035 |
| X6-H7 | 12 | 9.95 | 1.055 | 1.1 |
| | | *** | | |
| cal08 | 8 | 8.87 | 1.16 | 1.21 |
| | | *** | | |
| Swaptions | | | | |
| X6h7 | 12.5 | 9.95 | 0.39 | 0.48 |
| X6h7 | 8 | 9.95 | 0.22 | 0.3 |
| Cal07 | 9.25 | 9.23 | 0.96 | 1.06 |
| Cal08 | 5 | 8.85 | 0.075 | 0.12 |
| Cal08 | 10 | 8.85 | 0.93 | 1.03 |

33.    On August 31 at 3:36 p.m., Lee e-mailed another spreadsheet file to Connor, in the format of forwarding to him an e-mail Connor had sent to "BMO IBGPO Pricing" and others (including Lee) the month before.  This new e-mail contained the same information as in the 3:04 p.m. e-mail, but added the following information at the top:

8/31/2006

NATURAL GAS

| MTH | YEAR | STRIKE | STR.BID | STR.OFFR |
|---|---|---|---|---|
| V | 2006 | | 0.96 | 0.99 |
| X | 2006 | | 1.94 | 2 |
| Z | 2006 | | 2.7 | 2.75 |
| F | 2007 | | 3.36 | 3.44 |
| G | 2007 | | 3.86 | 2.93 |

34.    Forty-three minutes later, at 4:19 p.m. on August 31, Connor e-mailed Lee the following spreadsheet and document that supposedly represented Optionable's independent price quotations and pipeline volatility report (from which

prices could be calculated).  In fact, except for two contracts, the spreadsheet and

document was identical to the spreadsheets and document Lee had e-mailed Optionable

earlier in the day.  Connor's e-mail stated:

8/31/2006

NATURAL GAS

| MTH | YEAR | STRIKE | STR.BID | STR.OFFR |
|-----|------|--------|---------|----------|
| V | 2006 | | 0.96 | 0.99 |
| X | 2006 | | 1.94 | 2 |
| Z | 2006 | | 2.7 | 2.75 |
| F | 2007 | | 3.31 | 3.41 |
| G | 2007 | | 3.83 | 3.93 |

* * *

Market Quotes

| Strip | Strike | Cross | Bid | Offer |
|-------|--------|-------|-----|-------|
| v06 | 5.5 | 6.08 | 0.065 | 0.09 |
| v06 | 7 | 6.08 | 0.22 | 0.255 |
| v06 | 10 | 6.08 | 0.01 | 0.035 |
| v06 | 4.5 | 6.08 | 0.01 | 0.035 |
| X6-H7 | 12 | 9.95 | 1.055 | 1.1 |

* * *

| cal08 | 8 | 8.87 | 1.16 | 1.21 |

* * *

Swaptions

| X6h7 | 12.5 | 9.95 | 0.39 | 0.48 |
| X6h7 | 8 | 9.95 | 0.22 | 0.3 |
| Cal07 | 9.25 | 9.23 | 0.96 | 1.06 |
| Cal08 | 5 | 8.85 | 0.075 | 0.12 |
| Cal08 | 10 | 8.85 | 0.93 | 1.03 |

* * *

08/31/06
To Whom It May Concern:

Pipeline Volatility, stated as a differential to Nymex; are as follows:

| Region | Pipeline | Nymex Differential (vols) |
|---|---|---|
| Appalachia: | Columbia Appalachia | -1/+3 |
| | CNG Appalachia | -1/+3 |
| Mid-West: | Chicago City-gate | -2/+2.5 |
| | N.N. Gas Demarcation | -1/+2.5 |
| | Northern Ventura | -2/+2.5 |

35.    Finally, at 4:27 p.m. on August 31, Connor e-mailed BMO's pricing department, with a copy to Lee, the same spreadsheet and document he had e-mailed to Lee eight minutes earlier.  The circular quotation process was now complete.

36.    In the following instances (among others), Cassidy, O'Connor, Woodgate, and Connor received pipeline volatility reports and price quotations from Lee by e-mail (or instant messaging ("IM")) and then passed them off to BMO as Optionable's independent assessments:

| Time | From | To | Type |
|---|---|---|---|
| October 31, 2003 | | | |
| 11:28 a.m. | Lee | Woodgate | Proposed quotes |
| 3:50 p.m. | Woodgate | BMO | Final quotes |
| October 29, 2004 | | | |
| 12:16 p.m. | Lee | Woodgate | Proposed quotes |
| 3:26 p.m. | Woodgate | BMO | Final quotes |
| December 29, 2004 | | | |
| 8:55 a.m. 2:45 p.m. 3:30 p.m. | Lee (e-mail, IM) | Woodgate | Proposed quotes |
| 2:41 p.m. | Lee (IM) | Cassidy | Proposed quotes |
| 3:39 p.m. | Woodgate | BMO | Final quotes |
| January 31, 2005 | | | |
| 10:18 a.m. | Lee | Woodgate | Proposed quotes |
| 4:18 p.m. | Woodgate | BMO | Final quotes |

| Time | From | To | Type |
|---|---|---|---|
| March 31, 2005 | | | |
| 10:22 a.m. 3:16 p.m. | Lee | Woodgate | Proposed quotes |
| 3:38 p.m. | Woodgate | BMO | Final quotes |
| April 29, 2005 | | | |
| 1:59 p.m. | Lee | Woodgate | Proposed quotes |
| 3:56 p.m. | Woodgate | Lee | Draft final quotes |
| 4:07 p.m. | Woodgate | BMO | Final quotes |
| May 31, 2005 | | | |
| 11:37 a.m. 2:27 p.m. | Lee | O'Connor | Proposed quotes |
| 2:59 p.m. 3:35 p.m. | O'Connor | Lee | Draft final quotes |
| 3:52 p.m. 3:54 p.m. | O'Connor | BMO | Final quotes |
| September 29, 2005 | | | |
| 1:51 p.m. 3:49 p.m. | Lee | Connor | Proposed quotes |
| 4:24 p.m. | Connor | Lee | Draft final quotes |
| November 30, 2005 | | | |
| 8:59 a.m. 3:53 p.m. | Lee | Connor | Proposed quotes |
| 4:01 p.m. | Connor | Lee | Draft final quotes |
| December 29, 2005 | | | |
| 9:19 a.m. 3:24 p.m. | Lee | Connor | Proposed quotes |
| 3:34 p.m. 3:35 p.m. | Connor | Lee | Draft final quotes |
| January 31, 2006 | | | |
| 3:41 p.m. | Lee | Connor | Proposed quotes |
| 4:12 p.m. | Connor | Lee | Draft final quotes |
| March 31, 2006 | | | |
| 9:51 a.m. 4:43 p.m. | Lee | Connor | Proposed quotes |
| 4:54 p.m. | Connor | BMO | Final quotes |
| May 31, 2006 | | | |
| 10:37 a.m. 3:31 p.m. | Lee | Connor | Proposed quotes |
| 3:55 p.m. | Connor | Lee | Draft final quotes |
| 4:15 p.m. | Connor | BMO | Final quotes |

| Time | From | To | Type |
|---|---|---|---|
| June 29, 2006 | | | |
| 10:40 a.m. 3:25 p.m. | Lee | Connor | Proposed quotes |
| 3:34 p.m. | Connor | Lee | Draft final quotes |
| 3:52 p.m. | Connor | BMO | Final quotes |
| July 31, 2006 | | | |
| 8:41 a.m. 4:04 p.m. | Lee | Connor | Proposed quotes |
| 4:11 p.m. | Connor | Lee | Draft final quotes |
| 4:32 p.m. | Connor | BMO | Final quotes |
| August 31, 2006 | | | |
| 9:09 a.m. 3:36 p.m. | Lee | Connor | Proposed quotes |
| 3:04 p.m. | Lee | Cassidy | Proposed quotes |
| 4:19 p.m. | Connor | Lee | Draft final quotes |
| 4:27 p.m. | Connor | BMO | Final quotes |
| September 28, 2006 | | | |
| 9:06 a.m. 3:28 p.m. | Lee | Connor | Proposed quotes |
| 11:33 a.m. | Lee | Cassidy | Proposed quote grid |
| 4:31 p.m. 4:37 p.m. 4:39 p.m. | Connor | Lee | Draft final quotes |

37.     The price quotes that Lee sent to Optionable generally were more favorable to his positions than actual market prices, and allowed Lee to overstate the value of his natural gas options positions, create fictitious profits, and conceal losses.

38.     For example, Lee's August 31, 2006 quote, confirmed by Optionable, for the v06 (October 2006) strip with a 5.5 strike price – a bid of 0.065 and an offer of 0.09 – was far lower than the prices quoted by other market participants at the time, which ranged from 0.219 to 0.256.  Because BMO held a short position in this particular option, lower prices generated greater profits.  In this case, Lee's quote inflated BMO's profit by more than $500,000.

39.     Lee's August 31, 2006 quote, confirmed by Optionable, for the cal08 (calendar 2008) strip with an 8 strike price – a bid of 1.16 and an offer of 1.21 –

was also significantly off market, which ranged from 1.03 to 1.05.  Here, BMO held a long position, so higher prices generated greater profits.  In this case, Lee's quote inflated BMO's profit by more than $15 million.

40.     Lee's September 28, 2006 quote, confirmed by Optionable, for the cal08 (calendar 2008) strip with a 5.5 strike price – a bid of 0.39 and an offer of 0.42 – was likewise significantly off market, which ranged from 0.32 to 0.36.  Here, BMO also held a long position, so Lee's inflated quote artificially increased BMO's profit by more than $6 million.

41.     Lee's arrangement with Optionable, whereby Optionable would simply return Lee's price quotes to BMO without independent verification, allowed Lee to falsify his price quotes without fear that his scheme would be exposed.

42.     As a result of his arrangement with Optionable, Lee received continued employment, increased salary, increased stature, and increased bonus compensation from BMO.  Moreover, Lee's trading activity and false quotes resulted in financial gain to Optionable, Cassidy, O'Connor, Woodgate, and Connor by, for example, increasing the volume of trades with Optionable or its affiliates and making Optionable appear to be a successful, growing business.  Lee, upon information and belief, received and/or was promised things of value by Optionable, Cassidy, and others in exchange for participating in the arrangement with Optionable.

43.     The arrangement between Lee and Optionable also resulted in continued employment, increased salary, increased stature, and increased bonus compensation for Moore by creating the appearance of profits for the Commodity

Derivatives Group.  Moore, as a result of his conduct, received gifts and personal benefits

from Optionable and certain of the other defendants.

44.    MF Global, through Saab, also provided to BMO supposedly

independent price quotations.  When it provided the quotations, MF Global represented

on the spreadsheets it sent BMO that "They Are Numbers That Reflect A Consensus

Taken On That Date And Time, From Different Sources In The Market Place."

45.    In actuality, MF Global's quotations did not reflect a "consensus,"

and were not from "different sources," but were in nearly all cases simply a regurgitation

of quotes supplied by Lee.

46.    For example, on December 29, 2005, starting at 3:06 p.m., Saab,

whose screen name was "jsngotc," exchanged the following instant messages with Lee:

```
# Start of transcript
# Participant jsngotc@AIM.im entered on Dec 29, 2005 3:06:52 PM
# Participant information
buddyName: jsngotc
networkID: AIM
# End of participant information
jsngotc@AIM.im (3:06:53 PM): we're doing month-end today
David.P.Lee@bmo.com (3:12:36 PM): yes
jsngotc@AIM.im (3:12:57 PM): do g-z instead of c6
jsngotc@AIM.im (3:13:09 PM): please????????????????????????
David.P.Lee@bmo.com (3:22:21 PM): g6-z6 2.60/2.66
David.P.Lee@bmo.com (3:22:28 PM): j-v06 2.40/2.46
David.P.Lee@bmo.com (3:22:34 PM): x6h7 4.02/4.08
David.P.Lee@bmo.com (3:22:58 PM): 07 3.46/3.60
David.P.Lee@bmo.com (3:23:13 PM): 08 3.16/3.30
David.P.Lee@bmo.com (3:23:19 PM): 09 2.93/3.08
David.P.Lee@bmo.com (3:23:23 PM): 10 2.75/2.95
jsngotc@AIM.im (3:24:34 PM): how about jv7?
David.P.Lee@bmo.com (3:26:23 PM): 2.89/3.04
# Participant jsngotc@AIM.im left on Dec 29, 2005 3:41:23 PM
# End of transcript
```

47.     At 3:28 p.m. on December 29, 2005, just two minutes after Lee gave Saab the last of the quotes contained in the above exchange, Saab e-mailed a spreadsheet to Lee and others at BMO which read in part:

| ATM-OPTIONS | | | |
|---|---|---|---|
| TERM | STRIKE | BID | ASK |
| Apr-06 - Oct-06 | $10.3000 | $2.4000 | $2.4600 |
| Nov-06 - Mar-07 | $11.4500 | $4.0200 | $4.0800 |
| Apr-07 - Oct-07 | $9.4500 | $2.8900 | $3.0400 |
| Feb-06 - Dec-06 | $10.6500 | $2.6000 | $2.6600 |
| Cal-07 | $10.1500 | $3.4600 | $3.6000 |
| Cal-08 | $9.2500 | $3.1600 | $3.3000 |
| Cal-09 | $8.4500 | $2.9300 | $3.0800 |
| Cal-10 | $7.8000 | $2.7500 | $2.9500 |

48.     These quotations that Saab sent to BMO contained exactly the same information as those Lee had just sent to him by instant messaging.  For example, Lee's message "j-v06 2.40/2.46" meant for the term April ("j") to October ("v") 2006, the bid was $2.40 and the ask $2.46 – precisely what Saab then included in the first row of his table.

49.     Rather than Saab providing independent quotations *to* Lee, Saab solicited these quotations *from* Lee.  As shown in the IM exchange above, Saab opened the exchange with the comment, "we're doing month-end today," and then asked Lee to "do g-z instead of c6 . . . please?????????????????????????"  Saab later asked Lee, "how about jv7?"

50.     Saab opened another IM exchange with the request, "month end please?"  In yet another exchange, when it was getting late in the day and Saab had not yet received quotations from Lee, he began his IM exchange with Lee with "well?"

51.    In the following instances (among others), Saab received price quotations from Lee by instant messaging and then passed them off to BMO as MF Global's independent assessments:

| Time | From | To | Type |
|------|------|----|------|
| September 30, 2004 | | | |
| 4:05 p.m. | Lee | Saab | Proposed quotes |
| 4:42 p.m. | Saab | BMO | Final quotes |
| December 29, 2004 | | | |
| 3:30 p.m. | Lee | Saab | Proposed quotes |
| 3:45 p.m. | Saab | BMO | Final quotes |
| January 31, 2005 | | | |
| 3:13 p.m. | Lee | Saab | Proposed quotes |
| 3:35 p.m. | Saab | BMO | Final quotes |
| April 29, 2005 | | | |
| 3:30 p.m. | Lee | Saab | Proposed quotes |
| 3:34 p.m. | Saab | BMO | Final quotes |
| May 31, 2005 | | | |
| 3:12 p.m. | Lee | Saab | Proposed quotes |
| 3:32 p.m. | Saab | BMO | Final quotes |
| November 30, 2005 | | | |
| 3:51 p.m. | Lee | Saab | Proposed quotes |
| 4:30 p.m. | Saab | BMO | Final quotes |
| December 29, 2005 | | | |
| 3:06 p.m. | Lee | Saab | Proposed quotes |
| 3:28 p.m. | Saab | BMO | Final quotes |
| January 31, 2006 | | | |
| 3:26 p.m. | Lee | Saab | Proposed quotes |
| 4:12 p.m. | Saab | BMO | Final quotes |
| March 31, 2006 | | | |
| 3:30 p.m. | Lee | Saab | Proposed quotes |
| 4:47 p.m. | Saab | BMO | Final quotes |
| May 31, 2006 | | | |
| 3:33 p.m. | Lee | Saab | Proposed quotes |
| 3:58 p.m. | Saab | BMO | Final quotes |
| July 31, 2006 | | | |
| 3:44 p.m. | Lee | Saab | Proposed quotes |
| 4:05 p.m. | Saab | BMO | Final quotes |
| January 31, 2007 | | | |
| 3:30 p.m. | Lee | Saab | Proposed quotes |
| 3:47 p.m. | Saab | BMO | Final quotes |

52.     As with Optionable, BMO employees incorporated the MF Global quotations into spreadsheets in which they compared those quotations to the prices Lee had previously recorded in BMO's records.

53.     The price quotes that MF Global supplied generally were more favorable to Lee's positions than actual market prices, and allowed Lee to overstate the value of his natural gas options positions, create fictitious profits, and conceal losses.

54.     For example, MF Global's September 28, 2006 quote for the November 2006-December 2006 at-the-money option – a bid of 1.43 and an offer of 1.47 – was off market, which ranged from 1.34 to 1.38. Because BMO held a long position in this particular option, MF Global's inflated quote generated inflated profits.

55.     Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, Saab, and Lee fraudulently concealed the circular quotation process from BMO until 2007.

***Optionable's Revenue From Trades With BMO***

56.     As part of his fraudulent scheme with Optionable and the other defendants, and, upon information and belief, in exchange for receiving (or the promise of receiving) payments or other personal benefits from Optionable, Cassidy, and/or others, Lee directed increasing amounts of BMO's business to Optionable. Indeed, throughout 2005 and 2006, BMO was Optionable's biggest client. As the volume of trading activity that Lee directed to Optionable increased, so did the incentive for the defendants to continue colluding to cover up the pattern of false price quotes and inflated profits.

57.    Optionable earned commissions from BMO for the transactions it entered into with Lee. It also received commissions from the counterparties in the EOO transactions, and fees from NYMEX for transactions that it routed through NYMEX's Clearport trading platform.

58.    In particular, in at least 2006 and 2007, Optionable had an incentive arrangement with NYMEX under which Optionable would receive a share of the revenues NYMEX received from transactions cleared through its Clearport trading platform. The size of Optionable's share of NYMEX's Clearpoint revenues was determined by the volume of over-the-counter ("OTC") transactions Optionable arranged that were cleared through Clearport.

59.    Lee cleared a large number of the transactions he entered into with Optionable through Clearport.

60.    The increased BMO business provided by Lee, therefore, not only provided Optionable with commissions and brokers fees from BMO, as well as revenue from NYMEX for the BMO transactions themselves, but also enabled Optionable to earn more revenue from transactions by others that were cleared through Clearport.

**Optionable and Cassidy's Provision of Personal Benefits to Lee and Moore**

61.    In order to encourage Lee to continue to participate in his fraudulent scheme with Optionable, and to encourage Moore to look the other way, Optionable and Cassidy plied Lee and Moore with gifts and inducements, including gambling vacations. Upon information and belief, Lee also received and/or was promised things of value by Optionable, Cassidy, and others in exchange for participating in the arrangement with Optionable.

62.     Notwithstanding their fiduciary obligations as employees, Lee and Moore accepted these gifts and inducements, which included:

(a)     $650 in tickets purchased by Cassidy for Moore on March 16, 2004;

(b)     expensive dinners for Moore at restaurants at the Foxwoods Resort Casino on December 5, 2004, April 9, 2005, April 22, 2006, and November 1, 2006; in Manhattan on March 2, 2007; and at the Mohegan Sun Resort and Casino on March 3, 2007;

(c)     hundreds of dollars to a men's grooming club in Manhattan for Moore and Lee on July 28, 2005 and October 17, 2005;

(d)     more than a thousand dollars for expenses for Lee and Moore at the Borgata Hotel Casino & Spa in Atlantic City, New Jersey on November 18-19, 2005; and

(e)     more than a thousand dollars of car and limousine services for Moore on March 7, 2005, June 1, 2006, and August 17, 2006.

**BMO's Discovery of Valuation Issues**

63.     Starting in 2006, Lee entered into increasing numbers of natural gas options positions, which caused the size of BMO's natural gas options book to increase. Most of the transactions Lee entered into during the second half of 2006 were "proprietary" positions, meaning they were not transactions intended to offset the risk of client trades or to make markets in natural gas options.

64.    Encouraged by Moore, Lee put on these proprietary positions to make it appear that the Commodity Derivatives Group was earning more revenue, and thereby to increase Lee and Moore's own reputations and independence within BMO.

65.    Starting in late 2005, BMO's Market Risk department began to suggest that BMO subscribe to a multicontributor service called "Totem RealMarks" ("Totem"), in part because of the increased size of the natural gas options book.

66.    Totem quotes reflect prices and estimates submitted by subscribers. Totem then eliminates outliers, averages the remaining quotes and gives these averaged numbers to subscribers to use in their price verification processes.

67.    Some of the most significant participants in the natural gas options trading markets were subscribers to the Totem service.

68.    Nonetheless, Moore and Lee strongly resisted the Market Risk department's efforts to use the independent pricing data from Totem in BMO's IPV process, claiming that quotes from Optionable and other brokers were the best way to value the natural gas book.

69.    Moore and Lee did so in order to avoid having the natural gas options book valued independently, to maintain BMO's reliance on their supposed expertise, and thereby allow Lee to continue colluding with Optionable and the other defendants.

70.    Despite Moore and Lee's efforts, BMO subscribed to Totem beginning on September 11, 2006. As part of this subscription, BMO provided Totem with a list of its prices for natural gas options as of the end of each month, and shortly

thereafter, Totem sent BMO a list of price quotations that BMO could use for its IPV process.

71.     In early October 2006, BMO's Market Risk department submitted BMO's September month-end data to Totem.  After BMO received the Totem quotes for month-end September, it used them in the IPV process to test the valuation of the natural gas options book.  That test revealed a large discrepancy between Lee's valuation of the natural gas options book, and the valuation using the Totem quotes.

***Moore and Lee's Campaign to Discredit Totem From Late 2006 to Early 2007***

72.     In response to the discrepancy between Lee's and Totem's valuations of the natural gas book, Moore and Lee – assisted by Cassidy and Optionable – waged a campaign from October 2006 to May 2007 to discredit the reliability of the Totem data, and to defend Lee's valuation of BMO's natural gas options book.  With the knowing assistance and participation of Cassidy and Optionable, Moore and Lee tried to convince BMO that the Totem prices were incorrect, and that therefore Optionable's prices – which supposedly reflected actual market prices rather than a "survey" – were superior to the Totem quotes.  They did so in order to maintain BMO's reliance on Optionable's – that is, Lee's – prices.

73.     Beginning in late 2006, Moore, Lee, Cassidy, and others participated in an effort to have Optionable sell BMO additional price quotations via Optionable's newly developed options trading platform, called OPEX Analytics RealMarks ("OPEX").  They did so in order to increase BMO's reliance on Optionable, and to persuade BMO not to rely on the independent marks provided by Totem.

74.    In a press release dated September 6, 2006, Optionable touted OPEX as "a real time mark-to-market valuation service for natural gas and crude oil options." In the press release, Cassidy stated: "Clients frequently asked us to provide actual market valuations instead of the theoretical modeling often used to mark-to-market their books. We are pleased to formalize this as a product that will provide clients with up-to-date, reliable information as to the real-time market valuations of their options. This product will be an invaluable tool for clients in monitoring their natural gas and energy derivative portfolios."

75.    As a result of the effort by Moore, Lee, Cassidy, and others to get BMO to use OPEX, Optionable began to regularly provide BMO with a grid of quotes for the values of certain options, supposedly derived from the OPEX trading platform. On January 19, 2007, Optionable's Steven Laker represented to the director of Market Risk for BMO's commodity line of business that the OPEX quotes were obtained from "different market makers, Banks, Brokerage houses, Energy trading companies, Hedge funds, etc. and we send you a complete sampling of IM's and OPEX screen shots of actual quotes and actual trades."

76.    In an agreement BMO signed with Optionable on February 23, 2007 (the "OPEX Analytics RealMarks Agreement"), Optionable represented that "OPEX Analytics RealMarks provides specific market information based on actual market quotes obtained by Optionable."

77.    Contrary to Optionable's representations, the pricing grid provided to BMO by the OPEX system was filled out by Lee with prices that favored his positions, and then sent by Optionable to BMO.

*Lee's Execution of Trades to Conceal Increased Risk in the Natural Gas Options Book*

78.    As part of its efforts to measure and control risk in its trading and other operations, BMO uses "value-at-risk" (or "VaR") models.  These models are designed to measure risk so that BMO can compare the VaR to established risk limits and, if necessary, tell traders to reduce the size of their positions if VaR exceeds a set limit.

79.    In late July 2006, the VaR for the natural gas options book increased significantly and at times exceeded pre-approved limits.

80.    Instead of reducing the risk of the natural gas options book to bring it within VaR limits, Lee and Moore argued that BMO's VaR model was unreliable.  In addition, with Moore's assistance and encouragement, Lee entered into transactions – known as "1x2" trades – with the sole purpose of temporarily reducing the VaR of the natural gas options book.  In these trades, Lee would purchase a close-to-the-money option (i.e., an option whose exercise price was close to the current price) and simultaneously sell two out-of-the-money options.

81.    Lee and Moore continued to enter into 1x2 trades and to argue against the reliability of the VaR model through December 2006, when BMO's management instructed them to reduce the size of the natural gas options book.  The 1x2 trades significantly increased the size of the book as well as increasing the book's exposure to risk factors, leading to losses.  Lee entered into the 1x2 trades because selling or closing out positions would have revealed that Lee had mismarked the book.

*Lee's Execution of the EOO Trades*

82.     Lee's increasingly large unprofitable positions – including the 1x2 trades – began to generate even larger losses in the fall of 2006.  To cover these losses, starting in mid-October 2006, Lee began executing "exchange of options for options" ("EOO") trades, with the sole purpose of recording large artificial profits.

83.     An EOO trade involves two types of options, known as "American-style" and "European-style" options.  The holder of an American-style option can exercise the right to buy or sell any time before or on the option's expiration date.  The holder of a European-style option, in contrast, can exercise the right to buy or sell only on the option's expiration date.  The two types of options, therefore, can share all the same terms but have different values because the American-style option offers more flexibility in when it can be exercised.

84.     Each EOO trade consisted of BMO's buying an American-style straddle option on NYMEX and selling a European-style straddle option over the counter.  Both straddles involved the same number of underlying futures contracts involving the same amount of natural gas in the same month at the same exercise price, but the American-style straddle option could be exercised at any time before or at expiration, while the European-style straddle option could only be exercised at expiration.  Because of its flexibility, the American-style option that BMO bought cost it a larger premium than it received for the sale of the European-style option.  As a result, each EOO trade resulted in a net cash payment of premium by BMO to the counterparty.

85.     A small sample of the EOO trades includes the following:

| Date | Description | Average Unit Premium | Premium Amount |
|------|-------------|---------------------|----------------|
| 10/11/06 | Buy 48,000,000 American options (24,000,000 calls, 24,000,000 puts) | 1.4735 | ($70,728,000) |
| 10/11/06 | Sell 48,000,000 European options (24,000,000 calls, 24,000,000 puts) | 1.4500 | 69,600,000 |
| Net premium received (paid) | | | ($1,128,000) |
| 10/30/06 | Buy 180,000,000 American options | 1.3313 | ($239,640,000) |
| 10/30/06 | Sell 180,000,000 European options | 1.2897 | 232,140,000 |
| Net premium received (paid) | | | ($7,500,000) |
| 10/31/06 | Buy 96,000,000 American options | 1.3188 | ($126,600,000) |
| 10/31/06 | Sell 96,000,000 European options | 1.2725 | 122,160,000 |
| Net premium received (paid) | | | ($4,440,000) |
| 11/2/06 | Buy 60,000,000 American options | 1.3000 | ($78,000,000) |
| 11/2/06 | Sell 60,000,000 European options | 1.2475 | 74,850,000 |
| Net premium received (paid) | | | ($3,150,000) |
| 11/9/06 | Buy 84,000,000 American options | 1.3500 | ($113,400,000) |
| 11/9/06 | Sell 84,000,000 European options | 1.3138 | 110,355,000 |
| Net premium received (paid) | | | ($3,045,000) |

86.     Even though each EOO trade actually cost BMO money, when Lee entered the EOO trades into BMO's systems, he did so in a manner that depicted their value as exactly the opposite.

87.     Each of the EOO trades involved a huge quantity of underlying futures contracts.  Lee entered into EOO trades from mid-October 2006 through early March 2007.  The EOO trades caused BMO to lose hundreds of millions of dollars.

**Optionable and Its Allies' Participation in the EOO Trades**

88.     Optionable, Cassidy, Nordlicht, and others developed the idea of the EOO trades and presented it to Lee.  Capital or Orion, with which Cassidy and O'Connor were associated, acted as the broker on nearly all of the EOO trades.

89.     Optionable, Cassidy, O'Connor, and Nordlicht also connected Lee to a number of counterparties, which entered into EOO trades on terms highly unfavorable to BMO. These counterparties included Platinum Partners Value Arbitrage Fund, LP ("Platinum Partners Fund"), Platinum Partners, LP, the Murray Huberfeld and David Bodner Partnership ("Huberfeld-Bodner Partnership"), Fennmore Holdings ("Fennmore"), Hazan Energy, LLC ("Hazan"), and Bromley Energy LLC (a/k/a Bromley Energy Fund LLP) ("Bromley").

90.     Platinum Management (NY), LLC, of which Nordlicht is the Managing Member, is the General Partner of Platinum Partners Fund. Huberfeld-Bodner Partnership, Fennmore, and Bromley share an address with Platinum Partners Fund. Bromley's principal trader, David Boim, was, with Nordlicht, one of the assignors to Optionable of a patent pending for a system and method for real-time trading over a computer network.

91.     The EOO trades allowed the defendants to accomplish several goals that furthered their scheme. First, the EOO trades generated millions of dollars in commissions and fees for Optionable, including commissions from BMO, commissions from BMO's counterparties in the EOO trades, and fees from NYMEX, all of which made Optionable appear to be a profitable and growing business. Throughout this period, upon information and belief, Optionable and Cassidy, at least, continued to provide Lee with gifts and other benefits and promises as an inducement to continue funneling business, commissions, and fees to Optionable.

92.     Second, because Lee manipulated the manner in which the EOO trades were entered into BMO's systems, they falsely appeared to result in immediate

profits that masked the mounting losses in BMO's natural gas options book.  This

allowed the defendants to continue to hide their fraud and collusion from BMO.

***Moore's Knowledge of, and Failure to Stop Lee***
***From Entering Into Additional, EOO Trades***

93.     By January 19, 2007 at the latest, Moore was aware of the EOO

trades and the fact that they were falsely depicted by Lee as being profitable.  Although

Moore claimed that he told Lee to stop entering into EOO trades, Lee continued entering

into them.

94.     In or around February 2007, BMO's Market Risk department

informed Moore that Lee should not enter into any more EOO trades because of the size

of the positions on Lee's book from those trades.  Moore told Market Risk that he would

stop Lee from entering into any more EOO trades, but, again, Lee continued them.

95.     Moore also failed to report the EOO trades, or the large but

fictitious recorded profits they generated, to his superiors or to the independent

consultants who were examining the natural gas book at this time.  Had he done so, BMO

could have forced Lee to stop entering into EOO trades and would have avoided

substantial losses and the corresponding financial benefits to those at Optionable who

colluded with Lee.

***Massive Losses Are Revealed in April 2007***

96.     In April 2007, after further review, BMO decided to use price

quotes from Totem and other multicontributor platforms such as Intercontinental

Exchange ("ICE") in the IPV process.

97.     Recognizing that he could no longer convincingly assert that his

marks were consistent with market prices, on April 19, 2007, Lee re-marked his book,

resulting in a US$70 million loss for BMO.  Lee's marks, however, were still substantially off market.

98.     The combination of the losses incurred in the second quarter of 2007 from the EOO trades and Lee's other positions, the IPV reserve resulting from the use of Totem and ICE prices (which also reflected earlier losses that had previously been concealed by Lee's use of fraudulent broker quotes), and Lee's re-marking of his book led to BMO's announcement of projected pre-tax losses of between CDN$350 million and CDN$450 million on April 27, 2007.

***BMO's Discovery of the EOO Trades***

99.     After these initial losses were discovered, Optionable, Cassidy, Nordlicht, and Lee continued to conceal their fraudulent transactions, including the EOO trades.

100.    BMO brought several executives and traders to New York from Toronto and Chicago to examine the Commodity Group's books and supervise trading going forward.

101.    In May 2007, these traders discovered the EOO trades, and determined that they were overvalued.  They also discovered that BMO's counterparties for most of the EOO trades were connected to Optionable.  The discovery of the EOO trades forced BMO to recalculate its estimated losses.

102.    On May 4, 2007, BMO put Lee and Moore on leave of absence.

103.    On May 8, 2007, BMO announced that it had ceased doing business with Optionable.

104.    On or about May 12, 2007, faced with the possibility that BMO and the press had discovered the fact that he had several prior felony convictions and that those convictions might be disclosed to the public, Cassidy resigned as CEO of Optionable.

105.    Lee resigned from BMO on May 15, 2007.  BMO terminated Moore's employment the next day.

106.    On May 17, 2007, BMO announced that due to a revaluation of its natural gas options book – including a revaluation of the EOO trades – it would post a CDN$680 million pre-tax loss, instead of the projected pre-tax loss of CDN$350 million to CDN$450 million it had originally announced on April 27.

107.    Of BMO's CDN$680 million pre-tax loss, CDN$477 million was attributable to transactions during the BMO fiscal year that began November 1, 2006, and the remainder was attributable to transactions prior to November 1, 2006.

**BMO Discovers the Circular Quotes**

108.    On May 18, 2007, outside experts hired by BMO discovered that, on or about April 28, 2007 (the day after BMO's April 27 press release), Lee had deleted more than 100 files from his personal laptop computer including pricing spreadsheets that he had used to e-mail price quotes to Optionable.  Lee deleted these files despite having received a notice on April 27 directing him to preserve information related to BMO's trading losses.

109.    BMO subsequently determined that Optionable had sent these supposedly "independent" broker quotes to BMO's Market Risk department for use in

BMO's IPV process.  BMO's investigation revealed that Lee and Optionable had fraudulently manufactured supposedly "independent" price quotes since at least 2003.

110.    On June 13, 2008, in its annual report filed with the Securities and Exchange Commission ("SEC"), MF Global's parent admitted that one of MF Global's brokers who did business with Lee used bid and offer prices for forward OTC trades that Lee sent to him as a basis for prices that the broker sent to BMO as "consensus" price indications.

### Lee's Guilty Plea and the Government Proceedings

111.    The revelation of the defendants' conduct led to an investigation by multiple government agencies, including the New York County District Attorney's Office, the United States Attorney's Office for the Southern District of New York, the SEC, the Commodity Futures Trading Commission ("CFTC"), and the Board of Governors of the Federal Reserve System (the "Federal Reserve Board").

112.    As a result of these investigations, on November 13, 2008, Lee pled guilty in the New York Supreme Court, New York County, to falsifying BMO's trading records, a violation of the New York Banking Law.  On the same date, Lee also pled guilty in the United States District Court for the Southern District of New York to conspiracy to commit wire fraud and to make false bank entries, wire fraud, false statements to a bank, and obstruction of justice.

113.    Also on November 13, 2008, a federal grand jury in the Southern District of New York issued a sealed indictment of Cassidy on six counts of conspiracy to commit wire fraud and to make false bank entries, wire fraud (two counts), false

statements to a bank, and securities fraud (two counts). Cassidy was arrested on

November 18, 2008. He was released after posting a $10 million bond.

114. On November 17, 2008, the Federal Reserve Board issued a

consent order prohibiting Lee, among other things, from participating in any manner in

the conduct of the affairs of any insured depository institution, depository institution

holding company, or foreign bank.

115. On November 18, 2008, the SEC sued Lee, Cassidy, O'Connor,

and Connor in the United States District Court for the Southern District of New York,

alleging that they violated the antifraud and other provisions of the federal securities

laws. In connection with that suit, Lee and Connor have consented to the entry of a

permanent injunction restraining and enjoining them from violating the federal securities

laws.

116. Also, on November 18, 2008, the CFTC sued Cassidy, O'Connor,

Optionable, Lee, and Moore in the United States District Court for the Southern District

of New York, alleging violations of the federal Commodity Exchange Act.

**COUNT I**
**FRAUD**
**(Against Optionable, MF Global, Cassidy,**
**O'Connor, Woodgate, Connor, and Saab)**

117. BMO repeats and re-alleges the foregoing allegations of the

Complaint as if fully set forth herein.

118. Optionable, Cassidy, O'Connor, Woodgate, and Connor knowingly

and intentionally, or recklessly, misrepresented that the price quotes that Optionable

provided to BMO's Market Risk department were independent quotes when they knew,

or recklessly disregarded evidence indicating, that Lee had created those quotes.

768427.2                                  34

119.    Optionable, Cassidy, O'Connor, Woodgate, and Connor knowingly and intentionally, or recklessly, misrepresented that the price quotes that Optionable provided to BMO's Market Risk department reflected actual market values when they either knew that the quotes did not reflect actual market values, or made the representations with reckless disregard of whether the quotes reflected actual market values.

120.    MF Global and Saab knowingly and intentionally, or recklessly, misrepresented that the price quotes that MF Global provided to BMO's Market Risk department were independent quotes when they knew, or recklessly disregarded evidence indicating, that Lee had created those quotes.

121.    MF Global and Saab knowingly and intentionally, or recklessly, misrepresented that the price quotes that MF Global provided to BMO's Market Risk department reflected actual market values when they either knew that the quotes did not reflect actual market values, or made the representations with reckless disregard of whether the quotes reflected actual market values.

122.    Lee provided quotes to Optionable and MF Global with prices favorable to his positions, which he knew Optionable and MF Global would then submit to BMO as "independent" quotes to be used to verify the marks that Lee used for his natural gas options book.

123.    Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab knowingly submitted Lee's quotes to BMO for the purpose of supplying independent price verification, thus undermining BMO's IPV process.

124.   Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab intended that BMO rely on these "independent" quotes to verify Lee's valuation of the natural gas options book.

125.   The prices Lee used to value the natural gas options book generally were more favorable to BMO's positions than actual market prices.  A truly independent price verification would have revealed that Lee's own marks had overvalued the book.

126.   The defendants' submission of Lee's incorrect prices as "independent" prices allowed Lee to hide his trading losses and make it appear that he was making money for BMO when in fact he was making money for Optionable, MF Global, and the other defendants.  As a result, BMO continued to employ Lee and pay him millions of dollars in bonuses and other compensation and Optionable continued to provide Lee with gifts and other financial benefits, as well as, upon information and belief, promises of future financial reward.  Optionable also continued to provide Moore with gifts and other financial benefits.

127.   Optionable, Cassidy, O'Connor, Woodgate, and Connor also knowingly and intentionally misled BMO about Optionable's prominence in the natural gas markets, with the intent that BMO rely on those misrepresentations and continue to use Optionable's brokerage and market data services, and increase the volume of BMO's trades cleared through NYMEX, for which Optionable received compensation from NYMEX.

128.   BMO reasonably and justifiably relied on the foregoing misrepresentations by Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab.  BMO's reliance was justified because at all times, Optionable posed as a

legitimate broker and continually portrayed itself and its officers and employees as major players in the commodity derivatives market, and because of MF Global's established reputation in the market.

129.   As a direct result of the foregoing misrepresentations by Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab, BMO suffered trading losses that could have been prevented had BMO been given correct pricing information concerning its natural gas positions on a timely basis.

130.   As a direct result of the foregoing misrepresentations by Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab, BMO also continued to employ Lee and Moore and pay them compensation from May 2003 to May 2007 totaling approximately $10 million for Lee and $13 million for Moore.

131.   As a direct result of the foregoing misrepresentations by Optionable, Cassidy, O'Connor, Woodgate, and Connor, BMO paid Optionable millions of dollars in broker fees and commissions.  BMO would not have paid these fees and commissions had it known of Optionable's participation in the scheme with Lee and in particular its provision of fraudulent price quotes to BMO.

132.   As a direct result of the foregoing misrepresentations by MF Global and Saab, BMO paid MF Global substantial broker fees and commissions. BMO would not have paid these fees and commissions had it known of MF Global's participation in the scheme with Lee and in particular its provision of fraudulent price quotes to BMO.

133.   As a direct result of the foregoing misrepresentations by Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab, BMO has

incurred legal fees and expenses in responding to criminal and regulatory investigations of the commodities loss.

134.    In acting as described herein, Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab acted willfully and maliciously with a manifest disregard not only for the rights of BMO and its shareholders, but also for the effect their actions might have on the natural gas market.

**COUNT II**
**NEGLIGENT MISREPRESENTATION**
**(Against Optionable, MF Global, Cassidy,**
**O'Connor, Woodgate, Connor, and Saab)**

135.    BMO repeats and re-alleges the foregoing allegations of the Complaint as if fully set forth herein.

136.    Optionable, Cassidy, O'Connor, Woodgate, and Connor negligently misrepresented that the price quotes that Optionable provided to BMO's Market Risk department were independent quotes when in fact Lee had created them.

137.    Optionable, Cassidy, O'Connor, Woodgate, and Connor negligently misrepresented that the price quotes that Optionable provided to BMO's Market Risk department reflected actual market values when in fact they did not.

138.    MF Global and Saab negligently misrepresented that the price quotes that MF Global provided to BMO's Market Risk department were independent quotes when in fact Lee had created them.

139.    MF Global and Saab negligently misrepresented that the price quotes that MF Global provided to BMO's Market Risk department reflected actual market values when in fact they did not.

140.    Lee provided quotes to Optionable and MF Global with prices favorable to his positions, which he knew Optionable and MF Global would then submit to BMO as "independent" quotes to be used to verify the marks that Lee used for his natural gas options book.

141.    Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab submitted Lee's quotes to BMO for the purpose of supplying independent price verification, thus undermining BMO's IPV process.

142.    Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab knew that BMO would rely on these "independent" quotes to verify Lee's valuation of the natural gas options book.

143.    The prices Lee used to value the natural gas options book generally were more favorable to BMO's positions than actual market prices.  A truly independent price verification would have revealed that Lee's own marks had overvalued the book.

144.    The defendants' submission of Lee's incorrect prices as "independent" prices allowed Lee to hide his trading losses and make it appear that he was making money for BMO when in fact he was making money for Optionable, MF Global, and the other defendants.  As a result, BMO continued to employ Lee and pay him millions of dollars in bonuses and other compensation and Optionable continued to provide Lee with gifts and other financial benefits, as well as, upon information and belief, promises of future financial reward.  Optionable also continued to provide Moore with gifts and other financial benefits.

145.    Optionable, Cassidy, O'Connor, Woodgate, and Connor also negligently misrepresented to BMO Optionable's prominence in the natural gas markets,

with the knowledge that BMO would rely on those misrepresentations and continue to use Optionable's brokerage and market data services, and increase the volume of BMO's trades cleared through NYMEX, for which Optionable received compensation from NYMEX.

146.    BMO reasonably and justifiably relied on the foregoing misrepresentations by Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab.  BMO's reliance was justified because at all times, Optionable posed as a legitimate broker and continually portrayed itself and its officers and employees as major players in the commodity derivatives market, and because of MF Global's established reputation in the market.

147.    As a direct result of BMO's reliance on the foregoing misrepresentations by Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab, BMO suffered trading losses that could have been prevented had BMO been given correct pricing information concerning its natural gas positions on a timely basis.

148.    As a direct result of BMO's reliance on the foregoing misrepresentations by Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab, BMO also continued to employ Lee and Moore and pay them compensation from May 2003 to May 2007 totaling approximately $10 million for Lee and $13 million for Moore.

149.    As a direct result of BMO's reliance on the foregoing misrepresentations by Optionable, Cassidy, O'Connor, Woodgate, and Connor, BMO paid Optionable millions of dollars in broker fees and commissions.  BMO would not

have paid these fees and commissions had it known of Optionable's provision of non-independent price quotes to BMO.

150.    As a direct result of BMO's reliance on the foregoing misrepresentations by MF Global and Saab, BMO paid MF Global substantial broker fees and commissions.  BMO would not have paid these fees and commissions had it known of MF Global's provision of non-independent price quotes to BMO.

151.    As a direct result of BMO's reliance on the foregoing misrepresentations by Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab, BMO has incurred legal fees and expenses in responding to criminal and regulatory investigations of the commodities loss.

## COUNT III
## AIDING AND ABETTING FRAUD
## (Against All Defendants)

152.    BMO repeats and re-alleges the foregoing allegations of the Complaint as if fully set forth herein.

153.    Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab knew that Lee was fraudulently misrepresenting the prices in his natural gas book as having been verified by independent market price quotes when Lee had engineered a process by which his own prices were recycled as supposedly independent prices.

154.    Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab substantially assisted Lee's fraud by submitting Lee's prices to BMO while representing them as prices that were provided independently by Optionable or MF Global.  Indeed, upon information and belief, Optionable and Cassidy, at least,

actively encouraged Lee to perpetrate his fraud by providing or promising to provide Lee with gifts, payments, or other things of value in exchange for his fraudulent conduct. Optionable and Cassidy, at least, also induced Moore to keep quiet about Lee's conduct by providing Moore with gifts and other things of value.

155.    Lee knowingly and intentionally, or recklessly, misrepresented to BMO that the EOO trades were legitimate transactions that generated a net profit for BMO. In fact, as he knew, the EOO transactions did not generate any net profit for BMO, but rather required a net payment of premium by BMO to its counterparties. Lee knew or recklessly disregarded the fact that there was no legitimate business reason for BMO to enter into these trades, and that the trades had the purpose or effect of concealing the overvaluation of and losses suffered by BMO's natural gas options book. Lee knowingly and intentionally, or recklessly, entered the EOO transactions into BMO's systems in a manner that concealed their true valuation.

156.    Lee also knowingly and intentionally, or recklessly, misrepresented that the 1x2 trades and EOO trades he caused BMO to enter into from mid-2006 onward were intended to reduce the risk in BMO's natural gas book and generate revenue, when he knew or recklessly disregarded the fact that these trades actually had the purpose or effect of concealing spiraling risk and losses in the natural gas book.

157.    Lee intended that BMO rely on his assurances that the 1x2 trades and EOO trades would reduce the risk in the natural gas book, so that it would appear he was trying to keep within the risk limits set by BMO. This enabled Lee to retain his reputation and his job with its associated high compensation and continue funneling

business, commissions, and fees to his friends at Optionable, in exchange for which he received or, upon information and belief, had the expectation of receiving payments or other things of value from Optionable, Cassidy, and/or other defendants. Further, BMO's reliance on Lee's assurances resulted in Optionable, Cassidy, and other defendants obtaining additional business and income from BMO, portions of which were then provided by Optionable, Cassidy, and/or other defendants to Lee and Moore.

158.    BMO reasonably and justifiably relied on Lee's misrepresentations. BMO's reliance was justified because, as an employee of BMO, Lee had a duty of fidelity and fair dealing to his employer. Moreover, Lee continually represented to BMO's employees that he was working to reduce the risk in the natural gas book.

159.    Optionable, Cassidy, O'Connor, and Nordlicht, through Lee, participated in a number of EOO trades with BMO in late 2006 and early 2007, by arranging EOO trades.

160.    Optionable, Cassidy, O'Connor, and Nordlicht knew that Lee misrepresented to BMO that the EOO trades were legitimate transactions that generated a net profit for BMO. Optionable, Cassidy, O'Connor, and Nordlicht knew that, in fact, the EOO trades required a net payment of premium by BMO to its counterparties, and that the reason Lee arranged the EOO trades was to conceal the overvaluation of and losses suffered by BMO's natural gas options book.

161.    Optionable, Cassidy, O'Connor, and Nordlicht substantially assisted Lee's EOO trading fraud by arranging the EOO trades with BMO. The EOO trades assisted Lee in covering up his fraud because Lee entered the EOO transactions

into BMO's systems in a manner that concealed their true valuation, which helped Lee conceal losses from his other positions.

162.    Optionable, Cassidy, O'Connor, and Nordlicht benefited from their assistance with Lee's fraud. The EOO trades generated significant commissions and fees for Optionable at a time when Optionable was attempting to portray itself as a successful, growing business so that Nordlicht, Cassidy, and O'Connor could sell their shares of Optionable's common stock to the NYMEX for a total of nearly $29 million (which they did on April 10, 2007). Also, Lee was able to book fictitious profits that enabled him to conceal his losses, thereby perpetuating the highly profitable relationship with BMO on which Optionable depended.

163.    As a direct result of the assistance of the defendants in Lee's fraud, BMO suffered trading losses of hundreds of millions of dollars.

164.    As a direct result of the assistance of the defendants in Lee's fraud, BMO paid Optionable and MF Global millions of dollars of commissions that BMO otherwise would not have paid.

165.    As a direct result of the assistance of the defendants in Lee's fraud, BMO continued to employ Lee and Moore and pay them compensation from May 2003 to May 2007 totaling approximately $10 million for Lee and $13 million for Moore.

166.    As a direct result of the assistance of the defendants in Lee's fraud, BMO has incurred legal fees and expenses in responding to criminal and regulatory investigations of the commodities loss.

167.   In acting as described herein, the defendants acted willfully and maliciously with a manifest disregard not only for the rights of BMO and its shareholders, but also for the effect their actions might have on the natural gas market.

## COUNT IV
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
## (Against All Defendants)

168.   BMO repeats and re-alleges the foregoing allegations of the Complaint as if fully set forth herein.

169.   As employees of BMO, Lee and Moore owed fiduciary duties to BMO, including duties of loyalty, good faith, care, and disclosure.

170.   Pursuant to these duties, Lee and Moore were at all times during their employment bound to exercise the utmost loyalty, good faith, and care in the performance of their duties, and owed their employer a duty to disclose to it material information and not to make misrepresentations to it.

171.   Lee breached his fiduciary duties to BMO by misrepresenting to BMO that the price quotes that Optionable and MF Global provided to BMO's Market Risk department were independent quotes and reflected actual market values when he knew that he had created those quotes and that they did not reflect actual market values.

172.   Lee further breached his fiduciary duties to BMO by providing quotes to Optionable and MF Global with prices favorable to his positions, which he knew Optionable and MF Global would then submit to BMO as "independent" quotes to be used to verify the marks that Lee used for his natural gas options book, thus undermining BMO's IPV process and allowing Lee to hide his trading losses and make it appear that he was making money for BMO when in fact he was not.

768427.2

45

173.   Lee and Moore breached their fiduciary duties to BMO by resisting the Market Risk department's efforts to use independent pricing data from Totem in BMO's IPV process, and, when those efforts were unsuccessful, waging a campaign against the use of Totem and other multicontributor data in order to avoid having the natural gas options book valued independently and to maintain BMO's reliance on their supposed expertise.

174.   Lee breached his fiduciary duties to BMO by misrepresenting that the EOO trades were legitimate transactions that generated a net profit for BMO when, as he knew, there was no legitimate business reason for BMO to enter into these trades, Lee had arranged them to conceal the overvaluation of and losses suffered by BMO's natural gas options book, and Lee knew that they did not in fact generate any net profit for BMO, but rather required a net payment of premium by BMO to its counterparties.

175.   Lee further breached his fiduciary duties to BMO by entering the EOO transactions into BMO's systems in a manner that concealed their true valuation.

176.   Lee further breached his fiduciary duties to BMO by misrepresenting that the 1x2 trades and EOO trades he caused BMO to enter into from mid-2006 onward were intended to reduce the risk in BMO's natural gas book and generate revenue, when he knew they actually were designed to conceal spiraling risk and losses in the natural gas book.

177.   Moore breached his fiduciary duties to BMO by permitting Lee to continue entering into EOO trades, despite his knowledge that Lee was recording them as resulting in large but fictitious profits for BMO, and despite the instruction from BMO's

Market Risk department that Lee should not enter into any more EOO trades and Moore's promise that he would stop Lee from doing so.

178.    Moore also breached his fiduciary duties to BMO by failing to report the EOO trades, or the fictitious profits they generated, to his superiors, or to the independent consultants who were examining the natural gas book at the time.

179.    Lee and Moore breached their fiduciary duties by obtaining things of more than nominal value from Optionable and Cassidy, without disclosing this fact to BMO, when Lee and Moore knew or should have known that the reason for their receipt of these personal benefits was to induce Lee to continue to perpetrate his scheme with Optionable's assistance, and to induce Moore to refrain from reporting the losses being generated by this scheme to BMO.

180.    Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab knew that Lee was misrepresenting the prices in his natural gas book as having been verified by independent market price quotes when Lee had engineered a process by which his own prices were recycled as supposedly independent prices.

181.    Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab substantially assisted Lee's breaches of fiduciary duty by submitting Lee's prices to BMO while representing them as prices that were provided independently by Optionable or MF Global.  Optionable and Cassidy, at least, also substantially assisted Lee's breaches of fiduciary duty by providing or promising to provide him with things of value as an inducement to commit and continue these breaches.  Optionable and Cassidy, at least, also substantially assisted Moore's breaches of fiduciary duty by providing

—

Moore with things of value in order to induce him not to report Lee's breaches of fiduciary duty to BMO.

182.   Optionable, Cassidy, O'Connor, and Nordlicht, through Lee, participated in a number of EOO trades with BMO in late 2006 and early 2007, by arranging EOO trades.

183.   Optionable, Cassidy, O'Connor, and Nordlicht knew that Lee misrepresented to BMO that the EOO trades were legitimate transactions that generated a net profit for BMO. Optionable, Cassidy, O'Connor, and Nordlicht knew that, in fact, the EOO trades required a net payment of premium by BMO to its counterparties, and that the reason Lee arranged the EOO trades was to conceal the overvaluation of and losses suffered by BMO's natural gas options book.

184.   Optionable, Cassidy, O'Connor, and Nordlicht substantially assisted Lee's breaches of fiduciary duty by arranging the EOO trades with BMO. The EOO trades assisted Lee in covering up his fraud because Lee entered the EOO transactions into BMO's systems in a manner that concealed their true valuation, which helped Lee conceal losses from his other positions.

185.   Optionable, Cassidy, O'Connor, and Nordlicht benefited from their assistance with Lee's and Moore's breaches of fiduciary duty. The EOO trades generated significant commissions and fees for Optionable at a time when Optionable was attempting to portray itself as a successful, growing business so that Nordlicht, Cassidy, and O'Connor could sell shares of Optionable's common stock to NYMEX for a total of nearly $29 million (which they did on April 10, 2007). Also, Lee was able to book

768427.2                                              48

fictitious profits that enabled him to conceal his losses, thereby perpetuating the highly profitable relationship with BMO on which Optionable depended.

186.    As a direct result of the assistance of the defendants in Lee's and Moore's breaches of fiduciary duty, BMO suffered trading losses of millions of dollars.

187.    As a direct result of the assistance of the defendants in Lee's and Moore's breaches of fiduciary duty, BMO paid Optionable and MF Global millions of dollars of commissions that BMO otherwise would not have paid.

188.    As a direct result of the assistance of the defendants in Lee's and Moore's breaches of fiduciary duty, BMO continued to employ Lee and Moore and pay them compensation from May 2003 to May 2007 totaling approximately $10 million for Lee and $13 million for Moore.

189.    As a direct result of the assistance of the defendants in Lee's and Moore's breaches of fiduciary duty, BMO has incurred legal fees and expenses in responding to criminal and regulatory investigations of the commodities loss.

## COUNT V
## BREACH OF CONTRACT
## (Against Optionable)

190.    BMO repeats and re-alleges the foregoing allegations of the Complaint as if fully set forth herein.

191.    BMO and Optionable are parties to the OPEX Analytics RealMarks Agreement, in which Optionable agreed to provide through its OPEX Analytics RealMarks service "specific market information based on actual market quotes obtained by Optionable."

192.    Optionable breached the OPEX Analytics RealMarks Agreement by instead providing quotations provided by Lee that were not actual market quotes.

193.    Optionable's breaches of the OPEX Analytics RealMarks Agreement resulted from willful misconduct or gross negligence on the part of Optionable.

194.    In the OPEX Analytics RealMarks Agreement, Optionable also agreed to indemnify BMO from and against any and all damages and losses directly or indirectly arising out of or in any way related to Optionable's performance under the Agreement, and all costs and expenses incurred by BMO as a result thereof, including attorneys' fees and court costs.

195.    As a direct result of Optionable's breaches of the OPEX Analytics RealMarks Agreement, BMO suffered trading losses of millions of dollars.

196.    Under the OPEX Analytics RealMarks Agreement, Optionable is liable to indemnify BMO for the legal fees and expenses it has incurred in responding to criminal and regulatory investigations of its commodities loss and in investigating and pursuing the instant litigation.

**PRAYER FOR RELIEF**

WHEREFORE, BMO demands that judgment be entered as follows:

A.    On Counts I and II of the Complaint, awarding BMO damages against Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab, jointly and severally, in an amount to be determined at trial;

B.    On Counts III and IV, awarding BMO damages against all defendants, jointly and severally, in an amount to be determined at trial;

768427.2

C.      On Count V, awarding BMO damages against Optionable in an amount to be determined at trial;

D.      Awarding BMO punitive damages against all defendants in an amount to be determined at trial;

E.      Awarding BMO interest and costs; and

F.      Granting BMO such other and further relief as the Court deems just and proper.

## JURY DEMAND

BMO demands a jury trial on all issues so triable.

Dated:  New York, New York
        August 28, 2009

_____

Robert J. Lack (rlack@fklaw.com)
Anne E. Beaumont
Sheela V. Pai
FRIEDMAN KAPLAN SEILER &
ADELMAN LLP
1633 Broadway
New York, NY 10019-6708
(212) 833-1100

*Attorneys for Plaintiff Bank of Montreal*