UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                          :

BANK OF MONTREAL,                      :

            Plaintiff,          :

         - against -         :     No. 09-CV-7557 (GBD)

                                            :

OPTIONABLE, INC., MF GLOBAL INC.,  :
KEVIN P. CASSIDY, EDWARD J.       :
O'CONNOR, MARK A. NORDLICHT,    :
RYAN B. WOODGATE, SCOTT         :
CONNOR and JOSEPH D. SAAB,       :

              Defendants.    :

-------------------------------------------------------------x

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS TO DISMISS THE COMPLAINT

Robert J. Lack
Anne E. Beaumont
Lisa S. Getson
Sheela V. Pai
FRIEDMAN KAPLAN SEILER &
  ADELMAN LLP
1633 Broadway
New York, NY 10019-6708
(212) 833-1100

*Attorneys for Plaintiff Bank of Montreal*

February 19, 2010

## <u>TABLE OF CONTENTS</u>

*Page*

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ............................................................................... 1

STATEMENT OF FACTS ....................................................................................... 2

ARGUMENT ......................................................................................................... 12

I.   THE COMPLAINT EASILY SATISFIES *IQBAL*'S "PLAUSIBILITY"
     STANDARD ................................................................................................ 12

II.  THE COMPLAINT ADEQUATELY ALLEGES A CLAIM FOR
     FRAUD ........................................................................................................ 15

     A.   The Complaint Alleges That Defendants Made Material
          Misrepresentations to BMO ................................................................ 15

     B.   The Complaint Alleges That Defendants Intended to Defraud
          BMO ..................................................................................................... 22

     C.   The Complaint Alleges That BMO Reasonably Relied Upon
          Defendants' Misrepresentations ........................................................... 27

     D.   The Complaint Alleges That Defendants' Misrepresentations
          Proximately Caused BMO's Damages ................................................. 32

     E.   BMO's Fraud Claim Is Not Duplicative of Its Breach of Contract
          Claim .................................................................................................... 38

     F.   The *In Pari Delicto* Defense Does Not Bar BMO's Claims .............. 39

III. THE COMPLAINT ADEQUATELY ALLEGES A CLAIM FOR
     NEGLIGENT MISREPRESENTATION ..................................................... 46

     A.   The Complaint Alleges That Defendants Had a Special
          Relationship with BMO ....................................................................... 47

     B.   The Complaint Alleges That Defendants Made False
          Representations Upon Which BMO Reasonably Relied ...................... 51

     C.   The Negligent Misrepresentation Claim Is Timely .............................. 51

*Page*

IV.   THE COMPLAINT ADEQUATELY ALLEGES AIDING AND
ABETTING CLAIMS .......................................................................52

    A.   The Complaint Alleges That Defendants Knew That Lee Was
Committing Fraud and That Lee and Moore Were Breaching Their
Fiduciary Duty .........................................................................54

    B.   The Complaint Alleges That Defendants Substantially Assisted
Lee's Fraud and Lee and Moore's Breaches of Fiduciary Duty ...............58

    C.   The Complaint Alleges Proximate Cause ...................................61

    D.   The Claim for Aiding and Abetting Breach of Fiduciary Duty Is
Timely ......................................................................................62

V.   THE COMPLAINT ADEQUATELY ALLEGES A BREACH OF
CONTRACT CLAIM ..........................................................................63

    A.   The Complaint Alleges That Optionable Breached Its Contract
With BMO ................................................................................63

    B.   The Agreement's Indemnification Clause Covers Certain of
BMO's Losses ...........................................................................65

VI.   THE ALLEGATIONS REGARDING CASSIDY'S CRIMINAL
RECORD SHOULD NOT BE STRICKEN ..........................................69

CONCLUSION ..............................................................................................71

## <u>TABLE OF AUTHORITIES</u>

*Page(s)*

### Cases

*30 FPS Prods., Inc. v. Livolsi*,
    891 N.Y.S.2d 162 (2d Dep't 2009)......................................................................................53

*380544 Can., Inc. v. Aspen Tech., Inc.*,
    633 F. Supp. 2d 15 (S.D.N.Y. 2009)...................................................................................25

*ABF Capital Mgmt. v. Askin Capital Mgmt.*,
    957 F. Supp. 1308 (S.D.N.Y. 1997)...................................................................59, 60, 61

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*,
    404 F. 3d 566 (2d Cir. 2005)................................................................................................69

*AIG, Inc. v. Greenberg*,
    976 A.2d 872 (Del. Ch. 2009)..............................................................................................45

*Allied Irish Banks, P.L.C. v. Bank of Am.*,
    No. 03 Civ. 3748 (DAB), 2006 U.S. Dist. LEXIS 4270 (S.D.N.Y. Jan. 31, 2006)......... *passim*

*Argentina v. Emery World Wide Delivery Corp.*,
    93 N.Y.2d 554, 693 N.Y.S.2d 493 (1999) .........................................................................62

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009)..............................................................................................13, 14

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007).....................................................................................................25

*Baena v. Woori Bank*,
    No. 05 Civ. 7018 (PKC), 2006 U.S. Dist. LEXIS 74549 (S.D.N.Y. Oct. 11, 2006).........39, 40

*Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*,
    57 F.3d 146 (2d Cir. 1995)......................................................................................................47

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................................................................13

*Benoit v. Commercial Capital Corp.*,
    No. 03 Civ. 5328 (PKL), 2008 U.S. Dist. LEXIS 64905 (S.D.N.Y. Aug. 25, 2008) ..............53

*Bertoglio v. Tex. Int'l Co.*,
    488 F. Supp. 630 (D. Del. 1980)...........................................................................................71

Page(s)

*Boulevard Assocs. v. Sovereign Hotels, Inc.*,
  72 F.3d 1029 (2d Cir. 1995)................................................................67

*Breeden v. Kirkpatrick & Lockhart LLP*,
  336 F.3d 94 (2d Cir. 2003)................................................................44

*Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*,
  98 F.3d 13 (2d Cir. 1996) ................................................................38

*Buckley v. Deloitte & Touche USA LLP*,
  No. 06 Civ. 3291 (SHS), 2007 U.S. Dist. LEXIS 37107 (S.D.N.Y. May 22, 2007).........40, 41

*Center v. Hampton Affiliates, Inc.*,
  66 N.Y.2d 782, 497 N.Y.S.2d 898 (1985) ..............................................44

*Century Pac., Inc. v. Hilton Hotels Corp.*,
  No. 03 Civ. 8258 (SAS), 2004 U.S. Dist. LEXIS 6904 (S.D.N.Y. Apr. 20, 2004) ................50

*Chanayil v. Gulati*,
  169 F.3d 168 (2d Cir. 1999)................................................................15

*Christopher S. v. Douglaston Club*,
  275 A.D.2d 768, 713 N.Y.S.2d 542 (2d Dep't 2000) ............................................45

*Colon v. Banco Popular N. Am.*,
  59 A.D.3d 300, 874 N.Y.S.2d 44 (1st Dep't 2009) ..............................................52

*Conway v. Icahn & Co.*,
  16 F.3d 504 (2d Cir. 1994)................................................................48

*Cortec Indus. Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991)................................................................69

*Cosmas v. Hassatt*,
  886 F.2d 8 (2d Cir. 1989) ................................................................29

*Country World, Inc. v. Imperial Frozen Foods Co.*,
  186 A.D.2d 781, 589 N.Y.S.2d 81 (2d Dep't 1992)................................................29

*Crigger v. Fahnestock & Co.*,
  No. 01 Civ. 0781 (JFK), 2003 U.S. Dist. LEXIS 16438 (S.D.N.Y. Sept. 18, 2003)...............49

*Cromer Fin. Ltd. v. Prival N.V.*,
  137 F. Supp. 2d 452 (S.D.N.Y. 2001)................................................................61, 62

iv

*Page(s)*

*Cuoco v. Moritsugu,*
    222 F.3d 99 (2d Cir. 2000)...........................................................................................69

*De Kwiatkowski v. Bear, Stearns & Co.,*
    306 F.3d 1293 (2d Cir. 2002)................................................................................48, 49

*DeBlasio v. Merrill Lynch & Co.,*
    No. 07 Civ. 318 (RJS), 2009 U.S. Dist LEXIS 64848 (S.D.N.Y. July 27, 2009) .......49, 64, 65

*Eastman Kodak Co. v. Wachovia Bank N.A.,*
    No. 02-CV-6441T, 2007 U.S. Dist. LEXIS 61283 (W.D.N.Y. Aug. 21, 2007)....................64

*Ernst & Young v. Bankr. Servs., Inc.,*
    311 B.R. 350 (S.D.N.Y. 2004)......................................................................................52

*Espie v. Murphy,*
    35 A.D.3d 346, 825 N.Y.S.2d 537 (2d Dep't 2006) ..............................................................52

*Fezzani v. Bear, Stearns & Co.,*
    592 F. Supp. 2d 410 (S.D.N.Y. 2008)............................................................................60

*First Fed. Sav. & Loan Ass'n v. Oppenheim, Appel, Dixon & Co.,*
    629 F. Supp. 427 (S.D.N.Y. 1986)................................................................................38

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC,*
    479 F. Supp. 2d 349 (S.D.N.Y. 2007)............................................................... *passim*

*Friedman v. Anderson,*
    23 A.D.3d 163, 803 N.Y.S.2d 514 (1st Dep't 2005) .......................................................35, 36

*Fromer v. Yogal,*
    50 F. Supp. 2d 227 (S.D.N.Y. 1999).........................................................................46, 52

*Frota v. Prudential-Bache Sec., Inc.,*
    639 F. Supp. 1186 (S.D.N.Y. 1986)..............................................................................65

*Geisler v. Petrocelli,*
    616 F.2d 636 (2d Cir. 1980).........................................................................................13

*Georgia Pac. Consumer Prods., LP v. Int'l Paper Co.,*
    566 F. Supp. 2d 246 (S.D.N.Y. 2008)............................................................................67

*Ghartey v. St. John's Queens Hosp.,*
    869 F.2d 160 (2d Cir. 1989).........................................................................................45

*Page(s)*

*Global Minerals & Metals Corp. v. Holme*,
    35 A.D.3d 93, 824 N.Y.S.2d 210 (1st Dep't 2006) ...............................................53

*Goldman v. Belen*,
    754 F.2d 1059 (2d Cir. 1985)..................................................................................29

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
    17 F. Supp. 2d 275 (S.D.N.Y. 1998)..........................................................31, 32, 44

*Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*,
    748 F.2d 729 (2d Cir. 1984)....................................................................................31

*Hooper Assocs. v. AGS Computers, Inc.*,
    74 N.Y.2d 487, 549 N.Y.S.2d 365 (1989) .............................................................67

*Hunter v. Allis-Chalmers Corp.*,
    797 F.2d 1417 (7th Cir. 1986) ..........................................................................40, 42

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*,
    12 N.Y.3d 132, 879 N.Y.S.2d 355 (2009) .............................................................63

*Ingle v. Glamore Motor Sales*,
    140 A.D.2d 493, 528 N.Y.S.2d 602 (2d Dep't 1988) ............................................53

*Int'l Prods. Co. v. Erie R.R.*,
    244 N.Y. 331, 155 N.E. 662 (1927)........................................................................47

*In re Livent, Inc. Sec. Litig.*,
    148 F. Supp. 2d 331 (S.D.N.Y. 2001).....................................................................38

*In re Maxwell Newspapers, Inc.*,
    164 B.R. 858 (Bankr. S.D.N.Y. 1994) ...................................................................40

*In re Optionable Sec. Litig.*,
    577 F. Supp. 2d 681 (S.D.N.Y. 2008).....................................................................70

*In re Parmalat Sec. Litig.*,
    383 F. Supp. 2d 587 (S.D.N.Y. 2005).....................................................................45

*In re Parmalat Sec. Litig.*,
    421 F. Supp. 2d 703 (S.D.N.Y. 2006).....................................................................45

*In re Parmalat Sec. Litig.*,
    No. 04 MD 1653 (LAK), 2007 U.S. Dist. LEXIS 19293 (S.D.N.Y. Feb. 21, 2007)...............41

*Page(s)*

*In re Parmalat Sec. Litig.*,
    No. 04 MD 1653 (LAK) 2009 U.S. Dist. LEXIS 85523 (S.D.N.Y. Sept. 18, 2009)..............44

*J.A.O. Acquisition Corp. v. Stavitsky*,
    8 N.Y.3d 144, 863 N.E.2d 585 (2007)...................................................................................46

*JP Morgan Chase Bank v. Winnick*,
    406 F. Supp. 2d 247 (S.D.N.Y. 2005)............................................................. *passim*

*Karasyk v. Mark Commodities Corp.*,
    770 F. Supp. 824 (S.D.N.Y. 1991)........................................................................................24

*Katara v. D.E. Jones Commodities, Inc.*,
    835 F.2d 966 (2d Cir. 1987)..................................................................................................15

*Katz v. Image Innovations Holdings, Inc.*,
    No. 06 Civ. 3707 (JGK), 2008 U.S. Dist. LEXIS 22979 (S.D.N.Y. Mar. 24, 2008)..............69

*Kaufman v. Cohen*,
    307 A.D.2d 113, 760 N.Y.S.2d 157 (1st Dep't 2003) ....................................................53, 63

*Kimmell v. Schaefer*,
    89 N.Y.2d 257, 675 N.E.2d 450 (1996).................................................................................47

*Kirschner v. Grant Thornton LLP*,
    No. 07 Civ. 11604 (GEL), 2009 U.S. Dist. LEXIS 32581 (S.D.N.Y. Apr. 14, 2009)............45

*Kirschner v. KPMG LLP*,
    590 F.3d 186 (2d Cir. 2009)..................................................................................................45

*Kolbeck v. LIT Am., Inc.*,
    939 F. Supp. 240 (S.D.N.Y. 1996)........................................................................................62

*Kramer v. Lockwood*,
    No. 08 Civ. 2429 (DAB), 2009 U.S. Dist. LEXIS 85285 (S.D.N.Y. Sept. 1, 2009)..............53

*Laub v. Faessel*,
    297 A.D.2d 28, 745 N.Y.S.2d 534 (1st Dep't 2002) ......................................................35, 36

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006)..................................................................................................56

*Maldonado v. Flynn*,
    597 F.2d 789 (2d Cir. 1979)..................................................................................................70

vii

*Page(s)*

*Marine Midland Bank v. John E. Russo Produce Co.*,
  50 N.Y.2d 31, 427 N.Y.S.2d 961 (1980) ...............................................................41

*Mazzaro de Abreu v. Bank of Am. Corp.*,
  525 F. Supp. 2d 381 (S.D.N.Y. 2007).............................................................56, 57

*McKenna v. Wright*,
  386 F.3d 432 (2d Cir. 2004).................................................................................45

*Meisel v. Grunberg*,
  651 F. Supp. 2d 98 (S.D.N.Y. 2009)................................................................46, 47

*Moy v. Adelphi Inst.*,
  866 F. Supp. 696 (E.D.N.Y. 1994) .......................................................................71

*MTV Networks v. Curry*,
  867 F. Supp. 202 (S.D.N.Y. 1994)...................................................................27, 29

*Musalli Factory for Gold & Jewellry v. JPMorgan Chase Bank, N.A.*,
  No. 08 CV 01720 (LAP), 2009 U.S. Dist. LEXIS 27363 (S.D.N.Y. Mar. 31, 2009).............53

*Nomura Sec. Int'l v. E*Trade Sec., Inc.*,
  280 F. Supp. 2d 184 (S.D.N.Y. 2003)..................................................................43

*Noz v. Value Investing Partners, Inc.*,
  No. 98 Civ. 6977 (RO), 1999 U.S. Dist. LEXIS 8836 (S.D.N.Y. June 11, 1999)..................49

*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*,
  322 F.3d 147 (2d Cir. 2003)..................................................................................45

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC*,
  568 F.3d 374 (2d Cir. 2009)...........................................................................12, 36, 37

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC*,
  446 F. Supp. 2d 163 (S.D.N.Y. 2006)...................................................................50

*Pfizer, Inc. v. Stryker Corp.*,
  348 F. Supp. 2d 131 (S.D.N.Y. 2004).....................................................................68

*Pinter v. Dahl*,
  486 U.S. 622 (1988)...............................................................................39, 40, 42, 44

*Primavera Familienstiftung v. Askin*,
  173 F.R.D. 115 (S.D.N.Y. 1997) .........................................................................55

viii

*Page(s)*

*Pross v. Katz*,
 784 F.2d 455 (2d Cir. 1986)....................................................................................69

*Rosner v. Bank of China*,
 No. 06 CV 13562 (VM), 2008 U.S. Dist. LEXIS 105984 (S.D.N.Y. Dec. 18, 2008)............56

*Ruffolo v. Oppenheimer & Co.*,
 987 F.2d 129 (2d Cir. 1993)....................................................................................69

*S.A. Carmeuse v. M.J. Stavola Indus., Inc.*,
 823 F. Supp. 125 (S.D.N.Y. 1993)...........................................................................66

*Schenkman v. N.Y. Coll. of Health Prof'ls*,
 29 A.D.3d 671, 815 N.Y.S.2d 159 (2d Dep't 2006).................................................53

*Schiavone Constr. Co. v. Fitzpatrick*,
 717 F.2d 747 (2d Cir. 1983)...............................................................................66, 67

*SEC v. Dunn*,
 587 F. Supp. 2d 486 (S.D.N.Y. 2008)......................................................................25

*SEC v. Pentagon Capital Mgmt. PLC*,
 612 F. Supp. 2d 241 (S.D.N.Y. 2009)................................................................13, 25

*SEC v. U.S. Envtl., Inc.*,
 82 F. Supp. 2d 237 (S.D.N.Y. 2000).....................................................................19, 22

*Shields v. Citytrust Bancorp, Inc.*,
 25 F.3d 1124 (2d Cir. 1994)....................................................................................24

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
 250 F.3d 87 (2d Cir. 2001)..........................................................................47, 49, 50

*Sultan v. Read*,
 No. 03 Civ. 7462 (PKL), 2005 U.S. Dist. LEXIS 3133 (S.D.N.Y. Mar. 1, 2005) .................39

*Sundance Cruises Corp. v. Am. Bureau of Shipping*,
 799 F. Supp. 363 (S.D.N.Y. 1992)...........................................................................65

*Symbol Tech., Inc. v. Deloitte & Touche, LLP*,
 No. 33150/06, 2009 N.Y. App. Div. LEXIS 7689 (2d Dep't 2009)........................................44

*Tel. Sys. Int'l, Inc. v. Cecil*,
 No. 02 CV 9315 (GBD), 2003 U.S. Dist. LEXIS 17000 (S.D.N.Y. Sept. 26, 2003) ..............69

ix

*Page(s)*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................................24, 25

*Thomas H. Lee Equity Fund V, L.P. v. Grant Thornton LLP*,
    586 F. Supp. 2d 119 (S.D.N.Y. 2008).............................................................54, 57

*Vitale v. Steinberg*,
    307 A.D.2d 107, 764 N.Y.S.2d 236 (1st Dep't 2003) ........................................53

*VTech Holdings Ltd. v. Lucent Tech. Inc.*,
    172 F. Supp. 2d 435 (S.D.N.Y. 2001)................................................................38

*Wallack Freight Lines, Inc. v. Next Day Express*,
    273 A.D.2d 462, 711 N.Y.S.2d 891 (2d Dep't 2000) ........................................53

*Wight v. Bankamerica Corp.*,
    219 F.3d 79 (2d Cir. 2000)................................................................................45

## Statutes and Rules

15 U.S.C. § 78u-4(b)(2) ..............................................................................................25

Fed. R. Civ. P. 9(b) ............................................................................................ *passim*

Fed. R. Civ. P. 12(f) ...................................................................................................69

Fed. R. Civ. P. 15(a)(2) ..............................................................................................69

Fed. R. Evid. 404(b) ...................................................................................................70

Fed. R. Evid. 609(a) ...................................................................................................70

Fed. R. Evid. 609(b) ...................................................................................................70

Fed. R. Evid. 802 .......................................................................................................30

N.Y. CPLR § 213(8) ...................................................................................................52

N.Y. CPLR § 1411.......................................................................................................52

## Other Authority

MERRIAM-WEBSTER COLLEGIATE DICTIONARY (10th ed. 1999) ...................................19

## PRELIMINARY STATEMENT

In this action, plaintiff Bank of Montreal ("BMO") seeks damages from defendants – two brokerage firms and their officers, directors, and employees – for colluding with a rogue BMO natural gas trader to make it seem like the defendants were independently verifying the trader's prices when in fact they were simply parroting the trader's own inflated prices back to BMO's Market Risk department.  The wrongful imprimatur that defendants placed on the trader's prices, and additional trades in which certain of the defendants were involved, were critical in helping the trader, David P. Lee, to hide losses and risk in his portfolio from the risk supervisors at BMO.  After the scheme was exposed, BMO realized hundreds of millions of dollars in losses, and the Securities and Exchange Commission, the Commodity Futures Trading Commission, or both commenced proceedings against defendants Optionable, Inc. ("Optionable"), MF Global Inc. ("MF Global"), and Optionable employees Kevin P. Cassidy, Edward J. O'Connor, and Scott Connor.  Lee and Cassidy were criminally charged.

BMO's 51-page, nearly 200-paragraph complaint (the "Complaint" or "Compl.") sets forth in great detail – down to the minute – dozens of fraudulent e-mails and instant messages sent to and from defendants in pursuit of the scheme.  It lays out with great particularity how defendants committed fraud and negligent misrepresentation (Counts I and II), aided and abetted fraud and breach of fiduciary duty (Counts III and IV), and breached a contract with BMO (Count V).  The role played by each of the individual and corporate defendants is spelled out explicitly.  It would be difficult to imagine a more detailed pleading.  Defendants' motions to dismiss (Dkt. Nos. 37, 40, 42, 47, 55, 61) should be denied.

## STATEMENT OF FACTS

### BMO's Independent Price Verification Process for Natural Gas Options

Optionable and MF Global provided brokerage services to BMO's Commodity Derivatives Group traders from at least 2003 until early May 2007.  (Compl. ¶¶ 5-6, 25.)  These traders included Lee, who was the Group's head natural gas options trader, and Lee's boss, Robert B. Moore, Jr.  (*Id.* ¶¶ 1-2, 22.)  During this period, defendants Cassidy and O'Connor served at various times as Optionable's CEO.  (*Id.* ¶¶ 7-8.)[1]  Defendant Mark A. Nordlicht, Optionable's second largest shareholder, was chairman of its board.  (*Id.* ¶ 9.)  Defendants Ryan B. Woodgate and Scott Connor were Optionable employees, and defendant Joseph D. Saab was an employee of MF Global.  (*Id.* ¶¶ 10-12.)[2]

BMO's Commodity Derivatives Group traded natural gas options, which give the holder the right (but not the obligation) to buy or sell a natural gas futures contract at a specified "exercise price" on (or before) a specified expiration, or "exercise" date.  (*Id.* ¶¶ 16-17.)  Lee was responsible for placing trades, determining strategy, taking positions in the natural gas book, and valuing those positions daily.  (*Id.* ¶ 21.)  Moore was responsible for overseeing commodities traders (including Lee) and ensuring that commodities traders' books were correctly valued (or "marked to market") daily.  (*Id.* ¶ 22.)

---

[1] Cassidy continued to run Optionable's day-to-day operations from April 1, 2004 to October 15, 2005 with the title of "consultant."  (Compl. ¶ 7.)  He also served as vice-chairman of Optionable's board of directors until May 12, 2007.  (*Id.*)  O'Connor also was president of Optionable from March 2001 to January 2009 and has served as a director since March 2001. (*Id.* ¶ 8.)

[2] Woodgate has not moved to dismiss, and thus his role is discussed only to a limited extent in this memorandum.

2

To value its natural gas options book, BMO used a valuation model that required various inputs such as interest rates, spot prices of natural gas, and exchange settlement prices. (*Id.* ¶ 23.)  When public data was not available for some of these inputs, such as volatility or certain data for infrequently traded options, Lee was supposed to input or adjust such data according to his knowledge and judgment of the current market.  (*Id.*)  Twice each month, BMO's Market Risk department engaged in an Independent Price Verification ("IPV") process, in which it sought to value a representative sample of trades in the natural gas options book, independent of Lee's valuations, using data that BMO believed to be independent data from third parties, including prices from Optionable and MF Global.  (*Id.* ¶¶ 24, 26.)

Optionable and MF Global, as well as Cassidy, O'Connor, Connor, and Saab, all knew that BMO relied on these price quotations to conduct the IPV process.  (*Id.* ¶ 27.)  This awareness of the purpose of the quotations was not only apparent from the fact that they were being provided directly to BMO's back office, but was specifically discussed with Optionable and MF Global in e-mails that asked for "independent market quotes," referred to these quotations as a "month end pricing check," and asked for "confirm[ation]" that certain volatilities were "correct."  (*Id.* ¶ 27(a)-(c).)  Indeed, MF Global expressly represented on the spreadsheets it sent BMO that it was providing "Numbers That Reflect A Consensus Taken On That Date And Time, From Different Sources In The Market Place."  (*Id.* ¶ 44.)  Similarly, Optionable labeled bids and offers sent to BMO as "Market Quotes."  (*Id.* ¶¶ 34-35.)

**The Circular-Quotation Scheme**

Notwithstanding their understanding that they were providing quotations for BMO's IPV process, these defendants colluded with Lee to circumvent the independence of the IPV process.  Starting in 2003, Lee began feeding to Optionable the prices he wanted Optionable

to provide to BMO as independent prices.  (*Id.* ¶ 29.)  Lee would create a spreadsheet and memo reflecting his desired prices and e-mail these documents to Cassidy, O'Connor, Woodgate, or Connor at Optionable.  They then e-mailed them, unchanged or virtually unchanged, but under the guise of sending independent prices, back to BMO, where they were used in the IPV process. (*Id.* ¶¶ 29-30.)

The Complaint sets forth in great detail the communications demonstrating the "circular" quotation process between Optionable, Cassidy, O'Connor, Connor, and Woodgate (the "Optionable defendants") and Lee.  First, it sets forth several verbatim examples of the e-mails and spreadsheets exchanged between the Optionable defendants and Lee (some of which, as detailed below, Lee deleted from his personal laptop as his scheme was close to unraveling) in compiling the quotations and sending them back to BMO.  (*Id.* ¶¶ 31-35, 108.)  Second, it lists by date and time *61 specific instances* from 2003 to 2006 in which the Optionable defendants sent or received e-mails or instant messages in the process by which quotations from Lee were passed off to BMO as Optionable's independent assessments.  (*Id.* ¶ 36.)[3]

For example, the Complaint alleges that on August 31, 2006, at 3:04 p.m., Lee e-mailed to Cassidy a spreadsheet file that read in part (*id*. ¶ 32):

Market Quotes

| Strip | Strike | Cross | Bid | Offer |
|---|---|---|---|---|
| v06 | 5.5 | 6.08 | 0.065 | 0.09 |
| v06 | 7 | 6.08 | 0.22 | 0.255 |
| v06 | 10 | 6.08 | 0.01 | 0.035 |
| v06 | 4.5 | 6.08 | 0.01 | 0.035 |
| X6-H7 | 12 | 9.95 | 1.055 | 1.1 |

---

[3] Although the Complaint sets forth 17 different month-ends on which Optionable provided collusive quotes (Compl. ¶ 36), Optionable falsely characterizes these as "a few examples" (Optionable Br. at 10).

4

About an hour later, at 4:27 p.m., Connor (after sending an intervening draft to Lee), e-mailed BMO's pricing department a spreadsheet that read in part (*id*. ¶¶ 34-35):

Market Quotes

| Strip | Strike | Cross | Bid | Offer |
|-------|--------|-------|-----|-------|
| v06 | 5.5 | 6.08 | 0.065 | 0.09 |
| v06 | 7 | 6.08 | 0.22 | 0.255 |
| v06 | 10 | 6.08 | 0.01 | 0.035 |
| v06 | 4.5 | 6.08 | 0.01 | 0.035 |
| X6-H7 | 12 | 9.95 | 1.055 | 1.1 |

The Complaint similarly sets forth *24 specific communications* between Lee and Saab from 2004 to 2007 in which Saab received price quotations from Lee by instant messaging and then passed them off to BMO as MF Global's independent assessments.  (*Id.* ¶ 51.)  For example, on December 29, 2005, starting at 3:06 p.m., Saab, whose screen name was "jsngotc," exchanged the following instant messages with Lee (*id.* ¶ 46 (emphasis added)):

> jsngotc@AIM.im (3:06:53 PM): we're doing month-end today
> David.P.Lee@bmo.com (3:12:36 PM): yes
>                 * * *
> David.P.Lee@bmo.com (3:22:58 PM): 07 **3.46/3.60**
> David.P.Lee@bmo.com (3:23:13 PM): 08 **3.16/3.30**
> David.P.Lee@bmo.com (3:23:19 PM): 09 **2.93/3.08**
> David.P.Lee@bmo.com (3:23:23 PM): 10 **2.75/2.95**

At 3:28 p.m., just a few minutes after Lee gave Saab these quotes, Saab e-mailed a spreadsheet to Lee and others at BMO which read in part (*id.* ¶ 47 (emphasis added)):

| ATM-OPTIONS | | | |
|-------------|--------|------|------|
| TERM | STRIKE | BID | ASK |
| * * * | | | |
| Cal-07 | $10.1500 | **$3.4600** | **$3.6000** |
| Cal-08 | $9.2500 | **$3.1600** | **$3.3000** |
| Cal-09 | $8.4500 | **$2.9300** | **$3.0800** |
| Cal-10 | $7.8000 | **$2.7500** | **$2.9500** |

When it provided the quotations, MF Global represented on the spreadsheets it sent to BMO that "They Are Numbers That Reflect A Consensus Taken On That Date And

Time, From Different Sources In The Market Place." (*Id.* ¶ 44.)  In actuality, MF Global's quotations did not reflect a "consensus," and were not from "different sources" or even from "the market place," but were in nearly all cases simply a regurgitation of inflated quotes supplied by Lee. (*Id.* ¶ 45.)  Indeed, on June 13, 2008, in its SEC Form 10-K, MF Global's parent admitted that one of MF Global's brokers who did business with Lee used bid and offer prices for forward OTC trades that Lee sent to him as a basis for prices that the broker sent to BMO as "consensus" price indications. (*Id.* ¶ 110.)[4]

The price quotes that Lee sent to Optionable and MF Global, and that they sent back to BMO, generally were more favorable to Lee's positions than actual market prices, and allowed him to overstate the value of his natural gas options positions, create fictitious profits, and conceal losses. (*Id.* ¶¶ 37-40, 53, 54.)  Lee's arrangement allowed him to falsify his price quotes without fear that his scheme would be exposed. (*Id.* ¶ 41.)

---

[4] In December 2009, after the commencement of this action, the CFTC announced the filing and simultaneous settlement of charges against MF Global.  The CFTC order, which imposed a $10 million civil penalty on MF Global, stated, among other things, that from approximately May 2003 until April 2007, MF Global provided "a customer" – clearly BMO – with voice brokerage services in its natural gas derivatives trading business, which generated commissions for MF Global, and that MF Global failed to implement procedures to ensure appropriate transmission of price indications to the customer for certain natural gas options.  In particular, the order states that MF Global failed to have procedures to ensure that the price indications transmitted by its broker to the customer "reflect a consensus taken on [a particular] date and time" and were derived "from different sources in the market place" – the same language noted above. *See* Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act and Making Findings and Imposing Remedial Sanctions, at 2, 6, *In re MF Global Inc.*, No. 10-03 (CFTC Dec. 17, 2009), http://www.cftc.gov/ucm/groups/public/@lrenforcementactions/documents/legalpleading/enfmfglobalorder12172009.pdf (accessed Feb. 6, 2010).

**The Campaign Against Totem**

Starting in late 2005, BMO's Market Risk department began to suggest that BMO subscribe to a multicontributor service called "Totem RealMarks" ("Totem"),[5] in part because of the increased size of the natural gas options book.  (*Id.* ¶ 65.)  Moore and Lee strongly resisted the Market Risk department's efforts to use Totem in BMO's IPV process, claiming that quotes from Optionable and other brokers were the best way to value the natural gas book.  (*Id.* ¶¶ 67-68.)  They did so to avoid having the natural gas options book valued independently and to maintain BMO's reliance on their supposed expertise, and thereby allowed Lee to continue colluding with Optionable and the other defendants.  (*Id.* ¶ 69.)

BMO eventually subscribed to Totem in September 2006.  (*Id.* ¶ 70.)  In early October 2006, after BMO received the Totem quotes for month-end September, it used them in the IPV process, and discovered a large discrepancy between Lee's valuation of the natural gas options book, and the valuation using the Totem quotes.  (*Id.* ¶ 71.)  In response to this discrepancy between Lee's and Totem's valuations of the natural gas book, Moore and Lee, assisted by Cassidy and Optionable, waged a campaign from October 2006 to May 2007 to discredit Totem and defend Lee's valuation and maintain BMO's reliance on Optionable's – that is, Lee's – prices.  (*Id.* ¶ 72.)  As part of this campaign, Moore, Lee, Cassidy, and others at Optionable sought to increase BMO's dependence on Optionable by having Optionable sell BMO additional price quotations through a service called OPEX Analytics RealMarks ("OPEX").  (*Id.* ¶ 73.)

---

[5] Totem quotes reflect prices and estimates submitted by subscribers.  Totem then eliminates outliers, averages the remaining quotes and gives these averaged numbers to subscribers to use in their price verification processes.  (Compl. ¶ 66.)

OPEX turned out to be just another way for Optionable to feed BMO pricing from Lee.  Optionable told BMO that the OPEX quotes were obtained from "different market makers, Banks, Brokerage houses, Energy trading companies, Hedge funds, etc. and we send you a complete sampling of IM's and OPEX screen shots of actual quotes and actual trades."  (*Id.* ¶ 75.)  In a February 2007 contract with BMO, Optionable represented that "OPEX Analytics RealMarks provides specific market information based on actual market quotes obtained by Optionable."  (*Id.* ¶ 76.)  In fact, however, the OPEX pricing grids that Optionable provided to BMO were filled out by Lee.  (*Id.* ¶ 77.)

**Lee's 1x2 and EOO Trades Conceal Losses and
Increased Risk in the Natural Gas Options Book**

Starting in 2006, Lee entered into increasing numbers of positions, increasing the size of BMO's natural gas options book.  (*Id.* ¶ 63.)  When, in late July 2006, Lee's natural gas options book exceeded pre-approved limits based on a metric called "value-at risk" (or "VaR") (*id.* ¶¶ 78-79), Lee did not respond by reducing the size and risk of the book by closing out positions, which would have revealed that he had mismarked the book.  (*Id.* ¶¶ 80-81.)  Instead, Lee entered into additional transactions – known as "1x2" trades[6] – that had the sole purpose of temporarily reducing the book's VaR.  (*Id.* ¶ 80.)  The 1x2 trades significantly increased the size of the book as well as increasing its exposure to risk factors, leading to losses.  (*Id.* ¶ 81.)

Meanwhile, in the fall of 2006, Lee's increasingly large unprofitable positions – including the 1x2 trades – had begun to generate even larger losses.  (*Id.* ¶ 82.)  To cover these losses, starting in mid-October 2006 and continuing through early March 2007, Cassidy, Nordlicht, and others at Optionable developed the idea of having Lee execute "exchange of

---

[6] In these trades, Lee would purchase a close-to-the-money option (i.e., an option whose exercise price was close to the current price) and simultaneously sell two out-of-the-money options.  (*Id.* ¶ 80.)

options for options" ("EOO") trades.[7]  These trades would have the sole purpose of recording large artificial profits that would cover up Lee's mounting losses, while actually costing BMO hundreds of millions of dollars.[8]  (*Id.* ¶¶ 82, 87; *see also id.* ¶ 85.)  Brokers with which Cassidy and O'Connor were associated were involved in nearly all of the EOO trades.  (*Id.* ¶ 88.) Optionable, Cassidy, O'Connor, and Nordlicht also connected Lee to counterparties affiliated with Nordlicht that entered into EOO trades on terms that were highly unfavorable to BMO.  (*Id.* ¶¶ 89-90.)

       The EOO trades furthered defendants' scheme by generating millions of dollars in commissions and fees for Optionable, all of which made Optionable continue to appear to be a profitable and growing business.  (*Id.* ¶¶ 56-60, 91.)  Because Lee manipulated the entry of the EOO trades into BMO's systems to make them falsely appear to generate immediate profits, they masked the mounting losses in BMO's natural gas options book.  (*Id.* ¶ 92.)  To encourage Lee to continue to participate in his fraudulent scheme with Optionable, and to encourage Moore to look the other way, Optionable and Cassidy plied Lee and Moore with gifts and inducements, including gambling vacations.  (*Id.* ¶¶ 61-62.)

**Lee's Massive Trading Losses Are Revealed**

       In April 2007, BMO decided to begin using price quotes from Totem and other multicontributor platforms such as Intercontinental Exchange ("ICE") in the IPV process.  (*Id.*

---

    [7] An EOO trade involves two types of options, known as "American-style" and "European-style" options.  An American-style option can be exercised at any time before or on the option's expiration date, while a European-style option can be exercised only on its expiration date.  The two types of options, therefore, can share all the same terms but have different values because the American-style option offers more flexibility in when it can be exercised.  (*Id.* ¶ 83.)

    [8] Even though each EOO trade actually cost BMO money, when Lee entered these trades into BMO's systems, he did so in a manner that depicted their value as exactly the opposite.  (*Id.* ¶ 86.)

¶ 96.)  Recognizing that he could no longer convincingly assert that his own marks were consistent with market prices, on April 19, 2007, Lee re-marked his book, resulting in a US$70 million loss for BMO.  (*Id.* ¶ 97.)  Lee's marks, however, were still substantially off market.  (*Id.*)  The combination of the losses incurred in the second quarter of 2007 from Lee's positions, the IPV reserve resulting from the re-marking of the natural gas options book using Totem and ICE prices (which also reflected earlier losses that had previously been concealed by Lee's use of fraudulent broker quotes), and Lee's own re-marking of his book led to BMO's announcement on April 27, 2007 of projected pre-tax losses of CDN$350-450 million.  (*Id.* ¶ 98.)

       After these initial losses were discovered, BMO brought several executives and traders to New York from Toronto and Chicago to examine the Commodity Derivatives Group's books and supervise trading going forward.  (*Id.* ¶ 100.)  In May 2007, these traders discovered the EOO trades, and determined that they were overvalued.  (*Id.* ¶ 101.)  They also discovered that BMO's counterparties for most of the EOO trades were connected to Optionable.  (*Id.*)  The discovery of the EOO trades forced BMO to recalculate its estimated losses.  (*Id.*)  BMO also put Lee and Moore on leaves of absence and announced that it had ceased doing business with Optionable.  (*Id.* ¶¶ 102-03.)  Shortly thereafter, Lee resigned from BMO, and BMO terminated Moore.  (*Id.* ¶ 105.)  Faced with the possibility that BMO and the press had discovered the fact that he had several prior felony convictions and that those convictions might be disclosed to the public, Cassidy resigned as CEO of Optionable.  (*Id.* ¶ 104.)

       On May 17, 2007, BMO announced that due to a revaluation of its natural gas options book – including a revaluation of the EOO trades – it would post a CDN$680 million

pre-tax loss, instead of the projected pre-tax loss of CDN$350-450 million announced on April 27.  (*Id.* ¶ 106.)

On May 18, 2007, outside experts hired by BMO discovered that, on or about April 28, 2007 (the day after BMO's April 27 press release), Lee had deleted more than 100 files from his personal laptop computer, including spreadsheets that he had used to e-mail price quotes to Optionable.  (*Id.* ¶ 108.)  BMO subsequently determined that Optionable had sent these supposedly independent broker quotes to BMO's Market Risk department for use in BMO's IPV process.  (*Id.* ¶ 109.)  BMO's investigation revealed that Lee and Optionable had fraudulently manufactured supposedly independent price quotes since at least 2003.  (*Id.*)

**Lee's Guilty Plea and the Government Proceedings**

The revelation of defendants' conduct led to investigations by multiple government agencies, including the New York County District Attorney's Office, the United States Attorney's Office for the Southern District of New York, the SEC, the CFTC, and the Federal Reserve Board.  (*Id.* ¶ 111.)

As a result of these investigations, on November 13, 2008, Lee pled guilty to both state and federal charges and has been barred by the Federal Reserve Board from, among other things, participating in any manner in the conduct of the affairs of any insured depository institution, depository institution holding company, or foreign bank.  (*Id.* ¶¶ 112, 114.)  Cassidy was indicted by a federal grand jury and is free on bail, having posted a $10 million bond.  (*Id.* ¶ 113.)[9]

---

[9] Cassidy asserts that "[h]is last arrest was in 1993."  (Cassidy Br. at 11.)  It actually was on November 18, *2008*, when he was arrested in connection with charges that he defrauded BMO. (Compl. ¶ 113.)

Meanwhile, the SEC sued Lee, Cassidy, O'Connor, and Connor, alleging that they violated the antifraud and other provisions of the federal securities laws.  (*Id.* ¶ 115.)  *See SEC v. Lee*, No. 08-cv-9961 (GBD) (filed Nov. 18, 2008).  In connection with that suit, Lee and Connor have consented to the entry of a permanent injunction restraining and enjoining them from violating those laws.  (Compl. ¶ 115.)  The CFTC sued Cassidy, O'Connor, Optionable, Lee, and Moore, alleging violations of the federal Commodity Exchange Act.  (*Id.* ¶ 116.)  *See CFTC v. Cassidy*, No. 08-cv-9962 (GBD) (filed Nov. 18, 2008).[10]

**Plaintiff's Claims**

BMO filed this action on August 28, 2009, asserting claims for fraud and negligent misrepresentation against Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab (Compl. ¶¶ 117-51); aiding and abetting fraud and breach of fiduciary duty against all defendants (*id.* ¶¶ 152-89); and breach of contract against Optionable in connection with the agreement for the OPEX service (*id.* ¶¶ 190-96).  BMO seeks to recover its damages resulting from defendants' wrongdoing as well as contractual indemnification from Optionable. (*Id.* ¶¶ 3, 129-33, 147-51, 163-66, 186-89, 195-96.)

## ARGUMENT

## I.

## THE COMPLAINT EASILY SATISFIES *IQBAL*'S "PLAUSIBILITY" STANDARD

In the adjudication of a motion to dismiss, the allegations of the complaint "must be accepted as true, drawing all inferences from the pleaded facts in Plaintiffs' favor." *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC*, 568 F.3d 374, 377 (2d Cir. 2009).  As the Supreme Court has stated, "When there are well-pleaded factual allegations, a

---

[10] As detailed *supra* note 4, MF Global has settled the CFTC's claims against it.

court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).  The plausibility standard is not akin to a "probability requirement."  *See id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  Rather, "the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."  *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980); *see also SEC v. Pentagon Capital Mgmt. PLC*, 612 F. Supp. 2d 241, 257 (S.D.N.Y. 2009) (same).

In light of the facts alleged in the Complaint, the inference that defendants knowingly participated in a scheme to mislead BMO into thinking they were providing independent price verification is, at the very least, plausible, if not compelling.  Indeed, it is defendants' proffered explanations for their conduct – such as Optionable's argument that it acted innocently in copying Lee's numbers and sending them to BMO's back office because all it was doing was "review[ing] Lee's numbers for reasonableness" (Optionable Br. at 12) – that strain credulity.  If this was an innocent process, why did Lee erase the spreadsheets he sent to Optionable from his laptop when BMO's losses began to come to light?  (Compl. ¶ 108.)  If there in fact was some sort of "review," why did Optionable take only about 10 minutes (or less) on a number of occasions to send its quotes to BMO after receiving them from Lee?[11]  Why did MF Global send its quotes to BMO *just two minutes* after Lee finished giving his quotes to Saab

---

[11] For example, the Complaint alleges that on November 30, 2005, Lee sent Connor proposed quotes at 3:53 p.m. and Connor sent Lee a draft of Optionable's final quotes at 4:01 p.m., only eight minutes later.  On December 29, 2005, Lee sent Connor proposed quotes at 3:24 p.m. and Connor sent Lee draft final quotes at 3:34 and 3:35 p.m.  On March 31, 2006, Lee sent Connor proposed quotes at 4:43 p.m., and Connor sent BMO final quotes at 4:54 p.m.  On June 29, 2006, Lee sent Connor proposed quotes at 3:25 p.m. and Connor sent Lee draft final quotes at 3:34 p.m.  On July 31, 2006, Lee sent Connor proposed quotes at 4:04 p.m., and Connor sent Lee draft final quotes at 4:11 p.m.  (Compl. ¶ 36.)

by instant messaging?  (*Id.* ¶¶ 46-47.)[12]  Why were the numbers Optionable and MF Global

forwarded to BMO always unchanged or virtually unchanged from the ones Lee had provided?

(*Id.* ¶¶ 29, 45.)[13]  If Lee's conduct was legitimate, why did he plead guilty to charges of

conspiring to defraud BMO?  (*Id.* ¶ 112.)[14]

       As will be shown below, the Complaint "pleads factual content that allows the

court to draw the reasonable inference that [each] defendant is liable for the misconduct alleged."

*Iqbal*, 129 S. Ct. at 1949 (citation omitted).  *Iqbal* does not stand for the proposition that a

complaint may be dismissed if the *defendants* can concoct a theory of *non*-liability that their

counsel can present (at least in writing) with a straight face, as MF Global and Saab seek to do

while asking the Court to make assumptions not in the record.  (*See, e.g.*, MF Global/Saab Br. at

---

[12] As another example, on April 29, 2005, Lee sent Saab proposed quotes at 3:30 p.m., and Saab sent BMO final quotes at 3:34 p.m.  (Compl. ¶ 51.)  These instantaneous responses concerning the valuation of complex options undermine MF Global and Saab's assertion that "it can be inferred that Saab did, in fact, confirm Lee's numbers based upon Saab's knowledge and judgment of the market."  (MF Global/Saab Br. at 8.)

[13] Optionable argues that the fact that Optionable sometimes modified Lee's numbers "inevitably implies reviewing them."  (Optionable Br. at 13.)  MF Global and Saab make a similar argument.  (MF Global/Saab Br. at 9.)  At most, the modification of some numbers might imply that Optionable reviewed *those* numbers, but since the vast majority of Lee's numbers were unchanged, the inference is equally strong, if not stronger – especially in light of the very short "review" times discussed above – that the *un*changed numbers were *not* reviewed.

[14] In the Information to which Lee pled guilty, the Government charged that Lee sent a co-conspirator at Optionable described as "CC-1" price quotes for Lee's positions in BMO's natural gas options book "that matched Lee's inflated marks" and that "CC-1 instructed Optionable brokers to return – or regurgitate – Lee's self-serving quotes to BMO's price verification personnel as it they were Optionable's accurate view of prevailing market prices for Lee's positions and independent of Lee."  Information ¶ 11, *United States v. Lee*, No. 08 Cr. 1135 (RPP) (S.D.N.Y. filed Nov. 13, 2008) (Dkt. No. 1) (certain capitalization omitted).  The Information continued: "At all times, as CC-1 knew, BMO was using this pricing information from Optionable to evaluate the accuracy of Lee's marks while under the impression that it was accurate and independent of Lee."  *Id.*  From the Information's mention of an instant message Lee sent to CC-1 on December 29, 2004 at 2:41 p.m. (*id.* ¶ 26(c)), it is apparent that CC-1 is Cassidy.  (*See* Compl. ¶ 36 (identifying instant message in question as from Lee to Cassidy).)

14

20 (asking Court to "infer" that "Saab confirmed Lee's prices by comparing them to Saab's own valuation model").)[15]  That defendants can hypothesize facts and arguments that could lead a trier of fact to find in their favor presents interesting questions for trial, but is beside the point on a motion to dismiss.

## II.

## THE COMPLAINT ADEQUATELY ALLEGES A CLAIM FOR FRAUD

Under New York law, the elements of common law fraud are "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff."  *Chanayil v. Gulati*, 169 F.3d 168, 171 (2d Cir. 1999) (quoting *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970-71 (2d Cir. 1987)) (internal quotations omitted).  The Complaint properly alleges each of these elements.

### A.      The Complaint Alleges That Defendants Made Material Misrepresentations to BMO

The Complaint alleges that defendants (excluding Nordlicht) made material misrepresentations to BMO with respect to both their supplying of purportedly independent price quotations and their statements about their activity in the natural gas market.[16]  The Complaint alleges that Optionable and MF Global supplied BMO with supposedly independent price

---

[15] The Court also should disregard factual assertions by defendants that are nowhere to be found in the Complaint, such as that Lee "record[ed] his trades backwards" (Optionable Br. at 1), that BMO's loss "is largely just a write-down of falsely recorded paper gains rather than actual out-of-pocket damage" (*id.* at 8), and that "[a]s damages, BMO demands the amount of money it claims it would have earned if Lee's puffed-up numbers were right" (*id.* at 22).

[16] Since the Complaint adequately alleges misrepresentations, the Court need not reach MF Global and Saab's arguments regarding omissions.  (*See* MF Global/Saab Br. at 23-24.)

quotations, aware that the purpose of the data was to verify the value of options in Lee's natural gas options book as part of the IPV process.  (Compl. ¶¶ 24-27.)[17]

BMO pleads three separate instances when BMO employees requested independent quotes from defendants.  (*Id.* ¶ 27.)  In an August 29, 2003 e-mail to MF Global, a BMO employee specifically referred to sending a "pricing check" of Lee's book to an MF Global broker.  (*Id.*)  In a May 3, 2006 e-mail, another BMO employee requested that Connor provide confirmation that certain values in Lee's book were "correct."  (*Id.*)  In a third instance, a BMO employee sent an e-mail to an Optionable employee, dated September 28, 2006, requesting "*independent* market quotes as at the close of [the] September 28, 2006 trading day" (emphasis added) and that the quotes *not* include BMO as a contributor.  (*Id.*)  The Complaint also alleges that materials sent by Optionable to BMO referred to "Market Quotes" (*id.* ¶¶ 34-35), and that MF Global stated that its quotes "Reflect[ed] A Consensus . . . From Different Sources In The Market Place" (*id.* ¶ 44).  The Complaint thus alleges that, based on such communications and the purpose for which the quotations were being used, defendants knew that BMO sought actual market prices from sources other than Lee in order to verify that Lee's own values were correct.

The foregoing allegations refute defendants' assertion that the Complaint fails to plead that they knew their quotes were supposed to be independent.  Indeed, during oral argument of Optionable's motion to dismiss the CFTC's complaint, Optionable's counsel

---

[17] Cassidy, MF Global, and Saab argue that the Complaint does not provide enough information about the IPV process, including the size of the sample of options valued.  (*See* Cassidy Br. at 5; MF Global/Saab Br. at 28.)  Such evidentiary detail is not necessary to sufficiently plead that defendants intentionally made false material representations that they were providing independent market quotes as requested by BMO.  To the extent defendants seek to raise a potential factual dispute regarding the adequacy of BMO's pricing model, such an issue is irrelevant on a motion to dismiss.

16

conceded that an allegation that someone from BMO's back office told Optionable that BMO

wanted independent quotes would be a "smoking gun" for purposes of alleging scienter:

> There is nothing incoherent about the idea that BMO, rather than wanting
> independent quotes would just want a second opinion about whether the quote is
> within the range of reason.  Now, if they had wanted more than that, they
> certainly could have asked.  They could have sent a letter, they could have made a
> phone call.  There is no allegation at all that anybody from the BMO back office
> spoke to anybody at Optionable and said could you please make sure that what
> we're getting is in there.  Nothing like that at all.  And the absence of that key
> fact, that smoking gun, there's no scienter.

Transcript of Oral Argument, *CFTC v. Cassidy*, No. 08-cv-9962 (GBD), at 52:13-22 (S.D.N.Y.

Oct. 22, 2009, 11 a.m.) (Dkt. No. 65).  The Complaint here, in fact, alleges just such a "smoking

gun":

> On September 28, 2006, the director of Market Risk for BMO's commodity line
> of business e-mailed Steven Laker of Optionable "to request Optionable to
> provide us with *independent market quotes* as at the close of [the] September 28,
> 2006 trading day. . . .  It is understood that the quotes will be verifiable from IM
> [instant messaging] sheets on your archive . . . .  It is also understood that Bank of
> Montreal will not be a contributor to the quotes you collected upon this request."

(Compl. ¶ 27(c) (emphasis added).)

Despite BMO's request for independent prices from other market sources, BMO

alleges that Optionable and Lee commenced a scheme by which Optionable employees received

from Lee spreadsheets and short memoranda containing prices desired by Lee.  (*Id.* ¶ 29.)  The

Complaint alleges an Optionable employee then e-mailed those same documents, either

unchanged or virtually unchanged, to BMO's Market Risk department under the guise of sending

independent prices.  (*Id.*)  Particularly at month-end, it alleges that Lee sent Optionable pricing

information he wanted to have appear in Optionable's supposedly independent quotes so they

would be used by the BMO Market Risk department during the IPV process.  (*Id.* ¶ 30.)

The Complaint discusses in detail one instance of such price-quotation fraud that

occurred on August 31, 2006, quoting e-mail correspondence showing that Lee provided his

desired prices to Connor and Cassidy.  (*Id.* ¶¶ 31-33.)  The Complaint then alleges that shortly thereafter, Connor e-mailed Lee a spreadsheet and document (which is excerpted) that supposedly represented Optionable's independent price quotations and pipeline volatility report, but which, in fact, was virtually identical to spreadsheets and documents Lee had e-mailed Optionable earlier in the day.  (*Id.* ¶ 34.)  It alleges that the fraud was completed eight minutes later, when Connor forwarded the same e-mail he had just sent to Lee, consisting of prices provided solely by Lee, to BMO's pricing department.  BMO alleges 16 other occasions when the Optionable defendants similarly received pipeline volatility reports and price quotations from Lee by e-mail or instant messaging and then passed them off to BMO as Optionable's independent assessment.  (*Id.* ¶ 36.)  BMO alleges each of these instances of price quotation fraud with particularity, providing the dates, times, authors, recipients, and a description of the contents of the relevant communications.  Altogether, BMO specifically pleads 17 instances in which Optionable, Connor, Cassidy, and O'Connor provided quotations to BMO, misrepresenting them as collected from independent market sources as desired by BMO, when in fact the quotes were purely provided by Lee.[18]

----

[18] Cassidy compares the 17 cited occasions on which Optionable engaged in circular quotations to the "approximately 730 trading days" over a three-year period.  (Cassidy Br. at 6 n.4.)  But this is the wrong comparison, as BMO's list was limited to month-ends.  Thus, of the 36 month-ends during that three-year period, at least half involved circular quotations.  MF Global, Saab, and O'Connor argue that BMO should have pled even more instances of defendants forwarding fraudulent price quotations to BMO.  (*See* MF Global/Saab Br. at 28; O'Connor Br. at 15.)  In a case such as this, however, where fraudulent representations were made over a three-year period, the instances pleaded are more than sufficient to provide defendants with notice of the claim being asserted.  *See Allied Irish Banks, P.L.C. v. Bank of Am.*, No. 03 Civ. 3748 (DAB), 2006 U.S. Dist. LEXIS 4270, at *18-19 (S.D.N.Y. Jan. 31, 2006) (plaintiff asserting a claim for fraud based on a rogue trading scheme did not need to plead all of the misrepresentations made in the course of the scheme, just "enough to give Defendants notice of the specific claims against them").  Defendants' "demand for the pleading of detailed evidentiary matter is unreasonable at this early stage" and "such an application of [Fed. R. Civ. P.] 9(b) ignores the Second Circuit's repeated exhortation that [Fed. R. Civ. P.] 9(b) 'must be

The Complaint alleges a similar price-quotation scheme with respect to MF Global and Saab.  It alleges that MF Global sent spreadsheets to BMO containing supposedly independent price quotations with a representation stating the following regarding the quotations:  "They Are Numbers That Reflect A Consensus Taken On That Date And Time, From Different Sources In The Market Place."  (*Id.* ¶ 44.)  BMO alleges that the quotations provided by MF Global did not reflect a "consensus" and were not from "different sources," but were in nearly all cases simply a regurgitation of quotes supplied by Lee.  (*Id.* ¶ 45.)[19]

The Complaint discusses in detail one instance of such price-quotation fraud that occurred on December 29, 2006.  The Complaint quotes an instant message exchange between Lee and Saab which it alleges shows Saab soliciting quotations from Lee and Lee responding with his desired prices.  (*Id.* ¶¶ 46, 49-50.)  It then excerpts a spreadsheet that Saab e-mailed to BMO and Lee just two minutes following the termination of the exchange, alleging that the quotations in the spreadsheet contained exactly the same information that Lee had just sent to Saab via instant messaging.  (*Id.* ¶¶ 47-48.)  BMO alleges 11 other instances when Saab received price quotations from Lee by instant messaging and then passed them off to BMO as MF Global's independent assessment.  (*Id.* ¶ 51.)  BMO alleges each of these instances of price

read together with [Fed. R. Civ. P.] 8(a), which requires only a "short and plain statement of the claim" for relief.'"  *SEC v. U.S. Envtl., Inc.*, 82 F. Supp. 2d 237, 240 (S.D.N.Y. 2000) (Fed. R. Civ. P. 9(b) did not require plaintiff to plead every manipulative stock trade individually).

[19] MF Global and Saab's attempt to label Saab's quotes as non-actionable expressions of opinion (MF Global/Saab Br. at 21) falls flat, because – whether the "numbers" provided by Saab are characterized as "quotes," "prices," or "indications" – they were represented, as a matter of *fact*, as reflecting a "consensus" from "different sources in the market place" (Compl. ¶ 44), when they actually were simply provided by Lee.  MF Global and Saab's suggestion that Lee and Saab's "concurrence on price indications would, by definition, 'reflect a consensus . . . from differen[t] sources in the marketplace'" (MF Global/Saab Br. at 20) is absurd.  An agreement of two people does not form a consensus.  *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 246 (10th ed. 1999) (defining consensus as "general agreement," "the judgment arrived at by most of those concerned," and "group soldiarity in sentiment and belief").

quotation fraud with particularity, providing the dates, times, authors, recipients, and a description of the contents of the relevant communications.  Altogether, BMO specifically pleads 12 instances in which MF Global and Saab provided quotations to BMO while misrepresenting them as collected from independent market sources, when in fact the quotes were purely provided by Lee.[20]

Although defendants' misrepresentation as to their quotes' independence is sufficient to ground a claim for fraud, regardless of whether the quotes they provided were accurate (since the lack of independence rendered such quotes useless for price verification purposes), the Complaint in fact does allege that there were differences between the Lee-supplied quotes Optionable and MF Global sent to BMO and the actual market prices at the time. (*Id.* ¶¶ 37, 53.)  The Complaint specifically pleads four instances in which Lee's prices, confirmed by defendants, were off-market, inflating the supposed value of BMO's positions by a total of more than $21.5 million.  (*Id.* ¶¶ 38-40, 54.)[21]

The Complaint also alleges that Optionable misrepresented its prominence in the natural gas markets and its ability to supply actual market quotes in the course of marketing its OPEX service to BMO.  (*Id.* ¶¶ 72-74, 76, 127.)  To bolster this allegation, BMO specifically

---

[20] MF Global and Saab argue without citation of authority that "as long as BMO has not pleaded facts showing that the price indications were false, the *source* of the data Saab used cannot be material as a matter of law."  (MF Global/Saab Br. at 25 (emphasis in original).) Leaving aside the fact that BMO has pleaded that the price indications *were* false (Compl. ¶¶ 53-54), it is nonsensical to argue that BMO's Market Risk department, which was seeking independent verification of Lee's prices, would not have considered it important that the prices they were receiving from MF Global were not independent at all, but were prepared by Lee, or that Lee had engaged in collusion with Saab.

[21] MF Global and Saab's Rule 9(b) attack on BMO's allegation of off-market pricing (MF Global/Saab Br. at 21) is without merit.  One can hardly get more specific than alleging that "MF Global's September 28, 2006 quote for the November 2006-December 2006 at-the-money option – a bid of 1.43 and an offer of 1.47 – was off market, which ranged from 1.34 to 1.38."  (Compl. ¶ 54.)  The parties can explore the sources of these quotations in discovery.

20

pleads three separate instances – a September 6, 2006 press release, a January 19, 2007 conversation with the director of BMO's Market Risk department, and the February 23, 2007 OPEX Agreement with BMO – when Optionable and its employees represented that OPEX was a valuation service which provided market valuations based on actual market quotes from various sources.  (*Id.* ¶¶ 74-76.)  The Complaint quotes the relevant misrepresentations from the press release, conversation, and agreement.  (*Id.*)  The Complaint then alleges that the grids of quotes Optionable provided to BMO through OPEX were actually filled out by Lee with prices that favored his positions, instead of containing the independent real-time market quotes which Optionable claimed it could supply.  (*Id.* ¶¶ 75, 77.)[22]

O'Connor argues that "the allegation that BMO began negotiating with Optionable in mid-to-late 2006 for independent market prices quotes through OPEX, clearly reveals BMO's understanding that Optionable was *not*, in fact, providing independent market quotes prior to that time."  (O'Connor Br. at 13-14 (emphasis in original).)  Actually, the more compelling inference, and the one supported by the facts in the Complaint, is that the entry into the OPEX Agreement simply served to expand and formalize practices in which Optionable had already been engaged during the time O'Connor served as Optionable's president.  In particular, the Complaint alleges that OPEX was "an effort to have Optionable sell BMO *additional* price quotations."  (Compl. ¶ 73 (emphasis added).)  When Optionable introduced OPEX, Cassidy stated that "[c]lients frequently asked us to provide actual market valuations" – thus confirming that such "actual market valuations" had previously been provided to clients like BMO – and that Optionable was "pleased to *formalize* this as a product."  (*Id.* ¶ 74 (emphasis added).)

---

[22] These allegations satisfy the particularity requirement, and it is not necessary for BMO to go further and identify the particular OPEX grids containing Lee-generated quotes that are alleged in paragraph 77 of the Complaint.  (*See* Optionable Br. at 11-12.)

**B.**      **The Complaint Alleges That Defendants Intended to Defraud BMO**

Fed. R. Civ. P. 9(b) provides that though a fraud claim must be pled with particularity, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Also, "because a plaintiff cannot be expected to plead a defendant's actual state of mind, the plaintiff is entitled to a 'strong inference' of fraud, if it (a) alleges facts to show that defendant had both motive and opportunity to commit fraud, or (b) alleges facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *U.S. Envtl. Inc.*, 82 F. Supp. 2d at 240-41 (internal citation and quotations omitted).

As discussed below, the Complaint sufficiently alleges both grounds, creating a strong inference of fraud. Furthermore, the two main prongs of defendants' attack against the sufficiency of BMO's scienter allegations have no merit. Defendants argue that BMO does not allege a concrete motive (*see* Optionable Br. at 13-14; Cassidy Br. at 15 n.16; O'Connor Br. at 10-11), ignoring allegations that Optionable received a substantial amount of fees directly due to its business with BMO, and that Nordlicht, Cassidy, and O'Connor saw BMO's business as key to their ability to sell part of their stock in Optionable to the NYMEX. Defendants also mistakenly invoke a heightened scienter pleading standard which is only applicable to fraud claims subject to the Private Securities Litigation Reform Act ("PSLRA"), not to the common law fraud claims brought here.

Aside from the obvious fact that defendants had to know that their sending price information to BMO's back office would be meaningless if it consisted simply of a copy of Lee's own quotes, the Complaint alleges that defendants (excluding Nordlicht) knew that BMO sought independent prices from them for the purpose of verifying the values in the natural gas options book. This is indicated by three examples of communications sent by BMO employees to

22

Optionable and MF Global employees regarding price quotation requests (Compl. ¶ 27), MF
Global's representation on the spreadsheets that it provided to BMO that its numbers reflected a
"Consensus . . . From Different Sources In The Market Place" (*id.* ¶ 44), and Optionable's use on
its e-mail to BMO of the term "Market Quotes" (*id.* ¶¶ 34-35).  Despite representing to BMO
that they would provide quotes from independent market sources, the Complaint alleges that
defendants instead schemed with Lee to provide quotes he generated himself that were more
favorable to him than the actual market quotes at the time.  (*Id.* ¶¶ 37, 53.)  As discussed in
further detail above, BMO specifically pleads that defendants actively engaged in the scheme,
communicating back and forth with Lee, and even soliciting quotes from him, before forwarding
his quotes to BMO under the guise of being independent prices.  (*Id.* ¶¶ 29-36, 46-51.)  In
addition, the Complaint alleges that the Optionable defendants made multiple representations to
BMO, both orally and in writing, that they had access to and could supply real-time quotes from
actual independent market sources through the OPEX service, but instead continued to provide
quotes generated by Lee that favored his positions.  (*Id.* ¶¶ 73-77.)  Collectively, these
allegations show strong evidence of conscious misbehavior or recklessness on the part of
defendants in their bold, continuous misrepresentation of the source of the quotes they were
providing to BMO.

　　　　　With respect to the Optionable defendants and Nordlicht, the Complaint also
satisfies the motive and opportunity alternative test for a "strong inference" of intent.  The
Complaint alleges that BMO paid millions of dollars in brokerage fees and commissions to
Optionable which it would not have paid had it known about the Optionable defendants'
misrepresentations.  (*Id.* ¶ 131.)  It also alleges that Optionable earned fees directly from BMO's
NYMEX transactions routed through NYMEX's Clearport trading platform.  (*Id.* ¶ 57.)  Where,

as here, the fees that allegedly motivated defendants to perpetrate the fraud are "unusually large," the desire to obtain fees provides sufficient motive.  *See Allied Irish Banks*, 2006 U.S. Dist. LEXIS 4270, at *19-20.

BMO further alleges that the Optionable defendants and Nordlicht had a strong incentive to continue with the fraud since BMO was Optionable's biggest client, and Optionable was attempting to portray itself as a successful, growing business so that Nordlicht, Cassidy, and O'Connor could sell their shares of Optionable's common stock to the NYMEX for a total of nearly $29 million (which they did on April 10, 2007).  (Compl. ¶¶ 56, 162.)  *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (suggesting motive could be alleged by pleading that "false statements were made in an effort to sell off shares held by management").[23]

Optionable and O'Connor incorrectly assert that in order to establish a strong inference of scienter, BMO was required to allege facts creating an inference of scienter that was "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent."  (*See* Optionable Br. at 12; O'Connor Br. at 19 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)).)  The Supreme Court established this heightened pleading requirement in *Tellabs*, however, *only* with respect to securities fraud claims subject to the PSLRA.  *See* 551 U.S. at 324 (holding that since "the PSLRA [was] installed to screen out frivolous suits," a complaint brought pursuant to the statute "will survive . . . only if a reasonable person would deem the inference of scienter cogent and at

---

[23] Accordingly, Cassidy's citation of *Karasyk v. Mark Commodities Corp.*, 770 F. Supp. 824 (S.D.N.Y. 1991) (Cassidy Br. at 15 n.16), is misplaced.  In *Karaszyk*, the court held that the desire to earn commissions, without more, does not constitute a motive for fraud.  *See* 770 F. Supp. at 831.  Here, however, the "more" is plainly alleged.

least as compelling as any opposing inference one could draw from the facts alleged"); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007) (noting PSLRA's heightened standards for pleading scienter). The PSLRA's scienter pleading provision applies only "[i]n any private action arising under this title," 15 U.S.C. § 78u-4(b)(2), and not to common law fraud actions. As this Court stated in *SEC v. Dunn*, 587 F. Supp. 2d 486 (S.D.N.Y. 2008), in declining to extend the PSLRA heightened pleading standard to an action that was not brought under the statute:

> [T]he *Tellabs* decision [does not] indicate any intention to announce a broader Rule 9(b) standard. . . . Instead, as the Supreme Court acknowledged in *Tellabs*, the PSLRA created a distinct, heightened pleading standard for private securities actions, separate and apart from the general requirements of Rule 9(b). . . . It was that distinct, heightened pleading standard that formed the subject matter of the *Tellabs* decision, not the broader Rule 9(b) standards.

*Id.* at 501-02 (citations omitted).[24] Because BMO is alleging a common law fraud claim, not a fraud claim pursuant to the PSLRA, the PSLRA's heightened scienter pleading standard is inapplicable. *See 380544 Can., Inc. v. Aspen Tech., Inc.*, 633 F. Supp. 2d 15, 29 (S.D.N.Y. 2009) (although persuasive, "*Tellabs* is not controlling" because "the instant case does not concern fraud under the PSLRA but rather common law fraud").

Even if the PSLRA's heightened pleading standard were applicable, BMO's allegations of defendants' scienter are "cogent and at least as compelling as any opposing inference of nonfraudulent intent," *Tellabs*, 551 U.S. at 314. The opposing inferences suggested by MF Global and Saab do not undermine the strong inference of scienter established by BMO's allegations.

---

[24] In a recent decision holding that the PSLRA's heightened pleading standard for establishing a strong inference of fraud does not apply to actions brought by the SEC, this Court noted: "This area of the law has become somewhat muddled, due largely to the fact that the PSLRA uses the Second Circuit's 'strong inference' language but requires a different showing." *SEC v. Pentagon Capital Mgmt. PLC*, 612 F. Supp. 2d 241, 263 (S.D.N.Y. 2009).

First, MF Global and Saab assert that the representations on MF Global's quote spreadsheets did not necessarily indicate scienter because the supposed indications provided could have been arrived at by Saab in a "variety of ways" and that BMO does not "allege that there was any industry standard for arriving at an indication."  (*See* MF Global/Saab Br. at 28.) As discussed in further detail in Part II(A) *supra*, however, the Complaint pleads the instances of price quotation fraud perpetrated by MF Global and Saab with sufficient particularity to allege that their prices were derived from Lee, and no other sources or methods.  In each of the 12 instances pled, MF Global and Saab passed on to BMO as independent quotes the same or virtually the same quotes they had just received from Lee, often within minutes of receipt of Lee's quotes.  (*See* Compl. ¶¶ 46-51.)  MF Global and Saab's consistent pattern of providing to BMO quotes identical or virtually identical to those contained in instant messages from Lee that they received shortly beforehand, creates a strong inference that MF Global and Saab just passed on Lee-generated quotes rather than employing other methods for formulating market price indications.

Second, MF Global and Saab argue that since BMO's back office never asked MF Global or Saab to exclude Lee from the assessment of market consensus, Lee's involvement did not necessarily indicate scienter on their part.  (*See* MF Global/Saab Br. at 28.)  The Complaint alleges, however, that MF Global and Saab knew that BMO specifically sought independent market quotes for the IPV process in order to verify Lee's valuation of the natural gas options book.  (Compl. ¶¶ 24-27, 120-124.)  The objective of the IPV process – to check the accuracy of

Lee's pricing – would necessarily be defeated if Lee's valuations were verified using prices generated by Lee himself.[25]

## C.     The Complaint Alleges That BMO Reasonably Relied Upon Defendants' Misrepresentations

BMO clearly alleges that it reasonably relied upon defendants' misrepresentations regarding their purportedly independent price quotations and their prominence in the natural gas market.  Furthermore, defendants' arguments that BMO's reliance on these misrepresentations was not reasonable are not ripe for consideration on a motion to dismiss since "[q]uestions of the reasonableness of reliance raise issues of fact that must be resolved at trial."  *MTV Networks v. Curry,* 867 F. Supp. 202, 207 (S.D.N.Y. 1994).[26]

The Complaint alleges that BMO relied on the supposedly independent price quotations provided by Optionable and MF Global to conduct the IPV process for the natural gas options book, and that defendants were aware of this.  (Compl. ¶¶ 24-27, 124.)  It specifically alleges that BMO employees relied on the Optionable and MF Global quotations in the course of the IPV process by incorporating them into spreadsheets in which they compared those quotations to the prices Lee had previously recorded in BMO's records.  (*Id.* ¶¶ 30, 52.)  The Complaint alleges that BMO reasonably relied on defendants' misrepresentations regarding the source of their quotations, because (1) the Optionable defendants portrayed Optionable as a

---

[25] Optionable claims that "[t]he Complaint does not even allege that Optionable knew BMO thought it was getting independent information from Optionable," because "BMO only asserts that Optionable was 'aware that BMO relied on these price quotations to conduct the IPV process.'"  (Optionable Br. at 7 (citation omitted).)  But the "I" in "IPV" stood for "Independent."  (Compl. ¶ 24.)

[26] Optionable admits that the question of the justifiability of BMO's reliance is "a matter of fact."  (Optionable Br. at 15.)

major player in the derivatives market with access to actual market quotes from multiple sources; and (2) MF Global had an established reputation in the market.  (*Id.* ¶¶ 72-76, 128.)

Cassidy and O'Connor erroneously argue that BMO's assertion of reasonable reliance is undermined by its retrospective reference to "prices quoted by other market participants at the time" of the fraud in its discussion of how Lee's prices were off market.  (*See id.* ¶¶ 38-40).  They claim that BMO could have used these other prices *at that time* to verify the natural gas options book and should not have relied solely on the quotes supplied by Optionable. (*See* O'Connor Br. at 14 n.5; Cassidy Br. at 6, 8).  The Complaint, however, does *not* allege that these prices from other market participants were available to and accessible by BMO at the time of the fraud; they were not available to and accessible by BMO until after the fact, so BMO could not have used them for the IPV process to uncover the fraud at the time it was occurring.

BMO's allegation that it continued to rely on Optionable's quotes after application of the Totem data in October 2006 revealed a large discrepancy between Lee's valuation of the book and the valuation using the Totem quotes (Compl. ¶ 71) also does not undermine its allegation of reasonable reliance.  BMO clearly does not allege that it just chose to ignore this discrepancy or that it made "a calculated business decision to rely upon the valuations provided by Lee that enabled BMO to obtain greater profits for seven more months."  (O'Connor Br. at 14; *see* Optionable Br. at 15; Cassidy Br. at 9; MF Global/Saab Br. at 33.)  Rather, the Complaint alleges that the Optionable defendants actively impeded BMO's efforts to further test the Totem data by assisting Moore and Lee with their campaign to discredit the reliability of the Totem data.  (Compl. ¶ 72.)  It alleges that the Optionable defendants convinced BMO to use their OPEX service instead of Totem's by misrepresenting that, unlike Totem, Optionable could

provide BMO with actual market prices.  (*Id.* ¶¶ 72-76.)  BMO alleges that, instead, Optionable just provided more Lee-generated quotes through the service.  (*Id.* ¶ 77.)

In any event, defendants' argument that BMO could have obtained data from Totem or another service and, as a result, determined the correct market prices, raises issues of fact that may not be considered on the motions to dismiss.  "In a fraud action, whether a party could have ascertained the facts with reasonable diligence so as to negate justifiable reliance is a factual question." *Country World, Inc. v. Imperial Frozen Foods Co.*, 186 A.D.2d 781, 782, 589 N.Y.S.2d 81, 81 (2d Dep't 1992).

MF Global and Saab's argument that the Deloitte & Touche LLP ("D&T") report (Declaration of Therese M. Doherty, Dec. 7, 2009 ["Doherty Dec."] Ex. 4) provides proof that BMO did not reasonably rely on the quotes provided by MF Global (MF Global/Saab Br. at 30-32) is also inappropriate for consideration on a motion to dismiss.  "On a motion to dismiss, the district court must limit itself to consideration of the facts alleged on the face of the complaint, and to any documents attached as exhibits or incorporated by reference." *Cosmas v. Hassatt*, 886 F.2d 8, 13 (2d Cir. 1989) (citation omitted) (district court erred in considering statements from a company annual report and SEC filing, which were not incorporated by reference in or attached as exhibits to the complaint, in its analysis of a motion to dismiss; mere discussion of a document does not constitute incorporation by reference).  Furthermore, in resolving a motion to dismiss, where "the parties have submitted material outside the pleadings, the Court must either exclude those materials from consideration, or convert the motion to one for summary judgment." *MTV Networks*, 867 F. Supp. at 203; *see also Goldman v. Belen*, 754 F.2d 1059, 1066 (2d Cir. 1985) (to extent court decides to consider matters outside the complaint, motion shall be treated as one for summary judgment and all parties given reasonable opportunity to

present all material made pertinent to such a motion by Rule 56).  Since the D&T report is not an

exhibit to the Complaint and is not incorporated by reference, it should be excluded by the Court

in its consideration of MF Global and Saab's motion to dismiss.[27]  It also should be excluded

because it is inadmissible hearsay.  *See* Fed. R. Evid. 802.

Even if the Court were to consider the D&T report, the fact that it states that

BMO's Market Risk department received data from seven sources for price verification of

options (Doherty Dec. Ex. 4, at 47-48) would not undermine BMO's allegation that it reasonably

relied on the quotes provided by MF Global and Optionable, as MF Global and Saab argue.  (MF

Global/Saab Br. at 30-32.)[28]  That BMO may have had access to seven data sources does not

mean that, after assessing the representations made by these sources regarding the extent of their

activity in the natural gas market, it was unreasonable for BMO to decide to rely on MF Global's

---

[27] MF Global and Saab cite no authority for the proposition that BMO's reference to the
SEC's suit in paragraph 115 of the Complaint "incorporated [the SEC's complaint] by reference"
(MF Global/Saab Br. at 6 n.2), much less that it permits the Court to consider documents, like
the D&T report, that are another step removed from the Complaint simply because they are
mentioned in the SEC complaint.  Nor is there any basis for their argument that simply because
"BMO possesses the D&T report" and allegedly used it to prepare its pleading (there is in fact no
reference to the report in the Complaint), the Court "may take judicial notice" of it.  (*Id.* at 10
n.4.)  Such an argument would allow any evidence in a party's files to be used in connection with
a motion to dismiss.

In addition to the D&T report, at a minimum the following materials submitted by
defendants are not properly considered in connection with a motion to dismiss, and thus should
be stricken from the record:  BMO's press releases and conference call transcripts (Doherty Aff.
Exs. 1-2, 5-6; Declaration of Lawrence R. Gelber, Dec. 7, 2009 ["Gelber Dec."], Ex. 2), BMO's
letter to the SEC dated Nov. 30, 2007 (Gelber Dec. Ex. 1), Cassidy's discussion of Amaranth
Advisors, LLC (Cassidy Br. at 12 n.11, 14), Cassidy's and O'Connor's assertions "upon
information and belief" (Cassidy Br. at 13 & n.12; O'Connor Br. at 20 n.6), and O'Connor's
assertion that the sale of his Optionable stock was not contemplated in 2005 (O'Connor Br. at
12).

[28] MF Global and Saab allege that the D&T report "emphatically demonstrates that BMO
did *not* rely upon information from MFG[lobal] in its IPV process" (MF Global/Saab Br. at 10)
(emphasis in original), but the seven brokers from which the report states BMO had access to
pricing information included MF Global.  (Doherty Ex. 4, at 48 (referring to MF Global by its
former name, "Manfinancial").)

quotes, due to both its established reputation in the market and its claim that it had ready access to independent quotes.  MF Global and Saab also argue that the statement in the D&T report that BMO "used a single broker, Optionable (OPEX, Orion) for marking the natural gas NYMEX look-alike options transactions to market" (Doherty Dec. Ex. 4, at 50) is fatal to BMO's claim that it actually relied on MF Global's quotes.  (MF Global/Saab Br. at 30-31.)  The D&T report, however, was issued on April 13, 2007 (Doherty Dec. Ex. 4, at 2), weeks before BMO completed even its initial investigation of the cause of its losses (*see* Compl. ¶¶ 96-109).  Since the D&T report does not take into account later findings regarding the full extent of the circular quote process and how those quotes were relied upon in the IPV process, its statement regarding the usage of Optionable's quotes for marking options at best raises an issue of fact that cannot be resolved on a motion to dismiss.

Defendants argue that BMO, as a sophisticated business party, should have accessed other sources of market quotes and not relied on Optionable's and MF Global's quotes, citing *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.*, 748 F.2d 729 (2d Cir. 1984) and *Granite Partners, L.P. v. Bear, Stearns & Co.,* 17 F. Supp. 2d 275 (S.D.N.Y. 1998).  (*See* Optionable Br. at 15-16; Cassidy Br. at 9 n.9; MF Global Saab Br. at 31.)  These cases are inapposite.  In *Grumman*, the court dismissed the plaintiff's fraud claim on a motion for summary judgment, not a motion to dismiss.  *See* 748 F.2d at 740.  Summary judgment was granted (in part) on the grounds that the record, developed after years of "extensive and intensive discovery," reflected that the alleged fraud, which took place during plaintiff's acquisition of defendant's subsidiary, could have been uncovered by plaintiff if it had simply requested and reviewed certain documents that were accessible in the course of due diligence.  *See id.* at 737-38, 740.  Here, discovery has not commenced, so the Court cannot assess the factual question

31

raised by defendants of whether BMO's reliance on defendants' misrepresentations was reasonable.

In *Granite*, the plaintiff investment fund entered into an agreement with an investment advisor pursuant to which the advisor agreed to make investments with due care by rigorously and continuously analyzing each proposed investment using a sophisticated, proprietary computer model. *See* 17 F. Supp. 2d at 283. The advisor did not perform the promised analysis of the securities he bought for the fund since he did not use, or even have, sophisticated computerized analytical techniques. *See id.* The fund sued its brokers, claiming that they knew of the advisor's inability to analyze the investments and took advantage of that fact by concealing the strongly "bullish" nature of the securities they were selling to the fund. *See id.* at 284. The court dismissed the fund's claim against the brokers, because it was the investment advisor, not the brokers, that specifically agreed to act as "sole advisor" to the fund and committed to conducting extensive due diligence of all investments. *See id.* at 290-91. Thus, the advisor's blind reliance on the brokers' valuations and recommendations was not reasonable. *See id.* at 291. The defendants here stand in the shoes of the investment advisor in *Granite*, not the broker defendants. The Complaint alleges that defendants agreed to provide independent data directly to BMO, not an intermediary. The Complaint also alleges that defendants represented to BMO itself that the data was based on actual market prices, knowing that BMO's Market Risk department relied specifically on their data to conduct the IPV process for Lee's book in order to monitor his trades and detect any losses. (Compl. ¶¶ 26-27.)

**D.     The Complaint Alleges That Defendants' Misrepresentations Proximately Caused BMO's Damages**

BMO alleges several categories of damages proximately caused by its reliance on defendants' intentional misrepresentations that they were supplying BMO with independent price

quotes and the Optionable defendants' intentional misrepresentations regarding the extent of Optionable's activity in the commodity derivatives market.

The Complaint alleges that BMO's use of Optionable and MF Global quotes generated by Lee, instead of independent market quotes, to verify Lee's book, enabled Lee to conceal losses from BMO's Market Risk department and make it appear he was making money for BMO.  (*Id.* ¶¶ 37, 53.)  BMO alleges it suffered trading losses that could have been prevented had it been given correct pricing information concerning its natural gas positions on a timely basis.  (*Id.* ¶ 129.)[29]  Because the quotes made Lee's book appear to be highly profitable, the Complaint alleges that BMO continued to employ Lee and Moore (who campaigned for the continued usage of Optionable due to incentives they received from the Optionable defendants) and pay them millions of dollars in bonuses and other compensation.  (*Id.* ¶¶ 126, 130.)  BMO also alleges that the Optionable defendants' misrepresentation of Optionable's prominence in the natural gas market, and BMO's reliance on that misrepresentation, caused BMO to continue using Optionable's brokerage and market data services.  (*Id.* ¶ 127.)  The Complaint alleges that BMO paid Optionable and MF Global substantial brokerage fees and commissions that it would not have paid had it known of these entities' participation in the scheme with Lee and in particular their provision of fraudulent price quotes to BMO.  (*Id.* ¶¶ 131-32.)  It also alleges that due to criminal and regulatory investigations of the commodities loss resulting from defendants' misrepresentations, BMO has incurred legal fees and expenses in cooperating with such investigations.  (*Id.* ¶ 133.)

---

[29] MF Global and Saab incorrectly assert that they "are not alleged to have had any role in the very trading strategies that BMO admits caused its 'large losses'" (MF Global/Saab Br. at 7), ignoring the fact that the Complaint alleges that those strategies would have been stopped, and trading losses prevented, had MF Global and Saab not colluded with Lee to prevent correct pricing information from being given to BMO on a timely basis.  (Compl. ¶ 129.)

Optionable, MF Global, and Saab assert that the Complaint does not sufficiently plead that the EOO trades proximately caused harm to BMO.  (*See* Optionable Br. at 17-18; MF Global/Saab Br. at 37.)  This is incorrect.  BMO pleads that Lee, with the knowledge and substantial assistance of Optionable, Cassidy, O'Connor, and Nordlicht, manipulated the manner in which the EOO trades were entered into BMO's systems to make them falsely appear to result in immediate profits to BMO, when BMO was in fact paying a significant premium for the American-style options.  (Compl. ¶¶ 84-91.)  BMO alleges that it suffered damages resulting from the EOO trades because the large artificial profits disguised Lee's increasingly large unprofitable positions, preventing BMO from taking timely actions to mitigate the trading losses it was incurring in Lee's book.  (*Id.* ¶ 92.)[30]  The Complaint also alleges that the terms under which BMO entered into the EOO trades with the Nordlicht-affiliated counterparties were highly unfavorable to BMO.  (*Id.* ¶ 89.)

BMO's press release from April 27, 2007 – which, as noted earlier, may not be considered on these motions to dismiss because it is not an exhibit to the Complaint nor is it incorporated by reference – does not in any event contradict BMO's allegation that its losses were proximately caused by defendants' misrepresentations.  As stated in the release, BMO's positions in the natural gas market "were negatively impacted by changes in market conditions . . . [since] the market became increasingly illiquid and volatility dropped to historically low levels."  (Cassidy Br. at 5 (quoting press release).)  As alleged in the Complaint, however, Lee was able to conceal his losses during this period because Optionable and MF Global were providing quotes to BMO that he generated which were more favorable to his positions than the

---

[30] Contrary to MF Global and Saab's argument (MF Global/Saab Br. at 36-37), it certainly was foreseeable that their subversion of BMO's IPV process by rubber-stamping Lee's quotes could cause harm to BMO, given the critical role of that process in preventing loss.

34

actual market prices at the time.  (Compl. ¶¶ 37-40, 53-54.)[31]  As a result, the Complaint alleges

that BMO suffered trading losses that could have been prevented had BMO been given correct

pricing information concerning its natural gas positions on a timely basis.  (Compl. ¶ 129.)

        This is not "a self-serving conclusion," as O'Connor asserts.  (O'Connor Br. at

15.)  Though BMO may not have been able to avoid some of the losses it incurred as a result of

increased illiquidity in the natural gas market, timely access to independent pricing would have

alerted BMO to price movements so it could have taken steps to hedge against risks it would

have then realized were in its portfolio.  The Market Risk department would have exercised

tighter controls over Lee's trading activity, preventing him from entering into risky, loss-

producing trades, instead of allowing him to increase the size of his book based on the

appearance of profitability created by the inflated, Lee-generated quotes provided to BMO by

Optionable and MF Global.  As a result of defendants' misrepresentations, BMO was unaware of

the losses it was incurring due to the increasing volatility in the natural gas market and, thus,

could not counteract or prevent them.

        Optionable's reliance on *Friedman v. Anderson*, 23 A.D.3d 163, 803 N.Y.S.2d

514 (1st Dep't 2005), and *Laub v. Faessel*, 297 A.D.2d 28, 745 N.Y.S.2d 534 (1st Dep't 2002),

in support of its argument that BMO cannot adequately allege that Optionable's statements

proximately caused the losses in Lee's book (Optionable Br. at 17) is misplaced.  In both cases,

the court dismissed fraud claims where plaintiffs had alleged that defendants had misrepresented

the expertise of and their relationship with certain investment advisors.  Plaintiffs alleged that

these misrepresentations caused them to retain and rely on the advice of the recommended

---

[31] Contrary to Optionable's assertions (Optionable Br. at 17), the Complaint does allege in
detail "why Lee's trades turned out to lose money."  (*See* Compl. ¶¶ 37-40, 53-54, 126.)

investment advisors, resulting in trading losses.  The *Friedman* and *Laub* courts held that plaintiffs could not adequately allege loss causation because there was not enough of a nexus between defendants' recommendations and plaintiffs' later trading losses to allege that the misrepresentation was the direct and proximate cause of the losses.  *See Friedman,* 23 A.D.3d at 166-67, 803 N.Y.S.2d at 517-18; *Laub*, 297 A.D.2d at 29, 31-32, 745 N.Y.S.2d at 535-37.

        The Complaint, however, does allege a direct causal link between Optionable's misrepresentation and BMO's resulting damages.  Since Optionable falsely represented that it was supplying BMO with independent pricing, BMO relied on Optionable's data, along with MF Global's, to monitor Lee's book and assess the riskiness of his trades.  (Compl. ¶¶ 26-27, 29-36, 74-76.)  Because Optionable and MF Global were actually providing inflated quotes generated by Lee, the natural gas options book incurred massive losses without detection by BMO.  (*Id.* ¶¶ 37-41.)  Unaware of these building losses due to Optionable's and MF Global's continued provision of Lee-generated quotes, BMO had no opportunity to mitigate these losses by hedging against the risks in Lee's book or curbing his trading activity.  Unlike in *Friedman* and *Laub*, defendants' misrepresentations here are inextricably entwined with the losses incurred by BMO in Lee's book.

        MF Global and Saab's attempt to distinguish the Second Circuit's decision on loss causation in *Pension Committee* (*see* MF Global/Saab Br. at 37 n.13) is unavailing – to the contrary, that case is directly on point here.  In *Pension Committee*, the Second Circuit reversed the dismissal of hedge fund investors' aiding and abetting claims against a prime broker.  The court held that the investors' complaint sufficiently pleaded proximate cause because it alleged facts showing that the prime broker had knowingly incorporated the fund manager's false valuations of the funds' securities into documents bearing the broker's own name with actual

knowledge that those documents would be relied upon by the funds' auditor and administrator in preparing the funds' audited financial statements and reports, upon which investors would in turn rely.  *See* 568 F.3d at 381-82.  Likewise, BMO's Complaint here alleges facts showing that the defendants knowingly incorporated Lee's false valuations into documents bearing Optionable's and MF Global's names, with actual knowledge that those documents were being given directly to BMO, which would rely on them in the IPV process.  Indeed, the defendants here are significantly closer to BMO than the prime broker was to the plaintiffs in *Pension Committee*, who never communicated with the prime broker at all.

MF Global and Saab argue that causation is lacking because "when in 2006, BMO was confronted with the fact that Lee overvalued his trading book, BMO admits it did nothing." (MF Global/Saab Br. at 36 (citing Compl. ¶¶ 71, 96, 98, 100-03; emphasis in original).)  This is a gross distortion of the Complaint.  First, paragraph 71 of the Complaint does not allege that in 2006 BMO discovered that Lee had "overvalued his trading book," but that BMO's initial use of Totem data " revealed a large discrepancy between Lee's valuation of the natural gas options book, and the valuation using the Totem quotes."  (Compl. ¶ 71.)  The Complaint goes on to allege that "[i]n response to the discrepancy . . . , Moore and Lee – assisted by Cassidy and Optionable – waged a campaign from October 2006 to May 2007 to discredit the reliability of the Totem data" by arguing that Totem's "survey" of prices was inferior to the supposed actual market prices provided by Optionable (and by extension, MF Global).  (*Id.* ¶ 72.)

The other paragraphs MF Global and Saab cite allege that notwithstanding defendants' efforts, "after further review, BMO decided to use price quotes from Totem and other multicontributor platforms . . . in the IPV process," "brought several executives and traders to New York from Toronto and Chicago to examine the Commodity Group's books and

supervise trading," put Lee and Moore on leave of absence, and ceased doing business with

Optionable.  (*Id.* ¶¶ 96, 100, 102-03.)  This is hardly "doing nothing," and clearly does not

support MF Global and Saab's argument that had they provided independent quotes rather than

colluding with Lee, BMO would have suffered the same losses it did.  Here, the issue of

proximate cause is "ultimately a fact issue to be resolved after fuller development of the record."

*See JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 257 (S.D.N.Y. 2005).[32]

### E.      BMO's Fraud Claim Is Not Duplicative of Its Breach of Contract Claim

BMO's fraud claim is not duplicative of its breach of contract claim with respect

to the OPEX Agreement.  A claim of fraud can be maintained at the same time as a breach of

contract claim where the plaintiff has "'demonstrate[d] a fraudulent misrepresentation collateral

or extraneous to the contract.'"  *VTech Holdings Ltd. v. Lucent Tech. Inc.*, 172 F. Supp. 2d 435,

440 (S.D.N.Y. 2001) (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98

F.3d 13, 20 (2d Cir. 1996)).  "Therefore, to ensure its independence from the breach of contract

claim, a properly pled fraudulent inducement claim should be based upon a misrepresentation of

present fact that, though collateral to the contract, served as the inducement for the contract."

---

[32] Defendants also argue that they should be relieved of all liability, because BMO's losses were caused by the purported failure or inadequacy of its own internal controls, which constitutes an "intervening" cause.  (Optionable Br. at 14-15; MF Global/Saab Br. at 37.)  There is nothing in the Complaint to support these arguments, which therefore are irrelevant.  Further, the fact that multiple causes might have contributed to a plaintiff's harm does not preclude recovery against a particular defendant, so long as that defendant can be shown to have been a "substantial factor" in causing the plaintiff's losses.  *See In re Livent, Inc. Sec. Litig.*, 148 F. Supp. 2d 331, 366 (S.D.N.Y. 2001) (rejecting argument that causation not alleged because plaintiffs' losses caused by other defendants' fraudulent conduct).  Moreover, New York law is clear that the standard for intervening cause dismissal is extremely high:  an actor's conduct does not sever the chain of causation and cut off all other actors' liability unless it is so extraordinary that it is not foreseeable in the normal course of events.  *See Fraternity Fund*, 479 F. Supp. 2d at 372-73 ("by rubber stamping and submitting phony marks to E&Y, BAS made it possible for Beacon Hill to overstate NAVs without E&Y detecting the misstatements and revealing them to plaintiffs"); *First Fed. Sav. & Loan Ass'n v. Oppenheim, Appel, Dixon & Co.*, 629 F. Supp. 427, 437 (S.D.N.Y. 1986).  None of the defendants even attempts to satisfy this demanding standard.

*Sultan v. Read*, No. 03 Civ. 7462 (PKL), 2005 U.S. Dist. LEXIS 3133, at *10-11 (S.D.N.Y. Mar. 1, 2005).  With respect to OPEX, the Optionable defendants misrepresented – outside the contract – that the OPEX quotes were "real-time market valuations" obtained from "different market makers, Banks, Brokerage houses, Energy trading companies, Hedge funds, etc." (Compl. ¶¶ 74-75.)  The Complaint alleges that these particular misrepresentations about Optionable's prominence in the market induced BMO to continue to rely on Optionable for pricing information (*id.* ¶ 127), distinguishing BMO's fraud claim from its breach of contract claim.

In any event, even if there were an overlap between BMO's fraud claim and contract claim, the overlap would apply only to those quotes provided by Optionable on or after February 23, 2007, when the OPEX Agreement was signed (*id.* ¶ 76), and not to any of the quotes provided to Optionable prior to that date, or to any quotes provided by MF Global, and thus would not apply to any the quotes listed in the tables in paragraphs 36 and 51 of the Complaint.

**F.     The *In Pari Delicto* Defense Does Not Bar BMO's Claims**

The defense of *in pari delicto* – which literally means "in equal fault" – is based on the doctrine that a plaintiff should not be allowed to recover from third parties for losses resulting from its own wrongdoing.  *See Pinter v. Dahl,* 486 U.S. 622, 672 (1988).  To establish the *in pari delicto* defense on a motion to dismiss, a defendant must show that the complaint alone – giving the plaintiff the benefit of all reasonable inferences – establishes that (a) the plaintiff was an active, voluntary participant in the fraud; and (b) the plaintiff's wrongdoing is at least substantially equal to that of the defendant.  *See Baena v. Woori Bank*, No. 05 Civ. 7018

(PKC), 2006 U.S. Dist. LEXIS 74549, at *9 (S.D.N.Y. Oct. 11, 2006); *Allied Irish Banks*, 2006

U.S. Dist. LEXIS 4270 at *29-30; *see also Pinter,* 486 U.S. at 635-36.

    Where the plaintiff is a corporation, however, the defense depends on the

applicability of the general – but by no means immutable – principle of agency law that an

employee's conduct may be imputed to its employer.  *See, e.g., Buckley v. Deloitte & Touche*

*USA LLP,* No. 06 Civ. 3291 (SHS), 2007 U.S. Dist. LEXIS 37107, at *15-16 (S.D.N.Y. May 22,

2007).  Two important exceptions exist to this principle.  One is that where the particular

employee that engaged in wrongdoing is not a member of the company's decision-making

management, it cannot be presumed that the company's management was aware of the

wrongdoing or that it constitutes the corporation's deliberate act.  *See Hunter v. Allis-Chalmers*

*Corp.,* 797 F.2d 1417, 1422 (7th Cir. 1986) ("Since the acts of a corporation are acts of human

beings, to say that the 'corporation' has committed some wrong (rather than just that it is liable

under the doctrine of respondeat superior for an employee's wrong) simply means that someone

at the decision-making level in the corporate hierarchy has committed the wrong; the deliberate

act of such a person is the corporation's deliberate act.").

    In addition, where an unfaithful employee, regardless of level, has abandoned the

employer's interests in favor of committing a fraud for the employee's own benefit, the

employee is considered to have committed the fraud outside the scope of his agency, and his

conduct is not imputed to the employer – an exception to *in pari delicto* known as the "adverse

interest" exception.  *See Baena*, 2006 U.S. Dist. LEXIS 74549, at *9-11; *Allied Irish Banks,*

2006 U.S. Dist. LEXIS 4270, at *30; *see also In re Maxwell Newspapers*, 164 B.R. 858, 869

(Bankr. S.D.N.Y. 1994) (applying adverse interest exception because "[t]he fraud which the

Maxwells committed was one against Maxwell Newspapers, not on its behalf") (citing cases).

Where a plaintiff's complaint raises a question as to whose interests its unfaithful employee was serving, the plaintiff's claims should not be dismissed on *in pari delicto* grounds, because the imputation that is the foundation of the defense cannot be said to have been established as a matter of law.  *See Buckley,* 2007 U.S. Dist. LEXIS 37107, at *19 (application of *in pari delicto* defense precluded by complaint's allegations suggesting that plaintiff's "insiders benefited themselves at the expense of the corporation and its shareholders"); *In re Parmalat Sec. Litig.*, No. 04 MD 1653 (LAK), 2007 U.S. Dist. LEXIS 19293, at *3-4 (S.D.N.Y. Feb. 21, 2007) (rejecting *in pari delicto* argument at pleading stage on grounds that knowledge of plaintiff's directors could not be imputed to plaintiff as a matter of law because "[t]he complaint … may be read as alleging that these insiders were serving the interests of [the plaintiff's parent] or themselves and most assuredly not the interests of [plaintiff]"); *see also Marine Midland Bank v. John E. Russo Produce Co.*, 50 N.Y.2d 31, 43-44, 427 N.Y.S.2d 961, 968 (1980) (declining to impute scienter of bookkeeper to defendant company as a matter of law where corporate relationships raised fact question whether company's management knew of bookkeeper's check-kiting).

*Allied Irish Banks* is directly on point and demonstrates that the *in pari delicto* defense does not apply in a "rogue trader" case such as this, where a non-management employee has engaged in fraud *against* the plaintiff company, not on its behalf.  In that case, Allied Irish Banks ("AIB") sued Bank of America and Citibank for fraudulent concealment, aiding and abetting fraud and breach of fiduciary duty, rescission, money had and received, and unjust enrichment.  AIB sought to recover its losses resulting from the conduct of John Rusnak, a rogue foreign exchange trader employed by AIB's subsidiary, Allfirst.  *See* 2006 U.S. Dist. LEXIS 4270, at *1.  The defendants were alleged to have engaged in various acts that hid the risks of

41

and losses from Rusnak's trading and subverted Allfirst's internal controls.  Most relevant to the

case at bar, these acts included providing Allfirst with reports that Rusnak had manipulated to

disguise his losses, and engaging in trades with no economic purpose but to camouflage

Rusnak's losses.  *See id.* at *5-11.  The defendants moved to dismiss AIB's complaint on many

of the same grounds as defendants have here, including *in pari delicto*.

       The court rejected defendants' *in pari delicto* argument.  First, the court noted that

the defense only bars "a claim by a plaintiff who is an 'active, voluntary participant in the

unlawful activity that is the subject of the suit.'"  *See id.* at *29 (quoting *Pinter*).  The court

found that Allfirst did not fraudulently conceal information from itself, and therefore could not

have been an "active, voluntary participant" in Rusnak's concealment of such information from

Allfirst.  *See id.* at *30.  The court also held that "Rusnak's conduct is not imputed to Allfirst for

purposes of the *in pari delicto* defense" because the adverse interest exception to the *in pari*

*delicto* defense applied to the rogue trader.  *See id.*

       In this case, BMO stands in precisely the same position as AIB and Allfirst.  Just

as AIB and Allfirst alleged that they had been harmed by Allfirst's rogue trader Rusnak, BMO's

Complaint here alleges that it was harmed by the misconduct of its employees Lee and Moore.

(*See, e.g.*, Compl. ¶¶ 1, 81-82, 95, 98.)[33]  Moreover, there are strong similarities between the

---

[33] MF Global argues that it is somehow inconsistent for BMO to argue that the conduct of
Lee and Moore should not be imputed to it while seeking to hold MF Global liable as Saab's
employer.  (*See* MF Global/Saab Br. at 14 n.6.)  There is no inconsistency.  First, as the *Hunter*
court noted, there is a difference between saying that "the 'corporation' has committed some
wrong" for purposes of *in pari delicto* and saying that the corporation vicariously "is liable under
the doctrine of respondeat superior for an employee's wrong."  797 F.2d at 1422.  Second,
nothing in the Complaint suggests that Saab was acting with anything other than MF Global's
full knowledge and authority – indeed, MF Global's continuing support for Saab in this action,
including its filing of a joint brief with him, makes clear that it stands behind his conduct and can
fairly be held liable for it.  Third, unlike BMO, which did not benefit from Lee's and Moore's
conduct but suffered immediate harm in the form of an overly risky portfolio and money-losing

types of misconduct alleged in *Allied Irish Banks* and those alleged here.  For example, Rusnak was alleged to have asked Bank of America and Citibank to provide him – and Allfirst – with reports and information that "misrepresent[ed] the risks and results of Rusnak's trading."  *See* 2006 U.S. Dist. LEXIS 4270, at *7-8.  Here, both the Optionable defendants and the MF Global defendants are alleged to have provided BMO with information – at the request of Lee – that misrepresented to BMO the risks and results of Lee's trading.  (*See, e.g.*, Compl. ¶¶ 37-40, 53-54.)  Also, in *Allied Irish Banks*, defendants were alleged to have subverted Allfirst's internal controls by engaging in options transactions with Allfirst to "manage [Rusnak's] losses and credit exposure" and that "had no purpose but to camouflage Rusnak's spiraling losses."  *See* 2006 U.S. Dist. LEXIS 4270, at *10.  Here, the Optionable defendants, along with Nordlicht, are alleged to have introduced Lee to the concept of EOO transactions, which subverted BMO's internal controls and masked massive losses in Lee's trading book.  (*See, e.g.*, Compl. ¶¶ 82-95.)  And, just as Allfirst could not be said to have fraudulently concealed Rusnak's conduct from itself, BMO cannot be said to have concealed Lee's and Moore's misconduct from itself.  Thus, like AIB and Allfirst, BMO cannot be described as having been an "active, voluntary participant" in the conduct of Lee and Moore.[34]

---

EOO trades, MF Global actually benefited from the commissions Saab's collusive conduct brought in.

[34] MF Global and Saab argue that BMO itself engaged in fraud, citing an allegation to that effect in the SEC's civil complaint against Lee, Cassidy, O'Connor, and Connor.  (*See* MF Global/Saab Br. at 15.)  But BMO is not a defendant in that suit.  The SEC's allegation is just that – an allegation – and BMO vigorously disputes that Lee's and Moore's scienter can be imputed to BMO.  Moreover, this argument conflates two separate and distinct alleged frauds, only one of which is at issue in the Complaint here.  BMO's Complaint seeks to recover BMO's own losses due to defendants' conduct.  By contrast, the SEC's allegation concerns BMO's representations in its financial statements, which are not at issue in this case.  That is, BMO does not allege that defendants caused BMO to misstate its financials, but rather to sustain out-of-pocket losses in its natural gas trading portfolio.  *See Nomura Sec. Int'l v. E*Trade Sec., Inc.*,

The authorities cited by defendants do not justify application of the *in pari delicto* defense on this motion.  In particular, none of those cases involves the relatively rare combination of facts here, where the wrongdoing sought to be imputed to a plaintiff is that of a rogue, non-managerial employee (rather than upper management or directors) and that employee commits such fraud against – as opposed to on behalf of – the plaintiff.  *See Pinter*, 486 U.S. at 625-28 (claims between individuals for their personal wrongdoing); *Breeden v. Kirkpatrick & Lockhart LLP*, 336 F.3d 94, 97-98 (2d Cir. 2003) (claims regarding Ponzi scheme which defrauded outside investors and had been carried out by closely held corporation's sole shareholders, officers, and directors); *In re Parmalat Sec. Litig.*, No. 04 MD 1653 (LAK), 2009 U.S. Dist. LEXIS 85523, at *26-37 (S.D.N.Y. Sept. 18, 2009) (claims regarding fraudulent scheme carried out by "Parmalat and PCFL officers" through "ordinary functions of management" and "in furtherance of the company's interests," and noting that "[t]he presumption that PCFL corporate insiders would have passed on to their principal information concerning the transactions described in either of the PCFL complaints is perfectly sensible here"); *Granite*, 17 F. Supp. 2d at 308-10 (claim for inducing breach of fiduciary duty by manager and management company that were sole decision makers and portfolio managers of hedge fund); *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784, 497 N.Y.S.2d 898, 900 (1985) (claim seeking to impute knowledge of corporation's attorney and director to corporation; no factual allegations that he was conflicted or trying to defraud the corporation); *Symbol Tech., Inc. v. Deloitte & Touche, LLP,* No. 33150/06, 2009 N.Y. App. Div. LEXIS 7689, at *2 (2d

---

280 F. Supp. 2d 184, 201 (S.D.N.Y. 2003) (denying E*Trade's motion to dismiss on *in pari delicto* grounds, because Nomura was not suing E*Trade for stock manipulation in which Nomura allegedly was implicated).

Dep't 2009) (claims regarding fraud by senior management that inflated corporate revenues and earnings).[35]

Indeed, in a number of the cases cited by MF Global and Saab (*see* MF Global/Saab Br. at 13), the court declined to apply the *in pari delicto* defense where the complaint "allege[d] that the insiders 'orchestrated massive frauds on [the plaintiff] itself.'" *See In re Parmalat Sec. Litig.*, 421 F. Supp. 2d 703, 714 (S.D.N.Y. 2006); *accord In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 587, 598-99 (S.D.N.Y. 2005) (applying North Carolina law and holding *in pari delicto* defense applicable where transactions were intended to benefit Parmalat, but not applicable where they were intended to loot the company); *see also Wight v. Bankamerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000) (adverse interest exception to *in pari delicto* defense applied where complaint alleged that BCCI's corrupt management acted in their own interests and not in the interests of the company); *Christopher S. v. Douglaston Club*, 275 A.D.2d 768, 769, 713 N.Y.S.2d 542, 543 (2d Dep't 2000) (declining to apply general rule of

---

[35] MF Global and Saab cite *Kirschner v. Grant Thornton LLP*, No. 07 Civ. 11604 (GEL), 2009 U.S. Dist. LEXIS 32581 (S.D.N.Y. Apr. 14, 2009), but the import of the decision is unclear since it was appealed to the Second Circuit, which, in turn, certified many of the questions presented to the New York Court of Appeals. *See Kirschner v. KPMG LLP*, 590 F.3d 186 (2d Cir. 2009). MF Global and Saab also cite *AIG, Inc. v. Greenberg*, 976 A.2d 872 (Del. Ch. 2009), but that case, which involved claims against insiders of the plaintiff, not third parties, is factually inapposite and in any event involved the application of Delaware law. *See id.* at 887-88.

Cases cited by Cassidy (*see* Cassidy Br. at 18 n.20) also are inapplicable. *McKenna v. Wright*, 386 F.3d 432 (2d Cir. 2004), addressed the defense of qualified immunity and says nothing at all about *in pari delicto*. Neither does *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160 (2d Cir. 1989), which addresses a statute of limitations defense. *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,* 322 F.3d 147 (2d Cir. 2003), involved the application of Texas law, not New York law. *See* 322 F.3d at 165 (noting divergence between Second Circuit and Fifth Circuit on certain points). In any event, the alleged insider wrongdoers at Color Tile were its board and controlling shareholders. *See id.* at 163-64.

imputation where relevant information not acquired in scope of official duties and never

disclosed to corporation).[36]

       In sum, based on the allegations of the Complaint, there is no basis to apply the *in*

*pari delicto* defense, especially in the context of a motion to dismiss.

### III.

### THE COMPLAINT ADEQUATELY ALLEGES A
### CLAIM FOR NEGLIGENT MISREPRESENTATION

       For BMO to state a claim for negligent misrepresentation under New York law,

the Complaint must plead "(1) the existence of a special or privity-like relationship imposing a

duty on the defendant to impart correct information to the plaintiff; (2) that the information was

incorrect; and (3) reasonable reliance on the information."  *J.A.O. Acquisition Corp. v. Stavitsky*,

8 N.Y.3d 144, 148, 863 N.E.2d 585, 587 (2007).  "'Negligent misrepresentation involves most of

the same elements as fraud, with a negligence standard substituted for the scienter requirement.'"

*Meisel v. Grunberg*, 651 F. Supp. 2d 98, 123 (S.D.N.Y. 2009); *accord Fromer v. Yogal*, 50 F.

Supp. 2d 227, 243 (S.D.N.Y. 1999).  Because BMO's "allegations in support of its negligent

misrepresentation claim are based on the same set of facts upon which [its] fraud claim is

grounded, that claim must be pleaded with particularity pursuant to [Fed. R. Civ. P.] 9(b)."

---

[36] Optionable, MF Global, and Saab all argue that BMO knew that Lee's numbers were wrong in 2005 and/or 2006. (Optionable Br. at 22-23; MF Global/Saab Br. at 15.)  The Complaint cannot fairly be read to allege such knowledge.  Rather, the Complaint alleges that at various points in 2006, when BMO questioned or sought to verify Lee's valuations, Lee and Moore actively blocked those inquiries (*see* Compl. ¶¶ 63-77, 80), thus preventing BMO from gaining the very information defendants claim it had, and Moore failed to prevent Lee from entering into many of the trades that ultimately damaged BMO.  (*See id.* ¶¶ 93-95.)  Indeed, even when Lee was forced to re-mark his book in April 2007, he still materially misvalued it.  (*See id.* ¶ 97.)  Not until after Lee and Moore were physically displaced from their jobs, and a separate team installed to take over their book, did BMO discover what they had done and – most importantly here – defendants' extensive role in Lee's and Moore's wrongdoing.  (*See id.* ¶¶ 99-101.)

*Meisel*, 651 F. Supp. 2d at 108.  As discussed above with respect to its fraud claim, and for the following reasons, the Complaint adequately alleges a claim for negligent misrepresentation with sufficient particularity to comply with Rule 9(b).

**A.      The Complaint Alleges That Defendants Had a Special Relationship with BMO**

In *Kimmell v. Schaefer*, 89 N.Y.2d 257, 675 N.E.2d 450 (1996), the New York Court of Appeals held that whether a special relationship exists between two parties is an issue of fact, to be governed by weighing three factors: (1) "whether the person making the representation held or appeared to hold unique or special expertise"; (2) "whether a special relationship of trust or confidence" existed between the parties; and (3) "whether the speaker was aware of the use to which the information would be put and supplied it for that purpose."  *Id.* at 264, 675 N.E.2d at 454 (duty of care adequately pleaded by investors in a corporation's project who relied on defendant corporation officer's misrepresentations regarding the project's rate of return).[37]  The *Kimmell* court further held that "[i]n the commercial context, a duty to speak with care exists when 'the relationship of the parties, arising out of contract or otherwise, [is] such that in morals and good conscience the one has the right to rely upon the other for information.'"  *Id* at 263, 675 N.E.2d at 454 (quoting *Int'l Prods. Co. v. Erie R.R.*, 244 N.Y. 331, 338, 155 N.E. 662, 664 (1927)).

---

[37] In support of their claim that a special relationship did not exist between BMO and defendants, O'Connor and Optionable cite *Banque Arabe et Internationale D'Investissement v. Maryland National Bank*, 57 F.3d 146, 158 (2d Cir. 1995) (*see* O'Connor Br. at 26; Optionable Br. at 19).  However, *Banque Arabe* was decided before *Kimmell*, and "is therefore of limited precedential value on this issue of state law" regarding whether a special relationship exists between two parties.  *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 102-04 (2d Cir. 2001) (applying *Kimmell* factors to determine that a special relationship existed between plaintiff investors in an enterprise and defendant stakeholders in enterprise who persuaded plaintiffs to invest).

The Complaint alleges all three of the *Kimmell* factors, sufficiently pleading a special relationship between BMO and defendants.  BMO pleads the first *Kimmell* factor by alleging that (1) Optionable portrayed itself as a legitimate broker and claimed that Optionable and its officers and employees were major players in the commodity derivatives market; and that (2) MF Global had an established reputation in the market.  (Compl. ¶¶ 74-76, 145-46.)  BMO pleads the second *Kimmell* factor by alleging that BMO relied on defendants' price quotes to value the natural gas options book, as defendants were aware (*id.* ¶¶ 24, 26-27), and decided not to implement the Totem data in the IPV process, even after it revealed a discrepancy in Lee's valuation versus Totem's, due to Optionable and Cassidy's repeated assurances that they had access to independent market quotes from various sources (*id.* ¶¶ 71-77).  BMO pleads the third *Kimmell* factor by alleging that defendants knew that BMO used defendants' purportedly independent quotes to verify Lee's valuation of the natural gas options book and supplied the quotes for that purpose (*id.* ¶¶ 27, 142).

Cassidy, O'Connor, Optionable, MF Global, and Saab argue that, as BMO's brokers, they did not have a duty to BMO beyond executing trades with reasonable care.  (*See* Cassidy Br. at 16; O'Connor Br. at 17; Optionable Br. at 19; MF Global/Saab Br. at 38-40.)  The Second Circuit has held, however, that "a broker, as agent, has a duty to use reasonable efforts to give its principal information relevant to *the affairs that have been entrusted to it*."  *Conway v. Icahn & Co.*, 16 F.3d 504, 510 (2d Cir. 1994) (emphasis added); *accord De Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1305 (2d Cir. 2002) (citing *Conway*).  In other words, a broker's duty to its client is not limited to executing trades with reasonable care, but also includes performing any task "entrusted to it" with reasonable care.

The cases cited by defendants comport with this principle and do not support defendants' argument that the extent of a broker's duty to its customer is artificially fixed.  *See De Kwiatkowski*, 306 F.3d at 1305-09 (traders did not sufficiently plead a special relationship with broker they alleged failed to provide proper advice and warnings, since broker never specifically undertook an advisory role); *Noz v. Value Investing Partners, Inc.*, No. 98 Civ. 6977 (RO), 1999 U.S. Dist. LEXIS 8836, at *5-7 (S.D.N.Y. June 11, 1999) (no special relationship alleged where plaintiff investors specifically agreed to rely only on the advice of their own advisors and counsel); *DeBlasio v. Merrill Lynch & Co.*, No. 07 Civ. 318 (RJS), 2009 U.S. Dist LEXIS 64848, at *102-05 (S.D.N.Y. July 27, 2009) (no special relationship alleged where broker did not specifically undertake to monitor accounts for plaintiffs and advise them regarding the same); *Crigger v. Fahnestock & Co.*, No. 01 Civ. 0781 (JFK), 2003 U.S. Dist. LEXIS 16438, at *28-30 (S.D.N.Y. Sept. 18, 2003) (no special relationship alleged requiring broker to advise plaintiffs about investments where broker did not undertake an advisory role).

In none of the four cases did the broker agree or otherwise undertake to provide plaintiffs with the type of information at issue in BMO's negligent misrepresentation claim here. BMO alleges that, over the course of four years, as part of the package of brokerage services they provided to BMO, defendants undertook to provide BMO's Market Risk department with purportedly independent price quotes for the twice-monthly IPV process.  (Compl. ¶¶ 24-27.) The Complaint alleges that Optionable even entered into a formal agreement with BMO to that effect, after campaigning for BMO to continue using Optionable's data services instead of switching to Totem.  (*Id.* ¶¶ 72-76.)

In fact, the cases cited by MF Global and Saab as examples of cases in which a special relationship was sufficiently alleged are analogous to the instant case.  In *Suez Equity*

*Investors*, the court held a special relationship was adequately pled since plaintiffs alleged that in persuading them to invest in an enterprise, the defendants "induced them to forebear from performing their own due diligence, and repeatedly vouched for the veracity of the allegedly deceptive information."  250 F.3d at 103.  Similarly, the Complaint alleges that defendants repeatedly vouched to BMO that they were providing independent market quotes by their twice-monthly supplying of the quotes over the course of four years, and that Optionable and Cassidy used their assurances to induce BMO to stop investigating the discrepancies in Lee's valuations using the Totem data.  (Compl. ¶¶ 24-27, 44-45, 72-77.)  In *Century Pacific, Inc. v. Hilton Hotels Corp.*, No. 03 Civ. 8258 (SAS), 2004 U.S. Dist. LEXIS 6904 (S.D.N.Y. Apr. 20, 2004), a special relationship was adequately pled since plaintiffs alleged defendants induced them to enter into a long-term franchise agreement by making numerous false statements about their business plans for the franchise.  *Id.* at *24-25.  BMO similarly alleges that defendants made numerous false representations that they were supplying independent market quotes, inducing BMO to continue to pay them millions of dollars in brokerage fees and commissions.  (Compl. ¶¶ 24-27, 44-45, 72-77, 149-150.)

In *Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities, LLC*, 446 F. Supp. 2d 163 (S.D.N.Y. 2006), the court found that a special relationship was alleged between the plaintiff investors and the defendant where the plaintiffs alleged that they relied on the defendant to provide monthly statements of the fund's net asset value, and the defendant specifically undertook to reasonably and fairly report the values, but instead included fraudulently inflated figures in the statements.  *See id.* at 172-73, 199-200. Similarly, the Complaint here alleges that BMO relied on defendants to provide independent market quotes so it could conduct the IPV process twice a month, and defendants agreed to do

so, but instead supplied BMO with Lee-generated quotes.  (Compl. ¶¶ 26-27, 29-36, 44-51, 73-77.)

Contrary to MF Global and Saab's assertion, the Complaint alleges that MF Global and Saab *did* take "action to induce BMO's reliance based on MF Global or Saab's specialized knowledge."  (MF Global/Saab Br. at 39.)  The Complaint alleges that BMO was induced to rely on MF Global and Saab's misrepresentations that they were providing independent quotes by MF Global's established reputation in the market, and MF Global and Saab's representations that they had access to independent price quotes from various sources in a specialized market.  (Compl. ¶¶ 23-27, 44-51, 136-139, 146.)  In addition, BMO pleads that MF Global "encouraged it to rely" on its price quotes and "overstated their reliability."  (*See* MF Global/Saab Br. at 40.)  The Complaint specifically alleges that the note on MF Global's price-quotation spreadsheets falsely represented that the numbers provided were based on quotes collected from independent market sources, when they were, in fact, just numbers generated by Lee.  (Compl. ¶ 44.)

**B.    The Complaint Alleges That Defendants Made False
        Representations Upon Which BMO Reasonably Relied**

For the reasons stated in Parts I(A) and I(C) *supra*, BMO adequately alleges with particularity that defendants made false representations to BMO, and that BMO reasonably relied on those misrepresentations.

**C.    The Negligent Misrepresentation Claim Is Timely**

O'Connor claims that the negligent misrepresentation claim against him is time-barred, asserting that a three-year statute of limitations applies and that the only representation alleged against him occurred in March 2005.  (O'Connor Br. at 24-26.)  Under New York law, however, when a plaintiff asserts both fraud and negligent misrepresentation claims which are

51

based on essentially the same set of allegations, the six-year statute of limitations for fraud

claims (pursuant to N.Y. CPLR § 213(8)) applies to both claims.  *See Fromer*, 50 F. Supp. 2d at

242 (six-year statute of limitations for fraud actions applies to claim for negligent

misrepresentation which "is alleged according to facts that also state a cause of action for fraud"

and thereby "stands in the shadow of fraud"); *accord Espie v. Murphy*, 35 A.D.3d 346, 347-348,

825 N.Y.S.2d 537, 539 (2d Dep't 2006) (to the extent that plaintiffs' fraud cause of action

sounded in negligent misrepresentation, the latter claim was also subject to six-year statute of

limitations).  In the case cited by O'Connor in support of his argument, the court specifically

held that the six-year limitations period did not apply to the negligent misrepresentation claim at

issue solely because the plaintiff alleged neither fraud nor constructive fraud.  *See Colon v.*

*Banco Popular N. Am.*, 59 A.D.3d 300, 301, 874 N.Y.S.2d 44, 44 (1st Dep't 2009).  Because

BMO's negligent misrepresentation claim is, as O'Connor concedes, based on allegations

"substantially similar to its fraud claim" (O'Connor Br. at 16), the six-year statute of limitations

applies and the negligent misrepresentation claim is timely.[38]

## IV.

## THE COMPLAINT ADEQUATELY ALLEGES AIDING AND ABETTING CLAIMS

A claim for aiding and abetting fraud consists of the following elements: "(1) an

existing fraud, (2) knowledge of the fraud, and (3) substantial assistance to advance the fraud's

commission."  *Allied Irish Banks*, 2006 U.S. Dist. LEXIS 4270, at *32.  Similarly, a claim for

aiding and abetting breach of fiduciary duty requires allegations of "(1) a breach by a fiduciary

---

[38] The *in pari delicto* defense does not apply to BMO's negligence claims, as New York law
is clear that a plaintiff's contributory fault does not absolutely bar a negligence claim.  Rather,
that plaintiff's recovery may be reduced in proportion to the plaintiff's relative percentage of
fault, if any, as determined by a jury.  *See Ernst & Young v. Bankr. Servs., Inc.*, 311 B.R. 350,
375-76 (S.D.N.Y. 2004), *citing* N.Y. CPLR § 1411 (New York contributory negligence statute).

of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." *Kaufman v. Cohen*, 307 A.D.2d 113, 125, 760 N.Y.S.2d 157, 169 (1st Dep't 2003).[39]  Because the causes of action for aiding and abetting fraud and breach of fiduciary duty are "parallel in several respects," particularly where the same activity is alleged to constitute the primary violation underlying both claims, when a plaintiff "adequately pleads substantial assistance in connection with a fraud claim, he or she fulfills also the participation element of the breach of fiduciary duty claim." *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC,* 479 F. Supp. 2d 349, 360 (S.D.N.Y. 2007).

　　　　With the exception of Nordlicht, who purports to question whether an employee owes a fiduciary duty to his employer,[40] none of the defendants challenges the Complaint's

---

[39] Contrary to Nordlicht's and O'Connor's assertions, "the particularized pleading standards of Rule 9(b) do not apply" to a claim for aiding and abetting breach of fiduciary duty.  *See Musalli Factory for Gold & Jewellry v. JPMorgan Chase Bank, N.A.*, No. 08 CV 01720 (LAP), 2009 U.S. Dist. LEXIS 27363, at *24 (S.D.N.Y. Mar. 31, 2009).  But even if Rule 9(b) did apply, the allegations underlying the aiding and abetting breach of fiduciary duty claim largely mirror those underlying the aiding and abetting fraud claim and therefore meet the requirements of Rule 9(b).

[40] It is obvious from the Complaint that defendants knew that Lee was an employee of BMO and interacted with him in that capacity.  Inasmuch as "it is well settled in New York that an employee owes a fiduciary duty to an employer in the performance of the employee's duties," *Benoit v. Commercial Capital Corp.*, No. 03 Civ. 5328 (PKL), 2008 U.S. Dist. LEXIS 64905, at *33 (S.D.N.Y. Aug. 25, 2008); *30 FPS Prods., Inc. v. Livolsi*, 891 N.Y.S.2d 162, 163 (2d Dep't 2009); *Wallack Freight Lines, Inc. v. Next Day Express*, Inc., 273 A.D.2d 462, 463, 711 N.Y.S.2d 891, 891 (2d Dep't 2000) (same), Nordlicht's claim that the Complaint fails to allege knowledge of the existence of Lee's fiduciary duty to BMO (Nordlicht Br. at 10 n.5) is baseless.  The cases Nordlicht cites merely stand for the proposition that an *employer* does not owe a fiduciary duty to an employee regarding termination of employment at will.  *See Schenkman v. N.Y. Coll. of Health Prof'ls*, 29 A.D.3d 671, 672, 815 N.Y.S.2d 159, 161 (2d Dep't 2006); *Vitale v. Steinberg*, 307 A.D.2d 107, 108, 764 N.Y.S.2d 236, 237 (1st Dep't 2003); *Ingle v. Glamore Motor Sales*, 140 A.D.2d 493, 494, 528 N.Y.S.2d 602, 604 (2d Dep't 1988).  Other cases Nordlicht cites are inapposite.  In *Kramer v. Lockwood*, No. 08 Civ. 2429 (DAB), 2009 U.S. Dist. LEXIS 85285, at *58-59 (S.D.N.Y. Sept. 1, 2009), the court dismissed the claim because no fiduciary duty existed and the plaintiff had alleged "no facts" to support a claim of defendant's knowledge of such a duty.  *Global Minerals & Metals Corp. v. Holme*, 35 A.D.3d

allegations of the underlying fraud or breach of fiduciary duty committed by Lee and Moore.[41]

All of defendants' motions to dismiss instead focus on whether BMO has properly alleged

(1) defendants' knowledge of the underlying misconduct and (2) the requirements of substantial

assistance (fraud) and inducement or participation (breach of fiduciary duty).

**A.  The Complaint Alleges That Defendants Knew That Lee Was Committing
Fraud and That Lee and Moore Were Breaching Their Fiduciary Duty**

The knowledge requirement of an aiding and abetting claim is satisfied by

alleging "actual knowledge" of the underlying fraud.  *See Thomas H. Lee Equity Fund V, L.P. v.*

*Grant Thornton LLP*, 586 F. Supp. 2d 119, 131 (S.D.N.Y. 2008); *JP Morgan Chase*, 406 F.

Supp. 2d at 252.[42]  To survive a motion to dismiss, "the complaint must allege facts giving rise to

a strong inference of defendant's actual knowledge of the fraud."  *Thomas H. Lee*, 586 F. Supp.

2d at 131 (internal citations omitted); *see also Fraternity Fund*, 479 F. Supp. 2d at 367 (same).

In *Thomas H. Lee*, the allegations that outside auditor Grant Thornton "knew of or willfully

ignored the fraudulent conduct in whole or in part described herein" and was aware of several

"red flags" gave rise to a "strong inference of defendant's actual knowledge of the fraud."  586

F. Supp. 2d at 131.  Similarly, a plaintiff sufficiently alleges actual knowledge where it alleges

that its employee told the defendants that he wanted information omitted from certain

communications between defendants and plaintiff's employer because he sought to conceal such

---

93, 824 N.Y.S.2d 210, 217 (1st Dep't 2006), was a summary judgment case, determining based
on the evidence – not the pleadings – that the defendant did not have knowledge of the breach of
fiduciary duty.

[41] MF Global and Saab argue summarily that a fraud claim against Lee fails because BMO
lacks justifiable reliance.  This argument is addressed in Part II(C) *supra*.

[42] Defendants MF Global and Saab incorrectly state that the standard for pleading actual
knowledge in an aiding and abetting case is the same standard that governs scienter in PSLRA
cases.  (MF Global/Saab Br. at 43.)  As discussed in Part II(B), that standard does not apply to
non-PSLRA cases like this one.

information from his employer.  *See Allied Irish Banks,* 2006 U.S. Dist. LEXIS 4270, at *32.

And in *Fraternity Fund*, actual knowledge was alleged where the complaint suggested that the

defendant knew the wrongdoer was asking not to have his values corrected but wanted defendant

merely to confirm them.  *See* 479 F. Supp. 2d at 370.

           The Complaint here sufficiently alleges defendants' actual knowledge of Lee's

fraud and Lee's and Moore's breaches of fiduciary duty. The Complaint alleges that defendants

knew that BMO thought defendants were supplying independent prices.  (Compl. ¶¶ 25-26.)

With respect to all defendants except Nordlicht, the Complaint alleges that they were aware that,

in order to conduct its IPV process for its natural gas options book, BMO relied on the price

quotations that defendants supplied; the Complaint provides examples of e-mails indicating this

knowledge.  (Compl. ¶ 27.)[43]  One e-mail referred to the "month end pricing check"; another

contained a specific statement that "it is also understood that Bank of Montreal will not be a

contributor to the quotes you collected upon this request" for "independent market quotes" from

Optionable.  (*Id.*)  The Complaint also alleges that the spreadsheets MF Global sent to BMO

contained a representation that the numbers reflected a consensus "From Different Sources In

The Market Place."  (*Id.* ¶ 44.)  Despite these representations, the Complaint alleges, defendants

sent to BMO prices that Lee himself had provided, as opposed to the independent quotes they

had represented they would provide.  (*Id.* ¶¶ 29, 45.)  Indeed, MF Global has admitted in an SEC

---

[43] As paragraph 27 itself demonstrates, the Complaint is careful to delineate which defendants knew certain things or acted in certain ways.  Nevertheless, Nordlicht complains that certain allegations impermissibly "clump" defendants together.  (Nordlicht Br. at 4-5.)  But even if true, this does not merit dismissal.  "Where, as here, discovery has not commenced and the complaint is sufficiently detailed to permit a response, the failure to separate allegations of knowledge is not fatal."  *Primavera Familienstiftung v. Askin*, 173 F.R.D. 115, 128 (S.D.N.Y. 1997).

filing that one of its brokers used Lee's prices as a basis for prices that the broker sent to BMO as "consensus" price indications.  (*Id.* ¶ 110.)

    The Complaint thus alleges that defendants knew Lee was committing fraud by colluding with them to send to BMO's Market Risk department prices that Lee himself had generated under the guise of transmitting independent prices.  The Complaint details the specifics and numerous examples of this circular-quotation scheme.  (*See id.* ¶¶ 29-36, 44-52.) The price quotes that Lee sent to Optionable and MF Global – and that Optionable and MF Global then sent to BMO as their own independent prices – generally were more favorable to Lee's positions than actual market prices.  (*Id.* ¶¶ 37, 53.)  Cassidy and Optionable later assisted Moore and Lee in trying to convince BMO that Lee's valuation of his natural gas options book was accurate, in the face of conflicting data from Totem.  (*Id.* ¶ 72.)  Similarly, the Complaint sets forth the Optionable defendants and Nordlicht's knowledge of Lee's misrepresentations to BMO regarding the EOO trades, and their participation in developing the idea of the trades, arranging the trades, and connecting Lee to counterparties (which were intimately related to Nordlicht).  (*Id.* ¶¶ 88-90.)  The Complaint also alleges how Lee, Moore, and the defendants all benefited from this arrangement.  (*Id.* ¶¶ 42-43, 56-62.)

    Defendants rely on several cases where courts held that allegations that a defendant ignored warning signs did not adequately allege actual knowledge.  *See, e.g., Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006); *Rosner v. Bank of China,* No. 06 CV 13562 (VM), 2008 U.S. Dist. LEXIS 105984 (S.D.N.Y. Dec. 18, 2008); *Mazzaro de Abreu v. Bank of Am. Corp.*, 525 F. Supp. 2d 381 (S.D.N.Y. 2007).  But this is not a case where a defendant merely processed transactions that may – or merely should – have raised red flags.  Instead, in this case, the allegations detailed above show that Lee repeatedly and personally interacted with

individuals at the defendant brokers; that those individuals repeatedly engaged in a circular price quotation scheme with Lee that cannot plausibly be explained as legitimate; that Lee and those individuals had their own financial motives to perpetuate the scheme; and that those individuals assisted Lee in executing and concealing his fraud.  In such circumstances, actual knowledge is alleged, as numerous cases – including several cited by defendants – have held.  *See Mazzaro*, 525 F. Supp. 2d at 389 (actual knowledge alleged where correspondent bank provided advice to wrongdoer on how to conceal fraudulent activities); *Thomas H. Lee*, 586 F. Supp. 2d at 131; *Fraternity Fund*, 479 F. Supp. 2d at 370.

MFGlobal and Saab quote extensively from *Fraternity Fund* and claim that the court's conclusions regarding defendant Prudential in that case mandate a determination that BMO has not adequately pled actual knowledge.  (MF Global/Saab Br. at 42-43.)  But key distinctions compel the opposite result here.  In *Fraternity Fund*, the court noted that the Prudential broker's failure to conduct an independent valuation did not, by itself, indicate that he "knew that Beacon Hill's values were phony."  479 F. Supp. 2d at 369.  By contrast, with respect to defendant Banc of America Securities ("BAS"), the court found that actual knowledge *was* alleged; the allegations that Beacon Hill asked the broker to place the Beacon Hill values on BAS letterhead "would suggest strongly that BAS knew that Beacon Hill was not asking to have its values corrected, but wanted BAS blindly to confirm them," and the most likely explanation for Beacon Hill's request was that "it thought its prices were beyond the range of what could be corroborated."  These allegations tended to show that "BAS knew that the values were false or . . . it was aware of the possibility that they were phony," and satisfied the actual knowledge requirement.  *Id.* at 370.

57

Here, the Complaint's allegations are more like the allegations against BAS than those against Prudential in the *Fraternity Fund* case. BMO's Complaint alleges that the defendants knowingly incorporated Lee's false valuations into documents bearing Optionable's and MF Global's names, with knowledge that those documents were being given directly to BMO for use in conducting the IPV process. (Compl. ¶¶ 27, 153.) In contrast to the allegations against Prudential in *Fraternity Fund*, where there were no allegations of communications other than Beacon Hill sending values to Prudential and Prudential sending them back, the Complaint here alleges specific communications between BMO and the defendants that provided defendants with knowledge that BMO wanted and expected to receive independent quotes. (*Id.* ¶¶ 27, 34-35, 44.) Against this background, Lee's sending valuations to the defendants and the defendants returning them to BMO tends to show that – like BAS in the *Fraternity Fund* case – defendants either knew that Lee's values were false or were aware of the possibility that they were but did not inquire into their potential falsity. *See* 479 F. Supp. 2d at 370.

**B.     The Complaint Alleges That Defendants Substantially Assisted
Lee's Fraud and Lee and Moore's Breaches of Fiduciary Duty**

A defendant provides substantial assistance if it "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed." *JP Morgan Chase*, 406 F. Supp. 2d at 256 (denying motion to dismiss) (internal citations omitted). When a plaintiff "adequately pleads substantial assistance in connection with a fraud claim, he or she fulfills also the participation element of the breach of fiduciary duty claim." *Fraternity Fund*, 479 F. Supp. 2d at 360. The Complaint here more than adequately pleads substantial assistance with fraud, and therefore also satisfies the participation element of the breach of fiduciary duty claim. Substantial assistance is alleged with respect both to defendants' provision of quotes to BMO and to the EOO trades.

58

BMO alleges that Optionable, MF Global, Cassidy, O'Connor, Connor, and Saab substantially assisted Lee's fraud by submitting Lee's prices to BMO while representing them as independent prices from Optionable or MF Global.  (Compl. ¶ 153.)  The specific facts underlying these allegations are outlined above and set forth in paragraphs 25-62 of the Complaint, which are expressly incorporated into Counts III and IV.  (*Id.* ¶¶ 152, 168.)[44] Optionable and Cassidy actively encouraged Lee to perpetrate his fraud, and encouraged Moore to keep quiet about Lee's conduct, through the provision of gifts and other things of value.  (*Id.* ¶ 154.)

Optionable, Cassidy, O'Connor, and Nordlicht also assisted Lee's fraudulent scheme by arranging and entering into the EOO transactions, which they knew caused losses to BMO (in contradiction to Lee's representations to BMO that they generated a profit) and were for the purpose of covering up Lee's losses.  (*Id.* ¶¶ 159-61, 183.)[45]  *See, e.g., Allied Irish Banks*, 2006 U.S. Dist. LEXIS 4270, at *9 (booking "fake profit" from option transaction to disguise ongoing trading losses).  The Complaint's allegations thus show substantial assistance of Lee's fraud.  Even the mere execution of trades in the ordinary course may suffice to allege substantial assistance at the pleading stage, particularly where there is a "heightened economic motivation" on the part of the aider and abettor to aid a primary fraud.  *See ABF Capital Mgmt. v. Askin Capital Mgmt.*, 957 F. Supp. 1308, 1330 (S.D.N.Y. 1997) (denying motion to dismiss claim for

---

[44] O'Connor's argument that the allegations in paragraph 153 – and the later allegations of actual knowledge in paragraphs 180 and 183 – are conclusory and unsupported ignores the earlier portions of the Complaint. (O'Connor Br. at 21, 23.)  Similarly, Nordlicht disconnects the factual allegations in the earlier paragraphs from those in the actual counts, apparently forgetting that they are incorporated by reference.  (Nordlicht Br. at 4-5.)

[45] Cassidy asserts that he had no "access to BMO's systems," but BMO does not allege that Cassidy accessed the system, nor that such access was required for liability to exist based on Cassidy's involvement with the EOO trades.

aiding and abetting fraud); *JPMorgan Chase*, 406 F. Supp. 2d at 257 ("critical test is not . . .

whether the alleged aiding and abetting conduct was routine, but whether it made a substantial

contribution to the perpetration of the fraud").  But Optionable did not merely "execute" trades –

although that would be sufficient for substantial assistance.  Instead, Optionable, Cassidy,

Nordlicht, and others "developed the idea of the EOO trades," presented it to Lee, and connected

Lee to a number of counterparties related to Nordlicht and Optionable.  (Compl. ¶¶ 88-90.)[46]

That Optionable, MF Global, and the individual defendants had a "heightened

economic motivation" to aid the primary fraud by Lee is clear from the Complaint.  In exchange

for colluding with Lee, these defendants obtained significant commissions and fees.  (*Id.* ¶ 164.)

Its trading relationship with BMO lent credence to Optionable's portrayal of itself as a

successful, growing business, and consequently allowed Cassidy, O'Connor, and Nordlicht to

sell their shares of Optionable's common stock to the NYMEX for nearly $29 million.  (*Id.* ¶

162.)

Finally, defendants' provision of Lee's own quotes to BMO under the guise of

independent quotes constitutes substantial assistance.  In *ABF*, the court found substantial

assistance when the plaintiff alleged that the defendants provided a hedge fund manager with

false and inflated performance marks for ultimate dissemination to investors in the hedge fund.

957 F. Supp. at 1330.  Similarly here, the Optionable and MF Global defendants are alleged to

---

[46] These allegations of defendants' involvement in developing the EOO trades and their
motivation to participate differentiate this case from *Fezzani v. Bear*, *Stearns & Co.*, 592 F.
Supp. 2d 410, 423 (S.D.N.Y. 2008), cited by Nordlicht for the proposition that merely alleging
that several defendants helped arrange for legal options transactions does not sufficiently allege
substantial assistance.  (*See* Nordlicht Br. at 7.).  In *Fezzani*, Bear Stearns functioned as a
clearing broker, which as a matter of law was not responsible for the fraudulent sales practices of
the introducing broker when all that was alleged were "ordinary services rendered by a clearing
firm."  592 F. Supp. 2d at 426.  Here, Optionable was not acting as a clearing broker, and the
Complaint alleges that Nordlicht and Optionable directly participated in the fraudulent conduct.

have transmitted to BMO inflated quotes that were provided to defendants by Lee himself, in order for Lee to perpetrate the fraud of misrepresenting the value of his book. Like the provision of marks by the defendants in *ABF*, defendants' provision of quotes here "encouraged and facilitated the ongoing fraudulent scheme, and thus constitute[s] substantial assistance." *Id.*

## C.     The Complaint Alleges Proximate Cause

The substantial assistance prong overlaps with the concept of proximate cause, for whether the assistance is substantial or not "is measured by whether the action of the aider and abettor proximately caused the harm on which the primary liability is predicated." *JP Morgan Chase*, 406 F. Supp. 2d at 256 (citations omitted). In *JP Morgan Chase*, the court found proximate cause alleged based on allegations that the defendant was "directly involved in bringing about – including negotiating – transactions, which while not themselves necessarily fraudulent, are alleged to have been carried out solely for the purpose of inflating revenue and thus could reasonably be understood as a proximate cause leading foreseeably to defrauding the Banks." *Id.* at 257. Similarly here, BMO alleges that defendants were directly involved in transmitting supposedly independent quotes to BMO, and that they arranged the EOO trades. These activities were solely for the purpose of defrauding BMO by inflating the value of Lee's book.

Defendants' arguments that plaintiff has not pled proximate cause rely on examples of conduct much further removed from the underlying fraud than the conduct of defendants in this case. In *Cromer Finance Ltd. v. Prival N.V.*, 137 F. Supp. 2d 452 (S.D.N.Y. 2001) (cited in Optionable Br. at 20, MF Global/Saab Br. at 44), the court held that Bear Stearns' failure to enforce margin requirements did not constitute substantial assistance, and distinguished the situation from other cases where there was "more nefarious" conduct and more direct

involvement in the underlying fraud. *Id.* at 470. In one case that the *Cromer* court distinguished, "the brokers participated in the creation of the document which contained the false statements," *id.* at 472, just as defendants here are alleged to have done by submitting circular quotations to BMO.

In *Kolbeck v. LIT America, Inc.*, 939 F. Supp. 240 (S.D.N.Y. 1996) (cited in MF Global/Saab Br. at 43), an individual, Schindler, looted his clients' money by establishing a company (FIC), which he did not register with the CFTC, and then transferring his clients' funds into his own account. Plaintiffs claimed that if the defendant brokerage firms, which opened the accounts for FIC and Schindler, had investigated Schindler's status and learned that he was not registered with the CFTC, they would have stopped doing business with him or required him to register, and that either action would have prevented plaintiffs' losses from Schindler's looting. The court held that the chain of causation was "far too long" to constitute proximate cause, finding that Schindler's failure to register and defendants' failure to investigate "had little if anything to do with plaintiffs' losses." *Id.* at 249. Here, by contrast, defendants are alleged to have been directly involved in transmitting collusive quotes to BMO, which hid Lee's losses from BMO, and arranged the money-losing EOO trades. The chain of causation between these events and BMO's losses is far shorter than in *Kolbeck*.[47]

**D.      The Claim for Aiding and Abetting Breach of Fiduciary Duty Is Timely**

O'Connor argues that BMO's claim for aiding and abetting breach of fiduciary duty is time-barred, asserting that a three-year statute of limitations applies and that the only

---

[47] Cassidy's assertion that there is another cause of BMO's losses (Cassidy Br. at 19) is irrelevant to the motions to dismiss (which are limited to consideration of the factual allegations of the Complaint) and in any event does not foreclose liability for losses proximately caused by defendants, as "there may be more than one proximate cause of an injury." *Argentina v. Emery World Wide Delivery Corp.*, 93 N.Y.2d 554, 561 n.2, 693 N.Y.S.2d 493, 495 n.2 (1999).

representation that he is alleged to have made occurred in March 2005.  (O'Connor Br. at 25.)

However, O'Connor concedes that the aiding and abetting breach of fiduciary duty claim rests on

"essentially the same [facts] as those alleged in support of the claim for aiding and abetting Lee's

fraud."  (*Id.* at 23.)  Under New York law, "a cause of action for breach of fiduciary duty based

on allegations of actual fraud is subject to a six-year limitations period," and the same statute of

limitations applies to a claim for aiding and abetting breach of fiduciary duty.  *See Kaufman*, 307

A.D.2d at 119, 127, 760 N.Y.S.2d at 164, 170; *see also IDT Corp. v. Morgan Stanley Dean*

*Witter & Co.*, 12 N.Y.3d 132, 139, 879 N.Y.S.2d 355, 359 (2009) ("where an allegation of fraud

is essential to a breach of fiduciary duty claim, courts have applied a six-year statute of

limitations" regardless of whether the remedy sought is monetary or equitable).  Because the

aiding and abetting breach of fiduciary duty claim is based on allegations of fraud, the six-year

statute of limitations applies, and the claim is timely.

## V.

## THE COMPLAINT ADEQUATELY ALLEGES A BREACH OF CONTRACT CLAIM

### A.    The Complaint Alleges That Optionable Breached Its Contract With BMO

The Complaint alleges that BMO and Optionable are parties to the OPEX

Analytics RealMarks Agreement, which obligated Optionable to provide "specific market

information based on actual market quotes obtained by Optionable."  (Compl. ¶¶ 76, 191.)  It

then alleges that, rather than provide actual market quotes to BMO, Optionable instead

regurgitated Lee's "prices that favored his positions," which were "not actual market quotes."

(*Id.* ¶¶ 77, 192.)[48]  As a consequence of Optionable's breach, BMO alleges that it "suffered

---

[48] Optionable argues that in the February 2007 OPEX Agreement, it "disclaimed any
warranty about the accuracy of the data it was providing."  (Optionable Br. at 2.)  But it never
disclaimed, and in fact affirmatively represented, that the information it was providing was

trading losses of millions of dollars." (*Id.* ¶ 195.)  Although the contract contained a limitation

on damages "other than in the event of gross negligence or willful misconduct,"[49] the Complaint

alleges that the breaches were the result of "willful misconduct or gross negligence on the part of

Optionable" (*id.* ¶ 193) – allegations supported in many other parts of the Complaint.  (*See, e.g.,*

*id.* ¶¶ 25-43.)  *See Eastman Kodak Co. v. Wachovia Bank N.A.*, No. 02-CV-6441T, 2007 U.S.

Dist. LEXIS 61283, at *8-9 (W.D.N.Y. Aug. 21, 2007) (allegations that party acted in bad faith,

intentionally, willfully or in a grossly negligent manner sufficient to overcome motion to dismiss

breach of contract claim where contract provided that neither party would be liable for a failure

to notify absent a showing of bad faith, willful misconduct, or gross negligence).

　　　　　Contrary to Optionable's argument (Optionable Br. at 23), Rule 9(b) does not

apply to BMO's breach of contract claim, because that claim is clearly differentiated from

BMO's fraud claim.  In the only case cited by Optionable to support its assertion that Rule 9(b)

applies here, the court emphasized that Rule 9(b) applies to causes of action premised in fraud,

even if differently labeled, when "no effort is made to show any other basis for the claims" or

when the plaintiff has "made no effort to meaningfully distinguish the fraud allegations" in the

complaint.  *DeBlasio*, 2009 U.S. Dist LEXIS 64848, at *35-37 (internal citations omitted).  In

*DeBlasio*, the plaintiffs did not even identify any specific contracts or provisions in their breach

of contract claim.  *See id.* at *112-13.  Instead, they simply alleged that "'by making the

misrepresentations and omissions set forth in the SAC,' the Brokerage Defendants breached the

---

"based on actual market quotes" (OPEX Agreement [Bongiorno Dec. Ex. 1], at 1) when it was
actually just recycling Lee's numbers.

　　[49] Optionable misleadingly quotes the OPEX Agreement (Optionable Br. at 8) as providing
that "Optionable 'assumes no responsibility, and is not liable for, any damages that result' from
use of the service," conveniently leaving off the words "other than in the event of gross
negligence or wilful misconduct."  (*See* OPEX Agreement [Bongiorno Dec. Ex. 1], at 3.)

implied covenant of good faith and fair dealing."  *Id.* at *39.  Here, BMO pleads the existence of

an express agreement between BMO and Optionable, describes Optionable's duty to BMO under

that agreement to provide actual market quotes, and alleges that Optionable breached the

agreement by providing quotations provided by Lee that were not actual market quotes.  (Compl.

¶¶ 191-92.)[50]

Optionable asserts that BMO has not alleged that Optionable sent it any data after

entering into the OPEX Agreement in February 2007.  (Optionable Br. at 23.)  To the contrary,

the Complaint alleges that Optionable "provided BMO with supposedly independent prices"

until early May 2007 (Compl. ¶¶ 25-26), and that "the pricing grid provided to BMO by the

OPEX system was filled out by Lee with prices that favored his positions, and then sent by

Optionable to BMO" (*id.* ¶ 77).

**B.      The Agreement's Indemnification Clause Covers Certain of BMO's Losses**

BMO alleges that Optionable agreed to indemnify BMO from damages and losses

"directly or indirectly arising out of or in any way related to Optionable's performance under the

Agreement" and costs incurred by BMO as a result.  (*Id.* ¶ 194.)  Optionable argues that the

agreement's indemnification clause does not cover BMO's alleged losses, asserting that such

clauses "generally" are designed to protect against liability for damage to third parties.

(Optionable Br. at 25.)  But in the case it cites for that principle, *Sundance Cruises Corp. v.

American Bureau of Shipping*, 799 F. Supp. 363 (S.D.N.Y. 1992), the language of the "hold

harmless" clause at issue was not included in the opinion, making it impossible to compare with

---

[50] Optionable also cites *Frota v. Prudential-Bache Sec., Inc.*, 639 F. Supp. 1186 (S.D.N.Y. 1986), to bolster its claim that Rule 9(b) should apply to BMO's breach of contract claim, but no claim for breach of contract was alleged there.  Instead, the court held that plaintiffs' claims for common law fraud and breach of fiduciary duty, which comprised merely two paragraphs and "merely incorporate[d] the allegations of securities fraud and RICO counts" should be dismissed because plaintiffs failed to comply with Rule 9(b) in pleading any of the claims.  *Id.* at 1193.

the clause in the parties' agreement here.  Indeed, Optionable does not cite a single case where a court found that language like that contained in the indemnification clause here precluded coverage for a party's own losses.

To the contrary, this Court held that an indemnity clause containing expansive language like that in the OPEX Agreement "suggests that a broad concept of indemnity may have been intended" and introduced an ambiguity regarding whether it covered the contracting party's losses.  *S.A. Carmeuse v. M.J. Stavola Indus., Inc.*, 823 F. Supp. 125, 130 (S.D.N.Y. 1993).  The language of the indemnity clause in *S.A. Carmeuse*, which covered "all liabilities, losses, damages, deficiencies, costs or expenses," is comparable to the language in the OPEX Agreement, which covers "all actions, causes of action, suits, damages, liabilities, losses, claims and demands."  (Declaration of Michael G. Bongiorno, Dec. 7, 2009 ["Bongiorno Dec."] Ex. 1, at 3.)  At most, therefore, the clause at issue here is ambiguous regarding whether the parties intended it to cover liability for BMO's losses, and Optionable's motion to dismiss should be denied.

None of the cases cited by Optionable supports its claim that BMO's own losses are not covered by the parties' indemnification clause.  When the Second Circuit in *Schiavone Construction Co. v. Fitzpatrick*, 717 F.2d 747 (2d Cir. 1983), stated that "no legitimate argument could be made that 'claims, damages, costs, and expenses,' *as there used*, refers to anything other than direct liability to a third person," *id.* at 751 (emphasis added), it was not, as Optionable tries to suggest (Optionable Br. at 25), referring to those terms in general, but rather to those terms only "as there used" – that is, in a part of the indemnification clause that read: "claims, damages, costs, and expenses *arising from the use of any patented articles in connection with the work*."  717 F.2d at 751 (emphasis added).  A claim arising from the use of patented

articles would not typically be brought by the contracting party.  Yet even that clause was held to

be ambiguous with respect to whether the parties intended it to cover liability to the contracting

party rather than to third parties, and the court ordered that the "intent of the parties should be

fully explored with the help of parol evidence."  *Id.* at 751.[51]

    Optionable's argument that the indemnification provision does not cover BMO's

own losses (Optionable Br. at 25) is particularly strained when it comes to BMO's legal fees and

expenses incurred in responding to criminal and regulatory investigations.  BMO's situation in

this respect is akin to responding to a third party's lawsuit or subpoena.  Even under

Optionable's interpretation, the indemnification clause must cover BMO's costs of responding to

proceedings instituted by third parties, including governmental entities.[52]

---

[51] Other cases cited by Optionable (Optionable Br. at 25) are inapposite.  In *Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029 (2d Cir. 1995), the issue was whether an indemnification clause that provided for indemnity against "all liabilities, damages and other expenses" by reason of a tenant's failure to "perform or comply with any covenant required to be performed or complied with by the Tenant" sufficiently expressed the parties' intention to "contract around" the default rules under Connecticut law with respect to remedies for nonpayment of rent.  *Id.* at 1034-35.  The court held that it did not sufficiently express such an intention, reversing a judgment after a bench trial.  In *Georgia Pacific Consumer Prods., LP v. International Paper Co.*, 566 F. Supp. 2d 246 (S.D.N.Y. 2008), the court did not confront the question whether an indemnification clause could cover the contracting party's own liabilities.  Instead, the question was whether the indemnification agreement was limited to those liabilities that existed on the date of the closing, or whether it could be read to encompass liabilities imposed nearly a decade later.  *Id.* at 250.

[52] *Hooper Assocs. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 549 N.Y.S.2d 365 (1989), does not foreclose that part of BMO's indemnification claim that seeks the legal fees and expenses it has incurred in investigating and pursuing the instant litigation.  *Hooper* interpreted the indemnification provision in that case, which ran solely from the seller to the buyer, as not permitting the buyer to recover its attorneys' fees in its suit against the seller, because nothing in the provision was "exclusively or unequivocally referable to claims between the parties themselves" and thus should be understood to be limited to fees incurred in connection with third-party claims.  *Id.* at 492, 549 N.Y.S.2d at 367.  Here, however, the indemnification provision in the OPEX Agreement is mutual: "The parties hereto agree to indemnify . . . each other" for losses arising out of or relating to the other party's performance under the Agreement.  (Bongiorno Dec. Ex. 1, at 3.)  Inasmuch as BMO's performance under the Agreement is limited

Optionable also claims that the Agreement's limitation of damages to those caused by gross negligence or willful misconduct requires dismissal of BMO's claim for indemnification, arguing that it is inconsistent for the contract to absolve Optionable from damages other than from gross negligence or willful misconduct but to allow BMO to recover under the indemnification clause, which contains no such limitation.  (Optionable Br. at 24-25.)  It is, however, entirely possible for the damages limitation to coexist with an indemnification clause that requires indemnification both of losses caused to third parties and to losses caused to the other contracting party.  For example, the damages limitation could limit indemnification to losses resulting from a party's gross negligence or willful misconduct, either in the context of losses originally suffered by the contracting party, or in all indemnification situations.  Here, the Complaint alleges that BMO's losses, including "the legal fees and expenses it has incurred in responding to criminal and regulatory investigations of its commodities loss and in investigating and pursuing the instant litigation" (Compl. ¶ 196), were the result of Optionable's fraud and other willful misconduct (*see id.* ¶¶ 133, 166, 189), and thus are both subject to indemnification and not precluded by the damages limitation.[53]

---

to paying Optionable fees, it is difficult to see how this provision would be of any benefit to Optionable other than to recover its legal fees in suing BMO for nonpayment under the Agreement.  Given the mutuality of the provision, it thus must allow BMO to recover its legal fees in suing Optionable for breach of the Agreement.  *See Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131, 146 (S.D.N.Y. 2004).

[53] Optionable also argues that the indemnification provision of the OPEX Agreement cannot apply retroactively to losses predating the Agreement.  (Optionable Br. at 25.)  BMO has not asserted that it should apply retroactively, but instead is seeking indemnification "for the legal fees and expenses it has incurred in responding to criminal and regulatory investigations of its commodities loss and in investigating and pursuing the instant litigation" (Compl. ¶ 196), all of which occurred after the execution of the Agreement.

Accordingly, in addition to denying defendants' motions to dismiss BMO's fraud, negligent misrepresentation, and aiding and abetting claims, the Court should also deny defendants' motions to dismiss BMO's contract claim.[54]

## VI.

### THE ALLEGATIONS REGARDING CASSIDY'S CRIMINAL RECORD SHOULD NOT BE STRICKEN

The Complaint's allegations regarding Cassidy's criminal record and his failure to disclose it are relevant to BMO's claims and should not be stricken pursuant to Fed. R. Civ. P. 12(f).  Courts "should not tamper with pleadings unless there is a strong reason for doing so," and a motion to strike should not be granted unless it is clear that the allegations in question "can have no possible bearing on the subject matter of the litigation."  *Tel. Sys. Int'l, Inc. v. Cecil*, No. 02 CV 9315 (GBD), 2003 U.S. Dist. LEXIS 17000, at *8-9 (S.D.N.Y. Sept. 26, 2003) (internal citations omitted).

---

[54] If the Court finds that BMO has failed to sufficiently plead any of its claims, it should grant BMO leave to replead.  Fed. R. Civ. P. 15(a)(2) provides that a "court should freely give leave [to amend a pleading] when justice so requires."  This rule also applies to dismissals pursuant to Fed. R. Civ. P. 9(b), which "'are almost always accompanied by a grant of leave to amend, unless the plaintiff has had a prior opportunity to amend its complaint or the allegations were made after full discovery in a related case.'"  *Katz v. Image Innovations Holdings, Inc.*, No. 06 Civ. 3707 (JGK), 2008 U.S. Dist. LEXIS 22979, at *8 (S.D.N.Y. Mar. 24, 2008) (quoting *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 581 (2d Cir. 2005)); *see also Pross v. Katz*, 784 F.2d 455, 459 (2d Cir. 1986).  The cases cited by MF Global and Saab in support of the proposition that leave should be denied where the proposed amendment would be futile are inapposite.  In *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129 (2d Cir. 1993), the court denied leave to replead because, after two years of discovery, plaintiff was still unable to allege in his proposed amended complaint sufficient facts tending to show fraud.  *See id.* at 131-32.  The court in *Cuoco v. Moritsugu*, 222 F.3d 99 (2d Cir. 2000), held that repleading would be futile as a matter of law because the defendants were entitled to qualified immunity from the suit.  *Id.* at 112.  Similarly, in *Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991), the court denied leave to replead a claim where the plaintiff asserted a securities claim against a party that did not fall within the reach of the statute at issue.  *See id.* at 49.

Here, the allegations regarding Cassidy's background and Optionable's nondisclosure of it to BMO are relevant to BMO's claims against Cassidy and Optionable for fraud and negligent misrepresentation.  Cassidy's background is relevant to whether Optionable was indeed, as it purported to be, "a legitimate broker" that "continually portrayed itself and its officers and employees as major players in the commodity derivatives market," as alleged in BMO's claims for fraud and negligent misrepresentation.  (Compl. ¶¶ 128, 146.)  It certainly would have been important to BMO to know that Optionable's CEO had pled guilty on four different occasions to crimes including wire fraud, tax evasion, and improper reporting of currency transactions, and had been sentenced to prison.  (*See* Compl. ¶ 7.)[55]

Cassidy cites *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008), to support his claim that his past has no relevance to this case.  (Cassidy Br. at 19.)  The Court's holding there was only that the plaintiffs did not state a claim for violation of Rule 10b-5 regarding the nondisclosure of Cassidy's criminal convictions, because the applicable SEC regulations did not require Optionable to disclose those facts.  *See id.*  Whether Cassidy's background is relevant to the claims in this case – which do not implicate the securities laws – is an entirely different inquiry.  But even in the securities context, the SEC's disclosure rules set only "minimum standards" for disclosure.  *See, e.g., Maldonado v. Flynn*, 597 F.2d 789, 796 (2d Cir. 1979) ("going beyond the Rule [14a-9], . . . shareholders are entitled to truthful presentation

---

[55] Cassidy downplays his multiple felonies as "historical misdeeds" (Cassidy Br. at 11), and states that he "declined his right to a trial in each instance" (*id.* at 11 n.10) – that is, he pled guilty.  (Compl. ¶ 7.)  Although Cassidy may at the time of trial be able to avail himself of the time limit with respect to evidence of convictions under Fed. R. Evid. 609(b), that limit would not bar evidence of Cassidy's prior wrongdoing if offered for a purpose other than attacking his character for truthfulness, *id.* 609(a), or showing that he had a propensity to commit fraud, *id.* 404(b).  It is thus premature to conclude that evidence offered in support of the allegations in paragraphs 7 and 104 of the Complaint would be inadmissible.

of factual information 'impugning the honesty, loyalty or competency of directors' in their dealings with the corporation") (citations omitted).  In *Bertoglio v. Texas International Co.*, 488 F. Supp. 630 (D. Del. 1980), the court observed that the policy behind an SEC rule that required disclosure of convictions only within the last five years was "far less compelling" where the relevant conviction was – like Cassidy's here – "the first in a series of securities law and business difficulties . . . that continue until the present time."  *Id.* at 661.

Because it cannot be said that the allegations relating to Cassidy's background "can have no possible bearing on the subject matter of the litigation," the allegations contained in paragraphs 7 and 104 are relevant and should not be stricken.  *See Moy v. Adelphi Inst.*, 866 F. Supp. 696, 709 (E.D.N.Y. 1994) (denying motion to strike allegations regarding defendant's previous guilty pleas to fraud charges, as their relevance was "a matter better decided at trial").

## CONCLUSION

For all the foregoing reasons, defendants' motions should be denied in their entirety and the Court should grant such other and further relief as is just and proper.

Dated:   New York, New York
         February 19, 2010

Respectfully submitted,

FRIEDMAN KAPLAN SEILER &
  ADELMAN LLP


s/ Robert J. Lack
Robert J. Lack
Anne E. Beaumont
Lisa S. Getson
Sheela V. Pai
1633 Broadway
New York, NY 10019-6708
(212) 833-1100

*Attorneys for Plaintiff Bank of Montreal*

71