UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
SECURITIES AND EXCHANGE COMMISSION,
                                        Plaintiff,


                      -against-                                    08-CV-9961


DAVID LEE, KEVIN P.CASSIDY. EDWARD
O'CONNOR, and SCOTT CONNOR,
                                        Defendants.
------------------------------------------------------------------X
COMMODITY FUTURES
TRADING COMMISSION,
                                        Plaintiff,


                      -against-                                    08-CV-9962


KEVIN CASSIDY, EDWARD O'CONNOR
OPTIONABLE INC., DAVID LEE and
ROBERT MOORE,
                                        Defendants.
------------------------------------------------------------------X
CMEG NYMEX INC.
                                        Plaintiff,


                      -against-                                    09-CV-3677


OPTIONABLE INC., KEVIN CASSIDY,
PIERPONT CAPITAL, INC.,
EDWARD O'CONNOR, RIDGECREST CAPITAL
INC., and MARK NORDLICHT,
                                        Defendants.
------------------------------------------------------------------X
BANK OF MONTREAL,
                                        Plaintiff


                      -against-                                    09-CV-7557


OPTIONABLE INC., MF GLOBAL INC.,
KEVIN P. CASSIDY. EDWARD J. O'CONNOR,
MARK A. NORDLICHT, RYAN B. WOODGATE
SCOTT CONNOR and JOSPEH D. SAAB,
                                        Defendants.
------------------------------------------------------------------X

## MEMORANDUM DECISION AND ORDER

*Introduction*[1]

The Securities and Exchange Commission ("SEC"), Commodities Futures Trading Commission ("CFTC"), CME (as successor to the New York Mercantile Exchange) ("NYMEX") and the Bank of Montreal ("BMO") have each filed complaints stemming from an alleged fraudulent scheme perpetrated by a BMO trader, his supervisor and certain third-party brokerages between 2003 and 2007. On March 31, 2010, the defendants' motions to dismiss the SEC, CFTC and NYMEX complaints were denied. A conference relating to all four actions as well as further oral arguments relating to the motions to dismiss the BMO complaint were held on April 14, 2010. The Court has determined that issuing one combined decision is appropriate given the facts and issues common to each case. For the forgoing reasons, each of the motions to dismiss pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA") is denied.

*Background*

These four actions stem from a fraudulent scheme to overvalue oil and natural gas derivative options at the Bank of Montreal ("BMO") resulting in extensive losses.[2] The derivative options at issue are illiquid instruments that are "marked to model," as opposed to "marked to market," requiring that their values be determined based on various

---

[1] The allegations set forth in each complaint are presumed to be true for the purposes of this motion.

[2] The background is derived from the four complaints and associated documents. In deciding a motion to dismiss under Rule 12(b)(6), the court may refer "to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." Brass v. Am. Film Tech., Inc., 987 F.2d 142, 150 (2nd Cir. 1993) (citation omitted); see also Hayes v. Coughlin, 1991 U.S. Dist. LEXIS 14680, 1991 WL 220963, at *1 (S.D.N.Y. 1991) ("Papers outside a complaint may be incorporated by reference into the complaint when such papers are referred to within the body of the complaint.").

factors.[3]  BMO required that these values be calculated daily by its traders.  BMO's

market risk division ("Market Risk") (sometimes referred to as its "back office") would

periodically verify its traders' prices by obtaining valuations from third parties.  If there

existed a discrepancy between a trader's price and the third-party valuation, BMO would

record a reserve based on their "tolerance threshold."  Options can be traded on regulated

exchanges, such as the New York Mercantile Exchange ("NYMEX"), or on unregulated

exchanges, typically referred to as over-the-counter ("OTC") exchanges.  OTC

transactions are inherently riskier than those conducted on a regulated exchange.[4]

     The alleged fraudulent scheme involved David Lee ("Lee"), a now former BMO

trader, sending inaccurate (i.e. his own) pricing information relating to his positions to

third-party brokerages, most notably Optionable, Inc. ("Optionable"), as well as MF

Global Inc. ("MF Global") (collectively the "Third-Party Brokerages").[5]  BMO was

---

[3] A mark to model is less reliable than a mark to market, because it depends on the realism of the assumptions in the model and may attribute a degree of liquidity to the instruments being priced that may not be present.  http://www.amex.com/servlet/AmexFnDictionary?pageid=display&titleid=3916.

[4] See i.e. N.Y. Mercantile Exch., Inc. v. IntercontinentalExchange, Inc., 323 F. Supp. 2d 559, 565 (S.D.N.Y. 2004).  See also Stout, Lynn A. Why the Law Hates Speculators: Regulation and Private Ordering in the Market for OTC Derivatives, 48 Duke L.J. 701

[5] The defendants and their affiliations are detailed herein.  David Lee ("Lee") was a trader at the Bank of Montreal's New York office from 1997 until May 4, 2007.  He is no longer a party to any of the four actions.  Robert Moore ("Moore") was the executive managing director of the BMO Commodity Derivatives Group in the New York office from 2000 until May of 2007.  He was Lee's supervisor throughout that period.  Optionable, Inc. ("Optionable") is a corporation engaged in the commodity brokerage business.  Optionable's stock is registered with the SEC pursuant to Section 12(g) of the Exchange Act and trades on the OTC Bulletin Board.  It filed periodic reports including Form 10-KSB and 10-QSB pursuant to Section 13(a) of the Exchange Act and the Commission's Rules.  MF Global, Inc. ("MF Global") (formerly known as Man Financial Inc.) is the US operating subsidiary of MF Global Ltd., and is a broker of exchange-listed futures and options.  Kevin Cassidy ("Cassidy") was Optionable's CEO from March 1, 2001 until March 31, 2004 and from October 30, 2005 until May 12, 2007.  In between his terms as CEO he served as a consultant to Optionable.  He also served as the vice-chairman of Optionable's board of directors until May 12, 2007.  Cassidy was convicted of several criminal charges between 1987 and 1996 for which he served time in prison.  Prior to the execution of the Stock Warrant Purchase Agreement ("SWPA") he owned approximately 5.7% of Optionable's outstanding stock.  Pierpont Capital, Inc. ("Pierpont") is an entity controlled by Cassidy.  At least some of the Optionable stock sold by Cassidy was held in Pierpont's name.  Edward O'Connor ("O'Connor") was Optionable's president from March 2001 – January of 2009 and CEO from March 2004 – October 2005 (filling the void between Cassidy's terms) and from November 2007 – January 2009, and continues to serve as a director.  Prior to the SWPA he owned approximately 7% of Optionable's outstanding stock.  Ridgecrest Capital, Inc. ("Ridgecrest") is an entity controlled by O'Connor.  At least some of the Optionable stock sold by O'Connor was held in

-3-

Optionable's largest client.  BMO maintained non-discretionary accounts with the Third-

Party Brokerages which, in addition to providing standard brokerage services, also

provided valuations of Lee's positions.[6]  Optionable and MF Global are accused of

merely forwarding Lee's own quotes to Market Risk rather than providing an

independent assessment of their validity.  Quotes were forwarded by Optionable in three

formats: the "broker bid/offer quotes" which simply involved forwarding Lee's bids back

to BMO via e-mail; the "grid bid/offer quotes" which involved submitting grids

suggesting that quotes were received from multiple sources via Optionable's OPEX

Analytics RealMarks ("OPEX") trading platform (designed to compete with other multi-

party valuation services that BMO had been considering and began utilizing in 2006);

and the "other market participants' bid/offer quotes" which involved the use of allegedly

fraudulent instant messages ("IM's") designed to mislead Market Risk into believing that

they were quotes originating from other brokerages.  MF Global provided price

quotations on spreadsheets as well as through IM's.  At the heart of the parties' dispute is

whether Optionable and MF Global were providing "independently derived bids,"

representing those available in the market place, or, at the very least, utilizing "other

market participants" data in reaching a "consensus."

## Factual Allegations

---

Ridgecrest's name.  Mark Nordlicht ("Nordlicht") was the Chairman of Optionable's Board of Directors
from 2000 - May of 2007. Prior to the SWPA he owned approximately 30% of Optionable's outstanding
stock.  Scott Connor ("Connor") was an Optionable employee from at least June 2005 – January 2007.  He
appears pro se.  He has entered into a consent judgment with the SEC and has submitted an answer in the
BMO matter as well as cross-claims against Defendant Nordlicht, which Nordlicht has moved to dismiss,
and Optionable, Cassidy and O'Connor, which pursuant to a stipulation need not be responded to until after
the motions to dismiss are decided. (See Docket Entry No. 65.).  Ryan Woodgate ("Woodgate") was an
Optionable employee from at least February 2003 – May 2005.  Joseph Saab ("Saab") was a MF Global
employee from at least September 2004 – January 2007.
[6] In a non-discretionary account, "the customer chooses specific purchases and sales" with or without the
recommendation of the broker; in a discretionary account, the broker "manage[s] the account as the
customer stated in authorization papers.".  Smith v. Fahnestock & Co., 2002 U.S. Dist. LEXIS 3411
(S.D.N.Y. 2002) quoting Capital District Physician's Health Plan v. O'Higgins, 939 F. Supp. 992, 1002
(N.D.N.Y. 1996).

Lee was a natural gas trader at BMO from 2000 until 2007. (CFTC Cplt. ¶ 7.) He traded a variety of exchange-traded and over the counter ("OTC") options. (Id. ¶ 28.) Optionable and MF Global provided brokerage services in commodity derivative transactions. (Id. ¶ 9, BMO Cplt. ¶ 6.) At the end of each trading day, Lee was required to assign a value to the option positions that comprised his "book" and did so using a computer based "mark to model" method that utilized mathematical equations to forecast the value of each position. (CFTC Cplt. ¶¶ 24, 28.)   Depending on the profitability of his trades, Lee was eligible for salary increases and bonus payments. (Id. ¶ 16.) In order to verify its traders' positions, BMO employed certain procedures known as the independent price verification process (the "IPV Process"). (Id. ¶ 29.) The IPV Process' was utilized to ensure that BMO's trading books were reasonably in line with market prices quoted by external sources. (Id.) Optionable was BMO's primary source for brokerage information related to the IPV Process. (Id. ¶ 33.)   BMO's employees involved in the IPV process "believed that the bid/offer quotes they received from brokers represented the brokers' independent assessment of the bids and offers currently available in the market for certain option strips." (Id. ¶ 30.)  If the IPV process resulted in a discrepancy between a trader's model and the brokers' assessment, BMO would make a valuation adjustment based upon their "tolerance threshold." ( Id. ¶ 32.)  In addition to the IPV Process, BMO's Market Risk Division employed a volatility skew verification process (the "VSV Process") to ensure that BMO's trading books were in line with other market participants skews. (Id. ¶ 34.)

In spite of BMO's safeguards, Lee was able to mis-mark his book by approximately C$221,875,297 as of January 21, 2007 and C$257,801,706 as of March 30, 2007. (Id. ¶ 35.) On April 27, 2007, BMO announced that, due in large part to Lee's

mis-marking, it would suffer losses between C$350,000,000 and C$450,000,000.  (Id.)

On May 17, 2007, BMO announced that it had re-estimated its losses to be approximately

C$680,000,000.  (Id. ¶ 41.)

     Lee was able to carry out his mis-marking by fabricating bid/offer quotes and

transmitting them to the Third-Party Brokerages, chiefly Optionable, who would in turn

re-submit them to BMO employees carrying out the IPV process.  (Id. ¶¶ 44-48.)  This

process is referred to as "u-turning."  (SEC Cplt. ¶ 25.)  The price quotes Lee sent to

Optionable and MF Global were generally more favorable to his positions than actual

market prices, allowing Lee to overstate the value of his positions and bypass BMO's

internal controls.  (BMO Cplt. ¶¶ 37, 53.)  Over time, these tactics became more

elaborate.  For instance, Optionable developed a service called "OPEX Analytics

RealMarks"("RealMarks") which claimed to provide a greater array of independent

quotes, but in fact involved Lee fabricating bids and offers and emailing them in grid

format to Optionable from his home computer.  (CFTC Cplt. ¶ 50.)  Optionable would

then submit Lee's grids to BMO's back office.  (Id.)  "RealMarks" was designed by

Optionable to compete with Totem RealMarks ("Totem"), another multi-contributor

service which BMO was considering, and ultimately subscribed to (BMO Cplt. ¶¶ 65-73.)

In order to circumvent the VSV Process, Lee and Cassidy engaged in a similar practice of

submitting falsified IM's that were recorded by BMO's Market Risk Division to monitor

volatility skews by comparing their own skews to those of supposed other market

participants.  (Id. ¶ 52.)  The three aforementioned practices are referred to individually

as the "broker bid/offer quotes" the "grid bid/offer quotes" and the "other market

participants' bid/offer quotes".  (Id. ¶ 55.)  MF Global also submitted price quotes in

spreadsheet and IM format.  (BMO Cplt. ¶¶ 44- 52.)

These practices are alleged to have allowed Lee to mis-value his positions and enter into higher-value, riskier trades including "1x2" trades[7] designed to circumvent BMO's "value-at-risk" ("VaR") models and "exchange of options for options" (EOO[8]) trades designed to circumvent BMO's internal controls.  Lee also mis-valued certain paired option or "straddles" amongst other trades. (CFTC Cplt.  ¶¶ 37-39.)  Lee's supervisor was Robert Moore ("Moore") who served as the executive managing director of BMO's Commodity Derivatives Group during the relevant period.  (Id ¶ 8.)  Moore is claimed to have knowingly permitted Lee to make these trades and further the alleged fraudulent scheme.  (Id. ¶¶  72-86.)

In May of 2005, Optionable registered a public offering of its stock with the SEC. (NYMEX Cplt.  ¶ 18.)  Optionable was required to file periodic reports including Forms 10-KSB and 10-QSB with the SEC pursuant to Section 13(a) of the Exchange Act.  (SEC Cplt. ¶ 15.)  In 2006, Optionable publicly reported that it was experiencing a major increase in revenues and net income. (NYMEX Cplt. ¶ 28.).  This increase was due in large part to the business being received from BMO which was supplemented by commissions paid by counter-parties to the BMO transactions.  (Id. ¶ 30.)  Optionable's stock rose from its $1 approximate initial public offering price to as much as $2.84 in the last quarter of 2006.  (Id. ¶ 31.)

In late 2006 and early 2007, Kevin Cassidy ("Cassidy"), Edward O'Connor ("O'Connor") and Mark Nordlicht ("Nordlicht") negotiated with NYMEX to sell Optionable stock, provide a warrant for future stock purchases and further induce

---

[7] "1x2" trades involve purchasing a close-to-the-money option and selling two out-of-the-money options. A close-to-the-money option has an exercise price close to the current price whereas an out-of-the-money option does not.

[8] These EOO trades included both American and European-style "straddles", the fundamental difference being that American-style straddles may be exercised at any time before expiration, while European-style straddles may be exercised only within a specific period of time, generally on the last business day before expiration.  As such, American-style straddles are typically valued higher.

NYMEX to invest in Optionable. (Id. ¶ 41.)  In 2007, NYMEX, during the course of their due diligence investigation, asked defendants to provide information and documents relating to Optionable's business and financial conditions that would be of interest to prospective investors. (Id. ¶ 42.)  Defendants referred to and provided SEC filings that set forth an inaccurate description of Optionable's business. (Id. ¶ 43.)  On January 22, 2007, NYMEX signed a Term Sheet with Optionable, Cassidy, O'Connor and Nordlicht calling for NYMEX to purchase 7,000,000, 1,905,000 and 1,853,886 shares of Optionable stock from Nordlicht, O'Connor and Cassidy respectively at $2.69 per share. (Id. ¶ 45.)  The sales would provide NYMEX with a 19% interest in outstanding Optionable stock. (Id.)  The term sheet also provided that NYMEX would receive a warrant to purchase additional shares sufficient for it to own up to 40% of outstanding Optionable stock for $3.40 per share following an 18-month delay. (Id.)  The Term Sheet was contingent upon NYMEX completing due diligence and the execution of definitive agreements containing warranties and other terms by the defendants. (Id. ¶ 46.)

On April 10, 2007, after concluding their due diligence investigation, NYMEX entered into a definitive Stock and Warrant Purchase Agreement (the "SWPA") with defendants pursuant to which NYMEX paid Nordlicht $18,830,000 for 7,000,000 shares; Cassidy and/or Pierpont $5,124,450 for 1,905,000 shares; and O'Connor and/or Ridgecrest $4,986,953 for 1,853,886 shares and received the Warrant referenced in the Term Sheet. (Id. ¶¶ 48-49.)  The SWPA contained various guaranties, warranties and representation that did not detail the alleged scheme. (Id. ¶¶ 50-51.)  As part of their

-8-

agreement, NYMEX agreed to host Optionable's brokerage platform and pay commissions on trades routed through it.[9]

At the same time the SWPA was being negotiated, the Defendants were refusing to comply with requests from BMO to provide the sources and backup data relating the pricing information Optionable had been furnishing. (Id. ¶ 54.) The defendants did not disclose this to NYMEX. Less than a month after the SWPA was consummated, BMO issued a press release stating that its energy derivative positions had been overvalued and misstated, and that Lee as well as another employee (Moore) had been suspended, as had its business relationship with Optionable. (Id. ¶¶ 57-61.)

In the wake of the press release, Optionable's stock fell from $4.64 on May 9, 2007 to $0.85 on May 10, 2007 and as of March 26, 2009 was only worth $0.01. (Id. ¶¶ 59, 64.) Optionable stated in its Form 10-Q for the quarterly period ended June 30, 2002 (sic[10]) that the suspension of its business relationship with BMO had and would likely continue to have a "significant adverse impact" on its business. (Id. ¶ 63.) NYMEX claims to have lost virtually its entire $28.9 million investment in Optionable. (Id. ¶ 66.)

The alleged fraudulent scheme is claimed to have benefited each defendant. Lee and Moore are alleged to have received larger salaries and bonuses from BMO in addition to gifts from Optionable. (Id. ¶¶ 77-78.) Optionable and its employees, officers and directors are alleged to have profited from increased commissions from Optionable as well as NYMEX and the sale of stock to NYMEX. MF Global is alleged to have benefited from "substantial broker fees and commissions" resulting from the alleged scheme. (BMO Cplt. ¶¶ 132, 150.)

---

[9] Optionable's trading platform is referred to both "Clearport" and "Clearpoint" in the NYMEX complaint at ¶¶ 57-58).
[10] The Court notes that the year should read 2007.

-9-

## Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. The task of the court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." In re Initial Pub. Offering Secs. Litig., 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (internal quotation marks and citation omitted). The court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). In deciding a motion to dismiss, the Court is not limited to the face of the complaint. The Court "may [also] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit. ATSI Commc'ns v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

Fed. R. Civ. P. 9(b) applies to "all averments of fraud or mistake;" it requires that "the circumstances constituting fraud . . . be stated with particularity," but provides that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (U.S. 2007).

10

In a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter (when required) for each defendant; guilt by association is impermissible.  This can consist of allegations as to who "possessed . . . knowledge" of the fraud, "when and how they obtained [that] knowledge," or even why they "should have known" of the fraud.  Meijer, Inc. v. Ferring B.V. (In re DDAVP Direct Purchaser Antitrust Litig.), 585 F.3d 677, 695 (2d Cir. 2009) (internal citations omitted).

In addition, the Private Securities Litigation Reform Act ("PSLRA"), enacted in 1995, further requires that in a securities fraud case alleging a material misrepresentation or omission, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. §78u-4(b)(1).  The PSLRA also requires that in cases where a particular state of mind on the part of the defendant is required, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  To qualify as a "strong inference," the inference of scienter must be "more than merely plausible or reasonable - it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Tellabs, 551 U.S. at 314.  The requisite inference of scienter can be supported by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness.  Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000).  See also  Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc., 531 F.3d 190, 195 (2d Cir. 2008).  Recklessness is defined as "at the least, . . . an extreme departure from the standards of ordinary care to the extent that the danger was either

known to the defendant or so obvious that the defendant must have been aware of it."

Novak v. Kasaks, 216 F.3d at 308-09.

   BMO's causes of action are unique amongst the four complaints, as they sound in

New York state law, as opposed to federal securities laws.  BMO asserts claims for fraud,

negligent misrepresentation, aiding and abetting fraud, aiding and abetting breach of

fiduciary duty and breach of contract.  To assert a claim for fraud under New York law, a

plaintiff must plead the following four elements: (1) defendant made a material

misrepresentation; (2) defendant did so with intent of defrauding plaintiff; (3) plaintiff

relied upon the representation; and (4) plaintiff suffered damages as a result of its

reliance. Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 57

F.3d 146, 153 (2d Cir. 1995) (internal quotation marks omitted).  To assert a claim for

negligent misrepresentation under New York law, BMO must plead the following five

elements:  (1) the defendant had a duty, as a result of a special relationship, to give

correct information; (2) the defendant made a false representation that he or she should

have known was incorrect; (3) the information supplied in the representation was known

by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff

intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her

detriment. Hydro Investors v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000).

However, such misstatements are actionable only if the defendant is under a duty to the

plaintiff to exercise reasonable care in giving the information, and plaintiffs' reliance

upon the information is foreseeable. Eternity Global Master Fund Ltd. v. Morgan Guar.

Trust Co. of N.Y., 375 F.3d 168, 187 (2d Cir. 2004) (citing Heard v. City of New York,

82 N.Y.2d 66, 623 N.E.2d 541, 545, 603 N.Y.S.2d 414 (N.Y. 1993)). Liability for

negligent misrepresentations is "imposed only on those persons who possess unique or

specialized expertise, or who are in a special position of confidence and trust with the

injured party such that reliance on the negligent misrepresentation is justified." Eternity

Global Master Fund, 375 F.3d at 187 (quoting Kimmell v. Schaefer, 89 N.Y.2d 257, 675

N.E.2d 450, 652 N.Y.S.2d 715 (N.Y. 1996).

   In order to allege its claims of aiding and abetting fraud and aiding and abetting

breach of fiduciary duty, BMO must allege facts establishing that the initial violators

committed the underlying fraud and/or breach of fiduciary duty respectively. Kaufman v.

Cohen, 307 A.D.2d 113, 760 N.Y.S.2d 157, 169 (1st Dep't, 2003). See also Lerner v.

Fleet Bank, N.A., 459 F.3d 273, 292 (2d Cir. 2006) (holding that the existence of fraud

must be shown in order to establish a claim of aiding and abetting fraud). A claim for

aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of

obligations to another, (2) that the defendant knowingly induced or participated in the

breach, and (3) that plaintiff suffered damage as a result of the breach. Id. To state a

claim for the underlying breach of fiduciary duty in New York, BMO must allege: (1) the

existence of fiduciary relationship; (2) knowing breach of a duty that relationship

imposes; and (3) damages suffered. Carruthers v. Flaum, 388 F. Supp. 2d 360, 380

(S.D.N.Y. 2005).

   The elements required to establish a breach of contract under New York law are:

(1) the existence of a contract; (2) performance of the contract by one party; (3) breach by

the other party; and (4) damages resulting from the breach. Terwilliger v. Terwilliger,

206 F.3d 240, 246 (2d Cir. 2000) (citation and quotations omitted).

   The SEC and NYMEX complaints allege violations of Section 10(b) of the

Securities Exchange Act[11] and Rule 10b-5[12] promulgated thereunder. The SEC

---

[11]  Section 10(b) of the Exchange Act provides:

complaint also alleges violations of Section 17(a) [13] Securities Act.  The SEC and

NYMEX complaint assert claims for aiding and abetting under Section 20(e) of the

Securities Exchange Act. [14]  The SEC's aiding and abetting claims relate to violations of

Sections 13(a), 13(b)(2) and 13(b)(5) of the Exchange Act and Rules 12b-20, 13a-1, 13a-

13, 13a-14, 13a-16, 13b2-1 and 13b2-2, and involve fraud relating to the filing of reports

required by the SEC and circumventing internal records management and accounting

controls.  NYMEX's aiding and abetting claims relate to its Section 10(b) and Rule 10b-5

claims.  NYMEX also asserts multiple claims under New York State common law.  The

---

It shall be unlawful for any person
(b) To use or employ, in connection with the purchase or sale of any security...any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe.

[12]  Rule 10b-5 provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

[13]  Section 17(a) of the Securities Act provides that:
(a) It shall be unlawful for any person in the offer or sale of any securities or any security-based swap agreement by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly--
    (1) to employ any device, scheme, or artifice to defraud, or
    (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
    (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

[14]  Section 20(e) of the Exchange Act provides that:

For purposes of any action brought by the Commission under paragraph (1) or (3) of section 21(d) [15 USCS § 78u(d)(1) or (3)], any person that knowingly provides substantial assistance to another person in violation of a provision of this title [15 USCS §§ 78a et seq.], or of any rule or regulation issued under this title [15 USCS §§ 78a et seq.], shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

CFTC complaint alleges violations of Section 4c(b) of the Commodity Exchange Act and

Regulation 33.10 promulgated thereunder. [15]

      Section 17(a) of the Securities Act, 15 U.S.C. 77q(a), prohibits fraud in the offer

or sale of securities, using the mails or the instruments of interstate commerce.  Section

17(a)(1) forbids the direct or indirect use of any device, scheme, or artifice to defraud;

Section 17(a)(2) makes it unlawful to obtain money or property through misstatements or

omissions about material facts; and Section 17(a)(3) proscribes any transaction or course

of business that operates as a fraud or deceit upon a securities buyer.  SEC v. Softpoint,

Inc., 958 F. Supp. 846, 861 (S.D.N.Y. 1997), aff'd, 159 F.3d 1348 (2d Cir. 1998).

---

[15] Section 4c(b) of the CEA, 7 U.S.C. § 6c(b) provides that:

> No person shall offer to enter into, enter into or confirm the
> execution of, any transaction involving any commodity regulated
> under this Act  [7 USCS §§ 1 et seq.] which is of the character of, or
> is commonly known to the trade as, an "option", "privilege",
> "indemnity", "bid", "offer", "put", "call", "advance guaranty", or
> "decline guaranty", contrary to any rule, regulation, or order of the
> Commission prohibiting any such transaction or allowing any such
> transaction under such terms and conditions as the Commission shall
> prescribe. Any such order, rule, or regulation may be made only after
> notice and opportunity for hearing, and the Commission may set
> different terms and conditions for different markets.
>   "[i]t shall be unlawful for any person directly or indirectly:  (a) To
> cheat or defraud or attempt to cheat or defraud any other person; (b)
> To make or cause to be made to any other person any false report or
> statement thereof or cause to be entered for any person any false
> record thereof; (c) To deceive or attempt to deceive any other person
> by any means whatsoever in or in connection with an offer to enter
> into, the entry into, the confirmation of the execution of, or the
> maintenance of, any commodity option transaction.

CFTC Regulation 33.10, 17 CFR § 33.10 provides that:

> It shall be unlawful for any person directly or indirectly:
> (a) To cheat or defraud or attempt to cheat or defraud any other
> person; (b) To make or cause to be made to any other person any
> false report or statement thereof or cause to be entered for any person
> any false record thereof;
> (c) To deceive or attempt to deceive any other person by any means
> whatsoever in or in connection with an offer to enter into, the entry
> into, the confirmation of the execution of, or the maintenance of, any
> commodity option transaction.

Section 10(b), and Rule 10b-5 prohibit fraudulent conduct in connection with the purchase or sale of a security. See 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

       To state a claim under Sections 10(b) of the Exchange Act and 17(a) of the Securities Act, the plaintiff must successfully allege that each defendant: (1) committed a deceptive or manipulative act, or made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device; (2) with scienter; (3) which affected the market for securities or was otherwise in connection with their offer, sale or purchase. SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999). Under Section 10(b) of the Exchange Act and Rule 10b-5 a private plaintiff must also prove (4) reliance; (5) economic loss; and (6) loss causation. Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005).

       Similarly, to establish liability for fraud in connection with the sale of commodity options under Section 4c(b) of the Commodity Exchange Act, the CFTC must establish "(1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality. CFTC v. R.J. Fitzgerald & Co., Inc., 310 F.3d 1321, 1328 (11th Cir. 2002). See also CFTC v. Commodity Inv. Group, Inc., 2006 U.S. Dist. LEXIS 5772, 3-4 (S.D.N.Y. 2006).

       While proof of scienter is a necessary element of liability under Section 4c(b) of the Commodity Exchange Act and Sections 17(a)(1) and 10(b) of the Securities Exchange Act, it is not required for liability under Sections 17(a)(2) and 17(a)(3) of the Securities Exchange Act. Aaron v. SEC, 446 U.S. 680, 697, 100 S. Ct. 1945, 64 L. Ed. 2d 611 (1980).

       In order to state a claim under Sections 17(a) of the Securities Act, 10(b) of the Exchange Act and Section 4c(b) of the Commodity Exchange Act, the heightened

pleading standard of Federal Rule of Civil Procedure 9(b) must be satisfied. A securities

fraud complaint alleging a misstatement under Rule 10b-5(b) must (1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state

where and when the statements were made, and (4) explain why the statements were

fraudulent. Allegations that are conclusory or unsupported by factual assertions are

insufficient." ATSI Comms., 493 F.3d at 99; Caiafa v. Sea Containers Ltd., 525 F. Supp.

2d 398, 407 (S.D.N.Y. 2007). While claims brought pursuant to Rule 10b-5(b) require

plaintiffs to allege a false or misleading statement (or omission), subsections (a) and (c)

are not so restricted. In order to state a claim under Rule 10b-5(a) or (c) a complaint

must include an "allegation that the defendant (1) committed a manipulative or deceptive

act (2) in furtherance of the alleged scheme to defraud, (3) scienter, and (4) reliance." In

re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004). A

defendant can be held liable under subsections (a) and (c) for conduct in one period that

gives rise to a misstatement in a later period. Id. at 335. Unlike private litigants, who

must comply with the PSLRA, the SEC is not required to prove investor reliance, loss

causation, or damages in an action for securities fraud. SEC v. Simpson Capital Mgmt.,

586 F. Supp. 2d 196, 201 (S.D.N.Y. 2008) citing SEC v. KPMG LLP, 412 F. Supp. 2d

349, 375 (S.D.N.Y. 2005).

     In order to find a defendant liable for aiding and abetting securities fraud under

Section 20(e) of the Securities Exchange Act, the plaintiff must prove: (1) a securities

law violation by a primary wrongdoer; (2) knowledge of the violation by the person

sought to be charged; and (3) proof that the person sought to be charged substantially

assisted in the primary wrongdoing. SEC v. Wexler, 1993 U.S. Dist. LEXIS 12656

(S.D.N.Y. 1993).

## BMO's CAUSES OF ACTION[16]

MF Global and Saab are only named as defendants in the BMO action. They are

charged with fraud, negligent misrepresentation and aiding and abetting both fraud and

breach of fiduciary duty. MF Global is alleged to have provided BMO with price

quotations via spreadsheets which bore the following disclaimer:

> "Those Numbers Are Price Indications On The Corresponding Terms Of
> the NYMEX Natural Gas Contract Lookalike Financially Settled Options
> And Calendar Spreads Quoted On The Date And Time Shown Below.
> These Are Not Tradeable Markets. They Are Numbers That Reflect A
> Consensus Taken On that Date And Time, From Different Sources In The
> Marketplace. (Transcript of Oral Argument 4/14/10 21:6-12; BMO Cplt.
> ¶¶ 44-45.)

The spreadsheets provided Saab's e-mail address in the event further information

was required. BMO alleges that the prices at issue did not reflect a "consensus"

and were not from "different sources" but were rather regurgitations of Lee's own

quotes sent to Saab only minutes before they were sent back to BMO. (Id.) Saab

is alleged to have actively solicited the quotes from Lee via instant messaging,

and BMO provides examples of several specific communications relating to price

verifications between Lee and Saab ranging from 2004 and 2007. (Id. ¶¶ 49-51.)

The quotes Lee forwarded "generally were more favorable to his position than

actual market prices, and allowed Lee to overstate the value of his natural gas

options positions, create fictitious profits, and conceal losses." (Id. ¶ 53.) On

June 13, 2009, in its annual report filed with the SEC, MF Global's parent stated

that an MF Global broker used bids and offers that Lee sent to him as a basis for

prices that he sent back to BMO. (Id. ¶ 110.)

---

[16] As noted in footnote five, defendants Woodgate and Connor have not submitted motions to dismiss the BMO complaint. Defendant Connor has submitted a cross-claim against Defendant Nordlicht, which Nordlicht has moved to dismiss. Defendant Connor has also submitted cross-claims against defendants Optionable, Cassidy and O'Connor which, pursuant to a stipulation, need not be responded to until after the motions to dismiss are decided. (See Docket Entry No. 65.)

With regard to Optionable's role in the alleged fraudulent scheme, several

specific communications relating to the purported "independence" of the

bids/quotes are included in BMO's complaint.  Notably, on May 3, 2006, an

employee in BMO's Investment Banking Group Product Operations e-mailed

defendant Connor to ask him to

> "confirm that the Nymex Differnetial Vols [volatilities] for the El Paso,
> San Juan Pipeline is correct, as its giving me a huge variance on my P/L
> [profit and loss] calculations."  (Id. ¶ 27(b).)

On September 28, 2006, a Market Risk employee e-mailed an Optionable

employee to:

> "request Optionable to provide us with independent market quotes as at
> the close of [the] September 28, 2006 trading day. . . . It is understood that
> the quotes will be verifiable from IM [instant messaging] sheets on your
> archive. . . . It is also understood that Bank of Montreal will not be a
> contributor to the quotes you collected upon this request." (BMO Cplt. ¶
> 27(c).)

BMO's complaint goes on to detail sixty-one e-mail and instant message

communications between October 21, 2003, and September 28, 2006, that

involved Lee sending pipeline volatility reports and price quotations that were

inflated by millions of dollars to Woodgate, Cassidy and Connor, which were then

passed on to BMO as Optionable's independent assessment.  (Id. ¶¶ 36-40.)  In

an e-mail dated August 31, 2006, from Connor to Lee, the term "Market Quotes"

is used in a chart listing various option prices. (Id. ¶ 34.)  Optionable often

forwarded Lee's numbers back to BMO in under ten minutes.  (Id. ¶ 36.)  When

BMO was considering whether to utilize a different third-party valuation service,

Optionable assisted Lee and Moore with convincing BMO to retain its services.

(Id. ¶ 72.)  Prior to entering in to the OPEX Analytics RealMarks Agreement

19

("OPEX Agreement"), on January 19, 2007, an Optionable employee represented

that quotes were obtained from:

> "different market makers, Banks, Brokerage houses, Energy
> trading companies, Hedge funds, etc. and we send you a complete
> sampling of IM's and OPEX screen shots of actual quotes and
> actual trades." (Id. ¶ 75.)

In the subsequently entered into OPEX Agreement, Optionable represented that

> "OPEX Analytics RealMarks provides specific market information based
> on actual market quotes obtained by Optionable." (Id. ¶ 76.)

In 2007, BMO employees from New York, Chicago and Toronto began an

investigation regarding the Commodity Derivatives Group. The investigation

determined that, despite a notice dated April 27, 2007, directing Lee to preserve

relevant information, he had deleted more than one hundred files from his

personal laptop including pricing spreadsheets he had emailed to Optionable. (Id.

¶ 108.)

    **I.**    **Fraud**

        Each defendant, other than Nordlicht, is charged with fraud. A common

law fraud claim must meet the particularity requirements of Rule 9(b), however it

need not satisfy the PSLRA. <u>Muller-Paisner v. TIAA</u>, 289 Fed. Appx. 461, 463

(2d Cir. 2008). As noted above, BMO must plead a misstatement, intent on the

part of each defendant, reasonable reliance and damages.

        BMO has provided specific examples of how the alleged fraudulent

scheme was carried out. The misstatements alleged are the "market quotes" sent

to BMO that were not what they were purported to be. (Transcript of Oral

Argument, April 14, 2010 PP. 98:3 – 100:2.) Whether or not the parties

understood precisely what BMO expected or whether there exist alternate theories as to why BMO's fraud prevention systems failed are wholly irrelevant on a motion to dismiss.  It is undisputed that BMO wanted the third-party brokerages to do *something*, and a fair reading of the complaint as alleged indicates that they may have done *nothing*.  The third-party brokerages received millions of dollars in fees and commissions, corporate good-will, and in Optionable's case, the opportunity to sell millions of dollars worth of stock to NYMEX.  The intent behind the use of such terms as "independent," "market quotes," and "consensus" must be established in the context of the alleged fraudulent scheme.[17]  That said; the facts alleged support a plausible conclusion that BMO *did not* want the third-party brokers to merely review Lee's numbers without comparing them to those available in the marketplace, as alleged.  For instance, when asked at oral argument "[w]hat is it that MF Global was expected to do from your perspective," counsel for MF Global responded that "MF Global and Saab were checking the prices provided by Lee, checking to see if they were consistent with the marketplace, consistent with what they were seeing in the marketplace." (Transcript of Oral Argument, April 14, 2010, PP. 15:16 -16:1.)  The complaint alleges that this is precisely what the Third-Party Brokerages were not doing.  In short, the Third-Party Brokerages acknowledge that they received and represented that they confirmed Lee's numbers.  BMO alleges that Lee's numbers were wrong and caused them significant financial damage while providing a financial benefit

---

[17] The Court has considered the defendants' assertion that because the OPEX Analytics Agreement included the term "actual market quotes," that BMO could not have reasonably expected to receive such quotes prior to entering into the Agreement .  The fact that the Agreement reduces to writing the term "actual market quotes" does not in any way limit the proposition that BMO requested, and was entitled to receive, actual market quotes prior to entering the Agreement.

to the defendants.  Accordingly, the misstatement and intent prongs have been
met to the extent necessary to survive a motion to dismiss.

Similarly, when reaching a determination as to whether the plaintiffs'
reliance was justifiable under New York law, the Court will review the entire
context of the transaction.  Emergent Capital Inv. Mgmt., LLC v. Stonepath
Group, Inc., 343 F.3d 189, 195 (2d Cir. 2003).  While it is true that BMO is a
sophisticated corporate entity, it is also true that Optionable and MF Global
presented themselves as experts in the oil and natural gas commodity industry
and, even under their alternate theories, knew that the numbers they were
reviewing were likely to be relied upon by BMO's back office.  To the extent that
the defendants argue the availability of alternate sources of market data, audit
reports and other materials extraneous to the complaint, they are not appropriately
considered on a motion to dismiss as they raise disputed issues of fact.  Friedl v.
City of New York, 210 F.3d 79, 83 (2d Cir. 2000).  Those same arguments are
equally flawed when applied to the damages issue.  The alleged fraudulent
scheme was designed to circumvent BMO's IPV process and other fraud
prevention mechanisms.  Had BMO discovered that Lee's "book" was being
overvalued with the Third-Party Brokerage's assistance, it could have mitigated
the damages it ultimately suffered.

Lastly, to the extent that the defendants argue that BMO's fraud claim is
duplicative of its breach of contract claims, any overlap would extend only to
those quotes provided after the February 23, 2007, the date that the OPEX
Agreement (i.e. the contract at issue) was entered in to.  Furthermore, a claim of
fraud can be maintained along with a breach of contract claim where the

22

fraudulent misrepresentation alleged is collateral or extraneous to the contract.

Fashion Shop LLC v. Virtual Sales Group Corp., 525 F. Supp. 2d 436, 445

(S.D.N.Y. 2007) citing McKernin v. Fanny Farmer Candy Shops, 176 A.D.2d

233, 574 N.Y.S.2d 58, 60 (2d Dep't, 1991).  Optionable's assertions relating to

the source of the quotes utilized by the OPEX system fall outside of the contract.

(BMO Cplt. ¶¶ 74-75.)  Therefore, the fraud claim may proceed along with the

breach of contract claim.

## II.     Negligent Misrepresentation[18]

BMO's negligent misrepresentation claim, pled in the alternative, also satisfies

the requirements of Rule 9(b).  Negligent misrepresentation "involves most of the same

elements as fraud, with a negligence standard substituted for the scienter requirement."

Carroll v. Leboeuf, Lamb, Greene & MaCrae, LLP, 623 F. Supp. 2d 504, 510 (S.D.N.Y.

2009) (quotations omitted).  Thus, if a misrepresentation meets all of the elements of

fraud except for the element of scienter -- i.e., if the false statement was not known by the

defendant to be false -- it can still be the basis for a negligent misrepresentation claim if

(a) the defendant should have known that the statement was false, and (b) a special

relationship existed between the parties. Glidepath Holding B.V. v. Spherion Corp., 2010

U.S. Dist. LEXIS 33255, 36-37 (S.D.N.Y. Mar. 26, 2010).

---

[18] Defendant O'Connor asserts that the negligent misrepresentation and aiding and abetting breach of fiduciary duty claims against him are barred by a three-year statute of limitations.  BMO's negligent misrepresentation and aiding and abetting breach of fiduciary duty claims are based on substantially similar allegation to its fraud claim.  (O'Connor Br. PP. 16, 25.)  Under New York law, a claim for negligent misrepresentation based on the same facts as a claim for fraud is governed by the six-year statute of limitation for fraud under C.P.L.R.§ 213(8).  Von Hoffmann v. Prudential Ins. Co. of Am., 202 F. Supp. 2d 252, 263 (S.D.N.Y. 2002) citing Fromer v. Yogel, 50 F. Supp. 2d 227, 242 (S.D.N.Y. 1999).  Similarly, New York applies a six-year limitations period to both fraud and aiding and abetting fraud claims.  Kottler v. Deutsche Bank AG, 607 F. Supp. 2d 447, 459 (S.D.N.Y. 2009).  Accordingly, the Court finds O'Connor's statute of limitations argument to be unpersuasive.

The primary issue presented in this case is whether a "special relationship" existed between BMO and the Third-Party Brokerages.  BMO possesses significant knowledge and expertise.  However, its alleged purpose in utilizing the Third-Party Brokerages was to garner a professional independently derived confirmation of its own employee's figures, not to simply execute trades.  When determining if a special relationship exists, a factual inquiry is made as to (1) whether the person making the representation held or appeared to hold unique or special expertise; (2) whether a special relationship of trust or confidence existed between the parties; and (3) whether the speaker was aware of the use to which the information would be put and supplied it for that purpose.  Kimmell v. Schaefer, 89 N.Y.2d 257, 264 (N.Y. 1996).  Kimmell is not without limits, and cases decided in its wake have established that whether a "special relationship" exists should be governed by the particular relationship between the parties and is best determined on a case-by-case basis.  Murphy v. Kuhn, 682 N.E.2d 972, 975 (N.Y. 1997).  Brokers do not ordinarily have a "special relationship" with non-discretionary account holders because their responsibilities are, in most cases, limited to completing a single transaction.  De Kwiatkowski v. Bear, Stearns & Co., 306 F.3d 1293, 1310 (2d Cir. 2002).  Nevertheless, a "defendant-broker affirmatively establishes a trust relationship by recommending a stock to his clients. . . enhancement is warranted where a broker in such a trust relationship fails to disclose that he is receiving a substantial commission or other payment for the recommendation." United States v. Santoro, 302 F.3d 76, 80 (2d Cir. 2002) (criminal securities fraud).  This precedent suggests that an ongoing special  relationship may exist between a broker and client upon a proper set of facts.  Desia v. GE Life & Annuity Assur. Co., 2007 U.S. Dist. LEXIS 22179, 20-21 (D. Conn. Mar. 26, 2007).  The allegedly false quotes were received from the Third-Party

24

Brokerages from 2004 through 2007.  Furthermore, BMO has alleged that Cassidy, in a press release issued by Optionable, relating to the OPEX platform, stated that the product could provide "real-time market valuations of their options" rather than standard brokerage services. (BMO Cplt. ¶ 74.)  Continuously providing valuation services, along with a subscription based monitoring service, could plausibly be the basis for a finding of such an ongoing special relationship.  Accordingly, the Court finds that the negligent misrepresentation claim survives the motions to dismiss.

**III.     Aiding and Abetting Fraud and Aiding and Abetting Breach of Fiduciary Duty**

BMO must plead the required elements of aiding and abetting fraud with particularity, as required by Rule 9(b), however it need not meet the standard set forth in the PSLRA.  See i.e. Lerner v. Fleet Bank, N.A., 459 F.3d 273, 292-93 (2d Cir. 2006). BMO must plead the required elements of aiding and abetting breach of fiduciary duty with particularity, as required by Rule 9(b), to the extent the underlying primary violations are based on fraud.  Kolbeck v. LIT Am., 939 F. Supp. 240, 245 (S.D.N.Y. 1996).

Aiding and abetting both fraud and breach of fiduciary duty requires a primary violation, actual knowledge on the part of the aider and abettor, and substantial assistance.  Design Strategy, Inc. v. Davis, 469 F.3d 284, 303 (2d Cir. 2006) (aiding and abetting breach of fiduciary duty); JP Morgan Chase Bank v. Winnick, 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005) (aiding and abetting fraud).   Substantial assistance is found where (1) a defendant 'affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed; and (2) the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated.

25

Rosner v. Bank of China, No. 06 CV 13562, 2008 U.S. Dist. LEXIS 105984, at *13
(S.D.N.Y. Dec. 18, 2008) (internal citations omitted).  The "mere fact that participants in
a fraudulent scheme 'use accounts at [a bank] to perpetrate it, without more, does not in
and of itself rise to the level of substantial assistance.'" Nigerian Nat'l Petroleum Corp. v.
Citibank, N.A., No. 98 Civ. 4960, 1999 U.S. Dist. LEXIS 11599, at *26-27 (S.D.N.Y.
July 30, 1999) (quoting Williams v. Bank Leumi Trust Co., No. 96 Civ. 6695, 1997 U.S.
Dist. LEXIS 7538, at *14 (S.D.N.Y. May 30, 1997)).  Musalli Factory for Gold &
Jewellry v. JPMorgan Chase Bank, N.A., 261 F.R.D. 13, 25 (S.D.N.Y. 2009).  Similarly,
a clearing broker does not provide "substantial assistance" to or "participate" in a fraud
when it merely clears trades.  "The simple providing of normal clearing services to a
primary broker who is acting in violation of the law does not make out a case of aiding
and abetting against the clearing broker." Greenberg v. Bear, Stearns & Co., 220 F.3d 22,
29 (2d Cir. 2000).

 The primary violators underlying these claims are alleged to be Lee and Moore,
who are not charged in BMO's complaint.  It is accepted that Lee and Moore owed a
fiduciary duty and a duty of fair dealing to their employer, BMO.   At issue is whether the
defendants had actual knowledge of the underlying violation, and whether they provided
substantial assistance.   Nordlicht, along with the other Optionable defendants, is alleged
to have developed the idea of having BMO execute EOO trades on unfavorable terms.
(Id. ¶ 88.)  The EOO trades in question involved buying an American-style straddle
option on the NYMEX and selling a European-style straddle OTC.  (Id. ¶ 84.)
American-style straddle options offer more flexibility because they are redeemable at any
point up to their expiration date, whereas European-style straddle options are redeemable
only on their expiration date.  (Id. ¶ 83.)  Because of this difference, the purchase of the

America-style straddle options resulted in a cash payment by BMO to the counterparty. (Id. ¶ 84.)

Nordlicht is alleged to be the managing member of Platinum Management (NY), LLC., which is itself the General Partner of Platinum Partners Value Arbitrage Fund, LP ("Platinum Partners"), which was a counterparty to some of the EOO trades. (Id. ¶¶ 89-90.) Other counterparties includes the Murray Huberfeld and David Bodner Partnership, Fenmore Holdings, Hazan Energy, LLC and Bromley Energy LLC (a/k/a Bromley Energy Fund LLP) ("Bromley"). (Id.) With the exception of Hazan Energy, LLC, each of the aforementioned counterparties shared an address with Platinum Partners. Together with Bromley's principal trader, Nordlicht assigned a patent-pending system and method for real-time trading over a computer network to Optionable. (Id. ¶ 90.) Nearly all of the EOO trades were brokered by companies with which Cassidy and O'Connor were associated. (Id. ¶ 88.)

The EOO trades are alleged to have allowed the defendants to further their scheme by generating millions of dollars in commissions and fees and disguising actual losses as gains. (Id. ¶ 91-92.) It is alleged that Nordlicht, amongst others, "knew that Lee misrepresented to BMO that the EOO trades were legitimate transactions that generated a net profit for BMO. . .knew that in fact, the EOO trades required a new payment of premium by BMO to its counterparties, and that the reason Lee arranged the EOO trades was to conceal the overvaluation of and losses suffered by BMO's natural gas options book." (Id. ¶¶ 160, 183.) It is further alleged that Nordlicht, amongst others, "substantially assisted Lee's EOO trading fraud by arranging the EOO trades with BMO." (Id. ¶161.) They

allegedly "assisted Lee's breaches of fiduciary duty by arranging the EOO trades with BMO." (Id. ¶ 184.)  In addition to helping Optionable and the above-mentioned counterparties receive commissions, fees and other gains, Nordlicht, Cassidy and O'Connor allegedly sold $29 million of Optionable shares to NYMEX during the course of the alleged fraudulent scheme.  (Id. ¶ 185.)[19] Similarly, MF Global and Saab are alleged to have known of the existence of the alleged fraudulent scheme, provided offending quotes to BMO, and in doing so provided substantial assistance to furthering the alleged fraudulent scheme. (Id. ¶¶ 153, 154, 180, 181.)

BMO has asked the Court to examine various layers of the alleged fraudulent scheme to determine whether multiple, facially legal, activities can, when viewed as a whole, satisfy the pleading requirements of Rule 9(b). See i.e. Nathel v. Siegal, 592 F. Supp. 2d 452, 469 (S.D.N.Y. 2008) (Seemingly innocuous documents were sufficient for a finding of actual knowledge where they related to "the core of the alleged fraud").  Furthermore, the allegation of actual knowledge does not have to be based on a defendant's explicit acknowledgment of the fraud. See JP Morgan Chase Bank v. Winnick, s. 406 F. Supp. 2d 247, 249 (S.D.N.Y. 2005); Kottler v. Deutsche Bank AG, 607 F. Supp. 2d 447, 465 (S.D.N.Y. 2009) (false paper trail created to minimize the appearance of fraudulent tax shelters sufficient to allege aiding and abetting liability against the developer of the fraudulent strategy).

---

[19] The Court has carefully considered the intent/scienter requirements in light of the fact that those defendants that sold shares to NYMEX did not divest themselves of all of their holdings.  The SWPA included a warrant that would have permitted NYMEX to buy more shares at a higher price, which they would have likely exercised has Optionable remained a profitable entity.  The fact that the alleged scheme eliminated the chance of this transaction cannot be viewed in a given defendant's favor on a motion to dismiss.

This case involves more than simply clearing trades.  Optionable, MF Global and the individual defendants are alleged to have perpetrated a scheme whereby over a course of years they assisted in the overvaluing of a broker's book by proffering information they knew to be false, not to BMO's trader, but rather to those employees overseeing him.  The quotes provided were in fact more favorable to Lee's positions.  The complaint presents sufficient factual allegations to conclude that the quotes provided were not, under any reasonable definition of such terms as "independent" or derived from the "market," what the parties bargained for.  The facts as alleged are therefore sufficient to meet the plausibility threshold on a motion to dismiss, and provide the required degree of specificity under Rule 9(b).

**IV.    <u>Breach of Contract</u>**

This cause of action is brought by BMO against Optionable only for an alleged breach of the OPEX Analytics RealMarks Agreement (the "Agreement"). The parties do not dispute that the required prima facie elements, namely the existence of the contract, performance by one party, the breach and resulting damages have been successfully alleged.  Optionable argues that the claim should be dismissed for failure to comply with Rule 9(b) and because certain contractual provisions limit its liability.  Rule 9(b) applies only to allegations of fraud and mistake. <u>Harsco Corp. v. Segui</u>, 91 F.3d 337, 348 (2d Cir. 1996).  BMO's contract claim relating to the OPEX Agreement is separate and distinct from its fraud claim and is not subject to the heightened pleading standard of Rule 9(b).

The Agreement contained a limitation on damages "other than in the event of gross negligence or willful misconduct." (Bongiorno Dec, Ex. 1., the

29

Agreement P. 3.)  It also contains an indemnification clause under which

Optionable agreed to indemnify BMO from damages and losses "directly or

indirectly arising out of or in any way related to Optionable's performance under

the Agreement," and costs incurred by BMO as a result.  (BMO Cplt. ¶ 194.)

BMO has alleged that they received "supposedly independent prices," after

entering into the Agreement that were in fact Lee's own numbers.  (Id. ¶¶ 25, 26,

77.)  If a contract is ambiguous as applied to a particular set of facts, a court has

insufficient data to dismiss a complaint for failure to state a claim.  Eternity

Global Master Fund Ltd. v. Morgan Guar. Trust Co., 375 F.3d 168 at 178.  In

regards to the instant matter, BMO has proffered a sufficient argument to suggest

that the indemnity clause at issue may encompass BMO's losses.  See S.A.

Carmeuse v. M.J. Stavola Indus, Inc., 823 F.Supp. 125, 130 (S.D.N.Y 1993).

The Court accordingly denies the motion to dismiss the breach of contract claim.

### V. **In Pari Delicto**

Certain defendants have attempted to invoke the doctrine of in pari delicto

by arguing that BMO is at fault for not monitoring its own employees' activities.

To successfully apply the doctrine, the plaintiff must be an active, voluntary

participant in the wrongful conduct, and the plaintiff's wrongdoing must be at

least substantially equal to that of the defendant.  BrandAid Mktg. Corp. v. Biss,

462 F.3d 216, 218 (2d Cir. 2006) (internal citations omitted).  Furthermore, under

New York law, the doctrine of in pari delicto may be subject to the "adverse

interest" exception, which applies when an agent is defrauding the principle

exclusively for the agent's own benefit and to the detriment of the corporation.

Symbol Tech., Inc. v Deloitte & Touche, LLP, 2009 NY Slip Op 7826, 3 (N.Y.

App. Div. 2d Dep't, 2009). Another exception to the in pari delicto defense is the "innocent insider" exception, which provides that if there is another agent within the corporation who had no knowledge of the fraud, and who had the will and the ability to stop the fraud had it come to his or her attention, the in pari delicto defense will fail. Id.

It is unreasonable to conclude that BMO ratified or benefited from the self-serving actions undertaken by Lee and Moore. The BMO complaint alleges that Lee and Moore consciously sought to bypass BMO's internal controls in perpetrating the alleged scheme, and that BMO ultimately lost millions of dollars as a result. The fact that BMO's internal controls may have been inadequate would not rise to the level of active, voluntary participation and any short-term gains that were the product of the alleged fraudulent scheme do not suggest that BMO was aware of, or accepting of, Lee's and Moore's actions.[20] Therefore, the in pari delicto doctrine is not a basis on which to dismiss this case.

### THE SEC's CAUSES OF ACTION

The SEC's complaint asserts claims against Lee, Cassidy, O'Connor and Connor. Lee and Connor entered into Consent Judgments leaving Cassidy and O'Connor as the only remaining defendants (the "Remaining SEC Defendants"). (See Docket Entry Nos. 2 and 23.) Defendants Cassidy has submitted answers. (See Docket Entry No. 24.) Defendant O'Connor has moved to dismiss.

The SEC charges O'Connor with primary violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder, as well as Section

---

[20] The Second Circuit has recognized that questions exist regarding the doctrine of in pari delicto and recently certified several questions to the New York Court of Appeals. See Kirschner v. KPMG LLP, 590 F.3d 186, 194-195 (2d Cir. 2009).

17(a) of the Securities Act of 1933 for securities fraud. The SEC also asserts claims under Section 13(b)(5) of the Exchange Act and Rule 13b2-1 for causing the falsification of BMO's and Optionable's books and records. Finally, the SEC asserts claims under Rule 13b2-2 for misstatements to Optionable's auditors and Rule 13a-14 for misstatements in signed certifications. In the alternative, pursuant to Section 20(e) of the Exchange Act, the SEC charges O'Connor with aiding and abetting the other defendants,' as well as BMO's and Optionable's primary violations of Section 10(b) and Rule 10b-5.

The SEC alleges that "O'Connor handled the mechanics of the 'u-turn' process for a period of time in 2005…O'Connor gave Connor the names of the BMO personnel to whom Connor should send the quotes." (SEC Cplt. ¶ 26.) O'Connor would sometimes review and approve Connor's work after he took over handling the mechanics of the "u-turn" process. (Id. ¶ 27.)

The SEC also alleges that "O'Connor also made materially false and misleading statements about Optionable's business to Optionable's investors and outside auditors." (Id. ¶ 38.) The SEC alleges that O'Connor signed Optionable's Form 10-KSB for the fiscal year ending December 21, 2006, which falsely touted the independent derivatives valuation services that Optionable provided. (Id. ¶ 39.) As BMO was Optionable's largest customer, and Optionable was allegedly defrauding, rather than assisting with valuation services, these statements were misleading. (Id.) Optionable's quarterly reports, also signed by O'Connor, did not disclose that their business relationship with BMO was dependant on conspiring with Lee. (Id. ¶ 40.) The SEC further alleges that O'Connor falsely stated that he did not have knowledge of any fraudulent conduct on the part of management when interviewed by Optionable's auditors in 2006. (Id. ¶ 42.)

On April 10, 2007, O'Connor sold approximately 1.8 million shares of Optionable stock to the NYMEX for approximately $4.9 million through Ridgecrest Capital, Inc., an entity he controlled. (Id. ¶ 43.)  The SEC alleges that O'Connor made material misrepresentations in the SWPA in violation of the Sarbanes-Oxley Act of 2002. (Id.)

## I.    The Fraudulent Scheme Claim

The SEC does not allege that O'Connor made a misstatement of, or omitted, a material fact in furtherance of the fraudulent scheme.  The basis of the Section 10(b) and Rule 10b-5 claims are the allegations that he committed a manipulative or deceptive act in furtherance of the scheme.   Therefore the SEC's claims relating to the fraudulent scheme are confined to subsections (a) and (c) of Rule 10b-5 and not subsection (b). O'Connor's arguments for dismissal relating to misstatements and omissions are therefore inapplicable to the fraudulent scheme claims.  O'Connor seeks dismissal of a perceived Rule 10b-5(b) claim relating to the First Claim of the Complaint, however, the SEC has not asserted a primary claim against O'Connor under that subsection, thus rendering the issue moot.  (See Transcript of Oral Argument 10/21/09 PP. 32:25 – 33:4.)

"Any person or entity…who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming all of the requirements for primary liability under Rule 10b-5 are met. Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 191 (1994).  Section 10(b) and Rule 10b-5 impose primary liability on any person who *substantially participates* in a manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive device (such as the creation or financing of a sham entity) intended to mislead investors, even if a material misstatement by another person creates the nexus between the scheme and the

securities market.  <u>Filler v. Lernout (In re Lernout & Hauspie Sec. Litig.)</u>, 236 F. Supp.

2d 161, 173 (D. Mass. 2003) (emphasis added) (discussing <u>SEC v. First Jersey Securities,</u>

<u>Inc.</u>, 101 F.3d 1450 (2nd Cir. 1996) <u>cert. denied</u>, 118 S. Ct. 57 (1997) and <u>SEC v. U.S.</u>

<u>Environmental, Inc.</u>, 155 F.3d 107 (2nd Cir. 1998) (extending primary liability to a

registered trader who "did not himself have a manipulative purpose" when he engaged in

deceptive trading at the direction of his employer).

      The securities fraud allegations against O'Connor in the SEC Complaint provide a

sufficient level of specificity under Rule 9(b).  <u>See</u> <u>SEC v. Simpson Capital Mgmt.</u>, 586

F. Supp. 2d at 208.  In order to satisfy the required particularity standards for its Rule

10b-5(a) and (c) claims, the SEC must specify what deceptive or manipulative acts were

performed, which defendant(s) performed them, when the acts were performed, and what

effect the scheme had on investors in the securities at issue.  <u>See</u> <u>In re Parmalat Sec.</u>

<u>Litig.</u>, 376 F. Supp. 2d 472, 493 (S.D.N.Y. 2005) (declaring as subject to Rule 10b-5 (a)

and (c), transactions that were deceptive because they "created an appearance of

substance where substance was lacking").

      In the instant matter, the SEC provides allegations that the defendants colluded to

deceive BMO's Market Risk division into believing that the quotes originating with Lee,

and "u-turned" by Optionable, were independent quotes.  These actions were allegedly

taken in order for Lee to "smooth" the appearance of his book, and resulted in BMO

approving his request for higher trading limits.  O'Connor is alleged to have participated

in the perpetration of the alleged fraud.  The result was an allegedly material

overstatement of BMO's net income in the fiscal year 2006 and the first quarter of 2007

resulting in damages to BMO and investors in Optionable.

The SEC has specifically alleged how O'Connor employed a deceptive device and engaged in a deceptive course of conduct to defraud. At a bare minimum, the SEC alleges that O'Connor knew that Lee was the source of the quotes and personally assisted with the "u-turn" process designed to "smooth" Lee's "book." This enabled Lee to enter into higher value trades for the purpose of disguising his underlying losses and ultimately led to hundreds of millions of dollars in losses. The SEC has made sufficient allegations of the defendants' personal involvement to satisfy Rule 9(b) and to survive the motion to dismiss its primary violation claims under subsections (a) and (c) of Rule 10b-5.

Scienter and the "In Connection With" Requirement

To satisfy the pleading requirements of Section 10(b) and Rule 10b-5, the SEC must allege that O'Connor "acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94 (1976). To successfully plead scienter the SEC must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). A strong inference must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc.551 U.S. at 314.

Allegations of motives possessed by most corporate directors and officers do not adequately allege scienter and the motive to retain a business' largest client is a general rather than specific motive. Novak v. Kasaks, 216 F.3d 300,308 (2d Cir. 2000). This proposition must be reconciled with the fact that "there will rarely be direct evidence of intent to defraud." Global Crossing, 322 F. Supp.2d at 344. The SEC alleges that O'Connor, as a founder, President, director and former CEO and Treasurer of Optionable,

35

which advertised its independent valuation services to the public, could not possibly have

thought that his conduct was anything but knowingly deceptive and reckless. In short, if

BMO wanted Lee's valuations, they could have simply asked him and eliminated their

reliance on BMO's valuation services entirely. The scheme is alleged to have provided

both the opportunity to sell stock at an inflated price and expand Optionable's business

and its corresponding status in the marketplace. O'Connor is alleged to have benefited,

in a concrete and personal way that an average shareholder could not, by entering into the

SWPA. He allegedly knew facts or had information to suggest that Optionable's public

statements were inaccurate on account of his participation in the "u-turn" process. Novak

v. Kasaks, 216 F.3d at 308. Therefore, the SEC has adequately pled that O'Connor acted

with the required element of scienter in order to survive the motion to dismiss.

**II.      The SEC's Misstatement and Omission Claims**

The SEC has brought claims under Section 17(a) of the Securities Act and Section

10(b) of the Exchange Act and Rule 10b-5 relating to material misstatements and

omissions made in Optionable's public filings and to NYMEX. The SEC Complaint

describes which certifications and public filings it alleges were in violation and how they

related to both Optionable and NYMEX. (SEC Cplt. ¶¶ 39–43.) A factual statement,

misrepresentation, or omission is material if there is a substantial likelihood that

the misrepresentation "would have been viewed by the reasonable investor as having

significantly altered the 'total mix' of information made available." Basic, Inc. v.

Levinson, 485 U.S. 224, 231-32, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988) (quoting TSC

Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). Phrased differently,

"materiality depends on the significance the reasonable investor would place on the

withheld or misrepresented information." Id. at 241. The misstatements and omissions

alleged here indicate that Optionable purported to be a profitable business when it was in fact knowingly relying on the alleged scheme to maintain its status. The false statements complained of would be material to a reasonable investor. Therefore, the motion to dismiss those claims relating to material misstatements and omissions brought pursuant to Section 10(b), Rule 10b-5(b) and Section 17(a) is denied.

**III.    The SEC's Aiding and Abetting Claims**

The SEC alleges that periodic reports issued by both BMO and Optionable violated the Exchange Act, that O'Connor knew that the alleged fraudulent scheme sought to bypass internal record keeping and accounting controls, and that O'Connor substantially assisted in perpetrating the fraudulent scheme. Accordingly the SEC has adequately pleaded a claim for aiding and abetting against O'Connor to survive the motion to dismiss.

## THE CFTC CAUSES OF ACTION

The CFTC Complaint (the "CFTC Complaint") alleges that Lee, Cassidy, O'Connor, Moore and Optionable violated § 4c(b) of the Commodity Exchange Act (the "CEA"), 7 U.S.C. § 6b(c) and Regulation 33.10, 17 C.F.R. § 33.10 promulgated thereunder. Defendant's Lee and Moore have entered into Consent Judgments with the CFTC. (See Docket Entry Nos. 64, 68.) Defendants Optionable, Cassidy and O'Connor move to dismiss.

Commodities Futures Markets

A futures contract is an agreement to buy or sell a commodity, such as natural gas, and to deliver that item at a certain date in the future. Every aspect of a futures contract traded on the NYMEX…is standardized except for the price…Options contracts are contracts which give the buyer the right, but not the obligation, to buy or sell a

specified quantity of futures contracts at a predetermined price on or before a given date,

regardless of the market price at the time the option is exercised.  In re Crude Oil

Commodity Litig., 2007 U.S. Dist. LEXIS 47902, 3-4 (S.D.N.Y 2007).  Besides futures,

some traders enter into swaps.  A swap is similar to a futures contract, although all swaps

are financially settled. . . Swaps can be structured to feature economics similar to

commodities futures. . . Swaps can be traded on the Intercontinental Exchange ("ICE"),

which unlike NYMEX is not regulated by the CFTC.  Extensive arbitrage generally keeps

the prices of ICE swaps and the corresponding NYMEX futures in lockstep.  In re

Amaranth Natural Gas Commodities Litig., 587 F. Supp. 2d 513, 522-523 (S.D.N.Y.

2008).  Commodities contracts traded OTC are often based on NYMEX prices.  In re

Crude Oil Commodity Litig., 2007 U.S. Dist. LEXIS 47902 at 4.

I.      **Violations of the CEA**

The CFTC alleges that each defendant violated Section 4c(b) of the CEA and

Commission Regulation 33.10 (a), (b) and (c).  Cassidy is accused of participating in the

three distinct fabricated quote practices, and failing to disclose Lee's and his own

fraudulent conduct.  The CFTC alleges that defendant O'Connor participated in the

broker bid/offer quotes practice and failed to disclose Lee's and his own fraudulent

conduct.   The CFTC further alleges that Cassidy, O'Connor and two unnamed

Optionable employees received Lee's broker bid/offer quotes, transmitted them in false

reports to BMO, and failed to disclose Lee's, as well as their own, conduct.  Optionable is

not charged with participating in Lee's mis-valuation of his natural gas positions.  They

are charged with deceiving BMO about the independent nature of the quotes provided at

mid-month and end of the month.  (CFTC Opp. P. 1.)

The motions to dismiss the CFTC Complaint present two primary arguments: (1) Section 4c(b) applies only to an "offer to enter into," "ent[ry] into" or a "confirm[ation of] the execution of" a transaction in violation of a CFTC Regulation; and (2) the CFTC Complaint impermissibly seeks to expand the reach of Section 4c(b) by employing Commission Rule 33.10, 17 C.F.R § 33.10. Defendants also argue that the CFTC's claims fail under Fed. R. Civ. P. 12(b)(6), and that the CFTC does not allege fraud with sufficient particularity under Fed. R. Civ. P. 9(b).

Defendants argue that because they did not offer, enter into or confirm any trade, but are rather alleged to have assisted Lee in a collateral effort to mis-value options already owned by BMO, that they have not violated the CEA or any Regulation promulgated thereunder. They claim that the CFTC wrongfully seeks to apply the "in connection with" language of Rule 33.10 to the alleged quid pro quo scheme in which Optionable received increased orders in exchange for assisting Lee in mis-valuing his "book".

While there exists only limited case law regarding the application of Section 4c(b) in conjunction with Rule 33.10 in this context, the CFTC's suggested use is not unprecedented. In CFTC v. First Am. Inv. Servs., an introducing broker ("IB") stipulated that it was liable under Section 4c(b) and Rule 33.10. 2006 U.S. Dist. LEXIS 53669 (S.D. Fla. 2006) ( an IB is "any person . . . engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market . . . who does not accept any money, securities, or property." Section 1a(23) of the Act, 7 U.S.C. § 1a(23)). Similarly, in CFTC v. Carnegie Trading Group, Ltd., employees of an IB were held liable for fraudulent solicitations under both Sections 4b(a)(2)(i) and (iii) and 4c(b) of the CEA and Regulation 33.10, where their customers

accounts were held by a related corporation.  450 F. Supp. 2d 788, 801 (N.D. Ohio 2006).

Furthermore, the United States Supreme Court has recently provided a more expansive

interpretation of the "in connection with" requirement in the context of class actions.

Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 89 (U.S. 2006)

(fraudulent manipulation of stock prices--unquestionably qualifies as fraud "in

connection with the purchase or sale" of securities in a suit brought by "holders" of a

stock under SLUSA).  See also Korsinsky v. Salomon Smith Barney Inc., 2002 U.S.

Dist. LEXIS 259 at 10 (S.D.N.Y. 2002) (holding that positive recommendations made by

a research analyst with knowledge of a company's financial problems in order to boost

Salomon's investment banking business was "in connection with" the purchase or sale of

securities).

        The United States Court of Appeals for the Second Circuit has "broadly construed

the phrase 'in connection with,' holding that Congress, in using the phrase 'intended only

that the device employed, whatever it might be, be of a sort that would cause reasonable

investors to rely thereon, and, in connection therewith, so relying, cause them to purchase

or sell a corporation's securities.'" In re Carter-Wallace, Inc. Secs. Litig., 150 F.3d 153,

156 (2d Cir. 1998) (quoting SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 860 (2d

Cir.1968) (en banc)). Generally, the requisite connection exists "when the fraud alleged is

that the plaintiff bought or sold a security in reliance on misrepresentations as to its

value." In re Ames Dep't Stores Inc. Stock Litig., 991 F.2d 953, 966 (2d Cir. 1993).

Those cases that have dismissed for failure to satisfy the "in connection with"

requirement typically do so where "the alleged misrepresentations made by defendants

were not 'in connection with' the purchase or sale of securities, because they did not

pertain to the value, nature or investment characteristics of the securities at issue."

40

Production Resource Group, LLC v. Stonebridge Ptns. Equity Fund, 6 F. Supp. 2d 236,

240 (S.D.N.Y. 1998). See also Saxe v. E.F. Hutton & Co., 789 F.2d 105, 108 (2d Cir.

N.Y. 1986) (affirming dismissal of a Rule 10b-5 claim where plaintiff "failed to allege

any misrepresentation concerning the securities appellant sold").

　　　　In interpreting the "in connection with" requirement of the Commodities

Exchange Act, courts generally look to interpretations of the "in connection with"

requirement of 10(b) of the Securities Exchange Act.  Kearney v. Prudential-Bache

Securities, Inc., 701 F. Supp. 416, 421 (S.D.N.Y.1988) (standard met where the "alleged

fraud concern[s] the fundamental nature of the commodity futures contract").   Causation

under federal securities laws is two-pronged: a plaintiff must allege both transaction

causation, i.e., that but for the fraudulent statement or omission, the plaintiff would not

have entered into the transaction; and loss causation, i.e., that the subject of the fraudulent

statement or omission was the cause of the actual loss suffered." Suez Equity Investors v.

Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001).

　　　　It appears that the defendants in the instant case are essentially arguing that the

CFTC has failed to allege transaction causation.  It is true that the CFTC does not point to

any isolated transaction. Their theory is that, by participating in the fraudulent scheme,

Lee was able to "enter into additional natural gas options positions." (CFTC Cplt. ¶ 36.)

He also "entered into additional natural gas paired options trades" during the course of

the alleged scheme.  (Id. ¶ 39.)  The CFTC explicitly argues that the fraudulent scheme

was "in connection with" offers for and entry into certain option positions.  Lee was

allowed to continue entering into commodity trades on the NYMEX as a result of the

brokers' bid/offers quotes.  (Id. ¶ 46.)  The CFTC claims that the brokers' (Optionable

and an unnamed entity) actions "enabled Lee to continue to enter into natural gas options

41

for several years," and that these transactions would not have occurred absent

Optionable's forwarding of fraudulent bids and offers in connection with trades. (Id. ¶

47). Section 4c(b) expressly prohibits any "offer to enter into…any transaction" that

violates a "rule, regulation or order." The CFTC's allegations that Optionable was

functioning as a broker when it submitted "offers" as opposed to valuations, are accepted

as true, and therefore make dismissal inappropriate. Accordingly, the CFTC may rely on

the "in connection with" language of Rule 33.10 in asserting its claims pursuant to

Section 4c(b).

## II.       Particularity Under Federal Rule of Civil Procedure 9(b)

When applying Rule 9(b), the Second Circuit requires that a complaint alleging

fraud must (1) specify the statements, oral or written, that the plaintiff contends were

fraudulent, either as misrepresentations or containing fraudulent omissions; (2) identify

the speaker or the writer; (3) state where, when and to whom the statements were made;

and (4) explain why the statements were fraudulent. Fadem v. Ford Motor Co., 352 F.

Supp. 2d 501, 505 (S.D.N.Y. 2005) citing Acito v. IMCERA Group, Inc., 47 F.3d 47, 51

(2d Cir. 1995). In regards to claims alleging a scheme involving deceptive or

manipulative acts, plaintiffs must specify what deceptive or manipulative acts were

performed, which defendants performed them, when the acts were performed, and what

effect the scheme had on investors in the securities at issue. In re Parmalat Sec. Litig.,

376 F. Supp. 2d 472 at 493 citing SEC v. U.S. Envtl., Inc., 82 F. Supp.2d 237 at 240.

The CFTC proffers two ways that they satisfy the requirements of Rule 9(b); first, the

valuations forwarded to BMO by Optionable were false, and therefore fraudulent, and

second, that Optionable mislead BMO regarding the source of the information.

The CFTC charges Cassidy, O'Connor and an unnamed Optionable Employee with deceit through the issuance of false reports and omission of material information. (CFTC Cplt. ¶¶ 55, 57, 62.)  The CFTC alleges that Optionable and its employees were BMO's brokers and therefore owed BMO a fiduciary duty.  See Kolbeck v. LIT Am., 923 F. Supp. 557, 572 (S.D.N.Y. 1996) (A duty of care arises only when the broker does business with the plaintiff.  Then, the duty of the broker is to attend to the plaintiff's business with due care).  See also United States v. Dial, 757 F.2d 163, 168 (7th Cir. 1985).  Optionable's argument that Lee, as opposed to BMO, was their client is without merit, as he was an employee of BMO, the institution to which Optionable furnished the quotes and upon which those employees carrying out the IPV and VSV Processes relied.

The crux of the CFTC's claims is that had BMO been informed that Lee was the source of the bids and offers, BMO would not have utilized Optionable's services in carrying out the IPV and VSV Processes.  As a result, Lee was permitted to enter into more trades and forward more business to Optionable.   With regard to Optionable's intent, the Second Circuit permits plaintiffs to establish scienter in one of two ways: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious behavior or recklessness." Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000) (quoting Acito v. IMCERA Group, Inc., 47 F.3d 47, 51 (2d Cir. 1995)).  As alleged, Optionable knew that Lee was the source of the bids and offers, and it in turn portrayed them as independently derived quotes from the marketplace to BMO's "back office." Optionable knew BMO would find that fact to be important, and therefore material.  That alleged conduct constitutes strong circumstantial evidence of conscious misbehavior or recklessness, and therefore meets the standard required by Rule 9(b).

43

### III.   The Motions Submitted by O'Connor and Cassidy

Defendant O'Connor, in addition to joining Optionable's motion, argues that

because BMO maintained a non-discretionary account with Optionable, no fiduciary duty

can exist.  He claims that no "investment decision" was affected, that the alleged

misrepresentations were not material, and that the alleged deceit was not "in connection"

with an options transaction.  Defendant Cassidy argues that he did not possess the

required scienter, that no fiduciary duty existed, and that the breach of the RealMarks

agreement does not sound in fraud.

A non-discretionary relationship does not preclude the existence of a fiduciary

duty.  See United States v. Szur, 289 F.3d 200, 211 (2d Cir. 2002).  A material fact is one

that "would affect a reasonable investor's judgment." Tsc Indus. v. Northway, 426 U.S.

438, 445 (U.S. 1976).  The source of the bids/offers can certainly qualify as material and

enabled Lee to enter into additional options transactions.  Lastly, the grid/bid offer quotes

were simply the evolution of an ongoing fraudulent scheme and therefore not restricted to

a breach of contract claim.  For those reasons discussed above, and for substantially those

articulated in the CFTC's opposition, the Court denies the separate motions to dismiss the

complaint submitted by O'Connor and Cassidy.

### THE CMEG/NYMEX CAUSES OF ACTION

The NYMEX action stems from the sale of $28.9 million worth of Optionable

stock by the defendants to NYMEX in April of 2007, and the simultaneous issuance of a

warrant for the purchase of additional stock.[21]  (Collectively, the "SWPA").  NYMEX

asserts claims for: (1) violations of Section 10(b) of the Securities Exchange Act and

Rule 10b-5; (2) control person liability claims pursuant to Section 20(e) of the Exchange

---

[21] CMEG is the successor and successor-in-interest of NYMEX. (CMEG Cplt. ¶ 1.)

44

Act against Nordlicht, Cassidy and O'Connor; (3) breach of contract and warranty; (4) common law fraud; (5) aiding and abetting common law fraud; (6) negligent misrepresentation and; (7) punitive damages.

Defendants move to dismiss under Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), or in the alternative to strike certain allegations under Federal Rule of civil Procedure 12(f).

## I. NYMEX's Complaint Meets the Standards of the PSLRA and Rule 9(b)

The Defendants alleges that NYMEX impermissibly relies on the allegations set forth in the related SEC and CFTC actions.   They submit that ¶¶ 3-19, 16, 20-25, 32-40, 54, 55, 70-74 and 107 of the NYMEX Complaint should be struck as immaterial because they rely on government allegations, and that ¶¶ 14, 15, and 65 should be struck for expressly discussing the government's allegations that have not yet resulted in an adjudication on the merits, under Rule 12(f).  Even if the aforementioned paragraphs are not struck, Optionable argues that they are insufficient to meet the standard set forth under the PSLRA and Rule 9(b), since they do not "state with particularity all facts upon which the belief is formed."

Optionable alleges that NYMEX has failed to allege the "unlawful scheme" with particularity under 9(b) as the Complaint fails to mention any instance in which Optionable represented that the quotes it provided were derived "independently." Optionable further alleges that the misrepresentation claims relating to its 2005 and 2006 Forms 10-K are misplaced, as are the claims for nondisclosure relating to defendant Cassidy's criminal record.  The Defendants argue that Judge Kaplan rejected similar claims relating to Cassidy's record in In re Optionable, Inc., 577 F. Supp. 2d 681, 691-693 (S.D.N.Y. 2008).

45-

Fed. R. Civ. P. 12(f) permits the Court to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." To prevail on a motion to strike, a party must demonstrate that "(1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant." Roe v. City of N.Y., 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001).

In support of the 12(f) branch of their motion, defendants argue that if the government's complaint(s) did not result or has not yet resulted, in an adjudication on the merits that it cannot be cited by a plaintiff in their complaint. In re Merrill Lynch & Co. Research Reports Sec. Litig., 218 F.R.D. 76, 77-78 (S.D.N.Y. 2003).

There is no absolute rule barring a private plaintiff from relying on government pleadings and proceedings in order to meet the Rule 9(b) and PSLRA thresholds. Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC, 376 F. Supp. 2d 385, 395 (S.D.N.Y. 2005). Furthermore, there is nothing improper about utilizing information contained in an SEC complaint as evidence to support private claims under the PSLRA. NYMEX's acknowledgement and reliance on the SEC and CFTC allegations does not demonstrate that it lacks evidentiary support, but rather provides it with the necessary evidentiary support. De La Fuente v. DCI Telecomms., Inc., 259 F. Supp. 2d 250, 260 (S.D.N.Y. 2003) (finding that an SEC complaint may provide more evidentiary support then similar claims based upon media reports). Even if such a rigid rule existed, Defendants' incorrectly assert that "the basis for all of the allegations. . .about this unlawful scheme, are the SEC complaint, the CFTC complaint, and the indictment of Mr. Cassidy." (Transcript of Oral Argument Nov. 24, 2009 8:19-23.) NYMEX indicates that they rely on certain SEC filings, including filings referred to them by the Defendants.

(Id. ¶¶ 14, 43.) Lastly, while NYMEX's claims involve the alleged scheme, they are predicated on breaches of the SWPA, an agreement about which the Defendants negotiated with NYMEX during "conversations, meetings and other communications." (Id. 41.) Accordingly, the Rule 12(f) branch of the motions to dismiss is denied.

## II.  Scienter and Aiding and Abetting

Defendants argue that general motives such as profiting from the sale of stock, do not meet the requirements of the PSLRA and 9(b).  They claim that they could only expect to profit from the SWPA if it maintained its stock price for 18 months following the date of execution, and that the parties intended to partner with NYMEX and realize profits by engaging in future transactions.  Defendants further argue that the fact that they sold their stock below market value does not give rise to an inference of scienter. See Novak v. Kasaks, 216 F.3d 300 at 308-09.  Lastly, Defendants argue that, absent the existence of a fraudulent scheme and scienter, that a claim for aiding and abetting under Federal Rule 20(e) must fail.   For substantially those reasons discussed in the BMO, SEC and CFTC sections above (i.e. concrete and personal benefits, conscious misbehavior or recklessness in perpetrating the "u-turn" scheme), the Court finds that NYMEX has plead the required degree of scienter, and does not dismiss its aiding and abetting claims.

## III. The Individual Defendants Motions and The State Law Claims[22]

---

[22] Defendants Cassidy and Pierpont include additional facts in their brief, namely that Cassidy did not sell Optionable shares outside of the SWPA and that NYMEX betrayed Optionable when it announced that it would utilize the CME Globex platform, a competitor of Optionable's OPEX platform.  They claim that this ultimately caused the stock's loss in value.  In addition, Ben Chesir, NYMEX's Vice President of New Product development was appointed to Optionable's board as part of the SWPA.  He subsequently resigned on May 14, 2009, allegedly causing damage to Mr. Cassidy.  The Court has considered these additional facts and finds them insufficient to grant a motion to dismiss.

O'Connor and Ridgecrest submit that the negligent misrepresentation claim against them is preempted by New York State's Martin Act, N.Y. G.B.L. §§ 352, *et. seq.* NYMEX contends that the scope of the Martin Act is limited to misrepresentations concerning information specifically required by a regulation of the New York Attorney General of a provision of the Act. <u>Kerusa Co. LLC v. WIOZ/515 Real Estate Limited Partnership</u>, 12 N.Y. 3d 236, 246 (2009). The fact that the Attorney General could prosecute a case on the same set of facts under the Martin Act does not preclude a plaintiff from maintaining a common-law cause of action. <u>Scalp & Blade, Inc. v. Advest, Inc.</u>, 281 A.D.2d 882 (4th Dep't, 2001). Therefore, the negligent misrepresentation claims against O'Connor and Ridgecrest will not be dismissed.

Defendant Nordlicht argues that, because the actions upon which NYMEX relies do not name him as a defendant, NYMEX has failed to state a claim against him. For substantially the same reasons, Nordlicht contends that NYMEX has not plead scienter as required under Rule 9(b) and the PSLRA, nor has it plead control person liability. The NYMEX Complaint asserts that as Optionable's Chairman, Nordlicht had direct oversight responsibility for the operations at Optionable. (Opp. Ex. H, Optionable's 2005 10-K at 10.) Furthermore, Nordlicht is alleged to have supported Cassidy and O'Connor's refusal to provide BMO with certain backup data (NYMEX Cplt. ¶¶ 54-55.) Lastly, Nordlicht is alleged to have benefited in a personal and concrete way that an average shareholder could not, by selling stock pursuant to the SWPA.

The Court has carefully considered the additional arguments relating to the state law claims and finds that none warrants dismissal of those claims.

## CONCLUSION

Defendants' motions to dismiss in each of the entitled actions are denied.


Dated: June 18, 2010
       New York, New York

                                                    SO ORDERED:

                                                    _____
                                                    GEORGE B. DANIELS
                                                    United States District Judge

49