UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
_____
                                                    )
BANK OF MONTREAL                                    )    09 – CIV – 7557 (GBD)(JLC)
                                                    )    ECF Filed
         Plaintiff,                                 )
                                                    )
    v.                                              )
                                                    )
OPTIONABLE, INC., MF GLOBAL INC.,                   )
KEVIN P. CASSIDY, EDWARD J.                         )
O'CONNOR, MARK A. NORDLICHT.,                       )
RYAN B. WOODGATE, SCOTT CONNOR                      )
and JOSEPH D. SAAB,                                 )
                                                    )
         Defendants.                                )
_____ )


**DEFENDANT KEVIN P. CASSIDY'S
MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFF'S MOTION
<u>TO DISMISS ITS COMPLAINT WITHOUT  PREJUDICE</u>**


LAWRENCE R. GELBER
ATTORNEY AT LAW
THE VANDERBILT PLAZA
34 PLAZA STREET – SUITE 1107
BROOKLYN, NEW YORK 11238

www.GelberLaw.net
Phone: (718) 638 2383  Fax: (718) 857 9339
GelberLaw@aol.com     Cell: (917) 992 3596

# TABLE OF CONTENTS

**Section**                                                                                          **Page No.**

Table of Contents……………………………………………………………..……….……i

Table of Authorities ……………………………………………………………..……....ii

**INTRODUCTION**……………………….………………………………………..…………1

**BACKGROUND**  ……………………………………………………………..……………. 2

SIGNIFICANT BACKGROUND EVENTS TO BMO'S 2007 BLOW-UP………..……..……4

THE EVENTS THAT CAUSED BMO'S TRADING LOSSES………………………….…  5

BMO LAUNCHES ITS BLAME SHIFTING STRATEGY   …………………………………..  7

ARGUMENT …………………………………………………………………………….. 11

CONCLUSION  ……………………………………………………………………….14

## **TABLE OF AUTHORITIES**

**CASE**                                                                                                     **Page No**.

*Bridgeport Music, Inc. v. Universal-MCA Music Publishing, Inc.*,
583 F. 3d 948 (6th Cir. 2009)...…………………………………………..……..11

*Camilli v. Grimes,* 436 F. 3d 120 (2d Cir. 2006)…………………………………..11

*Cone v. West Virginia Pulp & Paper Co.,*
330 U.S. 212, 217, 67 S.Ct. 752, 91 L.Ed. 849 (1947)……………………………11

*D'Alto v. Dahon California, Inc.,* 100 F.3d 281, 283 (2d Cir.1996)……………….12

*Jones v. SEC,* 298 U.S. 1, 19, 56 S.Ct. 654, 80 L.Ed. 1015 (1936)……………..11

*In re Sizzler Restaurants Intern. Inc.,* 262 BR 811 (Br. C.D. Cal. 2001)………...13

*LeBlang Motors, Ltd. v. Suburu of Am., Inc.*,
148 F.3d 680, 685 (7th Cir. 1998)…………………………………………………..11

*McCants v. Ford Motor Co.*, 781 F.2d 855, 856 (11th Cir. 1986)..……………...11

*Phillips USA, Inc. v. Allflex USA, Inc.*, 77 F.3d 354, 358 (10th Cir. 1996)..……..14

Zagano v. Fordham University, 900 F.2d 12, 14 (2d Cir.1990)…………………..11, 12

**STATUTES   RULES   REGULATIONS   TREATISES**

Federal Rules of Civil Procedure Rule Rule 41(a)(2)………………..……..…..…11

## INTRODUCTION

Defendant Kevin P. Cassidy (Cassidy) opposes Plaintiff Bank of Montreal's (BMO) "without prejudice" motion to dismiss its claims against him.  The claims should be dismissed, but *with* prejudice, because: (1) BMO cannot prove that, *notwithstanding his guilty plea* (discussed *infra*), Cassidy or anyone else other than BMO itself caused BMO any losses, and (2) BMO brought this lawsuit[1] not because it believed Cassidy caused its losses, but because suing Cassidy was part of a well-engineered, professionally designed and ultimately malicious effort to shift the blame in order to protect BMO and its CEO, William Downe (Downe).  Because Cassidy did not cause BMO any loss (and no contrary evidence exists), BMO's repeated reference to Cassidy's plea deal with the Department of Justice (DOJ) is a red herring in BMO's argument here.

BMO, after being advised by Magistrate Judge Cott that it would most likely have to produce Downe for deposition in January, 2014 (Gelber Dec. Ex. S), and on the weekend before it was required to produce three witnesses for deposition, chose to fold its tent and go home.  The reasons it propounds for its departure are patently absurd and to permit BMO to now withdraw without prejudice would interfere with Cassidy's right to bring, if evaluation and further research permit, a claim for malicious prosecution as well as for other frauds just recently uncovered.

BMO's transparently flimsy rationale for dropping its $680 million case is that Cassidy cannot afford to pay the $8.6 million imposed as restitution if sustained on the

---

[1] A copy of the Complaint is annexed as Exhibit **A** to the Declaration of Lawrence R. Gelber (Gelber Dec.) sworn to November 27, 2013.

pending appeal.[2] Neither the Department of Justice (DOJ) nor BMO has been able to demonstrate that Cassidy caused any losses to BMO[3]. The evidence adduced thus far reveals that BMO targeted Cassidy and others (Gelber Dec. Ex. M) in order to conceal BMO's own deeply ingrained incompetencies (Gelber Dec. Ex. G) to protect itself from regulators, prosecutors and shareholder wrath, and to defraud its insurance carrier and ultimately this Court.

## BACKGROUND

BMO blamed its chief natural gas (NG) derivatives trader, David Lee (Lee), for "large losses caused by Lee's trading strategies". (Compl. ¶1). BMO says Lee's "exchange of options for options" (EOO) trading strategy (Compl. ¶ 82) "caused BMO to lose hundreds of millions of dollars." (Compl. ¶ 87). Though Cassidy had no input into Lee's supposed EOO strategy, and no contrary evidence, after 4 years of discovery, exists, BMO sued Cassidy *not* Lee.

BMO alleged Lee falsely entered EOO trades into BMO's books (Compl. ¶ 86), under the supervision of BMO employee Robert Moore (Moore), who (i) knew about Lee's EOO trades, (ii) knew that Lee was falsely depicting them as profitable (iii) told Lee to stop and (iv) failed to report Lee to Moore's superiors. (Compl. ¶¶ 93-95). Though Cassidy had no access to BMO's books, BMO sued Cassidy *not* Moore.

On or around May 23, 2007, BMO filed a Form 6K with the SEC. reporting a "previously announced $680 million dollar" year to date "Commodities Trading" loss.

---

[2] A copy of Cassidy's "Brief for Defendant-Appellant" dated November 7, 2013, is annexed as Exhibit **B** to the Gelber Dec.

[3] Indeed, the restitution is not premised on any losses supposedly caused to BMO but rather on the amount of money BMO paid in brokerage commissions and bonuses to its own employee.

2

BMO's commodities trading loss was the foreseeable culmination of years of defective valuation procedures, poor risk controls and inadequate supervisory systems. After BMO disclosed, in its 2001 annual report, a $51 million NG trading loss[4] to its shareholders, it retained a major accounting firm (Price Waterhouse) that advised BMO it had serious defects in its systems. BMO ignored the advice. So, in 2003 BMO was sued by AEP Energy Services, Inc. (AEP)[5], in connection with a $94 million dollar valuation discrepancy.  BMO's defective valuation procedures, which included applying wrong formulae, also regularly caused valuation issues with counterparties, such as HETCO, with whom BMO had a $5 million valuation discrepancy.[6]

By early 2007, with no effective controls in place, BMO had amassed an "utterly gigantic" [7] mostly proprietary position of over 7.6 million NG derivatives contracts.[8]

In late 2006 or early 2007, as its problems started to rise to the surface, BMO engaged Deloitte & Touche (Deloitte), to analyze BMO's systems. In April, 2007, Deloitte rendered a non-public report: "BMO Capital Markets Commodity Risk Measurement, Valuation & Control Infrastructure Assessment" (the Deloitte Report)

---

[4] BMO blamed the loss on its then trader Joseph Adevai. The SEC, in 2008 and again in 2012, alleged that BMO had fired Adevai for mismarking his book (i.e., assigning incorrect values to BMO's NG portfolio); first at ¶16 of its complaint in SEC v. Lee et al. 08 Civ. 9961 (GBD)(S.D.N.Y.) and again at ¶22 of its amended complaint filed August 14, 2012.

[5] AEP Energy Services, et ano. v. Bank of Montreal 03 Civ. 00335 (JLG-NMK) (S.D. Ohio). A copy of the first amended complaint in the AEP case is annexed as Exhibit **C** to the  Gelber Dec.

[6] A copy of the email chain reflecting the HETCO valuation dispute is annexed as Exhibit **D** to the Gelber Dec.

[7] A copy of the transcript of a telephone conversation between BMO employees Murray McIntosh and Pat Cronin as dated April 11, 2007 is annexed as Exhibit **E** to the Gelber Dec.

[8] A copy of the first page of the draft memo from Penny Somerville to Murray McIntosh dated January 2007 reflecting 7,613,906 total NG contracts is annexed as Exhibit **F** to the Gelber Dec.

3

detailing BMO's 40 (forty) or so deviations (six of which Deloitte deemed severe) from standard industry practice in the conduct, operation and valuation of BMO's high-risk NG derivatives trading efforts[9].

The Deloitte Report nowhere criticized Optionable, notwithstanding the false stories to that effect leaked by BMO to the press. It did, however, severely critique BMO, noting among BMO's deviations from industry standards: **BMO's failure to** (i) comparatively validate recorded telephone orders with actual trade confirmations; (ii) use automated procedures, to upload official price data sources and instead rely on its Front Office to *manually* update pricing spreadsheets; (iii) provide sufficient independence to Market Risk to ensure the integrity of gathered data; (iv) include critical portfolio attributes such as position by book, commodity and instrument in the management reporting package; (v) use more than one external source of data[10];  (vi) **use an adequate valuation equation or formula**; (vii) account for seasonality in its valuations; (viii) meet prevailing industry practices for risk model testing by using a six non-consecutive day approach when standard minimum  industry practice called for a thirty consecutive business day approach; among some thirty or so other deficiencies.

<u>SIGNIFICANT BACKGROUND EVENTS TO BMO'S 2007 BLOW-UP</u>

In June / July 2006, the MotherRock LP (MotherRock) hedge fund formed by former NYMEX executives lost some $230 million dollars trading NG derivatives.  Then, in September 2006, in the wake of MotherRock, Amaranth Advisors LLC (Amaranth), a BMO client, lost a record $6.5 billion dollars trading NG derivatives.

---

[9] A copy of the Deloitte Report is annexed as Exhibit **G** to the Gelber Dec.

[10] This despite Cassidy's advice to BMO to use multiple sources, as discussed, *infra.*

4

BMO was thus on sharp notice of the severe risks of not rectifying its defective systems. Nevertheless, in January, 2007, Bill Downe declined to change BMO's "method for determining market" even though BMO's Chief Risk Officer, Bob McGlashen, emailed Downe on January 26, 2007 to report **a possible $50 million**[11] "adjustment" in "Bob Moore's book, predominantly Natural Gas."

In fact, instead of *reducing* risk, BMO, with zero input from Cassidy or Optionable, voluntarily chose to *increase* risk multifold, jumping into the breach created by the Mother Rock / Amaranth debacles, acquiring an unprecedented position in NG options, some 7.6 million open contracts[12], upon information and belief the single largest position in global trading history, dwarfing the number of contracts that had contributed to the demise of Amaranth.

## THE EVENTS THAT CAUSED BMO'S TRADING LOSSES

BMO allowed its NG derivatives portfolio to grow so large that, starting in the fall of 2006, BMO was losing over $1 million every single day (some days approaching $2 million), month in and month out, due only to the passage of time; its money was figuratively "evaporating"; literally disappearing. BMO positioned itself to *automatically lose* $2-$3 million every 36 hours or so. The automatic loss of value in an options book

---

[11] Email dated January 29, 2007 annexed as Exhibit **H** to Gelber Dec.

[12] In a New York Times report in early 2011, Warren Buffett defended Berkshire Hathaway's use of derivatives, when the company had about 250 derivative contracts. "I want to know every contract…but I can't do it with 23,000 that a bunch of traders are putting on." He noted that when Berkshire bought General Re in 1998, General Re had 23,000 derivative contracts. "I could have hired 15 of the smartest people, you know, math majors, Ph.D.'s. I could have given them carte blanche to devise any reporting system that would enable me to get my mind around what exposure that I had, and it wouldn't have worked," he said to the government panel. "Can you imagine 23,000 contracts with 900 institutions all over the world with probably 200 of them names I can't pronounce?" Berkshire decided to unwind the derivative deals, incurring some $400 million in losses. Warren Buffet could not handle 23 thousand derivatives contracts, but Downe and BMO believed BMO could handle 7.6 million of them.

5

is called "theta loss: or "theta erosion". Just as water in a pot over a fire evaporates due to heat, the value of options in a portfolio decreases due to the passage of time. To carry the analogy forward, instead of turning off the heat, BMO put more water into the pot. "The time decay was in the range of $1-1.5MM per day over the last quarter. The business was unable to offset this cost of theta due to lower client flow and lower volatility. (A quick calculation of approximately USD1mm/day for the quarter is USD90mm of theta expense **and explains a large portion of our trading losses**.)"[13]

The "utterly gigantic" (Gelber Dec. Ex. E) volume of BMO's open contracts, combined with (i) BMO's multiple deviations from industry standards as detailed in the Deloitte Report (Gelber Dec. Ex. G); (ii) million-dollar-a-day theta erosion (Gelber Dec. Ex. I), and (iii) *BMO's failure to heed Cassidy's advice (detailed below),* among other factors within BMO's exclusive control, predictably resulted in BMO's second major loss in seven years.

Downe himself said the 2007 loss would have not occurred had BMO had proper risk controls in place. Specifically, on or around May 5, 2007, Downe wrote: "*The reason the book is illiquid, as opposed to the market being illiquid, is it has **a lot** of thinly traded positions. **It happens to be a fact and you couldn't lose this much money by taking one gigantic bet if you had risk controls in place**".[14] (Emphasis added). But BMO did not have such controls. Cassidy not telling BMO that the accurate month-end sample

---

[13] A copy of the Draft Commodities Brief, written by Penny Somerville on or around April 21, 2007, is annexed as Exhibit **I** to the Gelber Dec.

[14] Email dated May 5, 2007 from William Downe to Andy Plews is annexed as Exhibit **J** to the Gelber Dec.

6

quotes Optionable was testing in the market originated with Lee was irrelevant to BMO's losses.

Moreover, BMO knew, without needing to be told by Cassidy, that the quotes originated with Lee. "Some of Optionable quotes come from BMO…."[15] And even more pointedly: "The current practice of collecting quotes from other broker's is not independent *as we go through the trader to obtain them*."[16] (Emphasis added).

After BMO announced its loss, the Canadian press questioned the competence and risk management capabilities of BMO and particularly Downe.

For example, on May 18, 2007, Canadian Banks & Insurance wrote:

> This is not life-threatening for a bank that earned $2.7-billion in profit last year, but its credibility is on life support. **The crisis exposes a disconnect between its reputation as the safe, cautious bank among Canada's Big Five and internal practices. And it happened in the division Mr. Downe used to head, capital markets.** Given the size of the losses, some believe they build up over many months. "The absolute size of the estimated commodity trading losses far exceeds the bank's average market value exposure to commodities risk, is disproportionate to its total trading revenues, and does not reflect BMO's stated strategy of being a low-risk bank," credit rating agency Standard & Poor's said in a note. [Emphasis provided].

Evidently fearful of the truth being exposed by the press, BMO hired Dan Klores Communications LLC (DKC), a public relations firm, to implement a "strategy of assigning blame to Optionable" using "off the record tactics"[17] to manipulate Canadian newspapers, such as the Financial Post and the Globe and Mail, to issue false leaks to

---

[15] Handwritten notes of Penny Somerville dated February 2, 2007, are annexed as Exhibit **K** to the Gelber Dec.

[16] A copy of the email from Murray McIntosh to Eric Tripp April 5, 2007 is annexed as Exhibit **L** to the Gelber Dec.

[17] The Memorandum dated May 18, 2007 from DKC is annexed as Exhibit **M** to the Gelber Dec.

the press and make false allegations, to perpetrate a cover-up of BMO's exclusive responsibility for the claimed 2007 losses and scapegoat Optionable and Cassidy. For example:

    a.    BMO falsely leaked that the Deloitte Report was critical of Optionable, when it was not; it was critical only of BMO;

    b.    BMO falsely said that the "reliability" of quotes from Optionable was in question, when the quotes were unquestionably reliable;

    c.    BMO falsely asserted that a "multiple contributor" source of monthly quotes – Totem – showed vastly inconsistent quotes from those provided by Optionable, even though, according to an from the Director of Totem Commodities Tom Charlesworth to Murray McIntosh at BMO[18] there was **no material difference when an "apples to apples" comparison was made**;

    d.    BMO falsely and maliciously leaked that Cassidy discouraged BMO from checking sources other than Optionable for month-end data points when the well-documented opposite was true – Cassidy told BMO manager Murray McIntosh (McIntosh) to use additional sources[19] and not rely exclusively on Optionable. Cassidy's advice was known and acknowledged by BMO's risk officer, Penny Somerville.[20]

The "story" concocted by BMO was: (i) BMO sought end of the month market data about a miniscule portion of its NG book (ii) BMO wanted these end of month data to be "independent" of data provided by Lee, as supervised by Moore, (iii) BMO lost its shirt because Cassidy did not tell BMO that the data Optionable circulated in the market was not independent as it originated with BMO through Lee, and (iv) Cassidy prevented BMO's compliance department, risk management department, accounting department

---

[18] A copy of the Totem email to BMO dated February 9, 2007 is annexed as Exhibit **N** to the Gelber Dec.

[19] *See* page 11 of Murray McIntosh's "302", annexed as Exhibit **O** to the Gelber Dec.

[20] Email from Somerville to herself dated January 31, 2007, annexed as Exhibit **P** to the Gelber Dec.

8

and its various oversight teams from doing their jobs by discouraging BMO from getting data from sources other than Optionable.

BMO's story was and remains preposterous because:

(i) BMO had daily access to actual market data from NYMEX beyond the reach of Optionable and, though obligated by GAAP to use daily NYYMEX data, did not;

(ii) BMO risk department personnel always knew that the month-end data provided by Optionable could not be and was not independent. In fact, Jeff Wang in BMO's market risk department emailed Murray McIntosh on December 7, 2006, observing: "about segregating BMO quotes from the non-BMO quotes [t]here is no direct way to do it"[21]; (Emphasis provided).

(iii) BMO knew (a) that "some of Optionable quotes come from BMO" (Gelber Dec. Ex. K) and (b) that the quotes were also "**not independent as we go through the trader to obtain them**" (Gelber Dec. Ex. L);  and

(iv) Cassidy directly and unequivocally told BMO to use additional sources for month-end data. (Gelber Dec. Exhibit P)

In fact the accurate data provided by Optionable to BMO, alerted BMO to over $225 million in discrepancies on BMO's books relative to BMO's own faulty valuations[22], as follows:.

| Month | Lee's Overvaluation As Indicated by Optionable's Quotes |
|---|---|
| September | $23,571,496 |
| October | $12,197,079 |
| November | $30,468,147 |
| December | $17,561,005 |
| January | $32,378,758 |
| February | $29,102,654 |
| March | $83,835,810 |
| TOTAL | $229,100,000 |

---

[21] A copy of this email is annexed as Exhibit **Q** to the Gelber Dec.

[22] As fully discussed in the Appellate Brief, Gelber Dec. Ex. B.

9

BMO's fictional account began to unravel and the DOJ, despite its vast investigative power, was unable to identify any evidence that Cassidy ever provided false or inaccurate data to BMO, or that Cassidy caused BMO to lose any money. Accordingly, the DOJ repeatedly, over the course of three years, reduced the BMO-fed false accusations, superseding a six-count indictment with two different four-count indictments, which eliminated the false accusations about transmitting inaccurate quotes to BMO[23], until it minimized its charges against Cassidy on the eve of trial and settled with Cassidy in exchange for a plea to a single count information charging conspiracy with Lee to commit wire fraud.

> Cassidy's allocution also reflected the accuracy of the information transmitted:
>
> In the fall of 2006, I arranged for my company Optionable to develop a service called RealMarks, which was designed to provide market quotes concerning natural gas option contracts. From September 2006 to April 2007, this service provided market quotes to the risk management department of Bank of Montreal. ***While I believed that the RealMarks quotes provided to BMO were legitimate,*** most of the quotes that RealMarks provided to Bank of Montreal's risk management department originated with Bank of Montreal's own trader David Lee. I agreed with Lee that on month end days he would provide Optionable with the quotes, Optionable would make an effort to show the quotes to other traders in the market, and then at the end of the day, Optionable would send quotes to Bank of Montreal's risk management department. Although I understood that BMO's risk management department wanted quotes that were not contributed to RealMarks by Lee and felt it was an important factor, I did not tell the risk management department that many of the quotes had originated with Lee. I knew this was wrong at the time.
>
> THE COURT: Does the government agree that that is a sufficient allocution?
> MS. BERMAN: Yes, your Honor, we agree.

---

[23] Even the CFTC acknowledged that "We are not alleging nor do we believe we have to allege that what Lee was providing them was inaccurate." Portion of transcript of oral argument held October 22, 2009, is annexed as Exhibit **R** to the Gelber Dec.

10

The tragic irony of this case is that Cassidy pleaded guilty to failing to tell BMO what it already knew. But the reality of the matter, based on uncontroverted documentary evidence, is that BMO was fully responsible for its own losses and that it engineered an insidious campaign to destroy lives and businesses in order to protect itself and William Downe.

In sum, none of BMO's allegations in the complaint are supported by the evidence, all of which fairly well points to a maliciously prosecute Cassidy for the nefarious purpose of hiding its own embarrassing incompetencies.

## ARGUMENT

"A Rule 41(a)(2) dismissal may be conditioned on whatever terms the district court deems necessary to offset the prejudice the defendant may suffer from a dismissal without prejudice." *Bridgeport Music, Inc. v. Universal-MCA Music Publishing, Inc.*, 583 F. 3d 948 (6th Cir. 2009). *See also*, *LeBlang Motors, Ltd. v. Suburu of Am., Inc.*, 148 F.3d 680, 685 (7th Cir. 1998); *McCants v. Ford Motor Co.*, 781 F.2d 855, 856 (11th Cir. 1986).

BMO relies on *Camilli v. Grimes*, 436 F. 3d 120 (2d Cir. 2006), which observes:

"This Court reviews a decision to dismiss without prejudice pursuant to Fed. R.Civ.P. 41(a)(2) for abuse of discretion. S*ee Zagano v. Fordham University*, 900 F.2d 12, 14 (2d Cir.1990). Two lines of authority have developed with respect to the circumstances under which a dismissal without prejudice might be improper. One line indicates that such a dismissal would be improper if "the defendant would suffer some plain legal prejudice other than the mere prospect of a second lawsuit." *Cone v. West Virginia Pulp & Paper Co.*, 330 U.S. 212, 217, 67 S.Ct. 752, 91 L.Ed. 849 (1947); *see Jones v. SEC*, 298 U.S. 1, 19, 56 S.Ct. 654, 80 L.Ed. 1015 (1936). Another line indicates that the test for dismissal without prejudice involves consideration of various factors, known as the Zagano factors, including (1) the plaintiff's diligence in bringing the motion, (2) any

11

> undue vexatiousness on the plaintiff's part, (3) the extent to which the suit has progressed, including the defendant's efforts and expense in preparation for trial, (4) the duplicative expense of relitigation, and (5) the adequacy of the plaintiff's explanation for the need to dismiss. *See D'Alto v. Dahon California, Inc.*, 100 F.3d 281, 283 (2d Cir.1996); *Zagano*, 900 F.2d at 14."

BMO here argues the five so-called *Zagano* factors, set forth above.

*First*, BMO argues it brought this motion "promptly" after settling with the other defendants. BMO actually filed this motion before it settled with the other defendants, but did so after four years of litigation, which itself was not commenced until two years after others filed various suits and claims arising out of BMO's supposed harm. In fact, by the time BMO sued, the statute of limitations had run on any possible federal securities fraud claims.

*Second,* BMO argues it had no ill motive in bringing the lawsuit. This argument is premised on a falsehood, as the documents annexed to the accompanying Gelber Dec. readily demonstrate. Notwithstanding Cassidy's guilty plea, BMO never suffered losses from any act or omission of Cassidy, and nobody, certainly not the DOJ (Gelber Dec. Ex. B) has been able to show that the conduct to which Cassidy allocuted caused BMO any loss.

BMO's losses were caused by (i) ignoring Cassidy's advice to get month-end data from more than one source, (ii) by deviating in approximately 40 ways from industry standards, (Gelber Dec, Ex. G) (iii) by refusing to consider changes to its methodologies, even when facing a $50 million loss, (Gelber Dec. Ex. H) and (iv) by putting on such a large position that it was losing over $1 million dollars every day simply by time deterioration (Gelber Dec. Ex. I). There is no evidence to the contrary.

*Third.* Cassidy noticed the deposition of Downe, and BMO opposed it, resulting in a conference before Magistrate Judge Cott in which he indicated that BMO would likely have to produce Downe in January.[24] On the weekend before BMO was to produce three other witnesses for depositions by the defendants, BMO, not wanting the truth to emerge, "promptly" pushed for settlements, not yet executed, and made this motion.

Cassidy was preparing to move to amend his second affirmative defense – *in pari delicto* – in order to outline for the court BMO's misconduct.[25] Cassidy to the best of his hobbled ability has acted as aggressively as he could in connection with this litigation and would clearly be prejudiced by a "without prejudice" dismissal.

*Fourth,* there would not likely be *duplicative* costs, but it would be more expensive to gear up for a second litigation.

*Fifth*, while Cassidy has no economic ability to bear any judgment against him, assuming he would lose, it was equally true at the beginning of this case that he was not able to economically bear a judgment of $680 million. Right now, BMO is entitled to nothing. The restitution imposed against Cassidy is under appeal. (Gelber Dec. Ex. B).

BMO's actions were malicious and it brought this case for multiple improper purposes, as detailed above. Cassidy has the right to sue for malicious prosecution. That right is impaired by a "without prejudice" dismissal. Under such circumstances, the Court would be within its discretion to direct dismissal with prejudice. *In re Sizzler Restaurants Intern. Inc.*, 262 BR 811 (Br. C.D. Cal. 2001).

---

[24] Transcript of proceedings before Magistrate Cott on October 30, 2013 annexed as Exhibit **S** to the Gelber Dec.

[25] The draft of the proposed amendment to Cassidy's second affirmative defense – *in pari delicto* - is annexed as Exhibit **T** to the Gelber Dec.

13

Because BMO's claim here is a claim for money damages, and because BMO cannot prove that Cassidy caused it any losses, BMO also could lose on the merits here at trial. And clearly, an attempt to avoid an adverse decision on the merits may also constitute legal prejudice. *See, Phillips USA, Inc. v. Allflex USA, Inc.*, 77 F.3d 354, 358 (10th Cir. 1996).

Accordingly, the claims should be dismissed with prejudice as to Cassidy.

## CONCLUSION

BMO's claims should be dismissed with prejudice and the court should award such other and further relief as it deems just and equitable.

Dated:      Brooklyn, New York
            November 27, 2013

> Respectfully submitted,
>
> *Lawrence R. Gelber*
> Lawrence R. Gelber
> Attorney at Law
> The Vanderbilt Plaza
> 34 Plaza Street, Suite 1107
> Brooklyn, NY 11238
> T:      718-638-2383
> F:      718-857-9339
> GelberLaw@aol.com
>
> *Attorney for Defendant Kevin P. Cassidy*

14