Exhibit C

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| AEP ENERGY SERVICES, INC.<br>155 West Nationwide Blvd., Suite 500<br>Columbus, OH 43215<br><br>and<br><br>AMERICAN ELECTRIC POWER<br>COMPANY, INC.,<br>1 Riverside Plaza<br>Columbus, OH 43215<br><br>          Plaintiffs,<br><br>vs.<br><br>BANK OF MONTREAL,<br>c/o CT Corporation System, as Statutory<br>Agent for the Bank of Montreal<br>1300 E. 9th Street<br>Cleveland, OH 44114<br><br>          Defendant. | CASE NO. C2 03-335<br><br>JUDGE GRAHAM<br><br>MAGISTRATE JUDGE KING<br><br>JURY DEMAND ENDORSED HEREON |

**PLAINTIFFS AEP ENERGY SERVICES, INC.'S
AND AMERICAN ELECTRIC POWER COMPANY, INC.'S
FIRST AMENDED COMPLAINT**

Plaintiffs AEP Energy Services, Inc. ("AEPES") and American Electric Power Company, Inc. ("AEP") for their first amended complaint hereby allege and state as follows:

**PARTIES**

1. Plaintiff AEPES is an Ohio corporation with its principal place of business in the state of Ohio.

2. Plaintiff AEP is the parent corporation of AEPES. AEP is incorporated in the state of New York and has its principal place of business in the state of Ohio. (AEPES and AEP are sometimes referred to herein collectively as "Plaintiffs.")

COI-1257553v1

3. Defendant Bank of Montreal ("BMO") is a bank chartered by the Canadian government. BMO has its principal place of business in Montreal, Canada.

## JURISDICTION

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that the parties are citizens of a state and citizens or subjects of a foreign state and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

5. Venue is proper for this action in this district pursuant to 28 U.S.C. § 1391(a).

## BACKGROUND

*The Parties' Contracts*

6. On or about June 17, 1998, AEPES and BMO entered into an International Swap Dealers Association, Inc. Master Agreement (the "Master Agreement"). The Master Agreement, as amended from time to time, governs various financial derivatives transactions entered into between AEPES and BMO. (A true and accurate copy of the Master Agreement, its Schedule and Amendments, is collectively attached as Exhibit 1.) Between June 17, 1998 and March 2003, AEPES and BMO entered into numerous natural gas-related financial derivatives transactions pursuant to the Master Agreement.

7. On or about May 7, 1999, AEPES and BMO further entered into a Credit Support Annex to the Master Agreement (the "Credit Support Agreement"). The Credit Support Agreement establishes the credit support obligations that AEPES or BMO may owe to the other under the Master Agreement. (A true and accurate copy of the Credit Support Agreement is attached as Exhibit 2.) The Master Agreement and the Credit Support Agreement are sometimes referred to herein collectively as the "Agreements."

8. On or about November 18, 1999, plaintiff AEP, as the parent corporation of AEPES, agreed to provide credit support to AEPES by guaranteeing AEPES' obligations to BMO up to an aggregate amount of US$6 million (the "Corporate Guaranty"). The Corporate Guaranty initially ran through May 15, 2000, but was amended from time to time, with AEP now guaranteeing an aggregate of US$25 million of AEPES' obligations to BMO through April 15, 2004. (A true and accurate copy of the Corporate Guaranty is attached as Exhibit 3.)

***BMO's Posting of Collateral With AEPES***

9. Under the terms of the Credit Support Agreement, BMO -- as a Pledgor to AEPES -- was required to provide certain collateral to AEPES as a Secured Party based on the level of AEPES' credit "Exposure," or the amount owed to AEPES, for the financial transactions conducted between the parties. As set forth in the Credit Support Agreement, the amount of credit support obligated to be paid is determined by calculating the level of credit Exposure less a defined collateral "threshold" amount. The threshold amount applicable to BMO was amended from time to time, but the parties agreed it would be US$50 million as of March 2003. Accordingly, if and when AEPES' credit Exposure exceeded US$50 million, BMO was required under paragraph 3 of the Credit Support Agreement to provide credit support to AEPES equal to the amount that was in excess of US$50 million.

10. Under the terms of the Master Agreement, the "Exposure" is designed to approximate the value of a final Settlement Amount due from one party to the other in the event the Master Agreement is terminated. On March 12, 2003, BMO calculated and acknowledged that it owed, or AEPES had credit Exposure, in the amount of US$68,125,923. (A true and accurate copy of BMO's March 12, 2003 notification acknowledging this amount owed is attached as Exhibit 4.) Accordingly, BMO posted U.S. Treasuries as collateral to AEPES in the

-3-

COI-1257553v1

amount of approximately US$18 million on March 12, 2003, which is the difference between US$68 million and US$50 million.

11. As of the time of filing this Complaint, AEPES still holds the collateral provided by BMO to it on March 12, 2003.

*The Termination of the Master Agreement*

12. The Master Agreement defines a number of Events of Default or Termination Events, which permit the parties to terminate the Master Agreement as of a certain date. BMO, in particular, unless it elects otherwise or waives such right, is permitted to terminate the Master Agreement if the bond rating of AEP, as the Credit Support Provider to AEPES under the Corporate Guaranty, falls below certain rating classifications established by the Moody's or Standard & Poor's ratings agencies.

13. On or about February 10, 2003, Moody's downgraded the credit rating assigned to AEP's outstanding long-term unsecured debt to a level below Baa2, triggering BMO's right to declare an early termination of the Master Agreement. Rather than triggering its termination rights, however, BMO made substantial transfers of collateral over the next thirty-two days, entered into 34 new transactions with AEPES and assured AEPES at that time and repeatedly over the next month that it was comfortable with the credit support provided by plaintiffs despite the downgrade in AEP's bond rating and would not terminate the Master Agreement. (See also ¶¶ 24-28 below.) Nevertheless, on March 14, 2003, BMO hand-delivered to AEPES' offices in Columbus, Ohio -- without notice or warning -- a notice of termination effective as of March 14 based on the February 10 downgrade of AEP's bond rating. (A true and accurate copy of BMO's letter is attached as Exhibit 5.)

-4-

14.     On March 14, 2003, BMO sent an additional letter to AEPES by ordinary mail demanding a return of the approximately $18 million in collateral it had provided to AEPES on March 12, 2003.  (A true and accurate copy of BMO's letter is attached as Exhibit 6.)

15.     The Master Agreement provides that upon an early termination the parties will evaluate their obligations to each other as of the termination date.  Under Sections 6 and 14 of the Master Agreement, the parties are required to use a "Market Quotation" method, whereby, whenever practicable, quotations for the contracts at issue are obtained from at least three Reference Market-makers and prices for such contracts are established for use in calculating a Settlement Amount due by one party to the other.  The applicable provisions of the Master Agreement require both parties to obtain their price determinations in good faith.  (Master Agreement, §§ 6(a) and 14.)  More particularly, the Master Agreement provides that a party obtaining such quotations must act in good faith in selecting the day and the time of day for which the Market Quotations are obtained for purposes of determining the Settlement Amount.  (Id.)

***BMO's Bad Faith Calculation of a Settlement Amount***

16.     On March 24, 2003, BMO sent a letter to AEPES demanding payments purportedly due it because of its claimed early termination of the Master Agreement on March 14, 2003.  (A true and accurate copy of BMO's March 24, 2003 letter is attached as Exhibit 7.)  BMO claimed AEPES owed BMO a Settlement Amount of US$25,337,992.41 as of March 14.  Only two days earlier, on March 12, 2003, BMO had calculated and acknowledged that it owed AEPES US$68,125,923.  (See attached Exhibit 4.)  This represents a negative swing of approximately US$94 million in two days between what BMO first acknowledged was owed to AEPES as of March 12 (US$68,125,923) and its claim for approximately US$25 million purportedly owed by AEPES two days later.

-5-

17. On information and belief, BMO engaged in substantial trading activity on the New York Mercantile Exchange ("NYMEX") and other relevant trading markets at approximately the same time it was requesting from Reference Market-makers the Market Quotations for the contracts at issue here. This substantial trading activity contributed to a significant volatility in the prices and the Market Quotations received by BMO for the contracts being terminated. These trading activities, when combined with the manner in which BMO calculated the final Settlement Amount, resulted in a bad faith determination by BMO of its claimed Settlement Amount. BMO's calculations were also radically different from what BMO acknowledged it would have owed AEPES less than two days earlier. In addition, BMO's March 14, 2003 letter of termination was hand-delivered to AEPES' credit representatives only at or shortly after the time BMO started its activities in the relevant trading markets and began calling for market quotations. This completely unexpected termination (despite BMO's earlier assurances to the contrary) allowed BMO to engage in its activities in the relevant trading markets without allowing AEPES the reasonable opportunity to properly manage and orderly unwind the trading positions it had with BMO. In fact, BMO's actions on March 14, 2003 resulted in substantial new and unexpected trading positions without warning, which resulted in AEPES having to rapidly cover these positions in the relevant trading markets, causing great harm to AEPES.

18. BMO skewed the Market Quotations it obtained and selected in determining the Settlement Amount claimed in its March 24, 2003 letter in other ways. Industry practice and the Master Agreement typically require quotations to be obtained on standard-sized quantities or at the net buy/sell position by location when that net position is representative of a quantity of natural gas that Reference Market-makers would actually be willing to transact

business on in the ordinary course of business. The purpose of obtaining Market Quotations based on reasonable quantities of natural gas from parties who actually engage in transactions in the relevant trading markets is to obtain realistic market prices that a Reference Market-maker actually would be willing to transact business upon. The Market Quotation method is not intended to be a tool to obtain unrealistic prices and unrealistic buy/sell spreads.

19. On information and belief, BMO aggregated all buy contracts at each relevant trading location and sought a quotation for those buy contracts from Reference Market-makers without netting. BMO likewise sought a separate quotation for all sell contracts aggregated at each location without netting. Such quotations obtained by BMO in this way artificially created a much wider spread in the Market Quotations because Reference Market-makers will typically quote much larger buy/sell spreads for larger quantities of natural gas when compared to smaller quantities. Alternatively, even if the quotations obtained by BMO were based on netted buy/sell positions at each location, BMO nevertheless acted in bad faith because it knew or should have known that the quantities of natural gas generally were larger than what Relevant Market-makers would typically transact business on in the ordinary course of their business. As a result, BMO's approach was commercially unreasonable because: (i) it greatly distorted the spreads quoted by Reference Market-makers, (ii) it misrepresented the size of the effective net buy and sell position held by BMO and (iii) it yielded a claimed Settlement Amount by BMO that bore no reasonable relationship to the actual economic effect of the termination of all the natural gas transactions at issue.

20. To further distort its claimed Settlement Amount, BMO took advantage of the buy/sell spreads it created for itself for the contracts at issue and calculated the Settlement Amount by applying the buy Market Quotations to all aggregated sell transactions and the sell

Market Quotations to all aggregated buy transactions at each location. This methodology (as opposed to applying one price (Market Quotation) to the actual net buy/sell position held at each trading location) had the effect of artificially inflating BMO's purported exposure and resulted in a bad faith determination by BMO of its claimed Settlement Amount.

21.     The commercial unreasonableness of BMO's methodology in the immediately preceding paragraph is highlighted in instances where BMO calculated a Settlement Amount purportedly due to them for locations where they held an equal number of buy and sell contracts, even though there was no economic effect to BMO because such positions effectively netted each other out. These instances make it clear BMO's methodology had the effect of artificially inflating its claimed Settlement Amount.

22.     BMO's calculations of the Settlement Amount purportedly due by AEPES to BMO were thus made in bad faith and in a commercially unreasonable manner and are in violation of the Master Agreement and established industry practice.

*AEPES' Proper Calculation of a Settlement Amount*

23.     AEPES believes the approximately US$68 million that BMO acknowledged was due to AEPES as of March 12, 2003 plus interest represents a fair Settlement Amount owed by BMO to AEPES. Alternatively, even without taking into account BMO's bad faith activities on March 14, AEPES has calculated that BMO owes AEPES at least US$45,407,377 plus interest as of March 14, 2003. This calculation was based upon Market Quotations obtained at a time on March 14, 2003 when the market for natural gas derivatives had become less volatile and at a point when it was commercially reasonable to obtain Market Quotations for the contracts at issue. (A true and accurate copy of AEPES' calculations and the methodologies used to derive such calculations is attached as Exhibit 8.) As indicated above, this Settlement Amount calculation does not account for market activities engaged in by BMO.

-8-

***BMO's Conduct Subsequent To the Ratings Event***

24. On February 10, 2003, Moody's downgraded the credit rating for AEP Inc.'s outstanding long-term unsecured debt to a level below "Baa2," thereby triggering BMO's right to designate an Early Termination Date. However, BMO did not on February 10, 2003 elect to cease further trading; nor did it elect to designate an Early Termination Date. Instead, for the next thirty-two days BMO elected to perform and demand performance pursuant to the Agreement.

25. Between February 10, 2003 and March 14, 2003, BMO initiated at least thirty-four new transactions with AEP, each extending and modifying the Agreement and seeking the full and continuing benefit of the Agreement. The first of these new transactions was dated February 10, 2003 — the very day of the Ratings Event — and the last one was dated March 12, 2003 — two days before BMO decided to terminate the Agreement. Several of these new transactions, including those initiated just one day after the Ratings Event, added substantial risk to the portfolio and were long-dated and provided for performance as late as two and a half *years* following the date of the Ratings Event. Each of the thirty-four new transactions was documented in writing by a Confirmation prepared by BMO and forwarded to AEP for its acceptance. In all, these thirty-four additional transactions represented a material increase in BMO's potential exposure to AEP.

26. On February 12, 2003, two days following the Ratings Event, BMO notified AEP that it would satisfy AEP's margin call by pledging security collateral Thereafter, on five separate occasions, BMO transferred substantial amounts of securities to AEP as collateral pursuant to its obligations under the Credit Support Annex:

-9-

| Date | Approx. Market Value of Collateral |
|---|---|
| 02/27/03 | $49,887,875 |
| 02/28/03 | $11,973,010 |
| 03/04/03 | $7,404,009 |
| 03/10/03 | $259,807 |
| 03/11/03 | $11,994,627 |

BMO insisted on transferring collateral in the form of securities and not cash, which required AEP to establish a new account and procedures for accepting BMO's pledged securities. By transferring collateral and inducing AEP to take measures to accept delivery of the collateral, BMO elected to proceed with performance under the Agreement.

27.  Pursuant to the Credit Support Annex, each transfer of collateral by BMO to AEP was subject to the conditions precedent that: (i) "no ... Specified Condition has occurred and is continuing with respect to [AEP]" and (ii) "no Early Termination date . . . has been designated as a result of . . . [a] Specified Condition with respect to [AEP]." (CSA ¶ 4(a)(i), (ii).) With each post-February 10, 2003 transfer of collateral to AEP, BMO thus reiterated that no Specified Condition had occurred and no Early Termination Date had been designated. AEP was entitled to, and did, rely on BMO's representations and its continued performance under the Agreement.

28.  At no time between the February 10, 2003 announcement of Moody's downgrade and the March 14, 2003 hand delivery of BMO's Notice of Termination did BMO ever state that it intended to terminate the Agreement as a result of the Ratings Event. Ian Plester, a Director of BMO, had several telephone conversations with Christopher Morran, AEP's Credit Manager, during that time period and never stated that BMO intended to terminate the Agreement. To the contrary, from the outset, consistent with the course of conduct it followed,

-10-

BMO stated every intention of continuing the relationship pursuant to the Agreement. In fact, immediately after the Ratings Event, Ian Plester suggested that the Ratings Event "trigger" be re-set to a lower credit rating: an S&P rating of "BB" instead of "BBB." That clearly indicated that BMO was prepared to continue trading with AEP notwithstanding the credit downgrade. Indeed, Ian Plester stated that BMO was not inclined to do anything to terminate the Agreement as long as BMO was not exposed.

***BMO's Threat to Attempt to Collect Against the Corporate Guaranty.***

29. On April 2, 2003, BMO delivered a letter to AEP demanding that AEP promptly pay BMO US$25 million to cover AEPES' claimed obligations to BMO under the Corporate Guaranty. (A true and accurate copy of BMO's April 2, 2003 letter to AEP is attached as Exhibit 9.)

30. On information and belief, BMO intends to seek to enforce the Corporate Guaranty against AEP even though AEPES disputes the Settlement Amount claimed by BMO and BMO owes AEPES US$68,125,923.

## COUNT I: DECLARATORY JUDGMENT

31. Plaintiffs hereby incorporate the foregoing paragraphs of this complaint as if fully restated here.

32. The parties to this action are the parties who have or who may claim to have an interest that may be affected by the declaration requested.

33. This action is within the jurisdiction of this Court and plaintiffs are entitled to declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

34. An actual controversy exists between plaintiffs and BMO, which is justiciable in character, and speedy relief is necessary to preserve the parties' respective rights.

35. In the absence of a declaration, plaintiffs have no adequate remedy at law.

COI-1257553v1

36. BMO is in breach of the Agreements because of its improper and bad faith calculation of the Settlement Amount and because it has demanded approximately US$25 million from AEPES when BMO must pay AEPES US$68,125,923 plus interest. Alternatively, BMO should pay AEPES at least US$45,407,377 plus interest as a result of the early termination of the Master Agreement.

37. BMO contends that it has no obligation to cure its breach, that AEPES owes it approximately US$25 million, that AEPES is obligated to return the US$18 million collateral it posted on March 12, 2003, and that AEP is obligated to pay BMO US$25 million under the Corporate Guaranty. AEPES contends that it is entitled to set-off the posted collateral against the Settlement Amount BMO owes it following BMO's purported early termination of the Master Agreement. AEP further contends that it is not obligated to pay BMO US$25 million under the Corporate Guaranty given BMO's breach of the Master Agreement. Therefore, a declaration of this Court will resolve the actual controversy now present.

38. Unless this Court makes a declaration that plaintiffs are, as a result of BMO's breach, entitled to enforce their rights under the Master Agreement and Corporate Guaranty, plaintiffs will continue to suffer prejudice to their rights and substantial harm.

39. A declaratory judgment will resolve the entire dispute between the parties and save the parties substantial costs and expenses.

WHEREFORE, plaintiffs pray that the Court enter a declaratory judgment, declaring that: (a) the Master Agreement is valid and enforceable; (b) that BMO's calculation of the Settlement Amount, which was not made in good faith or in a commercially reasonable manner, constitutes a breach of the Master Agreement; (c) that BMO must pay AEPES US$68,125,923 plus interest or alternatively at least US$45,407,337 plus interest; (d) that

AEPES is entitled to retain the collateral posted by BMO on March 12, 2003, as a set-off of the obligations owed to AEPES by BMO until such time BMO pays the amount determined in accordance with (c) above; and (e) that AEP is not obligated to pay BMO US$25 million under the Corporate Guaranty or any other amount.

## COUNT II: SPECIFIC ENFORCEMENT OF THE AGREEMENTS

40. AEPES hereby incorporates the foregoing paragraphs of this complaint as if fully restated here.

41. The Master Agreement and Credit Support Agreement are valid and enforceable as a matter of law.

42. BMO's calculation of a settlement amount at a time and in a manner not done in good faith constitutes a clear and material breach of the plain terms of the Agreements.

43. Based on the clear provisions of the Agreements and BMO's direct breaches of those Agreements, AEPES is entitled to have the Agreements specifically enforced.

WHEREFORE, AEPES prays (a) that the Agreements be specifically enforced, (b) that BMO be ordered to cease any conduct in violation of the Agreements, and (c) that BMO be ordered to pay AEPES the US$68,125,923 plus interest or alternatively at least US$45,407,377 plus interest as a Settlement Amount required under the Agreements, less a set-off the US$18 million collateral posted by BMO on March 12, 2003.

## COUNT III: WAIVER, ESTOPPEL AND ELECTION OF REMEDIES

44. AEPES hereby incorporates the foregoing paragraphs of this complaint as if fully restated here.

45. The Master Agreement required BMO to promptly notify AEPES of any Termination Event and to promptly invoke that right. BMO, however, did not promptly invoke its right to terminate the Master Agreement early; rather, BMO repeatedly assured AEPES that it

-13-

had no concern with the downgrade of AEP's bond rating and represented that it would not terminate the Master Agreement and thus voluntarily relinquished a right known to it. AEPES relied upon these representations to its detriment. BMO's failure to notify AEPES of BMO's intent to terminate deprived AEPES of the opportunity to liquidate its net positions in an orderly manner, thus causing substantial harm to AEPES. BMO thus either waived its right to terminate the Master Agreement and/or is estopped from claiming any Settlement Amount other than the US$68,125,923 owned by BMO to AEPES and/or has elected its remedy.

46. This Court should accordingly find that BMO elected its remedy, waived or is estopped from enforcing its right to enforce the early termination provisions of the Master Agreement.

WHEREFORE, AEPES prays that BMO be found to have elected its remedy, waived or that it is estopped from claiming a termination of the Master Agreement or has elected, is estopped or waived any right to claim any Settlement Amount other than the US$68,125,923 owed to AEPES.

## COUNT IV: BREACH OF CONTRACT

47. AEPES hereby incorporates the foregoing paragraphs of this complaint as if fully restated here.

48. Although BMO could have elected to designate an Early Termination of the Master Agreement immediately upon the occurrence of the February 10, 2003 Ratings Event, BMO did not even attempt to do so for thirty-two days following the Ratings Event. Instead, during those thirty-two days, BMO elected to engage in a course of conduct and dealing with AEPES whereby BMO chose to continue to perform and demand performance under the Master Agreement in multiple significant ways, as outlined above, including entering into 34 new

-14-

transactions, transferring substantial collateral to AEPES, and making representations and providing assurances to AEP.

49. Under well-settled principles of waiver, estoppel and the doctrine of election of remedies, on March 14, 2003, BMO was not contractually entitled to designate an Early Termination Event on the purported basis of the Ratings Event that had occurred on February 10, 2003.

50. By purporting to exercise a non-existent contractual right on March 14, 2003, and by designating an Early Termination of the Master Agreement, BMO breached the Master Agreement.

51. WHEREFORE, AEPES prays that BMO be found to have breached the Master Agreement and that BMO be ordered to pay not less than $45,407,337 plus interest pursuant to the terms of the Master Agreement.

## COUNT V:  ATTORNEYS' FEES, COSTS AND LITIGATION EXPENSES

52. AEPES hereby incorporates the foregoing paragraphs of this complaint as if fully restated here.

53. The Master Agreement provides that BMO's failure to abide by its terms entitles AEPES to an award of attorneys' fees and reasonable expenses.

54. AEPES has been forced to incur such attorneys' fees and expenses because of BMO's failure to abide by the terms of the Master Agreement and its failure to calculate the Settlement Amount in good faith.

55. AEPES is thus entitled to an award of attorneys' fees, costs and litigation expenses.

WHEREFORE, AEPES prays that the Court award it attorneys' fees, costs and litigation expenses because of BMO's breach of the Master Agreement.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray that the Court enter judgment as follows:

(1)  That it enter a declaratory judgment, declaring (a) the Master Agreement to be valid and enforceable; (b) that BMO's calculation of the Settlement Amount constitutes a breach of the Master Agreement; (c) that AEPES' calculation of the settlement amount due from BMO to AEPES is correct and that BMO must pay AEPES US$68,125,923 plus interest or alternatively at least US$45,407,377 plus interest; (d) that AEPES is entitled to retain the collateral posted by BMO on March 12, 2003, as a set-off of the obligations owed to AEPES by BMO until such time BMO pays the amount determined in accordance with (c) above; and (e) that AEP is not obligated to pay BMO US$25 million under the Corporate Guaranty or any other amount;

(2)  That it specifically enforce the Agreements, order BMO to cease any conduct in violation of the Agreements, and order BMO to pay AEPES the US$68,125,923 plus interest or alternatively at least the US$45,407,377 plus interest owed to it by BMO;

(3)  That it find that BMO has elected its remedy, waived, or is estopped from asserting its right to enforce the early termination provisions of the Master Agreement or elected its remedy, is estopped, or has waived any right to claim any Settlement Amount other than the US$68,125,923 owed by BMO to AEPES;

(4)  That it find that BMO breached the Master Agreement when, on March 14, 2003, it purported to terminate the Master Agreement and order BMO to pay AEPES at least $45,407,337 plus interest; and

(5)  That it award such other and further relief as the Court may deem proper, in the form of declarations or otherwise, including an award of attorneys' fees, costs and litigation expenses, and such other and further equitable relief as the Court may deem appropriate.

-17-

Respectfully submitted,

s/Fordham Huffman
Fordham E. Huffman (0020870)
(Trial Attorney)

*Of Counsel*:

| | |
|---|---|
| David L. Carden | Douglas M. Mansfield (0063443) |
| Jayant W. Tambe | JONES DAY |
| JONES DAY | 41 South High Street, Suite 1900 |
| 222 East 41st Street | Columbus, Ohio 43215 |
| New York, New York 10017 | (614) 469-3939 |
| Tel: (212) 326-3939 | Email: fehuffman@jonesday.com |
| Fax: (212) 755-7306 | dmansfield@jonesday.com |

Attorneys for Plaintiffs AEP Energy Services, Inc. and American Electric Power Company, Inc.

## **JURY DEMAND**

Plaintiffs hereby demand that this action be tried to a jury of the maximum number permitted by law.

s/Fordham Huffman
Fordham E. Huffman (0020870)

**CERTIFICATE OF SERVICE**

This is to certify that a true copy of the foregoing Plaintiffs AEP Energy Services, Inc.'s and American Electric Power Co., Inc.'s First Amended Complaint was served by regular U.S. Mail upon Richard A. Frye, Esq., and Sarah D. Morrison, Esq., Chester Willcox & Saxbe, LLP, 65 E. State St., Suite 1000, Columbus, OH 43215-4213, and upon Thomas J. Maloney, Esq. and Sheilah M. Kane, Esq., Cleary, Gottlieb, Steen & Hamilton, One Liberty Plaza, New York, NY 10006, attorneys for defendant, this 7th day of January, 2004.

s/Fordham Huffman
One of the Attorneys Representing Plaintiffs
AEP Energy Services, Inc. and American
Electric Power Company, Inc.