Exhibit R

Transcript, CFTC v Optionable MTD hearing.txt
```
13   Court to one of the cases we discussed in our briefs, which is
14   Santos.  It's nearly identical.  DiBella is another very close
15   case, a District of Connecticut discussion.  There's also
16   kickback scheme cases in the Southern District of New York
17   where they all talk about the in connection with requirement
18   being satisfied, because of the options, the securities
19   transactions that were entered into as the quid pro quo.
20            THE COURT:  But this is not a classic kickback scheme
21   case?
22            MS. MANLEY:  It's not a classic kickback scheme, no,
23   sir.  But our case is very similar, very simple.  But for the
24   defendants' fraud, Lee would not have been enable to continue
25   to enter into additional options transactions and it was their
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300
```
                                                                              29
```
     9AMFCFTCA
 1   fraud, their deceit of the back office of BMO which was part of
 2   the negotiation, it was the quid pro quo.
 3            THE COURT:  It's unclear to me whether you're alleging
 4   that they did this knowing the information that Lee was
 5   providing was inaccurate or whether or not you're saying that
 6   they should have known.
 7            MS. MANLEY:  We're not saying either, sir.  We are not
 8   alleging nor do we believe we have to allege that what Lee was
 9   providing them was inaccurate.  The fraud that they are charged
10   with, the theory of fraud, and it's spelled out in the
11   complaint, is that they were passing these bids and offers to
12   BMO's back office as if it was their own personal view of the
13   market.  That was a lie.  It wasn't their own personal view, it
14   was Lee's advice, it was Lee's bids and offers.
15            THE COURT:  Wouldn't the real issue not be whether or
16   not it's their personal, whose personal view it was, the real
17   question would be whether or not those were accurate.
18            MS. MANLEY:  No, sir, the real question --
19            THE COURT:  What difference does it make whose views
20   they are if they're accurate?  How would that violate?
21            MS. MANLEY:  Here's the difference.  If the back
22   office of BMO knew that they were coming from the very trader
23   whose option positions they were valuating, they knew it would
24   be useless.  Why would you try to assess your own employee's
25   valuations by using numbers that he concocted?  You can't.  You
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300
```
                                                                              30
```
     9AMFCFTCA
 1   can't perform analysis or an assessment of your own broker's
 2   valuations if you use his view of the market.  You must use an
 3   independent, neutral set of data to evaluate your own broker's
 4   valuations.
 5            THE COURT:  Does your complaint rely on any specific
 6   either document or statement by anyone that they were in fact
 7   expecting that this was the kind of information they were given
 8   or is it more general than that?
 9            MS. MANLEY:  We do allege very specifically in the
10   complaint that -- we allege two things.  We allege that the BMO
11   employees understood what they were receiving from Optionable.
12            THE COURT:  When you say understood, was that the
13   written or oral agreement between the parties that that's what
14   they were supposed to provide to them?  What does "understood"
15   mean?
16            MS. MANLEY:  The BMO back office personnel, to perform
17   their function, which is to evaluate Lee's valuations, received
```
                                   Page 14