Exhibit S

```
                                                              1
        DAUVBANC                 Conference
 1      UNITED STATES DISTRICT COURT
 1      SOUTHERN DISTRICT OF NEW YORK
 2      -------------------------------x
 2
 3      BANK OF MONTREAL,
 3
 4                      Plaintiff,
 4
 5              v.                           09 CV 7557 (GBD)(JLC)
 5
 6      OPTIONABLE, INC., ET AL,
 6
 7                      Defendants.
 7
 8      -------------------------------x
 8
 9      CMEG NYMEX INC.,
 9
10                      Plaintiff,
10
11              v.                           09 CV 3677 (GBD)(JLC)
11
12      OPTIONABLE, INC., ET AL,
12
13                      Defendants.
13
14      -------------------------------x
14
15                                           New York, N.Y.
15                                           October 30, 2013
16                                           10:08 a.m.
16
17      Before:
17
18                          HON. JAMES L. COTT,
18
19                                           Magistrate Judge
19
20                              APPEARANCES
20
21      FRIEDMAN KAPLAN SEILER & ADELMAN
21           Attorneys for Plaintiff Bank of Montreal
22      BY:  ROBERT J. LACK
22           TIMOTHY M. HAGGERTY
23
23      MCCARTER & ENGLISH
24           Attorneys for Plaintiff CMEG NYMEX INC.
24      BY:  EDWARD T. MCDERMOTT
25           ANTHONY ZACCARIA
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

```
                                                           2
     DAUVBANC                    Conference
1                         APPEARANCES (continued)
2
3    MCCORMICK & O'BRIEN
3         Attorneys for Defendants Optionable, Inc.
4          and Ridgecrest Capital, Inc.
4    BY:  FRANCIS M. CURRAN
5
5    NORTON & ASSOCIATES
6         Attorneys for Defendant Optionable, Inc.
6    BY:  MICHAEL E. NORTON
7
7    LAW OFFICE OF SOLOMON N. KLEIN
8         Attorneys for Defendant Mark A. Nordlicht
8    BY:  SOLOMON N. KLEIN
9          AARON RUBIN
9
10   LAW OFFICES OF LAWRENCE R. GELBER
10        Attorneys for Defendant Kevin P. Cassidy
11   BY:  LAWRENCE R. GELBER
11
12   WHITE & CASE
12        Attorneys for Defendant Joseph D. Saab
13   BY:  DANIELLE M. AUDETTE
13
14
14
15
16
17
18
19
20
21
22
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

3

DAUVBANC                    Conference

```
 1                (In open court)
 2                THE COURT:  I'll just ask everyone, for the court
 3      reporter's benefit, when you speak, please identify yourself.
 4                For the record, I understand this morning we have two
 5      disputes this morning that I'm aware of.  And then I'll hear
 6      from the parties if there are any others.
 7                The first is the dispute as to the deposition of
 8      Mr. Downe; and the second has to do with a number of
 9      depositions of BMO witnesses and the scheduling of the
10      deposition of those witnesses.
11                My reading of the case law makes it somewhat unclear
12      as to who technically has had the burden on an issue of this
13      kind, whether it's the party seeking to compel the deposition
14      or whether it's the party seeking to prevent the deposition
15      from taking place.  My sense of that is that I think I should
16      hear from BMO first as to why they believe Mr. Downe's
17      deposition should not go forward, and then I'll hear from
18      counsel who want to proceed with it.
19                So who wants to be heard on behalf of BMO?
20                MR. LACK:  Robert Lack.
21                THE COURT:  Yes, Mr. Lack.  Go right ahead.
22                MR. LACK:  Would you like me to speak from the podium
23      or from here?
24                THE COURT:  Wherever you're comfortable.  Maybe the
25      podium would be better so that counsel can hear you better.
```

4
DAUVBANC                    Conference

```
 1                MR. LACK:  Your Honor, the defendants have not taken a
 2   single deposition in this case.  And they want --
 3                THE COURT:  Whose fault is that?
 4                MR. LACK:  That's the fault of the defendants, your
 5   Honor.
 6                THE COURT:  Is it?  Their letters seem to suggest
 7   you're preventing them from getting depositions scheduled.
 8                MR. LACK:  No, that's not true, your Honor.  In fact,
 9   we already have two depositions scheduled for November.
10                THE COURT:  Which depositions are scheduled so far?
11                MR. LACK:  November 15th, Marietta Bottero; and
12   November 21st, Thomas Merrall.  Those are both -- they've asked
13   for those dates; we gave them those dates.  Those are
14   confirmed.
15                THE COURT:  Terrific.  Glad to hear you're on track.
16                MR. LACK:  Yes.
17                And we also have dates that we can propose to the
18   defendants for Jeff Poulsen, Livio Bencich and Eric Tripp in
19   late November and in December.  And so we are prepared to
20   proceed with five depositions of BMO witnesses who actually
21   have information about the subject matter of the case.
22                THE COURT:  You said Poulsen, Tripp, and who was the
23   fifth person you identified?
24                MR. LACK:  Bencich.
25                THE COURT:  Okay.  Can't all five of them be
```

```
                                              5
        DAUVBANC                Conference
 1   accomplished in November?
 2            MR. LACK:  We don't think so, because we've checked
 3   with the witness.
 4            THE COURT:  When you say December, we're talking about
 5   through the first week of December?
 6            MR. LACK:  I'll give the actual dates.
 7            THE COURT:  You don't need to do that.  I don't need
 8   to preside over a meet-and-confer.
 9            MR. LACK:  The latest date is December 16th.
10            THE COURT:  December 16th?
11            MR. LACK:  16th.
12            THE COURT:  Why so late?  It's only October 30th now.
13            MR. LACK:  Because we have depositions -- we have
14   three depositions which we are proposing for November, and one
15   in early December, and one in mid-December.
16            THE COURT:  Do we anticipate these depositions are
17   going to take more than a day?
18            MR. LACK:  No, I don't.
19            THE COURT:  Then why can't they all take place in
20   November, because of the schedules of the individuals?
21            MR. LACK:  Because of the schedules of the
22   individuals.  Before proposing these dates, we checked with the
23   individuals and we ascertained their availability.
24            THE COURT:  All right.
25            MR. LACK:  And so we're perfectly willing to present
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

6

DAUVBANC                    Conference

1    for deposition BMO witnesses; but the case law of this Circuit
2    is very clear that it's not permissible to start off with the
3    CEO of the party as the first deponent.  In order to do that --
4    leaving aside the question of burden of proof, because your
5    Honor is correct, the case law is unclear who bears the burden
6    of proof.  But assuming that Bank of Montreal bears the burden
7    of proof, we have satisfied that burden; we have presented a
8    declaration from Mr. Downe, and it is very clear here that the
9    CEO, Mr. Downe, does not have unique personal knowledge.
10             THE COURT:  It's not very clear.  Be careful when you
11   say that.  I always tell my law clerks, when you say something
12   that's clear, it's usually not clear.  It's not really clear.
13             I mean the operative paragraph of the declaration,
14   Paragraph 9, says the following:  "The information I have
15   concerning the subject matter of the litigation, including the
16   information that I obtained while president and CEO, and in my
17   earlier roles within BMO, was obtained from others, including
18   lawyers, lower-level BMO employees, and individuals outside the
19   bank."
20             Now, we can unpack that sentence for a while, but I'm
21   not sure the way that's written suggests to me that his
22   knowledge is entirely limited to what other people told him.
23   That's, I assume, the intent of what is to be conveyed there.
24   But, for example, the other others, lower-level BMO employees
25   and individuals outside the bank are not even identified.  Are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:09-cv-07557-GBD-JLC   Document 252-17   Filed 11/27/13   Page 8 of 50

DAUVBANC                    Conference

1  any of those people Bottero, Merrall, Poulsen, Tripp, or
2  Bencich?
3          MR. LACK:  Yes.  Actually, leaving aside Ms. Bottero,
4  who's at human resources and is being deposed based on the
5  subject matter jurisdiction dispute, Mr. Merrall, Mr. Poulsen,
6  Mr. Bencich, and Mr. Tripp are all people who provided
7  information, either directly or indirectly, to Mr. Downe.
8          THE COURT:  Are there other individuals that would
9  fall into that category?  Because it seems to me, in order for
10 you to meet your burden, that you have to identify to the
11 defendants so that they can choose to depose those other
12 individuals if you want the Court to defer any decision with
13 respect to the deposition of Mr. Downe, don't you think?
14         MR. LACK:  Well, I don't think we have to identify
15 them; but the defendants have to be aware of them.  They
16 certainly are aware of them, because they've noticed the
17 depositions.  In fact, they've noticed the depositions, if you
18 leave out Mr. Downe, of 17 BMO witnesses, including
19 Ms. Bottero.
20         THE COURT:  Let me be precise with you about this.
21         You would not want Mr. Downe's deposition to take
22 place, and that's because you said he doesn't have unique
23 knowledge about the underlying facts of the case; correct?
24         MR. LACK:  That's the first part of it.
25         The second part of it is the burden it would place on
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

8

DAUVBANC                    Conference

 1   the bank to have its CEO to have to devote time to preparing
 2   for and giving testimony, when there are other people who have
 3   greater information and whose depositions will be less
 4   disruptive to the bank's operations.
 5           THE COURT:  The first factor is far more important
 6   than the second factor, it seems to me, because the fact that
 7   someone is busy, very busy, isn't, standing alone, really
 8   adequate to preclude their deposition.  It has to be that
 9   they're really not going to offer more than these other
10   witnesses are going to offer; that if you were to depose
11   Mr. Downe, it would be redundant, duplicative; there would be
12   no further information obtained from him that the defendants
13   wouldn't have already obtained from others; isn't that really
14   right?
15           MR. LACK:  I think both circumstances are important,
16   your Honor.  A CEO does have special consideration under the
17   case law because of the uniquely disruptive effect taking the
18   deposition of a CEO has.  So that whereas if you have several
19   lower-level people who arguably have overlapping information,
20   this question would not arise as to whether you have to
21   prioritize one over the other.
22           But the case law is clear that with respect to the
23   CEO, because of the burden -- it doesn't say the CEO never gets
24   deposed, but it's very clear the CEO should never be the first
25   person to be deposed, unless you could show that he has

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9
DAUVBANC                    Conference
1    information no one else has.  And that clearly can't be shown
2    here.
3           THE COURT:  Isn't the right result here to defer the
4    decision as to whether Mr. Downe should be deposed until these
5    other individuals are deposed?
6           MR. LACK:  Yes, that is the correct decision, your
7    Honor.  We're not saying that under no circumstances can a
8    showing ever be made that Mr. Downe's deposition should be
9    taken.  What we're saying is that today, in the absence of any
10   depositions being taken, and particularly in the absence of
11   these five depositions having been taken, it's not appropriate
12   to require Mr. Downe to be the first.
13          THE COURT:  I believe I read in one of the many
14   letters I received on this subject that in your Rule 26
15   disclosures, you identified close to 100 people who had
16   knowledge of the information that's set forth in the complaint;
17   is that right?
18          MR. LACK:  That's correct.
19          THE COURT:  All right.
20          So how, if I'm a defense lawyer, and I want to abide
21   by your position on some level that you obviously articulated a
22   meet-and-confer and they didn't abide by it, because here we
23   all are today, but what is going to reassure me that I'm going
24   to have the full panoply of knowledgeable witnesses available
25   to me if you don't identify them with particularity?  You said

```
     DAUVBANC                    Conference
 1   you have no obligation to identify those who are identified in
 2   Paragraph 9.  Why is that?  Why shouldn't you identify to them
 3   who -- make a list of who Mr. Downe essentially got his
 4   information from, as he put it, information that I obtained
 5   while president and CEO was obtained from lower-level BMO
 6   employees and individuals outside the bank.  Shouldn't you tell
 7   them who that is so they can then decide which of those -- if
 8   there are 30 people, which of those ten they want to depose,
 9   and then talk to you about, well, they want to depose five
10   more, and you're going to say, okay, we'll give you five more,
11   even though the rule only says you get ten in a
12   meet-and-confer, and then you don't come back and bother me
13   with that; or, alternatively, know you only get ten, in which
14   case they come back to me and say, Judge, we should get
15   Mr. Downe, unless they tell us, you know, who these people are
16   and we get 15 of them, if we need them.
17             MR. LACK:  Your Honor, we've produced, as you know,
18   millions of pages of documents in discovery.  And we've
19   produced emails that went to Mr. Downe from other people; we
20   produced minutes of meetings where Mr. Downe attended, where
21   other people reported on the trading losses and so on.
22             So, yes, I think that I would agree in concept that
23   defendants are entitled to know who the sources of information
24   from Mr. Downe are.  But we've given that information, and
25   they've noticed the depositions of these people already.  So,
```

DAUVBANC                    Conference

1   yes, I could go back and give them a list; probably could not
2   be exhaustive, given Mr. Downe probably gets reports from many,
3   many people in the organization.  But they could run a search
4   for all emails between Mr. Downe and someone else in Bank of
5   Montreal where they are sending him an email reporting on
6   circumstances underlying the facts of this case and get that
7   information.  We could do the same thing.
8          So it's not that they are in the dark.  The fact is
9   they have identified a number of Bank of Montreal witnesses who
10  are more knowledgeable about the facts than Mr. Downe; and
11  they've just decided they want to take Mr. Downe's deposition
12  first.
13         THE COURT:  In other like circumstances, when I've
14  seen declarations like the one that was submitted here, the
15  people who provide the information to the declarant or the
16  affiant are often identified.  That's why I'm pursuing this
17  with you, because the way it's written now, it's very
18  generalized.
19         And it's fine to say, Well, we identified almost 100
20  people, and we've given them millions of documents; but if you
21  were on the receiving end of that, you would feel a little bit
22  at sea, especially if the other side was going to have to defer
23  the deposition of Mr. Downe.  Now, they're going to argue why
24  they shouldn't have to, but if that deposition is deferred, one
25  of the reasons it should be deferred is so that they can make a

12

DAUVBANC                    Conference

 1   full record as to why he uniquely has information that these
 2   other people, who he says he got his information from, didn't
 3   provide -- didn't span the whole waterfront, if you will, with
 4   respect to the facts of this case.
 5              MR. LACK:  We could.  The reason why Paragraph 9 does
 6   not list people is because it would be a very large number of
 7   names.  And we believe that the defendants already know the
 8   names of those people, maybe not every single one of them, but
 9   a large number of them.  We identified those people in our
10   initial disclosures.  We could, if your Honor wanted, go back
11   and supplement and give them a list of names; but they've done
12   a pretty good job, I think, with the depositions that they've
13   noticed and we've agreed to provide dates for already in terms
14   of identifying people who were the sources of information for
15   Mr. Downe, including Mr. Merrall, and Mr. Tripp, Mr. Bencich,
16   and Mr. Poulsen.
17              So we think that those depositions, once they take
18   those depositions, and possibly other depositions, that would
19   be a time at the earliest to consider whether Mr. Downe has
20   anything additional to add.
21              THE COURT:  What is your response to the fact that
22   during the time period in question here, Mr. Downe was not, in
23   fact, the CEO, but was the COO and played, I think, another
24   role, in fact, as well; and so the apex witness analysis that
25   you have undertaken here really isn't as apt as it might be in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

DAUVBANC                    Conference

1   other circumstances.
2          MR. LACK:  I actually disagree with that, your Honor.
3   The apex analysis, the fact that he's CEO, goes to the position
4   he holds at the time the deposition is taken; because the
5   burden is based on the fact that at the time the deposition is
6   going to be taken, he is the CEO, not whether he was CEO during
7   the time of the events.
8          THE COURT:  That goes to sort of Factor 2, if you
9   will, not Factor 1 that we discussed earlier.
10          MR. LACK:  That's right.  His current status as CEO
11   goes to Factor 2.
12          We would take the position that as to Factor 1, that
13   the fact that he was chief operating officer of Bank of
14   Montreal before he was CEO doesn't mean that he has unique
15   personal knowledge as to these events either, especially
16   compared to the other people whose depositions are pending.  So
17   we don't think that they've satisfied the unique personal
18   knowledge with respect to Factor 1.  And Factor 2 what counts
19   now is that he is the CEO currently.
20          THE COURT:  How many depositions has Bank of Montreal
21   taken in this litigation?
22          MR. LACK:  Mr. Haggerty may know the -- I think maybe
23   four or five.  Mr. Haggerty would know the number.
24          MR. HAGGERTY:  Five, your Honor.
25          THE COURT:  And how many are you planning to take at

DAUVBANC                    Conference

1   the moment?
2           MR. LACK:  We're probably planning to take another
3   five, at most.
4           THE COURT:  Your intention at the moment is to stay
5   within the presumptive ten deposition limit that the rules
6   contemplate?
7           MR. LACK:  Yes, that's our intention.  I mean there
8   are many witnesses, potential witnesses, in this case.  And we
9   identified, as your Honor noted, close to 100 people who have
10  knowledge.  But the fact that there are close to 100 people who
11  have knowledge doesn't mean that 100 depositions have to be
12  taken in the case.
13          And as to the number, I think it's very difficult for
14  the defendants to argue that they should get carte blanche to
15  exceed the ten limit before they've taken even a single
16  deposition.
17          Again, our position is not under no circumstances
18  would it ever be possible to seek more than ten depositions
19  being taken by defendants in this case.  It's that now is not
20  the time to give them that authorization when they haven't even
21  taken a single deposition.
22          THE COURT:  So, in a nutshell, your position is not
23  necessarily denial, but deferral.
24          MR. LACK:  That's correct, your Honor.
25          THE COURT:  All right.

```
                                                      15
        DAUVBANC              Conference
 1              Let me hear from whoever wants to be heard,
 2     Mr. Cassidy's attorney or Optionable's attorney or whoever
 3     wants to be heard.
 4              MR. GELBER:  I'm Lawrence Gelber, and I represent
 5     Kevin Cassidy.  And I will respond.
 6              THE COURT:  Yes, Mr. Gelber.
 7              MR. GELBER:  My difficulty staying focused, only
 8     because Mr. Downe's role is so vast and so broad over such a
 9     long period of time at the bank, I can actually think of no
10     other human being at the Bank of Montreal who has more granular
11     knowledge about all of the events that took place starting from
12     back in early 2000, going up through 2007 when the events took
13     place.
14              THE COURT:  Why would his knowledge be so granular in
15     the positions that he held?
16              MR. GELBER:  Because he functioned in various
17     capacities that interacted directly with the commodities
18     derivatives group.  He was there when the Price Waterhouse
19     report came out, delineating all the defects in the systems
20     that Bank of Montreal had.
21              Mr. Lack has contended, Well, that's before the time
22     period of the complaint, which only goes from 2003 to 2007.  My
23     reaction to that was the complaint raises the crimes of my
24     client from 1992, when my client was a fall-down alcoholic.  My
25     client has been sober now for 21 years.  That had nothing to do
```

16

DAUVBANC                    Conference

1  with it, but it didn't stop them from bringing up old matters
2  because they felt there was some underlying connection.
3          The nexus between the systemic failures at the Bank of
4  Montreal while Bill Downe had the direct oversight of many of
5  these operations as part of the risk management committee, as
6  part of -- as being a deputy chair of BMO Financial are
7  unmatched by anybody else.
8          The burden argument is, quite frankly, bizarre.
9          THE COURT:  I don't understand why you think it's
10  bizarre.  He's the CEO of a big bank.  By definition,
11  generically, I would expect anyone in his position and any
12  lawyer representing him to argue exactly as Mr. Lack did; and
13  if you represented Mr. Downe, you'd make the same arguments.
14          MR. GELBER:  Here's the problem with the argument.
15  Call me crazy, but I would bet that if Mr. Downe had the
16  ability to go to London to sit Downe across a table for a
17  negotiation for a $25 million deal that would benefit the Bank
18  of Montreal, he would be able to have those two or three or
19  four days required for that $25 million deal.
20          He's now heading an institution that has brought a
21  multi-centimillion dollar claim, $500 million claim, against
22  the people sitting at this table, and he can't afford two days
23  away from the bank?  There's no burden.  He's got a vast
24  organization of subordinates that can run the bank.  He's got a
25  cell phone, he's in constant communication.  I'm not required

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DAUVBANC                    Conference

```
 1   to abandon common sense and human experience.  A modern
 2   executive runs the business from wherever they are.  The fact
 3   that he has to come to New York and meet with his lawyers
 4   doesn't keep him from his cell phone, doesn't keep him from his
 5   computer.  Am I supposed to believe he doesn't go on vacation?
 6              THE COURT:  Let me ask you a question, Mr. Gelber.
 7              MR. GELBER:  Yes.
 8              THE COURT:  Why doesn't it make sense to stage your
 9   depositions in a way where these lower-level employees are
10   deposed first, and then the decision as to whether Mr. Downe
11   should go forward should be made?  Why should I make it on what
12   is really an empty record at the moment, with a lot of
13   speculation, rather than harder, more concrete, information
14   generated from sworn testimony, rather than FBI agent 302
15   hearsay type stuff?
16              MR. GELBER:  Simply because of principles of judicial
17   economy, which really factor in here.  You have a human being
18   who has more knowledge about anything that went on in all of
19   these operations than anybody else at the bank.  He's stepping
20   away from things.
21              Here, just for example.  In my letter of October 21, I
22   mention the fact that he was -- I say:  Downe was the deputy
23   chair and, later, the hands-on chief operating officer of BMO
24   Financial Group.  They nowhere step away from the fact that he
25   was the hands-on COO when he became COO; but he was the deputy
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

DAUVBANC                    Conference

1  chair before that.  That's important, and I'll tell you why.
2          In his affidavit -- well, it wasn't really an
3  affidavit, it was a declaration, but he acknowledges penalties
4  of perjury apply, he describes himself only as the president of
5  a securities brokerage that's operated by the bank, and then in
6  2006 becoming the COO.
7          Why is he not saying in a sworn affidavit that he was
8  the deputy chair, which is what puts him square in the middle
9  of what's going on.
10          In a release, on September 22nd, 2005 -- this is on
11  BMO's website -- and I have copies if people want to see it,
12  there's a speech delivered by William Downe, deputy chair of
13  BMO Financial Group and Rob Pierce.  And in that speech,
14  Mr. Downe talks about risk, he talks about risk management, and
15  then he talks about a disciplined approach.  And then he passes
16  the rest of the speech over to somebody else.
17          Now, again, common human experience, you speak about
18  what you know about.  Every lawyer here, when you have a law
19  firm, you assign your bankruptcy person to your bankruptcy
20  matters because they know about it.  Here's a public speech
21  about where the bank is going, how the bank is managing and
22  assessing risk, and the person they put out to talk about it is
23  Bill Downe.  Was he just a strawman or did he have real
24  knowledge?
25          THE COURT:  How do you know what he spoke about won't
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

19

DAUVBANC                    Conference

1   be something that will be addressed in the Merrall, Poulsen,
2   Tripp, and/or Bencich depositions, and why wouldn't, if those
3   subjects are addressed by one or more of those individuals, be
4   sufficient for purposes of the defendants?  You don't know
5   that.  There's no way you can really answer that, because the
6   depositions haven't even been taken yet, right?
7            MR. GELBER:  To answer the last question first, right.
8            However, very interesting phenomenon.  BMO is still
9   producing documents.  There's a lot of stuff we don't know.
10  There are many, many things we don't know.
11           A year and-a-half ago, BMO stood up in court before
12  Judge Daniels and said, We have completed our document
13  production, and then proceeded to make multiple document
14  productions after that.  They just keep coming.
15           So it's a never-ending dribble of information that
16  forms a burden for us to put together.
17           Mr. Downe is where everything coalesces.  If I depose
18  Mr. Downe -- and I, quite frankly, think the correct order is
19  to depose him first, principal of the highest first, and then
20  move to the lower people, if necessary, because Mr. Downe was
21  in the position of authorizing things.  In some of his public
22  speeches they talk about, in terms of managing risk, not taking
23  huge positions in things.  And we know from the evidence
24  produced that BMO took the largest single position in natural
25  gas derivatives in history after the Amerist blowup.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

DAUVBANC                    Conference

1          THE COURT:  Can you cite to me any case law in which
2     the CEO of a company's deposition precedes before all the
3     lower-level employees?
4          MR. GELBER:  I cannot, but I can cite to you something
5     that contradicts what Mr. Lack just said about the unique
6     personal knowledge.
7          THE COURT:  So we're skipping over the law; we're
8     going just back to the facts?
9          MR. GELBER:  No, I'm going to tell you a case that
10    goes to that.  The case is cited in my brief, and it's --
11         THE COURT:  No one submitted briefs.
12         MR. GELBER:  Not briefs.  I apologize.  I misspoke
13    that one time in my life.
14         THE COURT:  What are you referring to?
15         MR. GELBER:  In my letter, the Chevron Corporation v.
16    Steven Donziger case.  And they cite to prior cases.  It's not
17    that the CEO needs to have unique personal knowledge; it's that
18    he needs to have either personal information or unique
19    knowledge.
20         THE COURT:  I'm sorry to interrupt you, but in the
21    Chevron case, as I remember it, the CEO deposition went forward
22    because there was only a month of discovery left.  And I
23    believe Judge Francis suggested that it would have been more
24    prudent to have deferred the CEO's deposition if the facts had
25    allowed for that, the timeline had allowed for that to

21

DAUVBANC                 Conference

1   determine whether or not it would be redundant.
2           But the facts of that particular case were rather
3   different from this one, since discovery doesn't close till
4   April.  And I guess what I'm still not quite hearing a good
5   answer to is why, if the five depositions Mr. Lack tells me are
6   going to take place in November and early December, and there
7   are clearly going to be another five-plus depositions of other
8   BMO witnesses, why we shouldn't defer the decision as to
9   whether Mr. Downe's deposition should takes place; and if it
10  should -- and I'm not suggesting it shouldn't at all take place
11  in this question -- why shouldn't we wait until January and
12  have it take place then, after a fuller record is developed,
13  because that strikes me as more consistent with almost every
14  case I've read on the subject.  And I don't understand what's
15  unique about these circumstances that would warrant Mr. Downe's
16  deposition to precede all the other deposition discovery that
17  is logical to take place.
18          MR. GELBER:  There's two points there.  And -- well,
19  three, if I may respond to them.
20          Our point about the Chevron case is not the final
21  real-world decision, but the principle that permitted it.  And
22  the principle that was stated was that courts disfavor -- we
23  agree with that -- requiring the depositions of senior
24  executives unless they have personal knowledge of relevant
25  facts or some unique knowledge that is relevant to the action.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

DAUVBANC                    Conference

 1          THE COURT:  I have a declaration from Mr. Downe
 2   disclaiming any personal knowledge.
 3          MR. GELBER:  But, as you noted, it was very vague.  As
 4   the Court noted, it was very, very vague.
 5          THE COURT:  It's very general.
 6          MR. GELBER:  It's very general.  The disclaimer, we
 7   believe, is disingenuous.
 8          And now I'll respond to the other part of your Honor's
 9   question.
10          The concern's about delaying or deferring Downe is
11   twofold:  One, we believe it's a far less efficient way to
12   proceed.  Mr. Lack, in his letter to the Court opposing my
13   letter, points to somebody named Penny Somerville, who's no
14   longer -- she's no longer at the bank, right; she's not even
15   there anymore, who was another key person on the risk
16   management committee after Downe.  So the hoops that plaintiffs
17   want us to jump through -- and, by the way, BMO is the
18   plaintiff here.  The hoops that the plaintiff wants us to jump
19   through to get meaningful discovery are formidable.  And if we
20   delay --
21          THE COURT:  What does that mean exactly?  What hoops
22   are formidable?
23          MR. GELBER:  Well, take all these people or get the
24   people who we no longer have control over anymore.  In fact,
25   BMO told us that they would not accept service for their former

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23

DAUVBANC                    Conference

1  employees; and yet they recite former employees in their letter
2  opposing my letter.
3          THE COURT:  Wouldn't your argument be even stronger if
4  you come back in December and say, Judge, we took these five
5  depositions; we're going to take five others.  But we can't
6  find these former employees; they are not receiving our
7  subpoenas; the bank won't receive them.  And that's all the
8  more reason, Judge, why we should get Mr. Downe's deposition,
9  because all these people that they are telling you have
10  knowledge that aren't at the bank anymore, we can't even depose
11  them.  Wouldn't that make your argument even stronger?
12          MR. GELBER:  It might be even stronger, but it doesn't
13  even it's not very strong now.
14          The fact of the matter is this:  BMO has engaged in
15  what we believe to be dilatory tactics.  And my co-counsel can
16  address that more fully in discussing the number-of-depositions
17  argument.
18          Our concern is that when we get to January, after
19  deposing five people, and we now have a stronger argument,
20  there will be more delay.  We have a firm,
21  don't-dare-come-to-me cutoff of, I believe, April 1st.
22          THE COURT:  Who said that?
23          MR. GELBER:  Some gentleman named Magistrate Judge
24  Cott.
25          THE COURT:  Gotcha.

24

DAUVBANC                    Conference

1          MR. GELBER:  So because we have great respect,
2    unbounded respect for the Court, we take that very, very
3    seriously.  And we're nervous, because up until now, BMO has
4    controlled the game; it's controlled the narrative, it's
5    controlled the scheduling; it's controlled the game.
6          New facts are emerging.  We believe the narrative is
7    going to shift dramatically.  And we are firmly convinced that
8    the most efficient, practical way to proceed is to take
9    Mr. Downe first.  There will be no burden to the bank.  I mean
10   I understand you get to say that, but in the real world, it's
11   zero burden.  The bank will function; nothing will collapse.
12         THE COURT:  Hold on.
13         If he's deposed, whether it's next week or in January
14   or whenever, he's going to have to prepare for the deposition,
15   and that's going to be a big project for him.  And every hour
16   he spends sitting with lawyers preparing for the deposition is
17   every hour he is feeling frustrated that he's not doing what he
18   should normally be doing.  So there is some burden attached to
19   that, even if he's on his BlackBerry during the preparation
20   dealing with bank business.
21         So let's not totally undersell the fact that there is
22   no burden here.  There is a burden.  How much of a burden, you
23   know, in the modern world we live in is probably different than
24   20 years ago; but there's a burden, to be sure.
25         MR. GELBER:  His frustration, quite frankly, means

25

DAUVBANC                  Conference

1   zero to me.  I have an extremely frustrated client.  We have a
2   record now that's rather firm, some of which documents were
3   presented to your Honor in connection with the confidentiality
4   efforts of BMO that show that there was a concerted effort to
5   shift the blame in order specifically to protect Bill Downe,
6   protect Bill Downe.  We want to manipulate the press to protect
7   Bill Downe.  We're afraid that Bill Downe will be confronted
8   with too many questions.  We need to protect Bill Downe.
9           And Bill Downe authorized a $25,000 per month payment
10  to a very high-profile PR firm to do that.  And they were still
11  doing that in 2008, protecting Bill Downe.  The memos are
12  replete with this concern about Bill Downe.  And the reason
13  there's such concern about protecting Bill Downe is because
14  Bill Downe is dead center in the middle of this.  They are the
15  plaintiff.  They are the plaintiff.  We're being sued for $500
16  million.  My client is in jail.
17          Bill Downe has engineered a public relations campaign
18  that's still ongoing.  We believe it's a fraud on the Court,
19  and I apologize, but that's what we believe.  And he needs to
20  sit down in a room, and answer questions about what he knew,
21  when he knew it, why, why he ducked responsibility.  He talks
22  in his public speeches, and they are all over the web, your
23  Honor can search them or I can hand them up to you right now,
24  about taking responsibility, about we're changing things here
25  at the bank; we're narrowing our focus.  He's in the middle.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

26

DAUVBANC                    Conference
1    That's why.
2              THE COURT:  Did I understand you, Mr. Gelber, to say
3    that the deposition would be two days of Mr. Downe?  Is that
4    what you're contemplating?
5              MR. GELBER:  We would love that; we also understand
6    we're likely to be restricted to seven hours.
7              But my client sat for 21 hours of deposition.  The
8    excuse was that there were multiple plaintiffs.  Twenty-one
9    hours, while he was undergoing the stress of losing another
10   relative.  He has one of these like Kennedy-esque tragic lives.
11   And it would be funny if it wasn't so tragic.  But in the
12   middle of the death of a close relative, while he was in the
13   process of being sentenced or preparing to go away, he sat for
14   21 hours of a deposition.
15             We would like Bill Downe for 14 hours.  And my
16   colleagues can talk about the number of people being deposed
17   and the length of time, because there are so many of us.
18             THE COURT:  Let me hear from some of your colleagues,
19   because I don't think we want to spend all morning discussing
20   this.  And at this rate, we will be spending all morning.
21             MR. GELBER:  I apologize.  But I truly appreciate the
22   opportunity the Court has granted to allow me to speak.
23             THE COURT:  Thank you, Mr. Gelber.
24             Who else wants to be heard for the defendants?
25             Mr. Klein.

27
DAUVBANC                    Conference
 1              MR. KLEIN:  Solomon Klein.
 2              MR. GELBER:  I apologize.
 3              I've just been reminded that all defendants who have
 4    been deposed sat for 21 hours.
 5              THE COURT:  All right.  Very well.
 6              MR. KLEIN:  Good morning, your Honor.  Solomon Klein
 7    for Mr. Nordlicht.
 8              I just wanted to add a couple of items regarding the
 9    deposition of Bill Downe and why I think it was inappropriate
10    even to try to stop it.
11              THE COURT:  It was inappropriate to try and stop it?
12              MR. KLEIN:  To avoid the deposition, given his role at
13    the very top.  And I understand some of the case law.
14              If there's anything that the case law stands for, it's
15    fundamentally that if you have a mortgage dispute with
16    Citibank, you can't go and depose the CEO.  Where the CEO has a
17    central role during the events, we're not just talking
18    afterwards as a collector of information, during the events --
19    he was then COO -- he was on the committee involving market
20    risk over several years.
21              THE COURT:  Were other people on the committee who
22    you're going to be deposing?
23              MR. KLEIN:  Mr. Tripp was on the committee.
24              THE COURT:  So why wouldn't what you're going to get
25    from Mr. Tripp be sufficient for your purposes?
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

28

DAUVBANC                    Conference

1          MR. KLEIN:  That's a very good point.  Usually that
2    would work.  But let's look at the email that I cite in my
3    letter, where Mr. Downe goes to Mr. Tripp and says, What's the
4    chances of something blowing up here?  I heard from Bob as
5    follows.  I've been hearing other things from other people.
6    This is during the process.  This is January 2007, several
7    months before it blows up.  He is the person that is gathering
8    the information from the different people at Bank of Montreal.
9          THE COURT:  Why doesn't it make more sense to take
10   Mr. Tripp's deposition first and then take Mr. Downe's
11   deposition?
12         MR. KLEIN:  I don't have a particular problem with
13   whether Mr. Tripp goes before Mr. Downe, because I think
14   regardless of who gets deposed, both of them need to be
15   deposed.
16         THE COURT:  But from where I sit, because as I read
17   the law, and as I understand the record that exists before me
18   right now, which is not a very well-developed record with
19   respect to parties, because you submitted letter briefs, which
20   is all that I asked for, so I'm not blaming anybody, but we
21   have a relatively scant record at the moment.  And why wouldn't
22   it make more sense to take the deposition of these individuals
23   who have been identified, and perhaps others, then have a
24   meet-and-confer, then see if you can persuade Mr. Lack and
25   Mr. Haggerty that, Hey, when we go before Judge Cott, he made

DAUVBANC                    Conference

1   pretty clear back in October that he was inclined to go forward
2   with Mr. Downe; he just wasn't willing to grant you his
3   deposition at the outset; he wanted to have an even more
4   developed record made.  And then they would know that the
5   chances of them not agreeing would lead them back here and
6   would lead them to an adverse result, because you have an even
7   stronger hand than you have now.
8          I understand the people at your table think you have a
9   good hand now.  But it seems to me that his deposition, if it's
10  going to go forward, would be far more justified, and you would
11  have a far stronger argument to make about how he has unique
12  information, it's not redundant, and all the other sorts of
13  things that courts look at after these depositions have taken
14  place.  That's where I'm struggling.
15         I'm not really struggling that there isn't a serious
16  likelihood that Mr. Downe's deposition should take place, but
17  I'm focused more on timing right now.  Or, to put it another
18  way, I'm disinclined to agree with your table that his
19  deposition should be in November; but I'm disinclined to agree
20  with Mr. Lack that his deposition shouldn't take place.  That's
21  sort of where I am right now.
22         MR. KLEIN:  I'm not particularly focused on whether or
23  not Mr. Downe's deposition takes place in November or whether
24  it is the fifth or sixth or eighth, for that matter.  I do
25  think there's enough on the table right now that defendants

DAUVBANC                Conference
1   collectively have presented to your Honor that he was
2   involved -- and if he wasn't the CEO, we wouldn't even be
3   having this conversation.  He would be up there and he would
4   show up.
5            And so the real question is Factor 2, and that is, is
6   there justification for saying Mr. Downe is now CEO, there's a
7   tremendous burden on the bank.  And I think there's no basis
8   for it.  Mr. Gelber presented those issues.  It's a modern
9   bank; he has a day or two to give away for a case like this.
10           THE COURT:  But to be clear, and not to put too fine a
11  point on it, you all talk like it's, you know, if it's a
12  14-hour deposition, that's really all he's giving up, and there
13  will be breaks, and he'll be in consultation with those he
14  would normally be in consultation with.
15           But it's actually a lot more than that; because his
16  deposition in this case will be a seminal event, and his
17  lawyers know it, and his lawyers will have to prepare him
18  thoroughly for it, and because there have been millions of
19  pages of documents produced in this case, and because there may
20  well have been other depositions taken in advance.  It's an
21  enormous event to prepare a CEO in a case like this for a
22  deposition.  You're talking about many, many hours that will be
23  involved in the mere preparation of the deposition, in advance
24  of the deposition itself.  That's the real world of modern 21st
25  century litigation, right?

31
DAUVBANC                 Conference
1              MR. KLEIN:  I understand that.
2              But the real issue right now is is there enough right
3    now for the Court to rule on whether or not Mr. Downe needs to
4    show up.  And I think that's the narrow question, that there's
5    enough information right now.
6              THE COURT:  And I have FBI agent notes saying one
7    person said Mr. Downe knew something else, and 302s from FBI
8    agents.  I mean, with respect, that's not the equivalent of,
9    Well, Mr. Tripp testified at these committee meetings this way
10   about certain facts, but that leaves open the obvious question
11   as to what Mr. Downe knew or said or saw or added or all those
12   sorts of things.  That would be a much stronger record than
13   what's before me now, wouldn't it?
14             MR. KLEIN:  I understand.
15             The reason we presented it now is because we're very
16   comfortable with what's in front of your Honor.  And that is
17   that Mr. Downe is involved, was involved, was involved during
18   the blowup, was involved for several years with the risk
19   committee; in fact, there were documents produced yesterday, I
20   don't know whether these are duplicates of other information,
21   but of Mr. Downe present at market risk meetings over several
22   years.  And with him being there, and not many people being,
23   over the years, in that same role, who got the information
24   relating to the commodities, was there after the blowup, was
25   there as it was happening, and was the person where the
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

```
          DAUVBANC                    Conference
 1    information was funneled through.  I think the email, without
 2    looking at the FBI issues, if you look at the email itself, a
 3    single email where Mr. Downe is asking one person, saying, I've
 4    heard this, there's at least three people communicated with
 5    Mr. Downe on one issue in January of 2010.
 6            THE COURT:  Right.  But to use Mr. Gelber's word, that
 7    hardly suggests Mr. Downe's involvement was granular; that
 8    suggests the opposite to me.  That's all these lower-level
 9    people are reporting to him, and he's at the top of the food
10    chain, and he has a much more macro view of the world, if you
11    will, and not a micro view.  And if that's true, at least on
12    the present record, that hardly justifies his deposition going
13    first.
14            MR. KLEIN:  And, like I said, I think the first is not
15    the question.
16            THE COURT:  I hear Mr. Gelber telling me he wants to
17    take his deposition tomorrow.  So for Mr. Gelber, he's first;
18    for you, it sounds like he could be sixth, you don't care, you
19    just want it.
20            MR. KLEIN:  And I think your Honor has enough
21    information presented already.  And, in fact, reading between
22    the lines, as your Honor started today, the affidavit suggests
23    even greater involvement than what we've presented to you
24    already in the vagueness of how many people and how many
25    discussions he had.
```

33

DAUVBANC                    Conference

```
 1           THE COURT:  So I'm supposed to infer by omission,
 2    infer from vagueness?
 3           MR. KLEIN:  Sometimes that's actually the most
 4    telling.  And I think, given the market risk, given the
 5    discussions he had with the emails during the period, and I
 6    stress the fact that -- I understand that CEOs, when there's a
 7    crisis and a blowup of this proportion, are going to be
 8    involved at the end and are going to receive information.
 9           But I think the real issue here is his involvement
10    during the events, not just several months before, as we've
11    shown, and over several years being involved with the market
12    risk committee as this was developing over the years as Bank of
13    Montreal was increasing its commodities trading, increasing its
14    profits in commodities trading, and then running from it when
15    it blew up.
16           So I think your Honor has enough right now to deal
17    with this issue.  And I think the timing is -- as Mr. Gelber
18    represented, he should be first.  Whether or not he should be
19    fifth or sixth is perhaps a question that also can be decided
20    today, but I don't see a need for his deposition.  So the
21    question to come to down the road, to be dealt with later, I
22    think there's enough on the table right now.
23           THE COURT:  Anything else you want to speak to?
24           MR. KLEIN:  In terms of the number of depositions, as
25    BMO has acknowledged, there were some hundred witnesses listed
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

34

DAUVBANC                    Conference
1    information.  At this point, the scope of this case is so
2    staggering that my suggestion has been let's get depositions
3    started.   It's been very generous that Mr. Lack showed up with
4    dates that he hadn't given me earlier, but these notices were
5    sent in September.  And this is the first we've heard on the
6    depositions for November into December.
7            I believe that if this case is going to go forward,
8    then we need to get rolling in November; there is no reason why
9    we can't have five depositions in November on this issue.  And
10   then we see at the end of November where we stand.
11           THE COURT:  All right.  Thank you, Mr. Klein.
12           Anyone else at defense counsel table want to be heard
13   on any of these issues?  Seeing no one with enthusiasm or
14   otherwise running to the podium, Mr. Lack, do you want to say
15   anything further about what's been said?
16           MR. LACK:  Nothing further, your Honor.
17           THE COURT:  All right.  Let's take a short break.
18           And actually, before we do that, let me ask, are there
19   any other issues that are going to be raised today, so I know
20   what they are?  Why don't we hear what they are before we take
21   a break
22           MR. MCDERMOTT:  Your Honor, I have one request.  I
23   don't think it should be an issue.
24           Judge Daniels ordered that discovery in this case be
25   coordinated, and that the actions be considered related.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

DAUVBANC                    Conference

1       I had suspicions before today that the various parties
2  were making submissions to the Court that were not distributed
3  to us in the NYMEX case.  Those submissions were in the BMO
4  case.  I've come today and found out that my suspicions were
5  correct.  I'm hearing of various letters to the Court, I'm
6  hearing of other submissions which we had no notice of.  I also
7  want to mention that I learned that deposition notices were
8  sent out in the BMO case which we never received.  And I'd ask
9  the Court today to remind the other parties to give us whatever
10 they sent out to the others and any dispute so that if we have
11 a voice -- or, rather, a view on the issue, we can voice it,
12 bring it to the Court in a timely fashion.  That's all.
13         THE COURT:  All right, Mr. McDermott.
14         Is there any quarrel with that, Mr. Lack or
15 Mr. Haggerty?
16         MR. LACK:  I have no quarrel with giving
17 Mr. McDermott --
18         MR. MCDERMOTT:  The problem hasn't been with them.
19 I've asked them for it, your Honor.  I think there may be some
20 oversight from BMO; I don't think it's them in particular, but
21 it's some of the other parties.
22         THE COURT:  Any reason at the back table that this
23 poses a problem?
24         Mr. Gelber.
25         MR. GELBER:  I don't know that it poses a problem.  I

36

DAUVBANC                    Conference

1   would plead guilty to not having copied Mr. McDermott on our
2   letters relating to the deposition of Mr. Downe because my
3   client has settled with NYMEX, my client has settled with the
4   CFTC, and my client has settled with the SEC; so we've not been
5   copying them.
6            THE COURT:  I think in an abundance of caution, unless
7   and until otherwise directed, everyone who is in all of the
8   remaining cases should copy everyone else on all correspondence
9   to the Court, on all notices of depositions, etc.  It seems to
10  me that makes a blanket rule that is easy to follow.
11           Any objection?
12           All right.  So that's so ordered.
13           Yes, sir.
14           MR. CURRAN:  Your Honor, Frances Curran on behalf of
15  defendant Edward O'Connor.
16           This isn't really an issue, but in light of some
17  possible former employees who reside in Canada, for Bank of
18  Montreal, I wanted to alert the Court that we may be seeking
19  letters rogatory in order to depose them.  I'll, of course,
20  confer with Mr. Haggerty and Mr. Lack with respect to the
21  timing and form of those.  But given the circumstances,
22  especially as one of the witnesses mentioned, Ms. Somerville is
23  no longer an employee, it may be necessary -- we'll try to
24  avoid it as we can, but if we have to get letters rogatory, I
25  wanted to alert the Court that that might be coming.

37

```
        DAUVBANC                    Conference
 1               THE COURT:  All right.  Thank you.
 2          Anything else anyone wants to raise?
 3               All right.  Let's take a brief adjournment.
 4          (Recess)
 5               THE COURT:  I appreciate all the arguments of counsel
 6    and the submissions that were made to the Court.
 7               The fact that Mr. Downe is the CEO of BMO and has
 8    obvious executive responsibilities does not preclude his
 9    deposition obviously.  His busy schedule, which I'm sure is
10    busy, doesn't justify on its own any.  And if we have a
11    protective order, what I ultimately have to determine is that
12    he lacks any relevant knowledge or that his deposition would be
13    redundant or might be tantamount to harassment.  If that were
14    true, then a protective order would be appropriate.
15               My reading of the cases suggest that it is prudent
16    wherever possible to proceed with lower-level employee
17    depositions first, and then make a determination as to whether
18    the deposition of a CEO, like Mr. Downe, should proceed, as I
19    suggested during colloquy.
20               So my ruling and my conclusion today for the reasons I
21    suggested during the course of our discussions is that
22    Mr. Downe's deposition will not proceed immediately.  And to
23    the extent I construed the applications by defendants as a
24    motion to compel his deposition to proceed immediately, I'm
25    denying that.  But I'm denying it without prejudice.  And I'm
```

38

```
DAUVBANC                    Conference
```

1   denying it without prejudice and anticipating that the
2   defendants are going to renew that application at a later date
3   on the conclusion of lower-level BMO employees' depositions,
4   when I believe they will be in an even better position to
5   articulate the unique information that they believe Mr. Downe
6   has to offer.
7          I think the submissions that the defendants made
8   today, in advance of today, I should say, were not as fully
9   developed as I would have needed to justify advancing
10  Mr. Downe's deposition to the head of the line, so to speak.
11  That strikes me as the extraordinary case and the extraordinary
12  circumstances which may be borne from time constraints as it
13  was in the Chevron case, or it might be borne of some other
14  circumstance, although I have not read any other case, and
15  counsel has cited none to me in which the CEO's deposition
16  precedes those of lower-level employees.
17         That said, I would be remiss if I did not add, as I
18  suggested during my colloquy with Mr. Lack, that the
19  declaration Mr. Downe submitted, his October 23rd declaration,
20  was just on the margins of meeting the burden, I think, that
21  needed to be met as a threshold matter.  It's a rather vague
22  declaration that I think invites many questions which I know
23  defense counsel are chomping at the bit to ask.  And without
24  more from BMO, I think, and I want to be crystal clear about
25  this, that I am highly likely inclined to order Mr. Downe's

```
         DAUVBANC                    Conference
 1   deposition at some future date.
 2           Consistent with my discussion with Mr. Lack, as part
 3   of my ruling today, I am directing BMO to identify to the
 4   defendants forthwith the lower-level BMO employees and the
 5   individuals outside the bank that are referred to in Paragraph
 6   9 so that that can help inform defense counsel which, if any,
 7   of them they might wish to depose.  I am not requiring that any
 8   of the attorneys be identified for obvious reasons.  I don't
 9   think we need to go down that path at this time.
10           I would add as a footnote that I would direct BMO to
11   file Mr. Downe's declaration and make it part of the record in
12   this case, even though it was attached to correspondence that
13   was deemed to contain confidential information and was not
14   otherwise placed on the docket.  I'm not requiring the letter
15   itself to be placed on the docket or any of the correspondence,
16   for that matter, necessarily be placed on the docket; I think
17   the parties fully ventilated their arguments that they set
18   forth in their letters to the Court at this public hearing.  If
19   anyone feels the need to put any of the correspondence on the
20   docket, I'm happy to hear from you in that regard, but I think
21   it's important to place Mr. Downe's declaration on the public
22   docket because I think we're going to revisit it down the road
23   or potentially revisit it down the road.
24           Let me add that to the extent BMO considers my ruling
25   a victory, it may well be a pure victory.  And I do think that
```

40

DAUVBANC                    Conference

 1   if BMO is not flexible about the number of depositions to be
 2   taken and the timing of those depositions, that that will
 3   ultimately ill serve the position that they wish to take with
 4   respect to discovery generally.
 5         The application as to whether the defendants may take
 6   more than ten depositions, to the extent that is a formal
 7   application, I'm going to defer until a later date.
 8         I've been told at this conference today that the
 9   plaintiffs are making five BMO employees available to
10   defendants on the timeline that begins sometime in November and
11   goes through December 16th.  That timeline is inadequate from
12   my standpoint, given the delays that have taken place as far as
13   getting deposition discovery going forward from BMO witnesses.
14   It's been represented to me -- and not contradicted -- that
15   notices were issued in September.  We're now almost at
16   November.  And it's almost disingenuous on the one hand for BMO
17   to suggest that any decision with respect to Mr. Downe's
18   deposition be deferred, and at the same time delay the
19   depositions of other witnesses in order to give the defendants
20   more information to determine whether they want to press
21   forward with Mr. Downe's deposition or not.  I think it's safe
22   to say that they are going to press forward with a request for
23   his deposition irrespective of what the discovery shows.  But
24   my sense is that I will be in a much better position, and the
25   record will be far more developed after depositions have been

DAUVBANC                    Conference

1   taken for a renewed application to be made for Mr. Downe's
2   deposition.
3           So, to that end, the five BMO employees who have been
4   identified on the record today, I direct that their depositions
5   all take place in the month of November, and that the parties
6   work that out among themselves, with the caveat that the Court
7   is not ordering -- and, indeed, directing -- that no
8   depositions take place on Thanksgiving Day.  And I say that
9   only because I know how hardworking and zealous everyone is in
10  this case.  But from where I sit, I want to make sure that
11  people take time away from this lawsuit, among your other
12  responsibilities, and do what one should be doing on
13  Thanksgiving, which is not expressing gratitude for litigation
14  or other such things.
15          But I do otherwise mean in all seriousness that I want
16  the parties to work out a schedule that would allow all five of
17  these depositions to take place in November.
18          What I am then contemplating is that the parties will
19  have a meet-and-confer the first week of December, the week of
20  December 2nd, and then we will have another conference on
21  Wednesday, December 11th, unless the parties work out these
22  open issues on their own.  And what I anticipate during the
23  week of December 2nd is these five depositions having been
24  taken, and a list of people that Mr. Downe identified in his
25  declaration haven't been identified, the parties will be in a

42

DAUVBANC                    Conference
1   better position to have a discussion about what other
2   depositions they believe need to be taken independent of
3   Mr. Downe, and on what schedule.  And I hope we'll be able to
4   work that out.
5           And if the parties conclude that they want to take
6   more than ten depositions, let's say 12 or 13 or something like
7   that, that, in the first instance, I would strongly encourage
8   counsel to work that out among themselves; because in a
9   complicated case like this, I think I'm going to be highly
10  inclined to grant a request, as long as the information can be
11  identified to me, that would justify taking those additional
12  depositions.
13          So what I would expect to happen then is at the
14  meet-and-confer the first week of December, you're going to
15  work out the remainder of your depositions as far as the BMO
16  witnesses are concerned and, frankly, whatever other
17  depositions have not yet been taken so that you all have a game
18  plan for the rest of deposition discovery, which I anticipate
19  will take place in December and January.
20          I anticipate that the parties are likely not to work
21  out the deposition of Mr. Downe, because I suspect Mr. Lack and
22  Mr. Haggerty will probably believe that what he will have to
23  offer will be redundant and not unique.  And I suspect we will
24  be back here in December having a similar discussion again.
25          My expectation is that if I were to rule that
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

43

DAUVBANC                    Conference

1   Mr. Downe's deposition were to take place, that it would take
2   place in January.  And that's well within the discovery
3   schedule that I have set.  And if I were to make that judgment
4   on December 11th, I would expect it to be no earlier than mid
5   January, and that would certainly give Mr. Downe and his
6   attorneys plenty of time to make whatever accommodations were
7   necessary to prepare for and ultimately take that deposition.
8   I say that without prejudging the ultimate decision, because I
9   think, as I said before, the record needs to be more fully
10  developed.  I say that without suggesting that if his
11  deposition were to go forward, it would necessarily be longer
12  than seven hours.
13          These are all open questions that, unless you all work
14  it out, we will revisit on December 11th.  And what I would
15  anticipate is that the parties will make some submission to me
16  by the end of the previous week, Friday the 6th of December, so
17  that I know where you stand on this and any other issue, for
18  that matter, as the December 11th conference will be a case
19  management conference, as this one was, as well, so that if
20  there are any other outstanding issues, we can address them at
21  that time.
22          I think that sufficiently covers all of the issues
23  that were raised this morning.  And I will issue an order that
24  memorializes my ruling and the dates and the schedule that I
25  suggested on the record today.  I think that will constitute my

44

DAUVBANC                    Conference
1    ruling on the open questions at this time.
2              Mr. Gelber?
3              MR. GELBER:  Two questions, both related to time.
4              The time of the December 11th conference will be 10
5    a.m.?
6              THE COURT:  10 a.m.
7              MR. GELBER:  Is the Court ruling on the length of time
8    that we'll be able to take some of these depositions for?
9              THE COURT:  Which depositions are you referring to?
10             MR. GELBER:  In other words, the depositions that BMO
11   was going to produce.
12             THE COURT:  You're talking about the five depositions
13   in November and whether they be more than seven hours?
14             MR. GELBER:  Correct.
15             THE COURT:  I don't know that that was an issue.  Is
16   that an issue?  Do you anticipate any of them being more than
17   seven hours?
18             MR. KLEIN:  It was mentioned in one of the letters,
19   but we didn't actually submit it to your Honor, because it's
20   hard to tell until we actually do it.  I would like to at least
21   take it without prejudice in terms of if things do not get
22   done -- put it this way:  I suspect some depositions can be
23   completed in one day, perhaps another might not.  So, for
24   example, Tripp's deposition is likely not to be completed in
25   one day.  But I don't think coming in right now and saying each

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

45
DAUVBANC                    Conference
1   one needs to be two days, I don't think each one needs to be
2   two days, but some of them might be.
3           THE COURT:  Well, can I rely on counsel to see if you
4   can work this out in the first instance?
5           Mr. Lack, do you have any instinctive reaction that
6   these depositions, at least some of them, might not need to be
7   more than a day?  Or let me rephrase that, because I think I
8   used a triple negative in that last statement or last question.
9           Are you concerned about these being more than one day,
10  given that I understand you have taken some up depositions that
11  were more than one day?
12          MR. LACK:  Well, these particular depositions I don't
13  expect to require more than one day.
14          THE COURT:  Even Mr. Tripp?
15          MR. LACK:  Even Mr. Tripp.
16          THE COURT:  Do you understand that you take that
17  position at your peril in the sense that the more restrictive
18  you are about making these witnesses available, the less
19  inclined I'm going to be to rule in your favor with respect to
20  Mr. Downe, because the better the argument they are going to
21  have that the record created was somehow limited and,
22  therefore, that would more fully justify Mr. Downe's
23  deposition?  You understand that?
24          MR. LACK:  I would approach it somewhat differently,
25  your Honor.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

46

DAUVBANC                      Conference

```
 1              THE COURT:  I'm sure you would.
 2              MR. LACK:  I would put it this way:  I think that if
 3     they've taken seven hours of Mr. Tripp's deposition, and it is
 4     clear that they have not had an opportunity to fully examine
 5     him, then we will meet and confer about whether there should be
 6     an extension.  I don't anticipate having a situation which we
 7     have improperly cut off the ability for them to examine
 8     lower-level witnesses.  I think that we'll see how they go
 9     after seven hours.  And if there's a need for more time, we
10     will meet and confer in good faith with them about whether
11     additional time will be provided.  And if we can't agree, we
12     can deal with that at the next conference.
13              THE COURT:  Let me ask you or Mr. Haggerty how many
14     BMO depositions that you've taken have exceeded seven hours --
15              MR. LACK:  Oh, well --
16              THE COURT:  -- on consent.
17              MR. LACK:  BMO itself has never examined a witness for
18     more than seven hours.  But the prior witnesses, depositions of
19     Mr. Cassidy and Mr. O'Connor, Mr. Nordlicht, those were taken
20     in multiple cases.  So that not only were they noticed in the
21     Bank of Montreal case, they were noticed in the SEC case and
22     the CMEG NYMEX case, as well.  And for that reason, they were
23     allotted more than seven hours.
24              The depositions that we have been discussing today
25     have only been noticed in the Bank of Montreal case.  And so
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DAUVBANC                    Conference
 1   that is a distinguishing feature.  And Bank of Montreal has
 2   never insisted that it had the right to examine any of the
 3   defendants for more than seven hours.
 4           THE COURT:  All right.  Well, I'm going to rely on the
 5   professionalism and good graces of counsel to attempt to work
 6   this out.  And if you can't, for some reason, I'm sure I'll
 7   hear about it.  And if you don't make someone available for
 8   more than seven hours, you do it with the understanding that if
 9   defense counsel make an application to me and I rule in their
10   favor, then you're going to have to bring someone back at
11   another time.  And that may be more inconvenient to them, and
12   they may be unhappy about that; and they may rather proceed
13   three more hours the next day and get it over with.
14           MR. LACK:  I understand, your Honor.
15           THE COURT:  I'm sure you do.
16           Mr. Klein.
17           MR. KLEIN:  Putting this issue aside, I just wanted to
18   raise one other issue.
19           Your Honor deferred the question on the number of
20   depositions.  I just want to make sure that we are permitted to
21   notice more than ten depositions.  This way, we don't have a
22   delay, especially with the letters rogatory, since that can
23   take a lot of time.  So we would be noticing more, although
24   obviously not presuming that we would necessarily get more than
25   that.

DAUVBANC                    Conference
```
 1          THE COURT:  Given the potential of letters rogatory,
 2   it seems to me appropriate that you do so with the
 3   understanding that if you can't work out a number with counsel,
 4   you're going to have to get the Court to intervene.  And then
 5   I'll obviously have to rule one way or the other on the
 6   question.  But you may proceed with the ministerial acts, if
 7   you will, as needed to set that in motion.
 8          Mr. McDermott?
 9          MR. MCDERMOTT:  Yes, your Honor.
10          The order you just delivered instructed BMO to
11   identify specific individuals and submit that to, I think you
12   said, the defendants.
13          THE COURT:  All parties.
14          MR. MCDERMOTT:  Thank you, your Honor.
15          THE COURT:  Anybody have anything else they want to
16   raise today?
17          All right.  Before we conclude, I'm going to excuse
18   the court reporter.
19                            *    *    *
20
21
22
23
24
25
```