Exhibit T

**R O U G H   D R A F T**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| BANK OF MONTREAL, | : |
| | : |
| Plaintiff, | : |
| | : |
| -against- | : |
| | : |
| OPTIONABLE, INC., MF GLOBAL INC., | : |
| KEVIN P. CASSIDY, EDWARD J. O'CONNOR, | : |
| MARK NORDLICHT, RYAN B. WOODGATE, | : |
| SCOTT CONNOR and JOSEPH D. SAAB, | : |
| | : |
| Defendants. | : |

09 – CIV – 7557 (GBD)(JLC)
ECF FILED

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Defendant Kevin P. Cassidy ("Cassidy"), notwithstanding his guilty plea, as acknowledged by the Department of Justice it cannot be shown that Cassidy caused one penny of loss to BMO. All of BMO's losses were caused by BMO's own vast and deeply ingrained incompetencies. Accordingly, Cassidy submits details to amend his Second Affirmative Defense (*in pari delicto*) to the claims asserted by Bank of Montreal (BMO), as follows:

BANK OF MONTREAL AND SOME RELEVANT BACKGROUND

1.    BMO's investment, institutional broker-dealer and corporate banking divisions use the trade name BMO Capital Markets, which in turn operates a line of business called the Commodities Derivatives Group (CDG).

2.    CDG engages in high volume, high risk leveraged commodities trading in the form of "deep out of the money" natural gas (NG) derivatives.

3.      On November 28, 2006, Yvan Bourdeau (Bourdeau), then CEO of BMO Capital Markets, falsely told analysts that BMO's NG derivatives trading was client driven and that BMO had, "reduced the risk profile we had even though it cost us some money…you will see that intrinsically we didn't have a large proprietary position in natural gas".

4.      BMO alleges (Compl. ¶ 63) that most of its trades in the latter half of 2006 were proprietary, not client driven as announced by Bourdeau.

5.      BMO's contradictory allegation thus demonstrates either (a) BMO knew Bourdeau was lying or (b) BMO was lying in a federal complaint.

6.      Upon information and belief, at least 70% (seventy percent) of BMO's position in NG derivatives was proprietary.

7.      BMO, which started trading risky NG derivatives in the late 1990s, ultimately became, by early 2007, the world's largest proprietary trader of NG derivatives in history.

8.      BMO's top NG trader for years was David Lee (Lee).

9.      Lee and BMO's other NG traders conducted NG derivatives trading through 10 different brokerages.

10.     Four  - Tradition Financial Services ("TFS"), ICAP, Amerex and GFI Group – were used to trade "pipeline swaps", and seven – Man Financial (a/k/a MF Global), Optionable (starting in 2003), Spectron, TFS, Prebon, Choice and United, were used to trade NG derivatives.

11.     In BMO's 2001 annual report, BMO disclosed a $51 million NG trading loss to its shareholders.

**ROUGH DRAFT**                    2

12.   But BMO knowingly concealed and failed to disclose to its shareholders in its 2001 annual report that its loss resulted from negligently uncured systemic defects in BMO's valuation models and risk control procedures.

13.   By early 2007, BMO recklessly had amassed an unmanageable, preponderantly proprietary, "utterly gigantic" (as described by BMO's Pat Cronin and Murray McIntosh in their April 11, 2007 telephone conversation) position of approximately 7.6 million derivatives contracts.[1]

14.   On or around May 23, 2007, BMO filed a Form 6K with the SEC. reporting a "previously announced $680 million dollar" year to date "Commodities Trading" loss.

15.   BMO plainly had failed to cure its systemic defects, despite having been put on specific written notice of them in or around 2000 - 2001 by Price, Waterhouse Coopers (PWC), through at least mid-2007.

16.   In late 2006 or early 2007, BMO engaged Deloitte & Touche (Deloitte), as BMO had previously engaged PWC, to analyze BMO's defects and deficiencies.

17.   Deloitte rendered a non-public report: "*BMO Capital Markets Commodity Risk Measurement, Valuation & Control Infrastructure Assessment*" (the Deloitte

---

[1] 1.   In a New York Times report in early 2011, Warren Buffett defended Berkshire Hathaway's use of derivatives, when the company had about 250 derivative contracts. "I want to know every contract…but I can't do it with 23,000 that a bunch of traders are putting on." He noted that when Berkshire bought General Re in 1998, General Re had 23,000 derivative contracts. "I could have hired 15 of the smartest people, you know, math majors, Ph.D.'s. I could have given them carte blanche to devise any reporting system that would enable me to get my mind around what exposure that I had, and it wouldn't have worked," he said to the government panel. "Can you imagine 23,000 contracts with 900 institutions all over the world with probably 200 of them names I can't pronounce?" Berkshire decided to unwind the derivative deals, incurring some $400 million in losses. Warren Buffet could not handle 23 thousand derivatives contracts, but Downe and BMO believed BMO could handle 7.6 million of them.

**ROUGH DRAFT**                    3

Report) in or around April 2007 detailing BMO's 40 (forty) or so deviations (six of which Deloitte deemed *severe*) from standard industry practice in the conduct, operation and valuation of BMO's high-risk NG derivatives trading efforts, including deviations that revealed BMO's public disclosures to be lies:

a. BMO failed to comparatively validate recorded telephone orders with actual trade confirmations;

b. BMO failed to use automated procedures, did not use automated methods to upload official price data sources and instead relied on its Front Office to manually update pricing spreadsheets;

c. Failed to provide sufficient independence to Market Risk to ensure the integrity of gathered market data;

d. Failed to provide consolidated profit & loss reports indicating monthly performance by date;

e. Failed to include critical portfolio attributes such as position by book, commodity and instrument in the management reporting package;

f. Failed to use more than one external source of data;[2]

g. Failed to implement a bank-wide approach for sourcing illiquid market data;

h. Failed to include a clearly defined market risk tolerance statement in its Market Risk Management Standards or in its market risk authority letters;

i. Failed to use an adequate valuation equation or formula;

j. Failed to account for seasonality in its valuations;

k. Failed to meet prevailing industry practices for risk model testing by using a six non-consecutive day approach when standard minimum industry practice called for a thirty consecutive business day approach;

l. Relied on an informal month-end skew calibration process instead of creating documentation to formalize the process and vet it for

---

[2] BMO blames Optionable for being the sole source of data when it was BMO's responsibility to obtain multiple data sources in accordance with standard industry practice. BMO's knowing shirk of its responsibilities is highlighted by its choice to not heed Cassidy's unequivocal advice that BMO use additional sources.

**ROUGH DRAFT**                    4

reasonableness;

m. Failed entirely (*i.e.,* did not even have an informal process) to implement any practice for the execution and vetting of skew calibration *within* any month;

n. Had no means to resolve the disconnect between Market Risk duties in Toronto and New York and the Front Office;

o. Failed to enter trades into their proper portfolios at the time of execution of such trades; and

p. Failed to have discrete VaR limits by commodity, geography and tenor (periodicity), among other failures, large and small.

18. Instead of taking responsibility for these and other failures, BMO chose to defraud by concealing its defects to its shareholders, materially omitting them from its glowing annual reports, and engage in the documented cover-up and blame-shifting scheme, still ongoing, detailed in this affirmative defense.

### WILLIAM A. DOWNE

19. William A. Downe (Downe) the CEO of BMO, served as the COO of BMO Capital Markets, the division that sustained the 2007 loss, during the relevant period, and, upon information and belief, was the ranking member of BMO's Risk Management Committee.

### DAN KLORES COMMUNICATIONS LLC

20. In the spring of 2007 Downe authorized BMO to hire Dan Klores Communications LLC (DKC), a public relations firm, to supervise BMO's cover-up and implement a strategy to scapegoat BMO's brokers – Cassidy (targeted for his marred history) and Optionable - for BMO's 2007 self-inflicted NG losses.

**ROUGH DRAFT**                              5

### THE DEFENSE

21.   The documentary evidence provided to Mr. Cassidy by the Department of

Justice (DOJ), materially undermines BMO's complaint and even contradict

the "legal facts" of this and its related cases.

22.   The evidence shows that BMO used devious techniques, including "off the

record tactics," strategic false leaks to the press and false allegations, to

perpetrate a cover-up of BMO's failures, faults and exclusive responsibility for

the claimed 2007 losses from its NG derivatives operation, and to shift the

blame for its failures onto others, including Cassidy..

23.   BMO's wrongful conduct includes, but is not limited to, BMO's, knowing and

corrupt efforts to:

a.   cover up BMO's massive valuation, market risk, accounting and
procedural incompetencies related to BMO's NG derivatives book by
falsely blaming and suing Cassidy, who never worked at BMO;

b.   leak false information causing the press to describe the Deloitte Report as
critical of Optionable, when it (i) was not and (ii) was critical only of BMO;

c.   falsely represent to the public and its shareholders that BMO was
operating a client-driven NG derivatives book, thereby communicating it
was engaged in conservative trading at the very moment BMO was taking
reckless risks with unprecedented, excessive proprietary trades;

d.   manipulate the press, particularly the Canadian press, as a core element
of BMO's strategic scheme, engineered by DKC, to lay BMO's failures on
Cassidy's head and publicly harm Cassidy's life and livelihood;

e.   instigate others to commence litigation, regulatory actions and criminal
proceedings against Cassidy as part of BMO's massive cover-up / corrupt
blame shifting tactics; and

f.   concoct and sell the illusion that BMO was a victim of something other
than its own negligence and incompetence.

**ROUGH DRAFT**                    6

**CONTEXTUAL HISTORY OF BMO'S SYSTEMIC INABILITY**
**AND REPEATED FAILURES TO CORRECTLY VALUE ITS BOOK**

24.     In or around October 1996, BMO hired David Klusendorf (Klusendorf) to manage BMO's newly formed CDG.

25.     Around March 5, 1997, Klusendorf hired Lee as a "Financial Analyst".

26.     BMO's NG derivatives book was being traded then by Tom Murtha (Murtha).

27.     Upon information and belief, Klusendorf and Murtha argued over (i) valuation and (ii) money lost due to theta[3] in BMO's NG derivatives book.

28.     Hence, Murtha closed out his NG positions, resulting in a $2 - $3 million loss in 1998, then a record loss for BMO.

29.     BMO replaced Murtha with Joseph Adevai ("Adevai").

30.     Then, via Adevai, BMO lost some C$ 64 million[4]  trading NG options through October, 2000.

31.     BMO's failure to account for a common metric called "skew", among other failures in its valuation methods, contributed to the Adevai loss.

32.     The SEC, in 2008 and again in 2012, alleged that BMO had fired Adevai for mismarking his book (*i.e.*, assigning incorrect values to BMO's NG portfolio); first at ¶16 of its complaint in *SEC v. Lee et al.* 08 Civ. 9961 (GBD)(S.D.N.Y.)

---

[3] "Theta" is one of several Greek letters and words (sometimes collectively referred to by derivatives traders as "the Greeks") used in NG derivatives trading. They represent certain ratios or conditions affecting value. Theta represents the automatic loss of value of every option contract due solely to the passage of time, much like water boiling in an open pot gets lost over time due to evaporation.

[4] This was ultimately reported to the public as a $51 million loss.

**ROUGH DRAFT**                    7

and again at ¶22 of its amended complaint filed August 14, 2012, though the SEC alleged BMO terminated Adevai in 1998.).[5]

33.   Another BMO employee looking at the Adevai losses, Bob Moore (Moore), spotted certain systemic deficiencies, including those related to "skew", which alone accounted for some US$15 - $19 million of the $51 million losses BMO reported to shareholders in its 2001 annual report.

34.   Moore's discovery of the skew problem raised his stature at BMO.

35.   BMO hired PWC in or around late 1999 or early 2000 to assess how BMO blew up[6] C$64 million.

36.   PWC advised BMO, in writing, of defects, mistakes, errors and shortcomings in BMO's internal valuation methods and its risk management procedures.

37.   BMO ignored PWC, and simply continued trading with all the defects uncured.

38.   Then BMO was sued in 2003 by AEP Energy Services, Inc. (AEP). *AEP Energy Services, et ano. v. Bank of Montreal* 03 Civ. 00335 (JLG-NMK) (S.D. Ohio).

39.   AEP alleged that BMO intentionally misvalued BMO's own portfolio to the tune of $94 million by (i) applying buy market quotations to aggregated sell transactions and (ii) applying sell market quotations to aggregated buy transactions, for the sole purpose of *shifting responsibility* to someone else.

40.   BMO, upon information and belief, paid AEP to settle the claims.

---

[5] If the SEC's allegation is *not* mistaken, then there was yet another broker prior to Adevai fired by BMO for mismarking his book.

[6] The term "blow up" is industry jargon to describe unusually large, unanticipated trading losses.

**ROUGH DRAFT**            8

41.   Next, bouncing from valuation debacle to valuation debacle, between 2003 and 2007 BMO had many multi-million dollar valuation disputes with counterparties, such as BP Corporation North America, Inc., Mitsui & Co. Energy Risk Management, Ltd., J. Aron & Company, Morgan Stanley Capital Group, Inc., Sempra Energy Trading Corp., JPMorgan Chase Bank and Barclay's Bank, PLC.

42.   For example, in early 2006, BMO was examining its "continuing difficulties", including a $5.1 million mark-to-market valuation dispute for a single transaction with counter-party HETCO.

43.   To resolve this and its numerous counterparty valuation disputes, BMO agreed to a "mid-point" valuation between current bid and ask quotes, a viable method for settling disputes, but a foolhardy method to value a portfolio.

## SIGNIFICANT BACKGROUND EVENTS TO BMO's 2007 BLOW-UP

44.   In June / July 2006, the MotherRock LP (MotherRock) hedge fund formed by former NYMEX executives Robert ``Bo'' Collins and John D'Agostino, lost some $230 million dollars trading NG derivatives.

45.   Then, in September 2006, in the wake of MotherRock, Amaranth Advisors LLC (Amaranth), a BMO client, lost a record $6.5 *billion* dollars trading NG derivatives.

46.   Both blow-ups, especially the one of its own client Amaranth, put BMO on sharp notice of the severe risks of not rectifying its valuation and risk control policies.

**ROUGH DRAFT**                                    9

47.   In January, 2007, Bill Downe declined to change BMO's "method for determining market" even though one Bob McGlashen emailed him on January 26, 2007 to report a possible $50 million "adjustment" in "Bob Moore's book, predominantly Natural Gas."

48.   BMO and Downe not only failed to rectify BMO's defective systems, but added unbearable pressures to those systems, thus converting its *risk* of loss into a *guaranty* of loss.

49.   BMO *increased* its risk exposure multifold, recklessly jumping into the breach created by the Mother Rock / Amaranth debacles, voiding any rational prospect to profit from its staggering[7]  highly leveraged bets on NG derivatives.

50.   Mere months after the Mother Rock / Amaranth blow-ups, BMO had recklessly acquired an unprecedented position in NG options, some 7.6 million open contracts, upon information and belief the single largest position in global trading history, dwarfing the number of contracts that had contributed to the demise of BMO's own client, Amaranth.

51.   BMO allowed its NG derivatives portfolio to grow so unfathomably large that, starting in the fall of 2006, BMO was losing over $1 million *every single day* (some days approaching $2 million), month in and month out, due only to the passage of time; its money was simply evaporating. (This "theta loss", as time value erosion is called, is detailed below).

52.   BMO positioned itself to *automatically* lose $2-$3 million every 36 hours or so.

---

[7] One metric used is called "notional value". The notional value of BMO's NG book was in the TRILLIONS of dollars.

53. The staggering size of BMO's position also prevented BMO from being able to take risk-adjusting steps, known as Delta hedges, in the market.

54. In sum, the volume of BMO's open contracts, combined with (i) BMO's lack of proper oversight (ii) enormous theta erosion, and (iii) BMO's failure to heed Cassidy's advice (detailed below), among other factors within BMO's control, predictably resulted in BMO's second huge loss in seven years.

55. On or around May 5, 2007, Downe acknowledged in an email that "you couldn't lose this much money by taking one gigantic bet if you had risk controls in place".

56. Despite Downe's admission of the truth, Downe launched the campaign of lies to cover his rear position.

**BMO STRATEGICALLY DECIDES TO BLAME OTHERS**

57. After BMO announced its $680 million dollar loss, the Canadian press questioned the competence and risk management capabilities of BMO and particularly Downe.

58. For example, on May 18, 2007, Canadian Banks & Insurance wrote:

> This is not life-threatening for a bank that earned $2.7-billion in profit last year, but its credibility is on life support. The crisis exposes a disconnect between its reputation as the safe, cautious bank among Canada's Big Five and internal practices. **And it happened in the division Mr. Downe used to head, capital markets**. Given the size of the losses, some believe they build up over many months. "The absolute size of the estimated commodity trading losses far exceeds the bank's average market value exposure to commodities risk, is disproportionate to its total trading revenues, and does not reflect BMO's stated strategy of being a low-risk bank," credit rating agency Standard & Poor's said in a note. [Emphasis provided].

**ROUGH DRAFT**                    11

59.  Downe and other BMO personnel, including nominal head of Market Risk[8],

Penny Somerville (Somerville), had to understand that truthful responses to

the press could result in shareholder lawsuits, a possible Enron-style run on

the bank itself and regulatory consequences, including fines and possible

criminal charges.

60.  So Downe and other BMO personnel colluded and conspired to develop a

plan to lie, to scapegoat Optionable and Cassidy, to fraudulently recover

money from its insurance carrier and to deceive this Court.

61.  Downe authorized BMO to hire DKC in or around May 2007 expressly (i) to

manipulate Canadian newspapers, such as the Financial Post and the Globe

and Mail, and (ii) to blame Cassidy for BMO's incompetency.

62.  To further its fraud, BMO issued a series of misleading press releases and

leaks with false information, and otherwise propounded false information. For

example:

a.  BMO falsely leaked that the Deloitte Report was critical of Optionable,
    when it was not and was critical only of BMO;

b.  BMO falsely said that the "reliability" of quotes from Optionable was in
    question, when the quotes were unquestionably  reliable;

c.  BMO falsely asserted that a "multiple contributor" source of monthly
    quotes – Totem – showed vastly inconsistent  quotes from those provided
    by Optionable, even though, according to an email dated February 9, 2007
    from the Director of Totem Commodities Tom Charlesworth to Murray
    McIntosh at BMO (the Charlesworth email), there was no material
    difference when an "apples to apples" comparison was made;

d.  BMO falsely and maliciously leaked that Cassidy discouraged BMO from
    checking sources other than Optionable for month-end data points when
    the well-documented opposite was true – Cassidy not only unequivocally
    told BMO manager Murray McIntosh (McIntosh) to use additional sources

---

[8] Downe was corporately senior to Somerville and sat on the Market Risk Committee.

and not rely exclusively on Optionable, but Cassidy's advice was made known to , and acknowledged by Downe's colleague on BMO's Risk Committee, Somerville.

63.   BMO's knowingly false leaks succeeded in diverting attention from BMO.

64.   The "story" concocted by BMO was: (i) BMO sought end of the month market data about a miniscule portion of its NG book (ii) BMO wanted these end of month data to be "independent" of data provided by Lee, its own trader who was supervised by Moore, (iii) BMO lost its shirt because Cassidy did not tell BMO that the data Optionable circulated in the market was not independent as it originated with BMO through Lee, and (iv) Cassidy prevented BMO's compliance department, risk management department, accounting department and its various oversight teams from doing their jobs by discouraging BMO from getting data from sources other than Optionable.

65.   BMO's story was and remains preposterous because:

    (i)    BMO had *daily* access to actual market data from NYMEX beyond the reach of Optionable and, though obligated by GAAP to use daily NYYMEX data, did not;

    (ii)    BMO risk department personnel always knew that the month-end data provided by Optionable could not be and was not independent. In fact, Jeff Wang in BMO's market risk department emailed Murray McIntosh on December 7, 2006, observing: "about segregating BMO quotes from the non-BMO quotes [t]here is no direct way to do it";

    (iii)    BMO well knew (a) that "some of Optionable quotes come from BMO" as per February 2, 2007 handwritten meeting notes[9] and (b) that the quotes were also "not independent as we go through the trader to obtain them" [10];  and

---

[9] The meeting was among McIntosh, BMO's Chief Accountant Cally Hunt, and its Senior Market Risk Officer Penny Somerville.

[10] Email from Murray McIntosh to Eric Tripp, April 5, 2007.

**ROUGH DRAFT**                    13

(iv)   Cassidy directly and unequivocally *told* BMO to use additional sources for month-end data.

66.   The accurate data provided by Optionable to BMO, actually alerted BMO to over $225 million in discrepancies on BMO's books relative to BMO's own faulty valuations, as follows:.

| Month | Lee's Overvaluation As Indicated by Optionable's Quotes |
|---|---|
| September | $23,571,496 |
| October | $12,197,079 |
| November | $30,468,147 |
| December | $17,561,005 |
| January | $32,378,758 |
| February | $29,102,654 |
| March | $83,835,810 |
| **TOTAL** | **$229,100,000** |

67.   However, BMO's fiction began to unravel and the DOJ, despite vast investigative power, was unable to identify any evidence that Cassidy ever provided false or inaccurate data to BMO, or that Cassidy caused BMO to lose any money.

68.   Based on lack of evidence, the DOJ repeatedly, over the course of three years, superseded its indictment. It steadily reduced the BMO-fed false accusations, superseding a six-count indictment with two different four-count indictments and deleting the false accusations about transmitting inaccurate quotes to BMO, until it minimized its charges against Cassidy on the eve of trial and settled with Cassidy in exchange for a plea to a single count information charging conspiracy with Lee to commit wire fraud.

69.     Cassidy's allocution[11] - all information that Optionable provided to BMO was

accurate - was not challenged by the DOJ and was accepted by the Court.

**BMO's Fraudulent Descriptions of its
Risk Management Capabilities**

70.     In BMO's 2006 annual report to its public shareholders, BMO stated:

As part of our enterprise-wide risk management framework, we
employ comprehensive governance and management processes
surrounding market risk-taking activities. These include: • oversight
by senior governance committees, including Market Risk Committee
(MRC), Balance Sheet Management Committee (BSMC), RMC and
RRC; • independent market risk oversight functions; • effective
processes to measure market risks linked to the allocation of
economic capital and the valuation of positions; • a well-developed
limit-setting and monitoring process; • **effective controls over
processes and models used**; and • a framework of scenario and
stress tests for worst-case events.
***
We use a variety of methods to ensure the integrity of our risk
models, including the application of back testing against hypothetical
losses. ***This process assumes there are no changes in the
previous day's closing positions. The process then isolates the
effects of each day's price movements against these closing
positions***.
***
Results of this testing confirm the reliability of our models. (Emphasis
added.

71.     BMO's representation to its shareholders that it used daily prices was a lie.

72.     At page 67 in its 2006 annual report, BMO proclaimed that it had a team of

professionals to "ensure adherence to **established risk management**

**standards** for the evaluation and acceptance of risk…." (Emphasis provided.)

---

[11] Cassidy allocuted to failing to advise BMO management that certain test quotes he verified in
the market as accurate had originated with Lee and were thus not independent. As noted
above, BMO *knew* the test quotes originated with Lee – management specifically wanted to
verify that Lee's quotes were accurate. **In addition Optionable advised BMO in writing every
month that the quotes were *not* "independent".**

**ROUGH DRAFT**                          15

73.   BMO's public statements about the effectiveness of its risk control policies were shown to be false by the Deloitte Report.

74.   The Deloitte Report stated in italics on its cover: "*This document is solely for the use of BMO Capital Markets personnel. No part of it may be circulated, quoted or reproduced for distribution outside of BMO Capital Markets without prior written approval from Deloitte & Touche. LLP*".

75.   BMO simultaneously concealed the actual findings of the Deloitte Report and maliciously leaked a story BMO knew to be false, that the Deloitte Report found fault with Optionable.

76.   BMO's lies and fraudulent leaks contributed to allegations contained in a class action that was filed against Cassidy and others, *In re Optionable Securities Litigation*, 577 F. Supp.2d 681 (S.D.N.Y 2008), which was dismissed on motion, but which put Cassidy and his long since redeemed history, into the limelight.

## BMO's Faulty Valuation Practices

77.   NG derivatives lack readily reported quotes. NG traders rely on various forms of calculus, equations, statistical analyses, formulas and ratios to assign a best guess value to the NG derivatives held on their books.

78.   A quoted *bid* price is the highest price a purchaser is willing to pay.

79.   A quoted *ask* price is the lowest price at which a seller is willing to sell.

80.   The proper conservative valuation practice is to use the most adverse quotes, that is, value a long position (securities ow**n**ed) at the bid and a short position (securities owed) at the ask.

81.   BMO instead improperly assigned mid-points between quoted bid and ask prices to value its entire portfolio.

82.   This created a $1.5 billion dollar wide spread on a portfolio of BMO's size, meaning that the C$680 million "loss" fell wholly *within* the bid-ask spread.

83.   The Deloitte Report confirms the CFTC's observation[12] that BMO used a midpoint, instead of following best valuation practice.

84.   If BMO simply met its legal obligation to adhere to GAAP instead of violating it, and had it followed standard industry practice of conservatively valuing its NG derivatives portfolio, it may not have had to restate its financials in 2007.

## ADDITIONAL ASPECTS OF BMO BLAME SHIFTING EFFORTS

85.   The frauds perpetrated by BMO were "turbo-charged" by the "circular reporting" effect of various plaintiffs conspiring (knowingly and unknowingly) with each other, including the CFTC, the SEC, NYMEX and the DOJ, each bootstrapping the nearly identical, but utterly unsupported (and upon analysis, impossible) allegations, into their respective complaints, often flipping the truth on its head, in derogation of the interests of this Court.

86.   In or around late 2006 or early, 2007, Cassidy told BMO, through Murray McIntosh (McIntosh) and Dan Costa (BMO risk management personnel), that BMO should use at least three brokers to get month end data points.

87.   Somerville was made aware of Cassidy's advice to McIntosh and in a summary email dated January 31, 2007 wrote that Cassidy "suggested that three brokers should be used" for end of month data points.

---

[12] CFTC v. Cassidy et al., 08 Civ. 9962 (GBD) ¶30 n.6.

**ROUGH DRAFT**                    17

88. McIntosh also reported Cassidy's advice to other BMO personnel on a conference call, in or around February 2007.

89. However, BMO continued to avoid using multiple sources even *after* Cassidy advised BMO to use multiple sources.

90. Despite uncontradicted evidence that Cassidy pointedly told BMO to *obtain* data from other brokers, BMO, in furtherance of its fraud, lied to the SEC, the CFTC, NYMEX and the DOJ, that Cassidy tried to *prevent* BMO from obtaining data from other brokers.

91. BMO has failed to disclose to regulators that its own employee, Moore, *not Cassidy*, was the primary source of resistance to obtaining valuation information from multiple sources.

92. As the SEC later alleged: "BMO failed to furnish to the [SEC], in accordance with the rules and regulations prescribed by the [SEC], such annual and other periodic reports as the [SEC] has prescribed and BMO failed to include, in addition to the information expressly required to be stated in such reports, such further material information as was necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading, in violation of Section 13(a) of the Exchange Act [15 U.S.C. *5* 78m(a)] and Rules 12b-20, 13a-1 and 13a-16 thereunder [17 C.F.R. *$5* 240.12b-20,240.13a-1 and 240.13a-161."

93. Cassidy was unaware that BMO was engaging in federal securities fraud.

94. If Cassidy had known BMO was engaging in securities fraud, Cassidy would not have permitted BMO to remain as a client of Optionable.

**ROUGH DRAFT**      18

**BMO's Natural Gas Derivative Trading**

95.    BMO first blamed its losses on Amaranth's supposed impact on liquidity and
volatility, issuing press releases in late April 2007 to that effect, as noted by *In
Re Optionable,* 577 F. Supp.2d at 690, *supra* (quoting BMO's press release of
April 27, 2007:  "In particular, the market became increasingly illiquid and
volatility dropped to historically low levels....")

96.    Certain of BMO's high-risk bets were placed through the exchange
maintained by NYMEX, where each transaction was "marked-to-market" at
the end of every trading day, thereby providing immediate information useful
to value BMO's portfolio daily.

97.    As the SEC alleged, BMO was required, but failed, to have its traders' books
marked *daily* and was *required* by GAAP to use NYMEX settlement prices.
(SEC Compl. ¶¶ 20, 36), available daily.

98.    Moreover, because there was no viable market other than BMO for BMO's
deep out of the money, far out in time bets, its positions could not be marked-
to-market; instead they had to be "marked to model" - a theoretical construct
of what the market might be sometime years in the future.

99.    However, as noted in the Deloitte Report, BMO, among its forty deviations,
was using *wrong equations and formulas* that failed to properly account for
defects or limitations in certain commonly used valuation modeling
techniques.

100.    To make things even worse, BMO had been plugging faulty or incomplete
information into its defective formulas for years.

## BMO's Market Risk Department and Management Structure

101. To mask its core incompetencies, BMO floated the illusion it was capable of properly valuing its total NG derivatives portfolio.

102. BMO claimed it had a highly sophisticated hierarchical structure to assure that its traders, such as Lee, did not exceed BMO's Value at Risk or VaR guidelines. This hierarchical structure included the following:

   a. Eric Tripp (Tripp), the Vice Chair, reporting to Downe, of BMO Capital Markets, headed BMO's Commodity Products Group (CPG), as of December 31, 2006.

   b. Mr. Tripp supervised Moore, who was the Executive Assistant in CPG.

   c. Moore supervised three groups: (i)Trading (ii) Marketing and (iii) Finance and Operations.

   d. Lee worked directly under Moore and was the Managing Director of Trading, located in New York.

   e. Livio Bencich headed BMO's Finance & Operations group in Toronto, Canada. Bencich was the Director of Commodity Derivatives, who supervised three financial analysts, one consultant and one Research and Analysis Director.

   f. Somerville headed BMO's Market Risk department.

   g. Ms. Somerville supervised (i) a Managing Director of Risk Models; (ii) a Managing Director of Risk Reporting (iii) McIntosh, the Managing Director of Risk Oversight, (iv) a Director of Market Risk Oversight / commodity Derivatives, one Jeff Wang and (v) two Senior Analyst / Market Risk Commodity Derivatives experts.

103. This multi-layered, team was paid by BMO to comport itself in accordance with industry standards, and in compliance with all statutes and regulations, to protect BMO (and ultimately its shareholders) from excessive trading risks.

104. It did not, even though BMO said it did.

105.    BMO also claimed to have sophisticated technological tools and systems in
place, to assist its risk control efforts.

106.    Thus, BMO claimed to have, at all relevant times, a redundant, sophisticated,
multi-layered human and electronic system in place to enable BMO to (i)
value its portfolio (ii) monitor its risk exposure and (iii) make buy, sell or hold
decisions regarding BMO's portfolio or any part of it.

107.    Concealed from, and thus unbeknownst to, Cassidy and BMO's public
shareholders, despite such publicized protections and supposedly
sophisticated systems, BMO, during Downe's tenure, managed to deviate
*undetected* from standard industry practice in at least the many material
respects identified by the Deloitte Report

## BMO's Huge Theta Loss

108.    In or around the fall of 2006, BMO became worried about accumulating
losses to its portfolio from the passage of time.

109.    For one particular 90 day stretch in or around the late fall of 2006 or early
spring of 2007, according to a memo prepared by Somerville, in addition to
regular *daily* six figure theta losses, BMO was losing approximately between
$1 million and $1.5 million dollars (U.S.) per day (some days approached $2
million).

110.    According to BMO's Somerville, theta losses accounted for a healthy
percentage of the loss that BMO announced in April 2007, but upon
information and belief, may have accounted for most if not all of them.

**ROUGH DRAFT**                          21

111.    Instead of reducing its financial exposure by unwinding or reducing its
        positions, BMO decided that it could reduce exposure to theta by *increasing*
        its positions*, i.e.,* take on more risk with options further out in time.

112.    This is akin to adding water from a limited supply to a boiling pot where the
        water is evaporating rapidly in the hope of losing less water.

113.    Considering only BMO's NG speculation (including options and swap
        contracts) BMO had a "netted open interest" at the end of 2005 of 668,603
        contracts. By January 2007, around 1 year later, BMO had 4,093,190 (over 4
        million) total natural gas contracts. Upon information and belief, in a matter of
        months in the first and second quarters of 2007, BMO guaranteed its doom by
        allowing its position to reach some 7.5 or 7.6 million open NG derivative
        contracts.  Dated:            November 10, 2013

                                    _____
                                    Lawrence R. Gelber
                                    Attorney at Law
                                    The Vanderbilt Plaza
                                    34 Plaza Street, Suite 1107
                                    Brooklyn, New York 11238
                                    T:      (718) 638 2383
                                    F:      (718) 857 9339
                                    E-mail: GelberLaw@aol.com

                                    *Attorney for Plaintiff Kevin P. Cassidy*

**ROUGH DRAFT**                     22