Exhibit A

ORIGINAL

JS 44C/SDNY
REV. 1/2008

**CIVIL COVER SHEET** 09 CV 7557

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

AUG 2 3 2009

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Bank of Montreal | Optionable, Inc. MF Global Inc., Kevin P. Cassidy, Edward J. O'Connor, Mark A. Nordlicht, Ryan B. Woodgate, Scott Connor and Joseph D. Saab |

| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Robert J. Lack, Anne E. Beaumont, Sheela V. Pai<br>Friedman Kaplan Seiler & Adelman LLP<br>1633 Broadway, New York, NY 10019-6708, (212) 833-1100 | Unknown |

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 U.S.C. § 1332: Fraud, negligent misrepresentation, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, breach of contract

Has this or a similar case been previously filed in SDNY at any time? No? [✓] Yes? [ ]    Judge Previously Assigned _____

If yes, was this case Vol.[ ] Invol. [ ] Dismissed. No[ ] Yes [ ] If yes, give date _____ & Case No. _____

(PLACE AN [x] IN ONE BOX ONLY)                    NATURE OF SUIT

**TORTS**

| CONTRACT | PERSONAL INJURY | PERSONAL INJURY | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 INSURANCE | [ ] 310 AIRPLANE | [ ] 362 PERSONAL INJURY - | [ ] 610 AGRICULTURE | [ ] 422 APPEAL | [ ] 400 STATE |
| [ ] 120 MARINE | [ ] 315 AIRPLANE PRODUCT | MED MALPRACTICE | [ ] 620 OTHER FOOD & | 28 USC 158 | REAPPORTIONMENT |
| [ ] 130 MILLER ACT | LIABILITY | [ ] 365 PERSONAL INJURY | DRUG | [ ] 423 WITHDRAWAL | [ ] 410 ANTITRUST |
| [ ] 140 NEGOTIABLE | [ ] 320 ASSAULT, LIBEL & | PRODUCT LIABILITY | [ ] 625 DRUG RELATED | 28 USC 157 | [ ] 430 BANKS & BANKING |
| INSTRUMENT | SLANDER | [ ] 368 ASBESTOS PERSONAL | SEIZURE OF | | [ ] 450 COMMERCE |
| [ ] 150 RECOVERY OF | [ ] 330 FEDERAL | INJURY PRODUCT | PROPERTY | | [ ] 460 DEPORTATION |
| OVERPAYMENT & | EMPLOYERS' | LIABILITY | 21 USC 881 | PROPERTY RIGHTS | [ ] 470 RACKETEER INFLU- |
| ENFORCEMENT | LIABILITY | | [ ] 630 LIQUOR LAWS | | ENCED & CORRUPT |
| OF JUDGMENT | [ ] 340 MARINE | PERSONAL PROPERTY | [ ] 640 RR & TRUCK | [ ] 820 COPYRIGHTS | ORGANIZATION ACT |
| [ ] 151 MEDICARE ACT | [ ] 345 MARINE PRODUCT | | [ ] 650 AIRLINE REGS | [ ] 830 PATENT | (RICO) |
| [ ] 152 RECOVERY OF | LIABILITY | [×] 370 OTHER FRAUD | [ ] 660 OCCUPATIONAL | [ ] 840 TRADEMARK | [ ] 480 CONSUMER CREDIT |
| DEFAULTED | [ ] 350 MOTOR VEHICLE | [ ] 371 TRUTH IN LENDING | SAFETY/HEALTH | | [ ] 490 CABLE/SATELLITE TV |
| STUDENT LOANS | [ ] 355 MOTOR VEHICLE | [ ] 380 OTHER PERSONAL | [ ] 690 OTHER | | [ ] 810 SELECTIVE SERVICE |
| (EXCL VETERANS) | PRODUCT LIABILITY | PROPERTY DAMAGE | | SOCIAL SECURITY | [ ] 850 SECURITIES/ |
| [ ] 153 RECOVERY OF | [ ] 360 OTHER PERSONAL | [ ] 385 PROPERTY DAMAGE | | | COMMODITIES/ |
| OVERPAYMENT | INJURY | PRODUCT LIABILITY | LABOR | [ ] 861 HIA (1395ff) | EXCHANGE |
| OF VETERAN'S | | | | [ ] 862 BLACK LUNG (923) | [ ] 875 CUSTOMER |
| BENEFITS | | | [ ] 710 FAIR LABOR | [ ] 863 DIWC/DIWW (405(g)) | CHALLENGE |
| [ ] 160 STOCKHOLDERS | | | STANDARDS ACT | [ ] 864 SSID TITLE XVI | 12 USC 3410 |
| SUITS | | | [ ] 720 LABOR/MGMT | [ ] 865 RSI (405(g)) | [ ] 890 OTHER STATUTORY |
| [ ] 190 OTHER | | | RELATIONS | | ACTIONS |
| CONTRACT | | | [ ] 730 LABOR/MGMT | FEDERAL TAX SUITS | [ ] 891 AGRICULTURAL ACTS |
| [ ] 195 CONTRACT | | | REPORTING & | | [ ] 892 ECONOMIC |
| PRODUCT | ACTIONS UNDER STATUTES | | DISCLOSURE ACT | [ ] 870 TAXES (U.S. Plaintiff or | STABILIZATION ACT |
| LIABILITY | | | [ ] 740 RAILWAY LABOR ACT | Defendant) | [ ] 893 ENVIRONMENTAL |
| [ ] 196 FRANCHISE | CIVIL RIGHTS | PRISONER PETITIONS | [ ] 790 OTHER LABOR | [ ] 871 IRS-THIRD PARTY | MATTERS |
| | | | LITIGATION | 26 USC 7609 | [ ] 894 ENERGY |
| | [ ] 441 VOTING | [ ] 510 MOTIONS TO | [ ] 791 EMPL RET INC | | ALLOCATION ACT |
| REAL PROPERTY | [ ] 442 EMPLOYMENT | VACATE SENTENCE | SECURITY ACT | | [ ] 895 FREEDOM OF |
| | [ ] 443 HOUSING/ | 28 USC 2255 | | | INFORMATION ACT |
| [ ] 210 LAND | ACCOMMODATIONS | [ ] 530 HABEAS CORPUS | IMMIGRATION | | [ ] 900 APPEAL OF FEE |
| CONDEMNATION | [ ] 444 WELFARE | [ ] 535 DEATH PENALTY | | | DETERMINATION |
| [ ] 220 FORECLOSURE | [ ] 445 AMERICANS WITH | [ ] 540 MANDAMUS & OTHER | [ ] 462 NATURALIZATION | | UNDER EQUAL |
| [ ] 230 RENT LEASE & | DISABILITIES - | [ ] 550 CIVIL RIGHTS | APPLICATION | | ACCESS TO JUSTICE |
| EJECTMENT | EMPLOYMENT | [ ] 555 PRISON CONDITION | [ ] 463 HABEAS CORPUS- | | [ ] 950 CONSTITUTIONALITY |
| [ ] 240 TORTS TO LAND | [ ] 446 AMERICANS WITH | | ALIEN DETAINEE | | OF STATE STATUTES |
| [ ] 245 TORT PRODUCT | DISABILITIES -OTHER | | [ ] 465 OTHER IMMIGRATION | | |
| LIABILITY | [ ] 440 OTHER CIVIL RIGHTS | | ACTIONS | | |
| [ ] 290 ALL OTHER | | | | | |
| REAL PROPERTY | | | | | |

**Check if demanded in complaint:**

[ ] CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $ TBD    OTHER _____

Check YES only if demanded in complaint
JURY DEMAND: [✓] YES  [ ] NO

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.?
IF SO, STATE:

08-CIV-9961-

JUDGE George B. Daniels    DOCKET NUMBER _____

NOTE: Please submit at the time of filing an explanation of why cases are deemed related.

| (PLACE AN x IN ONE BOX ONLY) | | | | ORIGIN | | | |
|---|---|---|---|---|---|---|---|
| ☑ 1 Original Proceeding | ☐ 2a. Removed from State Court ☐ 2b. Removed from State Court AND at least one party is pro se. | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from (Specify District) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judge Judgment | |

| (PLACE AN x IN ONE BOX ONLY) | BASIS OF JURISDICTION | IF DIVERSITY, INDICATE CITIZENSHIP BELOW. (28 USC 1322, 1441) |
|---|---|---|
| ☐ 1 U.S. PLAINTIFF   ☐ 2 U.S. DEFENDANT | ☐ 3 FEDERAL QUESTION (U.S. NOT A PARTY)   ☑ 4 DIVERSITY | |

CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

| | PTF | DEF | | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | ☒ 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | ☒ 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

Bank of Montreal
100 King Street West
1 First Canadian Place
Toronto, Ontario M5X 1A1
CANADA

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

See Attachment

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

| Check one: | THIS ACTION SHOULD BE ASSIGNED TO: (DO NOT check either box if this a PRISONER PETITION.) | ☐ WHITE PLAINS | ☑ MANHATTAN |
|---|---|---|---|

| DATE 8/28/09 RECEIPT # | SIGNATURE OF ATTORNEY OF RECORD | ADMITTED TO PRACTICE IN THIS DISTRICT [ ] NO ☒ YES (DATE ADMITTED Mo. Sept  Yr. 1982 ) Attorney Bar Code # |
|---|---|---|

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

J. Michael McMahon, Clerk of Court by _____ Deputy Clerk, DATED _____ .

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

## Attachment to Civil Cover Sheet

### Defendants' Addresses

| | |
|---|---|
| Optionable, Inc.<br>1230 Avenue of the Americas, 7th Floor<br>New York, NY 10020 | MF Global Inc.<br>717 Fifth Avenue, 9th Floor<br>New York, NY 10022 |
| Kevin P. Cassidy<br>76 Narrows Road<br>Bedford Hills, NY 10507 | Edward J. O'Connor<br>61 Hiram Hill Road<br>Monroe, CT 06468 |
| Mark A. Nordlicht<br>159 Wykagil Terrace<br>New Rochelle, NY 10804 | Ryan B. Woodgate<br>415 East 80th Street<br>New York, NY 11236-3136 |
| Scott Connor<br>41 Oakwood Avenue<br>Rye, NY 10580 | Joseph D. Saab<br>39 Stanford Place<br>Glen Ridge, NJ 07028-1813 |

### Statement of Related Case

This action is related to the cases titled *Securities and Exchange Commission v. Lee, et al.*, Docket No. 1:08-cv-09961-GBD (the "SEC Action"), and *Commodity Futures Trading Commission v. Cassidy, et al.*, Docket No. 1:08-cv-09962-GBD (the "CFTC Action"), both of which are pending before the Honorable George B. Daniels.

Rule 15 of the Southern District of New York Rules for the Division of Business Among District Judges states that, "[i]n determining relatedness, a judge will consider whether (i) a substantial saving of judicial resources would result; or (ii) the just efficient and economical conduct of the litigations would be advanced; or (iii) the convenience of the parties or witnesses would be served." The rule further states that, "a congruence of parties or witnesses or the likelihood of a consolidated or joint trial or joint pre-trial discovery may be deemed relevant."

There is significant overlap between the defendants in this case and those in the SEC and CFTC Actions before Judge Daniels: defendants Cassidy, O'Connor, and Connor are defendants in the SEC Action, and defendants Cassidy, O'Connor, and Optionable, Inc. are defendants in the CFTC Action. Judicial efficiency also is likely to result from Judge Daniels' familiarity with the underlying allegations and parties involved in the SEC and CFTC Actions, many of which also are involved in this action.

For these reasons, plaintiff Bank of Montreal respectfully requests that this case be assigned to Judge Daniels.

768235.1

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK  **09 CV  7557**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BANK OF MONTREAL,

                    Plaintiff,

               v.

OPTIONABLE, INC., MF GLOBAL INC.,
KEVIN P. CASSIDY, EDWARD J.
O'CONNOR, MARK A. NORDLICHT,
RYAN B. WOODGATE, SCOTT
CONNOR and JOSEPH D. SAAB,

                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

No.

**COMPLAINT**

**Jury Trial Demanded**

Plaintiff Bank of Montreal ("BMO"), by its undersigned attorneys, for its Complaint in this action, alleges as follows upon knowledge as to itself and its acts and as to all other matters upon information and belief:

### NATURE OF THE ACTION

1.      David P. Lee was formerly the head natural gas options trader in the Commodity Derivatives Group of BMO. Lee conspired or colluded with two energy derivatives brokerage firms used by BMO, defendants Optionable, Inc. ("Optionable") and MF Global Inc. ("MF Global"), their officers and employees, and others to defraud BMO by concealing large losses caused by Lee's trading strategies. The defendants did so by (i) arranging for Optionable and MF Global to provide supposedly "independent" market price quotations to BMO that were actually fictitious quotes supplied by Lee to Optionable and MF Global; (ii) entering into or encouraging Lee to enter into a large number of trades known as "1x2" trades to disguise the risk in the natural gas options book; and (iii) causing BMO to enter into large, unprofitable natural gas options trades

768427.2

known as "EOO" trades that Lee recorded in a manner that created the appearance of large profits, but that actually resulted in large losses for BMO.

2.     By these schemes, Optionable and MF Global benefited by receiving millions of dollars in commissions, fees, and other revenue in connection with Lee's transactions. These transactions also helped Optionable portray itself as a successful, growing business so that defendants Kevin P. Cassidy, Edward J. O'Connor, and Mark A. Nordlicht could sell nearly $29 million of their Optionable stock to the New York Mercantile Exchange ("NYMEX"). In addition to financially benefiting Optionable and MF Global, Lee received benefits from BMO, including millions of dollars in bonuses and other compensation. Lee also received gifts and other personal benefits from Optionable and certain of the other defendants. Further, upon information and belief, Lee received and/or was promised things of value by Optionable, Cassidy, and others in exchange for his involvement in the schemes. Lee's boss, Robert B. Moore, Jr., also received millions of dollars in bonuses and other compensation from BMO, while resisting efforts by BMO that would have led to an earlier discovery of the fraud. Moore, like Lee, received gifts and other personal benefits from Optionable and certain of the other defendants.

3.     As a result of the defendants' conduct, BMO has suffered millions of dollars in losses related to its natural gas options trading and in responding to government inquiries concerning the defendants' actions.

## PARTIES

4.     Plaintiff BMO is a bank chartered under the Bank Act (Canada), with its executive offices located at 1 First Canadian Place, 100 King Street West,

Toronto, Ontario M5X 1A1, Canada, and its head office located at 129 rue Saint Jacques, Montreal, Quebec H2Y 1L6, Canada. Through four operating groups – Personal and Commercial Banking Canada, Personal and Commercial Banking U.S., Private Client Group, and BMO Capital Markets – BMO serves a broad range of personal, commercial, corporate, and institutional customers. BMO Capital Markets is a trade name used by BMO for the wholesale banking and institutional broker-dealer businesses of various BMO companies. The Commodity Derivatives Group is a line of business within BMO Capital Markets.

5. Defendant Optionable is a Delaware corporation with its principal place of business in New York, New York. Optionable provided energy derivatives brokerage services to financial institutions, energy traders, and hedge funds. As part of its services, it provided trading and brokerage services for energy futures and derivatives. It also provided voice and floor brokerage services at the NYMEX.

6. Defendant MF Global, formerly known as Man Financial Inc., is a Delaware corporation with its principal place of business in New York, New York. MF Global is the U.S. operating subsidiary of MF Global Ltd., which describes itself as the leading broker of exchange-listed futures and options in the world.

7. Defendant Kevin P. Cassidy resides in Bedford Hills, New York. Cassidy has a long criminal record which he did not disclose to BMO. Cassidy pled guilty in 1987 to one felony count of wire fraud in Massachusetts and pled guilty to another felony count of wire fraud in Connecticut. He pled guilty in 1993 in New York to one federal count of tax evasion. Cassidy pled guilty in 1996 in Florida to federal felony counts of trafficking in a counterfeit device and improper reporting of currency

transactions, and was sentenced to two and a half years in prison. Despite Cassidy's criminal record, he served as Chief Executive Officer of Optionable from March 1, 2001 to March 31, 2004. He continued to run Optionable's day-to-day operations from April 1, 2004 to October 15, 2005 with the title of "consultant," and then again served as Optionable's CEO from October 30, 2005 to May 12, 2007. He also served as Vice-Chairman of the Board of Directors of Optionable until May 12, 2007. Cassidy also is associated with Capital Energy Services, LLC ("Capital"), f/k/a Orion Energy Services, LLC ("Orion").

8.     Defendant Edward J. O'Connor resides in Monroe, Connecticut. He served as Chief Executive Officer of Optionable from March 2004 to October 30, 2005, and again from about November 2007 to January 2009. He also served as President of Optionable from March 2001 to January 2009 and has served as a director since March 2001. From December 1996 to 2007, O'Connor served as a director, and periodically a managing director, at Capital.

9.     Defendant Mark A. Nordlicht resides in New Rochelle, New York. He is Optionable's second largest shareholder, with 16% of its stock, and served as Chairman of the Board of Directors of Optionable from February 4, 2000 to May 1, 2007.

10.    Defendant Ryan B. Woodgate resides in New York, New York. He was an Optionable employee from at least February 2003 to at least May 2005. Woodgate transacted business with BMO by sending, via electronic mail and instant messaging, supposedly independent – but in fact fraudulently collusive – price quotes to Lee and BMO, upon which BMO relied in allowing Lee to enter into and maintain certain loss-making positions.

11.     Defendant Scott Connor resides in Rye, New York. He was an Optionable employee from at least June 2005 to at least January 2007. Connor transacted business with BMO by sending, via electronic mail and instant messaging, supposedly independent – but in fact fraudulently collusive – price quotes to Lee and BMO, upon which BMO relied in allowing Lee to enter into and maintain certain loss-making positions.

12.     Defendant Joseph D. Saab resides in Glen Ridge, New Jersey. He was an MF Global employee from at least September 2004 to at least January 2007. From MF Global's offices in New York City, Saab transacted business with BMO by sending, via electronic mail and instant messaging, supposedly independent – but in fact fraudulently collusive – price quotes to Lee and BMO, upon which BMO relied in allowing Lee to enter into and maintain certain loss-making positions.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, because plaintiff BMO is a citizen or subject of a foreign state and all of the defendants are citizens of U.S. states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

14.     This Court has personal jurisdiction over the defendants because during the time period at issue in this case they each (a) transacted business in New York or contracted to provide goods or services in New York; (b) committed a tortious act within New York; or (c) committed a tortious act outside New York causing injury to the plaintiff in New York, and regularly does or solicits business, or engages in another persistent course of conduct, or derives substantial revenue from goods used or consumed

or services rendered in New York. In addition, defendants Cassidy, O'Connor, Nordlicht, Woodgate, and Connor reside in New York, and defendants Optionable and MF Global are doing business in New York.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(2), because jurisdiction is founded only on diversity of citizenship, and a substantial part of the events or omissions giving rise to plaintiff's claims occurred in this district.

## STATEMENT OF FACTS

### *Commodity Derivatives Trading at BMO*

16.     A derivative is a financial instrument that derives its value from the value of an underlying asset. One of the most common derivatives is an option, which is the right to buy or sell an asset. Options come in two basic varieties: a "put" gives the holder the right to sell an asset, and a "call" gives the holder the right to buy an asset.

17.     A commodity futures contract is an agreement to buy or sell a commodity (like natural gas) at a predetermined price and date. A natural gas option gives the holder the right (but not the obligation) to buy or sell a natural gas futures contract at a specified "exercise price" on (or before) a specified expiration, or "exercise" date. Natural gas options, which derive their value from natural gas futures contracts, are one type of commodity derivative that BMO trades.

18.     A "long-dated" option has an exercise date that is more than a year in the future (*e.g.*, an option sold in July 2006 that expires in July 2010). An option is considered "out-of-the-money" if the holder of the option cannot profit by exercising it

today – for example, a call option whose exercise price is higher than the current market price of the underlying asset, or a put option whose exercise price is lower than the current market price of the underlying asset. Trading in long-dated and out-of-the-money options tends to be less active than in short-dated or close-to-the-money options.

19.     BMO provides clients with commodity derivatives trading services, including entering into derivatives contracts with them to allow them to hedge certain risks in the energy markets.

20.     Although BMO's Commodity Derivatives Group engages in client-driven trading, it also independently trades in the commodities markets in order to support or hedge the positions it takes with or on behalf of its clients.

21.     From approximately 1997 until May 4, 2007, Lee was a natural gas derivatives trader in BMO's Commodity Derivatives Group located in New York. He was responsible for placing trades, determining strategy, taking positions in the natural gas book, and valuing those positions daily.

22.     From 2000 until May 4, 2007, Moore was head of the Commodity Derivatives Group. He was responsible for overseeing commodities traders (including Lee), managing BMO's commodities trading strategy, and ensuring that commodities traders' books were correctly valued (or "marked to market") daily.

### Defendants' Manipulation of BMO's Commodity Derivatives Valuation Procedures From 2003 Onward

23.     In order to value the natural gas options book, BMO used an option pricing model. These models used inputs from various public sources, including but not limited to interest rates, spot prices of natural gas, and exchange settlement prices. When public data did not exist for some inputs required by the pricing models, such as

volatility or certain data related to options that were traded infrequently, Lee was supposed to input or adjust these data points according to his knowledge and judgment of the current market.

24.     At mid-month and at the end of the month, BMO's Market Risk department would value a representative sample of trades in the natural gas options book, independent of Lee's valuation, using data that BMO believed to be independent data from third parties, including prices from brokers. This was known as the Independent Price Verification ("IPV") process.

25.     Optionable and MF Global provided brokerage services to BMO's commodity derivatives traders from at least 2003 until early May 2007.

26.     During that time, Optionable and MF Global provided BMO with supposedly independent prices to value some of its natural gas options as part of the IPV process.

27.     Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, Saab, Lee, and Moore all were aware that BMO relied on these price quotations to conduct the IPV process for its natural gas options book.

  (a)     For example, on August 29, 2003, in an e-mail to MF Global, an employee of BMO referred to the "month end pricing check being sent to broker at Mann [Man Financial]."

  (b)     On May 3, 2006, a person from BMO's Investment Banking Group Product Operations ("IBGPO") – to whose pricing unit Connor sent Optionable's quotations – e-mailed Connor, asking him if he could "confirm that the Nymex

Differential Vols [volatilities] for the El Paso, San Juan Pipeline is correct, as it's giving me quite a huge variance on my P/L [profit and loss] calculations."

(c)     On September 28, 2006, the director of Market Risk for BMO's commodity line of business e-mailed Steven Laker of Optionable "to request Optionable to provide us with independent market quotes as at the close of [the] September 28, 2006 trading day. . . .   It is understood that the quotes will be verifiable from IM [instant messaging] sheets on your archive . . . .   It is also understood that Bank of Montreal will not be a contributor to the quotes you collected upon this request."

28.     Cassidy and O'Connor formed personal friendships with Lee and Moore.  They socialized with Lee and Moore outside of work, took or discussed taking vacations with Lee and Moore, and assisted in finding a job at Optionable for Moore's son.

29.     Starting in 2003, Lee began communicating to Optionable the price quotes he wanted Optionable to provide to BMO as "independent" prices.  Lee created a spreadsheet and a short memorandum reflecting his desired prices and e-mailed these documents to an Optionable employee.  The Optionable employee then e-mailed those documents, unchanged or virtually unchanged, to BMO employees who conducted the natural gas options IPV process, under the guise of sending independent prices.  The BMO employees incorporated the Optionable quotations into spreadsheets in which they compared those quotations to the prices Lee had previously recorded in BMO's records.

30.     In particular, at month-end, Lee sent Optionable the pricing information he wanted to appear in Optionable's supposedly independent quotes.  Lee

took the word-processing document and spreadsheets that Optionable had transmitted to BMO by e-mail at the end of the preceding month and revised them to include the marks Lee wanted "verified" for the current month. He then e-mailed those computer files to Cassidy, O'Connor, Woodgate, or Connor. Later the same day, Optionable e-mailed those quotes back to BMO either unchanged or virtually unchanged. First, they e-mailed the quotes to Lee alone for his approval. Once they obtained Lee's approval, the quotes were e-mailed to people in BMO's IPV group, with a copy to Lee.

31.    The following examples show how the defendants perpetrated this price-quotation fraud. On August 31, 2006 at 9:09 a.m., Lee e-mailed to Connor a word-processing file that read, in part, as follows:

08/31/06
To Whom It May Concern:

Pipeline Volatility, stated as a differential to Nymex; are as follows:

| Region | Pipeline | Nymex Differential (vols) |
|--------|----------|---------------------------|
| Appalachia: | Columbia Appalachia | -1/+3 |
| | CNG Appalachia | -1/+3 |
| Mid-West: | Chicago City-gate | -2/+2.5 |
| | N.N. Gas Demarcation | -1/+2.5 |
| | Northern Ventura | -2/+2.5 |

32.    Later on August 31, at 3:04 p.m., Lee e-mailed to Cassidy at his personal e-mail address, energyorion@cs.com, a spreadsheet file that read, in part, as follows:[1]

---

[1] Months were represented by letter codes, as follows: F = January, G = February, H = March, J = April, K = May, M = June, N = July, Q = August, U = September, V = October, X = November, Z = December.

Market Quotes

| Strip | Strike | Cross | Bid | Offer |
|-------|--------|-------|-----|-------|
| v06 | 5.5 | 6.08 | 0.065 | 0.09 |
| v06 | 7 | 6.08 | 0.22 | 0.255 |
| v06 | 10 | 6.08 | 0.01 | 0.035 |
| v06 | 4.5 | 6.08 | 0.01 | 0.035 |
| X6-H7 | 12 | 9.95 | 1.055 | 1.1 |
|  |  | *** |  |  |
| cal08 | 8 | 8.87 | 1.16 | 1.21 |
|  |  | *** |  |  |
| Swaptions |  |  |  |  |
| X6h7 | 12.5 | 9.95 | 0.39 | 0.48 |
| X6h7 | 8 | 9.95 | 0.22 | 0.3 |
| Cal07 | 9.25 | 9.23 | 0.96 | 1.06 |
| Cal08 | 5 | 8.85 | 0.075 | 0.12 |
| Cal08 | 10 | 8.85 | 0.93 | 1.03 |

33.     On August 31 at 3:36 p.m., Lee e-mailed another spreadsheet file to Connor, in the format of forwarding to him an e-mail Connor had sent to "BMO IBGPO Pricing" and others (including Lee) the month before. This new e-mail contained the same information as in the 3:04 p.m. e-mail, but added the following information at the top:

8/31/2006

NATURAL GAS

| MTH | YEAR | STRIKE | STR.BID | STR.OFFR |
|-----|------|--------|---------|----------|
| V | 2006 |  | 0.96 | 0.99 |
| X | 2006 |  | 1.94 | 2 |
| Z | 2006 |  | 2.7 | 2.75 |
| F | 2007 |  | 3.36 | 3.44 |
| G | 2007 |  | 3.86 | 2.93 |

34.     Forty-three minutes later, at 4:19 p.m. on August 31, Connor e-mailed Lee the following spreadsheet and document that supposedly represented Optionable's independent price quotations and pipeline volatility report (from which

prices could be calculated). In fact, except for two contracts, the spreadsheet and

document was identical to the spreadsheets and document Lee had e-mailed Optionable

earlier in the day. Connor's e-mail stated:

8/31/2006

NATURAL GAS

| MTH | YEAR | STRIKE | STR.BID | STR.OFFR |
|-----|------|--------|---------|----------|
| V | 2006 | | 0.96 | 0.99 |
| X | 2006 | | 1.94 | 2 |
| Z | 2006 | | 2.7 | 2.75 |
| F | 2007 | | 3.31 | 3.41 |
| G | 2007 | | 3.83 | 3.93 |

* * *

Market Quotes

| Strip | Strike | Cross | Bid | Offer |
|-------|--------|-------|-----|-------|
| v06 | 5.5 | 6.08 | 0.065 | 0.09 |
| v06 | 7 | 6.08 | 0.22 | 0.255 |
| v06 | 10 | 6.08 | 0.01 | 0.035 |
| v06 | 4.5 | 6.08 | 0.01 | 0.035 |
| X6-H7 | 12 | 9.95 | 1.055 | 1.1 |
| | | *** | | |
| cal08 | 8 | 8.87 | 1.16 | 1.21 |
| | | *** | | |
| Swaptions | | | | |
| X6h7 | 12.5 | 9.95 | 0.39 | 0.48 |
| X6h7 | 8 | 9.95 | 0.22 | 0.3 |
| Cal07 | 9.25 | 9.23 | 0.96 | 1.06 |
| Cal08 | 5 | 8.85 | 0.075 | 0.12 |
| Cal08 | 10 | 8.85 | 0.93 | 1.03 |

* * *

08/31/06
To Whom It May Concern:

Pipeline Volatility, stated as a differential to Nymex; are as follows:

| Region | Pipeline | Nymex Differential (vols) |
|---|---|---|
| Appalachia: | Columbia Appalachia | -1/+3 |
| | CNG Appalachia | -1/+3 |
| Mid-West: | Chicago City-gate | -2/+2.5 |
| | N.N. Gas Demarcation | -1/+2.5 |
| | Northern Ventura | -2/+2.5 |

35.     Finally, at 4:27 p.m. on August 31, Connor e-mailed BMO's pricing department, with a copy to Lee, the same spreadsheet and document he had e-mailed to Lee eight minutes earlier. The circular quotation process was now complete.

36.     In the following instances (among others), Cassidy, O'Connor, Woodgate, and Connor received pipeline volatility reports and price quotations from Lee by e-mail (or instant messaging ("IM")) and then passed them off to BMO as Optionable's independent assessments:

| Time | From | To | Type |
|---|---|---|---|
| October 31, 2003 | | | |
| 11:28 a.m. | Lee | Woodgate | Proposed quotes |
| 3:50 p.m. | Woodgate | BMO | Final quotes |
| October 29, 2004 | | | |
| 12:16 p.m. | Lee | Woodgate | Proposed quotes |
| 3:26 p.m. | Woodgate | BMO | Final quotes |
| December 29, 2004 | | | |
| 8:55 a.m. 2:45 p.m. 3:30 p.m. | Lee (e-mail, IM) | Woodgate | Proposed quotes |
| 2:41 p.m. | Lee (IM) | Cassidy | Proposed quotes |
| 3:39 p.m. | Woodgate | BMO | Final quotes |
| January 31, 2005 | | | |
| 10:18 a.m. | Lee | Woodgate | Proposed quotes |
| 4:18 p.m. | Woodgate | BMO | Final quotes |

| Time | From | To | Type |
|------|------|-----|------|
| March 31, 2005 | | | |
| 10:22 a.m.<br>3:16 p.m. | Lee | Woodgate | Proposed quotes |
| 3:38 p.m. | Woodgate | BMO | Final quotes |
| April 29, 2005 | | | |
| 1:59 p.m. | Lee | Woodgate | Proposed quotes |
| 3:56 p.m. | Woodgate | Lee | Draft final quotes |
| 4:07 p.m. | Woodgate | BMO | Final quotes |
| May 31, 2005 | | | |
| 11:37 a.m.<br>2:27 p.m. | Lee | O'Connor | Proposed quotes |
| 2:59 p.m.<br>3:35 p.m. | O'Connor | Lee | Draft final quotes |
| 3:52 p.m.<br>3:54 p.m. | O'Connor | BMO | Final quotes |
| September 29, 2005 | | | |
| 1:51 p.m.<br>3:49 p.m. | Lee | Connor | Proposed quotes |
| 4:24 p.m. | Connor | Lee | Draft final quotes |
| November 30, 2005 | | | |
| 8:59 a.m.<br>3:53 p.m. | Lee | Connor | Proposed quotes |
| 4:01 p.m. | Connor | Lee | Draft final quotes |
| December 29, 2005 | | | |
| 9:19 a.m.<br>3:24 p.m. | Lee | Connor | Proposed quotes |
| 3:34 p.m.<br>3:35 p.m. | Connor | Lee | Draft final quotes |
| January 31, 2006 | | | |
| 3:41 p.m. | Lee | Connor | Proposed quotes |
| 4:12 p.m. | Connor | Lee | Draft final quotes |
| March 31, 2006 | | | |
| 9:51 a.m.<br>4:43 p.m. | Lee | Connor | Proposed quotes |
| 4:54 p.m. | Connor | BMO | Final quotes |
| May 31, 2006 | | | |
| 10:37 a.m.<br>3:31 p.m. | Lee | Connor | Proposed quotes |
| 3:55 p.m. | Connor | Lee | Draft final quotes |
| 4:15 p.m. | Connor | BMO | Final quotes |

| Time | From | To | Type |
|------|------|-----|------|
| June 29, 2006 | | | |
| 10:40 a.m.<br>3:25 p.m. | Lee | Connor | Proposed quotes |
| 3:34 p.m. | Connor | Lee | Draft final quotes |
| 3:52 p.m. | Connor | BMO | Final quotes |
| July 31, 2006 | | | |
| 8:41 a.m.<br>4:04 p.m. | Lee | Connor | Proposed quotes |
| 4:11 p.m. | Connor | Lee | Draft final quotes |
| 4:32 p.m. | Connor | BMO | Final quotes |
| August 31, 2006 | | | |
| 9:09 a.m.<br>3:36 p.m. | Lee | Connor | Proposed quotes |
| 3:04 p.m. | Lee | Cassidy | Proposed quotes |
| 4:19 p.m. | Connor | Lee | Draft final quotes |
| 4:27 p.m. | Connor | BMO | Final quotes |
| September 28, 2006 | | | |
| 9:06 a.m.<br>3:28 p.m. | Lee | Connor | Proposed quotes |
| 11:33 a.m. | Lee | Cassidy | Proposed quote grid |
| 4:31 p.m.<br>4:37 p.m.<br>4:39 p.m. | Connor | Lee | Draft final quotes |

37.     The price quotes that Lee sent to Optionable generally were more favorable to his positions than actual market prices, and allowed Lee to overstate the value of his natural gas options positions, create fictitious profits, and conceal losses.

38.     For example, Lee's August 31, 2006 quote, confirmed by Optionable, for the v06 (October 2006) strip with a 5.5 strike price – a bid of 0.065 and an offer of 0.09 – was far lower than the prices quoted by other market participants at the time, which ranged from 0.219 to 0.256. Because BMO held a short position in this particular option, lower prices generated greater profits. In this case, Lee's quote inflated BMO's profit by more than $500,000.

39.     Lee's August 31, 2006 quote, confirmed by Optionable, for the cal08 (calendar 2008) strip with an 8 strike price – a bid of 1.16 and an offer of 1.21 –

768427.2                            15

was also significantly off market, which ranged from 1.03 to 1.05. Here, BMO held a long position, so higher prices generated greater profits. In this case, Lee's quote inflated BMO's profit by more than $15 million.

40.    Lee's September 28, 2006 quote, confirmed by Optionable, for the cal08 (calendar 2008) strip with a 5.5 strike price – a bid of 0.39 and an offer of 0.42 – was likewise significantly off market, which ranged from 0.32 to 0.36. Here, BMO also held a long position, so Lee's inflated quote artificially increased BMO's profit by more than $6 million.

41.    Lee's arrangement with Optionable, whereby Optionable would simply return Lee's price quotes to BMO without independent verification, allowed Lee to falsify his price quotes without fear that his scheme would be exposed.

42.    As a result of his arrangement with Optionable, Lee received continued employment, increased salary, increased stature, and increased bonus compensation from BMO. Moreover, Lee's trading activity and false quotes resulted in financial gain to Optionable, Cassidy, O'Connor, Woodgate, and Connor by, for example, increasing the volume of trades with Optionable or its affiliates and making Optionable appear to be a successful, growing business. Lee, upon information and belief, received and/or was promised things of value by Optionable, Cassidy, and others in exchange for participating in the arrangement with Optionable.

43.    The arrangement between Lee and Optionable also resulted in continued employment, increased salary, increased stature, and increased bonus compensation for Moore by creating the appearance of profits for the Commodity

Derivatives Group. Moore, as a result of his conduct, received gifts and personal benefits from Optionable and certain of the other defendants.

     44.    MF Global, through Saab, also provided to BMO supposedly independent price quotations. When it provided the quotations, MF Global represented on the spreadsheets it sent BMO that "They Are Numbers That Reflect A Consensus Taken On That Date And Time, From Different Sources In The Market Place."

     45.    In actuality, MF Global's quotations did not reflect a "consensus," and were not from "different sources," but were in nearly all cases simply a regurgitation of quotes supplied by Lee.

     46.    For example, on December 29, 2005, starting at 3:06 p.m., Saab, whose screen name was "jsngotc," exchanged the following instant messages with Lee:

```
# Start of transcript
# Participant jsngotc@AIM.im entered on Dec 29, 2005 3:06:52 PM
# Participant information
buddyName: jsngotc
networkID: AIM
# End of participant information
jsngotc@AIM.im (3:06:53 PM): we're doing month-end today
David.P.Lee@bmo.com (3:12:36 PM): yes
jsngotc@AIM.im (3:12:57 PM): do g-z instead of c6
jsngotc@AIM.im (3:13:09 PM): please??????????????????????????
David.P.Lee@bmo.com (3:22:21 PM): g6-z6 2.60/2.66
David.P.Lee@bmo.com (3:22:28 PM): j-v06 2.40/2.46
David.P.Lee@bmo.com (3:22:34 PM): x6h7 4.02/4.08
David.P.Lee@bmo.com (3:22:58 PM): 07 3.46/3.60
David.P.Lee@bmo.com (3:23:13 PM): 08 3.16/3.30
David.P.Lee@bmo.com (3:23:19 PM): 09 2.93/3.08
David.P.Lee@bmo.com (3:23:23 PM): 10 2.75/2.95
jsngotc@AIM.im (3:24:34 PM): how about jv7?
David.P.Lee@bmo.com (3:26:23 PM): 2.89/3.04
# Participant jsngotc@AIM.im left on Dec 29, 2005 3:41:23 PM
# End of transcript
```

47.     At 3:28 p.m. on December 29, 2005, just two minutes after Lee gave Saab the last of the quotes contained in the above exchange, Saab e-mailed a spreadsheet to Lee and others at BMO which read in part:

| ATM-OPTIONS | | | |
| --- | --- | --- | --- |
| TERM | STRIKE | BID | ASK |
| Apr-06 - Oct-06 | $10.3000 | $2.4000 | $2.4600 |
| Nov-06 - Mar-07 | $11.4500 | $4.0200 | $4.0800 |
| Apr-07 - Oct-07 | $9.4500 | $2.8900 | $3.0400 |
| Feb-06 - Dec-06 | $10.6500 | $2.6000 | $2.6600 |
| Cal-07 | $10.1500 | $3.4600 | $3.6000 |
| Cal-08 | $9.2500 | $3.1600 | $3.3000 |
| Cal-09 | $8.4500 | $2.9300 | $3.0800 |
| Cal-10 | $7.8000 | $2.7500 | $2.9500 |

48.     These quotations that Saab sent to BMO contained exactly the same information as those Lee had just sent to him by instant messaging. For example, Lee's message "j-v06 2.40/2.46" meant for the term April ("j") to October ("v") 2006, the bid was $2.40 and the ask $2.46 – precisely what Saab then included in the first row of his table.

49.     Rather than Saab providing independent quotations *to* Lee, Saab solicited these quotations *from* Lee. As shown in the IM exchange above, Saab opened the exchange with the comment, "we're doing month-end today," and then asked Lee to "do g-z instead of c6 . . . please?????????????????????????" Saab later asked Lee, "how about jv7?"

50.     Saab opened another IM exchange with the request, "month end please?" In yet another exchange, when it was getting late in the day and Saab had not yet received quotations from Lee, he began his IM exchange with Lee with "well?"

51.   In the following instances (among others), Saab received price quotations from Lee by instant messaging and then passed them off to BMO as MF Global's independent assessments:

| Time | From | To | Type |
|------|------|------|------|
| September 30, 2004 | | | |
| 4:05 p.m. | Lee | Saab | Proposed quotes |
| 4:42 p.m. | Saab | BMO | Final quotes |
| December 29, 2004 | | | |
| 3:30 p.m. | Lee | Saab | Proposed quotes |
| 3:45 p.m. | Saab | BMO | Final quotes |
| January 31, 2005 | | | |
| 3:13 p.m. | Lee | Saab | Proposed quotes |
| 3:35 p.m. | Saab | BMO | Final quotes |
| April 29, 2005 | | | |
| 3:30 p.m. | Lee | Saab | Proposed quotes |
| 3:34 p.m. | Saab | BMO | Final quotes |
| May 31, 2005 | | | |
| 3:12 p.m. | Lee | Saab | Proposed quotes |
| 3:32 p.m. | Saab | BMO | Final quotes |
| November 30, 2005 | | | |
| 3:51 p.m. | Lee | Saab | Proposed quotes |
| 4:30 p.m. | Saab | BMO | Final quotes |
| December 29, 2005 | | | |
| 3:06 p.m. | Lee | Saab | Proposed quotes |
| 3:28 p.m. | Saab | BMO | Final quotes |
| January 31, 2006 | | | |
| 3:26 p.m. | Lee | Saab | Proposed quotes |
| 4:12 p.m. | Saab | BMO | Final quotes |
| March 31, 2006 | | | |
| 3:30 p.m. | Lee | Saab | Proposed quotes |
| 4:47 p.m. | Saab | BMO | Final quotes |
| May 31, 2006 | | | |
| 3:33 p.m. | Lee | Saab | Proposed quotes |
| 3:58 p.m. | Saab | BMO | Final quotes |
| July 31, 2006 | | | |
| 3:44 p.m. | Lee | Saab | Proposed quotes |
| 4:05 p.m. | Saab | BMO | Final quotes |
| January 31, 2007 | | | |
| 3:30 p.m. | Lee | Saab | Proposed quotes |
| 3:47 p.m. | Saab | BMO | Final quotes |

52.    As with Optionable, BMO employees incorporated the MF Global quotations into spreadsheets in which they compared those quotations to the prices Lee had previously recorded in BMO's records.

53.    The price quotes that MF Global supplied generally were more favorable to Lee's positions than actual market prices, and allowed Lee to overstate the value of his natural gas options positions, create fictitious profits, and conceal losses.

54.    For example, MF Global's September 28, 2006 quote for the November 2006-December 2006 at-the-money option – a bid of 1.43 and an offer of 1.47 – was off market, which ranged from 1.34 to 1.38. Because BMO held a long position in this particular option, MF Global's inflated quote generated inflated profits.

55.    Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, Saab, and Lee fraudulently concealed the circular quotation process from BMO until 2007.

### Optionable's Revenue From Trades With BMO

56.    As part of his fraudulent scheme with Optionable and the other defendants, and, upon information and belief, in exchange for receiving (or the promise of receiving) payments or other personal benefits from Optionable, Cassidy, and/or others, Lee directed increasing amounts of BMO's business to Optionable. Indeed, throughout 2005 and 2006, BMO was Optionable's biggest client. As the volume of trading activity that Lee directed to Optionable increased, so did the incentive for the defendants to continue colluding to cover up the pattern of false price quotes and inflated profits.

57.    Optionable earned commissions from BMO for the transactions it entered into with Lee. It also received commissions from the counterparties in the EOO transactions, and fees from NYMEX for transactions that it routed through NYMEX's Clearport trading platform.

58.    In particular, in at least 2006 and 2007, Optionable had an incentive arrangement with NYMEX under which Optionable would receive a share of the revenues NYMEX received from transactions cleared through its Clearport trading platform. The size of Optionable's share of NYMEX's Clearpoint revenues was determined by the volume of over-the-counter ("OTC") transactions Optionable arranged that were cleared through Clearport.

59.    Lee cleared a large number of the transactions he entered into with Optionable through Clearport.

60.    The increased BMO business provided by Lee, therefore, not only provided Optionable with commissions and brokers fees from BMO, as well as revenue from NYMEX for the BMO transactions themselves, but also enabled Optionable to earn more revenue from transactions by others that were cleared through Clearport.

**Optionable and Cassidy's Provision of Personal Benefits to Lee and Moore**

61.    In order to encourage Lee to continue to participate in his fraudulent scheme with Optionable, and to encourage Moore to look the other way, Optionable and Cassidy plied Lee and Moore with gifts and inducements, including gambling vacations. Upon information and belief, Lee also received and/or was promised things of value by Optionable, Cassidy, and others in exchange for participating in the arrangement with Optionable.

62.     Notwithstanding their fiduciary obligations as employees, Lee and Moore accepted these gifts and inducements, which included:

(a)     $650 in tickets purchased by Cassidy for Moore on March 16, 2004;

(b)     expensive dinners for Moore at restaurants at the Foxwoods Resort Casino on December 5, 2004, April 9, 2005, April 22, 2006, and November 1, 2006; in Manhattan on March 2, 2007; and at the Mohegan Sun Resort and Casino on March 3, 2007;

(c)     hundreds of dollars to a men's grooming club in Manhattan for Moore and Lee on July 28, 2005 and October 17, 2005;

(d)     more than a thousand dollars for expenses for Lee and Moore at the Borgata Hotel Casino & Spa in Atlantic City, New Jersey on November 18-19, 2005; and

(e)     more than a thousand dollars of car and limousine services for Moore on March 7, 2005, June 1, 2006, and August 17, 2006.

**BMO's Discovery of Valuation Issues**

63.     Starting in 2006, Lee entered into increasing numbers of natural gas options positions, which caused the size of BMO's natural gas options book to increase. Most of the transactions Lee entered into during the second half of 2006 were "proprietary" positions, meaning they were not transactions intended to offset the risk of client trades or to make markets in natural gas options.