64.     Encouraged by Moore, Lee put on these proprietary positions to make it appear that the Commodity Derivatives Group was earning more revenue, and thereby to increase Lee and Moore's own reputations and independence within BMO.

65.     Starting in late 2005, BMO's Market Risk department began to suggest that BMO subscribe to a multicontributor service called "Totem RealMarks" ("Totem"), in part because of the increased size of the natural gas options book.

66.     Totem quotes reflect prices and estimates submitted by subscribers. Totem then eliminates outliers, averages the remaining quotes and gives these averaged numbers to subscribers to use in their price verification processes.

67.     Some of the most significant participants in the natural gas options trading markets were subscribers to the Totem service.

68.     Nonetheless, Moore and Lee strongly resisted the Market Risk department's efforts to use the independent pricing data from Totem in BMO's IPV process, claiming that quotes from Optionable and other brokers were the best way to value the natural gas book.

69.     Moore and Lee did so in order to avoid having the natural gas options book valued independently, to maintain BMO's reliance on their supposed expertise, and thereby allow Lee to continue colluding with Optionable and the other defendants.

70.     Despite Moore and Lee's efforts, BMO subscribed to Totem beginning on September 11, 2006. As part of this subscription, BMO provided Totem with a list of its prices for natural gas options as of the end of each month, and shortly

thereafter, Totem sent BMO a list of price quotations that BMO could use for its IPV process.

71.     In early October 2006, BMO's Market Risk department submitted BMO's September month-end data to Totem. After BMO received the Totem quotes for month-end September, it used them in the IPV process to test the valuation of the natural gas options book. That test revealed a large discrepancy between Lee's valuation of the natural gas options book, and the valuation using the Totem quotes.

### Moore and Lee's Campaign to Discredit Totem From Late 2006 to Early 2007

72.     In response to the discrepancy between Lee's and Totem's valuations of the natural gas book, Moore and Lee – assisted by Cassidy and Optionable – waged a campaign from October 2006 to May 2007 to discredit the reliability of the Totem data, and to defend Lee's valuation of BMO's natural gas options book. With the knowing assistance and participation of Cassidy and Optionable, Moore and Lee tried to convince BMO that the Totem prices were incorrect, and that therefore Optionable's prices – which supposedly reflected actual market prices rather than a "survey" – were superior to the Totem quotes. They did so in order to maintain BMO's reliance on Optionable's – that is, Lee's – prices.

73.     Beginning in late 2006, Moore, Lee, Cassidy, and others participated in an effort to have Optionable sell BMO additional price quotations via Optionable's newly developed options trading platform, called OPEX Analytics RealMarks ("OPEX"). They did so in order to increase BMO's reliance on Optionable, and to persuade BMO not to rely on the independent marks provided by Totem.

74.     In a press release dated September 6, 2006, Optionable touted OPEX as "a real time mark-to-market valuation service for natural gas and crude oil options." In the press release, Cassidy stated: "Clients frequently asked us to provide actual market valuations instead of the theoretical modeling often used to mark-to-market their books. We are pleased to formalize this as a product that will provide clients with up-to-date, reliable information as to the real-time market valuations of their options. This product will be an invaluable tool for clients in monitoring their natural gas and energy derivative portfolios."

75.     As a result of the effort by Moore, Lee, Cassidy, and others to get BMO to use OPEX, Optionable began to regularly provide BMO with a grid of quotes for the values of certain options, supposedly derived from the OPEX trading platform. On January 19, 2007, Optionable's Steven Laker represented to the director of Market Risk for BMO's commodity line of business that the OPEX quotes were obtained from "different market makers, Banks, Brokerage houses, Energy trading companies, Hedge funds, etc. and we send you a complete sampling of IM's and OPEX screen shots of actual quotes and actual trades."

76.     In an agreement BMO signed with Optionable on February 23, 2007 (the "OPEX Analytics RealMarks Agreement"), Optionable represented that "OPEX Analytics RealMarks provides specific market information based on actual market quotes obtained by Optionable."

77.     Contrary to Optionable's representations, the pricing grid provided to BMO by the OPEX system was filled out by Lee with prices that favored his positions, and then sent by Optionable to BMO.

768427.2                                25

### Lee's Execution of Trades to Conceal Increased Risk in the Natural Gas Options Book

78.     As part of its efforts to measure and control risk in its trading and other operations, BMO uses "value-at-risk" (or "VaR") models. These models are designed to measure risk so that BMO can compare the VaR to established risk limits and, if necessary, tell traders to reduce the size of their positions if VaR exceeds a set limit.

79.     In late July 2006, the VaR for the natural gas options book increased significantly and at times exceeded pre-approved limits.

80.     Instead of reducing the risk of the natural gas options book to bring it within VaR limits, Lee and Moore argued that BMO's VaR model was unreliable. In addition, with Moore's assistance and encouragement, Lee entered into transactions – known as "1x2" trades – with the sole purpose of temporarily reducing the VaR of the natural gas options book. In these trades, Lee would purchase a close-to-the-money option (i.e., an option whose exercise price was close to the current price) and simultaneously sell two out-of-the-money options.

81.     Lee and Moore continued to enter into 1x2 trades and to argue against the reliability of the VaR model through December 2006, when BMO's management instructed them to reduce the size of the natural gas options book. The 1x2 trades significantly increased the size of the book as well as increasing the book's exposure to risk factors, leading to losses. Lee entered into the 1x2 trades because selling or closing out positions would have revealed that Lee had mismarked the book.

*Lee's Execution of the EOO Trades*

82.    Lee's increasingly large unprofitable positions – including the 1x2 trades – began to generate even larger losses in the fall of 2006. To cover these losses, starting in mid-October 2006, Lee began executing "exchange of options for options" ("EOO") trades, with the sole purpose of recording large artificial profits.

83.    An EOO trade involves two types of options, known as "American-style" and "European-style" options. The holder of an American-style option can exercise the right to buy or sell any time before or on the option's expiration date. The holder of a European-style option, in contrast, can exercise the right to buy or sell only on the option's expiration date. The two types of options, therefore, can share all the same terms but have different values because the American-style option offers more flexibility in when it can be exercised.

84.    Each EOO trade consisted of BMO's buying an American-style straddle option on NYMEX and selling a European-style straddle option over the counter. Both straddles involved the same number of underlying futures contracts involving the same amount of natural gas in the same month at the same exercise price, but the American-style straddle option could be exercised at any time before or at expiration, while the European-style straddle option could only be exercised at expiration. Because of its flexibility, the American-style option that BMO bought cost it a larger premium than it received for the sale of the European-style option. As a result, each EOO trade resulted in a net cash payment of premium by BMO to the counterparty.

85.    A small sample of the EOO trades includes the following:

| Date | Description | Average Unit Premium | Premium Amount |
|---|---|---|---|
| 10/11/06 | Buy 48,000,000 American options (24,000,000 calls, 24,000,000 puts) | 1.4735 | ($70,728,000) |
| 10/11/06 | Sell 48,000,000 European options (24,000,000 calls, 24,000,000 puts) | 1.4500 | 69,600,000 |
| Net premium received (paid) | | | ($1,128,000) |
| 10/30/06 | Buy 180,000,000 American options | 1.3313 | ($239,640,000) |
| 10/30/06 | Sell 180,000,000 European options | 1.2897 | 232,140,000 |
| Net premium received (paid) | | | ($7,500,000) |
| 10/31/06 | Buy 96,000,000 American options | 1.3188 | ($126,600,000) |
| 10/31/06 | Sell 96,000,000 European options | 1.2725 | 122,160,000 |
| Net premium received (paid) | | | ($4,440,000) |
| 11/2/06 | Buy 60,000,000 American options | 1.3000 | ($78,000,000) |
| 11/2/06 | Sell 60,000,000 European options | 1.2475 | 74,850,000 |
| Net premium received (paid) | | | ($3,150,000) |
| 11/9/06 | Buy 84,000,000 American options | 1.3500 | ($113,400,000) |
| 11/9/06 | Sell 84,000,000 European options | 1.3138 | 110,355,000 |
| Net premium received (paid) | | | ($3,045,000) |

86.     Even though each EOO trade actually cost BMO money, when Lee entered the EOO trades into BMO's systems, he did so in a manner that depicted their value as exactly the opposite.

87.     Each of the EOO trades involved a huge quantity of underlying futures contracts.  Lee entered into EOO trades from mid-October 2006 through early March 2007.  The EOO trades caused BMO to lose hundreds of millions of dollars.

**Optionable and Its Allies' Participation in the EOO Trades**

88.     Optionable, Cassidy, Nordlicht, and others developed the idea of the EOO trades and presented it to Lee.  Capital or Orion, with which Cassidy and O'Connor were associated, acted as the broker on nearly all of the EOO trades.

89.     Optionable, Cassidy, O'Connor, and Nordlicht also connected Lee to a number of counterparties, which entered into EOO trades on terms highly unfavorable to BMO. These counterparties included Platinum Partners Value Arbitrage Fund, LP ("Platinum Partners Fund"), Platinum Partners, LP, the Murray Huberfeld and David Bodner Partnership ("Huberfeld-Bodner Partnership"), Fennmore Holdings ("Fennmore"), Hazan Energy, LLC ("Hazan"), and Bromley Energy LLC (a/k/a Bromley Energy Fund LLP) ("Bromley").

90.     Platinum Management (NY), LLC, of which Nordlicht is the Managing Member, is the General Partner of Platinum Partners Fund. Huberfeld-Bodner Partnership, Fennmore, and Bromley share an address with Platinum Partners Fund. Bromley's principal trader, David Boim, was, with Nordlicht, one of the assignors to Optionable of a patent pending for a system and method for real-time trading over a computer network.

91.     The EOO trades allowed the defendants to accomplish several goals that furthered their scheme. First, the EOO trades generated millions of dollars in commissions and fees for Optionable, including commissions from BMO, commissions from BMO's counterparties in the EOO trades, and fees from NYMEX, all of which made Optionable appear to be a profitable and growing business. Throughout this period, upon information and belief, Optionable and Cassidy, at least, continued to provide Lee with gifts and other benefits and promises as an inducement to continue funneling business, commissions, and fees to Optionable.

92.     Second, because Lee manipulated the manner in which the EOO trades were entered into BMO's systems, they falsely appeared to result in immediate

profits that masked the mounting losses in BMO's natural gas options book. This allowed the defendants to continue to hide their fraud and collusion from BMO.

### Moore's Knowledge of, and Failure to Stop Lee From Entering Into Additional, EOO Trades

93.    By January 19, 2007 at the latest, Moore was aware of the EOO trades and the fact that they were falsely depicted by Lee as being profitable. Although Moore claimed that he told Lee to stop entering into EOO trades, Lee continued entering into them.

94.    In or around February 2007, BMO's Market Risk department informed Moore that Lee should not enter into any more EOO trades because of the size of the positions on Lee's book from those trades. Moore told Market Risk that he would stop Lee from entering into any more EOO trades, but, again, Lee continued them.

95.    Moore also failed to report the EOO trades, or the large but fictitious recorded profits they generated, to his superiors or to the independent consultants who were examining the natural gas book at this time. Had he done so, BMO could have forced Lee to stop entering into EOO trades and would have avoided substantial losses and the corresponding financial benefits to those at Optionable who colluded with Lee.

### Massive Losses Are Revealed in April 2007

96.    In April 2007, after further review, BMO decided to use price quotes from Totem and other multicontributor platforms such as Intercontinental Exchange ("ICE") in the IPV process.

97.    Recognizing that he could no longer convincingly assert that his marks were consistent with market prices, on April 19, 2007, Lee re-marked his book,

resulting in a US$70 million loss for BMO. Lee's marks, however, were still substantially off market.

98.    The combination of the losses incurred in the second quarter of 2007 from the EOO trades and Lee's other positions, the IPV reserve resulting from the use of Totem and ICE prices (which also reflected earlier losses that had previously been concealed by Lee's use of fraudulent broker quotes), and Lee's re-marking of his book led to BMO's announcement of projected pre-tax losses of between CDN$350 million and CDN$450 million on April 27, 2007.

**BMO's Discovery of the EOO Trades**

99.    After these initial losses were discovered, Optionable, Cassidy, Nordlicht, and Lee continued to conceal their fraudulent transactions, including the EOO trades.

100.    BMO brought several executives and traders to New York from Toronto and Chicago to examine the Commodity Group's books and supervise trading going forward.

101.    In May 2007, these traders discovered the EOO trades, and determined that they were overvalued. They also discovered that BMO's counterparties for most of the EOO trades were connected to Optionable. The discovery of the EOO trades forced BMO to recalculate its estimated losses.

102.    On May 4, 2007, BMO put Lee and Moore on leave of absence.

103.    On May 8, 2007, BMO announced that it had ceased doing business with Optionable.

104.    On or about May 12, 2007, faced with the possibility that BMO and the press had discovered the fact that he had several prior felony convictions and that those convictions might be disclosed to the public, Cassidy resigned as CEO of Optionable.

105.    Lee resigned from BMO on May 15, 2007.  BMO terminated Moore's employment the next day.

106.    On May 17, 2007, BMO announced that due to a revaluation of its natural gas options book – including a revaluation of the EOO trades – it would post a CDN$680 million pre-tax loss, instead of the projected pre-tax loss of CDN$350 million to CDN$450 million it had originally announced on April 27.

107.    Of BMO's CDN$680 million pre-tax loss, CDN$477 million was attributable to transactions during the BMO fiscal year that began November 1, 2006, and the remainder was attributable to transactions prior to November 1, 2006.

### BMO Discovers the Circular Quotes

108.    On May 18, 2007, outside experts hired by BMO discovered that, on or about April 28, 2007 (the day after BMO's April 27 press release), Lee had deleted more than 100 files from his personal laptop computer including pricing spreadsheets that he had used to e-mail price quotes to Optionable.  Lee deleted these files despite having received a notice on April 27 directing him to preserve information related to BMO's trading losses.

109.    BMO subsequently determined that Optionable had sent these supposedly "independent" broker quotes to BMO's Market Risk department for use in

BMO's IPV process. BMO's investigation revealed that Lee and Optionable had fraudulently manufactured supposedly "independent" price quotes since at least 2003.

110.    On June 13, 2008, in its annual report filed with the Securities and Exchange Commission ("SEC"), MF Global's parent admitted that one of MF Global's brokers who did business with Lee used bid and offer prices for forward OTC trades that Lee sent to him as a basis for prices that the broker sent to BMO as "consensus" price indications.

### Lee's Guilty Plea and the Government Proceedings

111.    The revelation of the defendants' conduct led to an investigation by multiple government agencies, including the New York County District Attorney's Office, the United States Attorney's Office for the Southern District of New York, the SEC, the Commodity Futures Trading Commission ("CFTC"), and the Board of Governors of the Federal Reserve System (the "Federal Reserve Board").

112.    As a result of these investigations, on November 13, 2008, Lee pled guilty in the New York Supreme Court, New York County, to falsifying BMO's trading records, a violation of the New York Banking Law. On the same date, Lee also pled guilty in the United States District Court for the Southern District of New York to conspiracy to commit wire fraud and to make false bank entries, wire fraud, false statements to a bank, and obstruction of justice.

113.    Also on November 13, 2008, a federal grand jury in the Southern District of New York issued a sealed indictment of Cassidy on six counts of conspiracy to commit wire fraud and to make false bank entries, wire fraud (two counts), false

statements to a bank, and securities fraud (two counts). Cassidy was arrested on November 18, 2008. He was released after posting a $10 million bond.

114.   On November 17, 2008, the Federal Reserve Board issued a consent order prohibiting Lee, among other things, from participating in any manner in the conduct of the affairs of any insured depository institution, depository institution holding company, or foreign bank.

115.   On November 18, 2008, the SEC sued Lee, Cassidy, O'Connor, and Connor in the United States District Court for the Southern District of New York, alleging that they violated the antifraud and other provisions of the federal securities laws. In connection with that suit, Lee and Connor have consented to the entry of a permanent injunction restraining and enjoining them from violating the federal securities laws.

116.   Also, on November 18, 2008, the CFTC sued Cassidy, O'Connor, Optionable, Lee, and Moore in the United States District Court for the Southern District of New York, alleging violations of the federal Commodity Exchange Act.

### COUNT I
### FRAUD
### (Against Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab)

117.   BMO repeats and re-alleges the foregoing allegations of the Complaint as if fully set forth herein.

118.   Optionable, Cassidy, O'Connor, Woodgate, and Connor knowingly and intentionally, or recklessly, misrepresented that the price quotes that Optionable provided to BMO's Market Risk department were independent quotes when they knew, or recklessly disregarded evidence indicating, that Lee had created those quotes.

768427.2                                    34

119.    Optionable, Cassidy, O'Connor, Woodgate, and Connor knowingly and intentionally, or recklessly, misrepresented that the price quotes that Optionable provided to BMO's Market Risk department reflected actual market values when they either knew that the quotes did not reflect actual market values, or made the representations with reckless disregard of whether the quotes reflected actual market values.

120.    MF Global and Saab knowingly and intentionally, or recklessly, misrepresented that the price quotes that MF Global provided to BMO's Market Risk department were independent quotes when they knew, or recklessly disregarded evidence indicating, that Lee had created those quotes.

121.    MF Global and Saab knowingly and intentionally, or recklessly, misrepresented that the price quotes that MF Global provided to BMO's Market Risk department reflected actual market values when they either knew that the quotes did not reflect actual market values, or made the representations with reckless disregard of whether the quotes reflected actual market values.

122.    Lee provided quotes to Optionable and MF Global with prices favorable to his positions, which he knew Optionable and MF Global would then submit to BMO as "independent" quotes to be used to verify the marks that Lee used for his natural gas options book.

123.    Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab knowingly submitted Lee's quotes to BMO for the purpose of supplying independent price verification, thus undermining BMO's IPV process.

124.    Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab intended that BMO rely on these "independent" quotes to verify Lee's valuation of the natural gas options book.

125.    The prices Lee used to value the natural gas options book generally were more favorable to BMO's positions than actual market prices. A truly independent price verification would have revealed that Lee's own marks had overvalued the book.

126.    The defendants' submission of Lee's incorrect prices as "independent" prices allowed Lee to hide his trading losses and make it appear that he was making money for BMO when in fact he was making money for Optionable, MF Global, and the other defendants. As a result, BMO continued to employ Lee and pay him millions of dollars in bonuses and other compensation and Optionable continued to provide Lee with gifts and other financial benefits, as well as, upon information and belief, promises of future financial reward. Optionable also continued to provide Moore with gifts and other financial benefits.

127.    Optionable, Cassidy, O'Connor, Woodgate, and Connor also knowingly and intentionally misled BMO about Optionable's prominence in the natural gas markets, with the intent that BMO rely on those misrepresentations and continue to use Optionable's brokerage and market data services, and increase the volume of BMO's trades cleared through NYMEX, for which Optionable received compensation from NYMEX.

128.    BMO reasonably and justifiably relied on the foregoing misrepresentations by Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab. BMO's reliance was justified because at all times, Optionable posed as a

legitimate broker and continually portrayed itself and its officers and employees as major players in the commodity derivatives market, and because of MF Global's established reputation in the market.

129.   As a direct result of the foregoing misrepresentations by Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab, BMO suffered trading losses that could have been prevented had BMO been given correct pricing information concerning its natural gas positions on a timely basis.

130.   As a direct result of the foregoing misrepresentations by Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab, BMO also continued to employ Lee and Moore and pay them compensation from May 2003 to May 2007 totaling approximately $10 million for Lee and $13 million for Moore.

131.   As a direct result of the foregoing misrepresentations by Optionable, Cassidy, O'Connor, Woodgate, and Connor, BMO paid Optionable millions of dollars in broker fees and commissions.  BMO would not have paid these fees and commissions had it known of Optionable's participation in the scheme with Lee and in particular its provision of fraudulent price quotes to BMO.

132.   As a direct result of the foregoing misrepresentations by MF Global and Saab, BMO paid MF Global substantial broker fees and commissions. BMO would not have paid these fees and commissions had it known of MF Global's participation in the scheme with Lee and in particular its provision of fraudulent price quotes to BMO.

133.   As a direct result of the foregoing misrepresentations by Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab, BMO has

768427.2                          37

incurred legal fees and expenses in responding to criminal and regulatory investigations of the commodities loss.

134.   In acting as described herein, Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab acted willfully and maliciously with a manifest disregard not only for the rights of BMO and its shareholders, but also for the effect their actions might have on the natural gas market.

**COUNT II**
**NEGLIGENT MISREPRESENTATION**
**(Against Optionable, MF Global, Cassidy,**
**O'Connor, Woodgate, Connor, and Saab)**

135.   BMO repeats and re-alleges the foregoing allegations of the Complaint as if fully set forth herein.

136.   Optionable, Cassidy, O'Connor, Woodgate, and Connor negligently misrepresented that the price quotes that Optionable provided to BMO's Market Risk department were independent quotes when in fact Lee had created them.

137.   Optionable, Cassidy, O'Connor, Woodgate, and Connor negligently misrepresented that the price quotes that Optionable provided to BMO's Market Risk department reflected actual market values when in fact they did not.

138.   MF Global and Saab negligently misrepresented that the price quotes that MF Global provided to BMO's Market Risk department were independent quotes when in fact Lee had created them.

139.   MF Global and Saab negligently misrepresented that the price quotes that MF Global provided to BMO's Market Risk department reflected actual market values when in fact they did not.

140.    Lee provided quotes to Optionable and MF Global with prices favorable to his positions, which he knew Optionable and MF Global would then submit to BMO as "independent" quotes to be used to verify the marks that Lee used for his natural gas options book.

141.    Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab submitted Lee's quotes to BMO for the purpose of supplying independent price verification, thus undermining BMO's IPV process.

142.    Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab knew that BMO would rely on these "independent" quotes to verify Lee's valuation of the natural gas options book.

143.    The prices Lee used to value the natural gas options book generally were more favorable to BMO's positions than actual market prices. A truly independent price verification would have revealed that Lee's own marks had overvalued the book.

144.    The defendants' submission of Lee's incorrect prices as "independent" prices allowed Lee to hide his trading losses and make it appear that he was making money for BMO when in fact he was making money for Optionable, MF Global, and the other defendants. As a result, BMO continued to employ Lee and pay him millions of dollars in bonuses and other compensation and Optionable continued to provide Lee with gifts and other financial benefits, as well as, upon information and belief, promises of future financial reward. Optionable also continued to provide Moore with gifts and other financial benefits.

145.    Optionable, Cassidy, O'Connor, Woodgate, and Connor also negligently misrepresented to BMO Optionable's prominence in the natural gas markets,

with the knowledge that BMO would rely on those misrepresentations and continue to use Optionable's brokerage and market data services, and increase the volume of BMO's trades cleared through NYMEX, for which Optionable received compensation from NYMEX.

146.   BMO reasonably and justifiably relied on the foregoing misrepresentations by Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab. BMO's reliance was justified because at all times, Optionable posed as a legitimate broker and continually portrayed itself and its officers and employees as major players in the commodity derivatives market, and because of MF Global's established reputation in the market.

147.   As a direct result of BMO's reliance on the foregoing misrepresentations by Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab, BMO suffered trading losses that could have been prevented had BMO been given correct pricing information concerning its natural gas positions on a timely basis.

148.   As a direct result of BMO's reliance on the foregoing misrepresentations by Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab, BMO also continued to employ Lee and Moore and pay them compensation from May 2003 to May 2007 totaling approximately $10 million for Lee and $13 million for Moore.

149.   As a direct result of BMO's reliance on the foregoing misrepresentations by Optionable, Cassidy, O'Connor, Woodgate, and Connor, BMO paid Optionable millions of dollars in broker fees and commissions. BMO would not

have paid these fees and commissions had it known of Optionable's provision of non-independent price quotes to BMO.

150.   As a direct result of BMO's reliance on the foregoing misrepresentations by MF Global and Saab, BMO paid MF Global substantial broker fees and commissions. BMO would not have paid these fees and commissions had it known of MF Global's provision of non-independent price quotes to BMO.

151.   As a direct result of BMO's reliance on the foregoing misrepresentations by Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab, BMO has incurred legal fees and expenses in responding to criminal and regulatory investigations of the commodities loss.

### COUNT III
### AIDING AND ABETTING FRAUD
### (Against All Defendants)

152.   BMO repeats and re-alleges the foregoing allegations of the Complaint as if fully set forth herein.

153.   Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab knew that Lee was fraudulently misrepresenting the prices in his natural gas book as having been verified by independent market price quotes when Lee had engineered a process by which his own prices were recycled as supposedly independent prices.

154.   Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab substantially assisted Lee's fraud by submitting Lee's prices to BMO while representing them as prices that were provided independently by Optionable or MF Global. Indeed, upon information and belief, Optionable and Cassidy, at least,

actively encouraged Lee to perpetrate his fraud by providing or promising to provide Lee with gifts, payments, or other things of value in exchange for his fraudulent conduct. Optionable and Cassidy, at least, also induced Moore to keep quiet about Lee's conduct by providing Moore with gifts and other things of value.

155.   Lee knowingly and intentionally, or recklessly, misrepresented to BMO that the EOO trades were legitimate transactions that generated a net profit for BMO. In fact, as he knew, the EOO transactions did not generate any net profit for BMO, but rather required a net payment of premium by BMO to its counterparties. Lee knew or recklessly disregarded the fact that there was no legitimate business reason for BMO to enter into these trades, and that the trades had the purpose or effect of concealing the overvaluation of and losses suffered by BMO's natural gas options book. Lee knowingly and intentionally, or recklessly, entered the EOO transactions into BMO's systems in a manner that concealed their true valuation.

156.   Lee also knowingly and intentionally, or recklessly, misrepresented that the 1x2 trades and EOO trades he caused BMO to enter into from mid-2006 onward were intended to reduce the risk in BMO's natural gas book and generate revenue, when he knew or recklessly disregarded the fact that these trades actually had the purpose or effect of concealing spiraling risk and losses in the natural gas book.

157.   Lee intended that BMO rely on his assurances that the 1x2 trades and EOO trades would reduce the risk in the natural gas book, so that it would appear he was trying to keep within the risk limits set by BMO. This enabled Lee to retain his reputation and his job with its associated high compensation and continue funneling

768427.2                                    42

business, commissions, and fees to his friends at Optionable, in exchange for which he received or, upon information and belief, had the expectation of receiving payments or other things of value from Optionable, Cassidy, and/or other defendants. Further, BMO's reliance on Lee's assurances resulted in Optionable, Cassidy, and other defendants obtaining additional business and income from BMO, portions of which were then provided by Optionable, Cassidy, and/or other defendants to Lee and Moore.

158.    BMO reasonably and justifiably relied on Lee's misrepresentations. BMO's reliance was justified because, as an employee of BMO, Lee had a duty of fidelity and fair dealing to his employer. Moreover, Lee continually represented to BMO's employees that he was working to reduce the risk in the natural gas book.

159.    Optionable, Cassidy, O'Connor, and Nordlicht, through Lee, participated in a number of EOO trades with BMO in late 2006 and early 2007, by arranging EOO trades.

160.    Optionable, Cassidy, O'Connor, and Nordlicht knew that Lee misrepresented to BMO that the EOO trades were legitimate transactions that generated a net profit for BMO. Optionable, Cassidy, O'Connor, and Nordlicht knew that, in fact, the EOO trades required a net payment of premium by BMO to its counterparties, and that the reason Lee arranged the EOO trades was to conceal the overvaluation of and losses suffered by BMO's natural gas options book.

161.    Optionable, Cassidy, O'Connor, and Nordlicht substantially assisted Lee's EOO trading fraud by arranging the EOO trades with BMO. The EOO trades assisted Lee in covering up his fraud because Lee entered the EOO transactions

into BMO's systems in a manner that concealed their true valuation, which helped Lee
conceal losses from his other positions.

162.    Optionable, Cassidy, O'Connor, and Nordlicht benefited from their
assistance with Lee's fraud. The EOO trades generated significant commissions and fees
for Optionable at a time when Optionable was attempting to portray itself as a successful,
growing business so that Nordlicht, Cassidy, and O'Connor could sell their shares of
Optionable's common stock to the NYMEX for a total of nearly $29 million (which they
did on April 10, 2007). Also, Lee was able to book fictitious profits that enabled him to
conceal his losses, thereby perpetuating the highly profitable relationship with BMO on
which Optionable depended.

163.    As a direct result of the assistance of the defendants in Lee's fraud,
BMO suffered trading losses of hundreds of millions of dollars.

164.    As a direct result of the assistance of the defendants in Lee's fraud,
BMO paid Optionable and MF Global millions of dollars of commissions that BMO
otherwise would not have paid.

165.    As a direct result of the assistance of the defendants in Lee's fraud,
BMO continued to employ Lee and Moore and pay them compensation from May 2003
to May 2007 totaling approximately $10 million for Lee and $13 million for Moore.

166.    As a direct result of the assistance of the defendants in Lee's fraud,
BMO has incurred legal fees and expenses in responding to criminal and regulatory
investigations of the commodities loss.

167.    In acting as described herein, the defendants acted willfully and

maliciously with a manifest disregard not only for the rights of BMO and its

shareholders, but also for the effect their actions might have on the natural gas market.

## COUNT IV
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
## (Against All Defendants)

168.    BMO repeats and re-alleges the foregoing allegations of the

Complaint as if fully set forth herein.

169.    As employees of BMO, Lee and Moore owed fiduciary duties to

BMO, including duties of loyalty, good faith, care, and disclosure.

170.    Pursuant to these duties, Lee and Moore were at all times during

their employment bound to exercise the utmost loyalty, good faith, and care in the

performance of their duties, and owed their employer a duty to disclose to it material

information and not to make misrepresentations to it.

171.    Lee breached his fiduciary duties to BMO by misrepresenting to

BMO that the price quotes that Optionable and MF Global provided to BMO's Market

Risk department were independent quotes and reflected actual market values when he

knew that he had created those quotes and that they did not reflect actual market values.

172.    Lee further breached his fiduciary duties to BMO by providing

quotes to Optionable and MF Global with prices favorable to his positions, which he

knew Optionable and MF Global would then submit to BMO as "independent" quotes to

be used to verify the marks that Lee used for his natural gas options book, thus

undermining BMO's IPV process and allowing Lee to hide his trading losses and make it

appear that he was making money for BMO when in fact he was not.

173.    Lee and Moore breached their fiduciary duties to BMO by resisting
the Market Risk department's efforts to use independent pricing data from Totem in
BMO's IPV process, and, when those efforts were unsuccessful, waging a campaign
against the use of Totem and other multicontributor data in order to avoid having the
natural gas options book valued independently and to maintain BMO's reliance on their
supposed expertise.

174.    Lee breached his fiduciary duties to BMO by misrepresenting that
the EOO trades were legitimate transactions that generated a net profit for BMO when, as
he knew, there was no legitimate business reason for BMO to enter into these trades, Lee
had arranged them to conceal the overvaluation of and losses suffered by BMO's natural
gas options book, and Lee knew that they did not in fact generate any net profit for BMO,
but rather required a net payment of premium by BMO to its counterparties.

175.    Lee further breached his fiduciary duties to BMO by entering the
EOO transactions into BMO's systems in a manner that concealed their true valuation.

176.    Lee further breached his fiduciary duties to BMO by
misrepresenting that the 1x2 trades and EOO trades he caused BMO to enter into from
mid-2006 onward were intended to reduce the risk in BMO's natural gas book and
generate revenue, when he knew they actually were designed to conceal spiraling risk and
losses in the natural gas book.

177.    Moore breached his fiduciary duties to BMO by permitting Lee to
continue entering into EOO trades, despite his knowledge that Lee was recording them as
resulting in large but fictitious profits for BMO, and despite the instruction from BMO's

Market Risk department that Lee should not enter into any more EOO trades and Moore's promise that he would stop Lee from doing so.

178.   Moore also breached his fiduciary duties to BMO by failing to report the EOO trades, or the fictitious profits they generated, to his superiors, or to the independent consultants who were examining the natural gas book at the time.

179.   Lee and Moore breached their fiduciary duties by obtaining things of more than nominal value from Optionable and Cassidy, without disclosing this fact to BMO, when Lee and Moore knew or should have known that the reason for their receipt of these personal benefits was to induce Lee to continue to perpetrate his scheme with Optionable's assistance, and to induce Moore to refrain from reporting the losses being generated by this scheme to BMO.

180.   Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab knew that Lee was misrepresenting the prices in his natural gas book as having been verified by independent market price quotes when Lee had engineered a process by which his own prices were recycled as supposedly independent prices.

181.   Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab substantially assisted Lee's breaches of fiduciary duty by submitting Lee's prices to BMO while representing them as prices that were provided independently by Optionable or MF Global. Optionable and Cassidy, at least, also substantially assisted Lee's breaches of fiduciary duty by providing or promising to provide him with things of value as an inducement to commit and continue these breaches. Optionable and Cassidy, at least, also substantially assisted Moore's breaches of fiduciary duty by providing

Moore with things of value in order to induce him not to report Lee's breaches of fiduciary duty to BMO.

182.    Optionable, Cassidy, O'Connor, and Nordlicht, through Lee, participated in a number of EOO trades with BMO in late 2006 and early 2007, by arranging EOO trades.

183.    Optionable, Cassidy, O'Connor, and Nordlicht knew that Lee misrepresented to BMO that the EOO trades were legitimate transactions that generated a net profit for BMO. Optionable, Cassidy, O'Connor, and Nordlicht knew that, in fact, the EOO trades required a net payment of premium by BMO to its counterparties, and that the reason Lee arranged the EOO trades was to conceal the overvaluation of and losses suffered by BMO's natural gas options book.

184.    Optionable, Cassidy, O'Connor, and Nordlicht substantially assisted Lee's breaches of fiduciary duty by arranging the EOO trades with BMO. The EOO trades assisted Lee in covering up his fraud because Lee entered the EOO transactions into BMO's systems in a manner that concealed their true valuation, which helped Lee conceal losses from his other positions.

185.    Optionable, Cassidy, O'Connor, and Nordlicht benefited from their assistance with Lee's and Moore's breaches of fiduciary duty. The EOO trades generated significant commissions and fees for Optionable at a time when Optionable was attempting to portray itself as a successful, growing business so that Nordlicht, Cassidy, and O'Connor could sell shares of Optionable's common stock to NYMEX for a total of nearly $29 million (which they did on April 10, 2007). Also, Lee was able to book

fictitious profits that enabled him to conceal his losses, thereby perpetuating the highly profitable relationship with BMO on which Optionable depended.

186.   As a direct result of the assistance of the defendants in Lee's and Moore's breaches of fiduciary duty, BMO suffered trading losses of millions of dollars.

187.   As a direct result of the assistance of the defendants in Lee's and Moore's breaches of fiduciary duty, BMO paid Optionable and MF Global millions of dollars of commissions that BMO otherwise would not have paid.

188.   As a direct result of the assistance of the defendants in Lee's and Moore's breaches of fiduciary duty, BMO continued to employ Lee and Moore and pay them compensation from May 2003 to May 2007 totaling approximately $10 million for Lee and $13 million for Moore.

189.   As a direct result of the assistance of the defendants in Lee's and Moore's breaches of fiduciary duty, BMO has incurred legal fees and expenses in responding to criminal and regulatory investigations of the commodities loss.

## COUNT V
## BREACH OF CONTRACT
### (Against Optionable)

190.   BMO repeats and re-alleges the foregoing allegations of the Complaint as if fully set forth herein.

191.   BMO and Optionable are parties to the OPEX Analytics RealMarks Agreement, in which Optionable agreed to provide through its OPEX Analytics RealMarks service "specific market information based on actual market quotes obtained by Optionable."

192. Optionable breached the OPEX Analytics RealMarks Agreement by instead providing quotations provided by Lee that were not actual market quotes.

193. Optionable's breaches of the OPEX Analytics RealMarks Agreement resulted from willful misconduct or gross negligence on the part of Optionable.

194. In the OPEX Analytics RealMarks Agreement, Optionable also agreed to indemnify BMO from and against any and all damages and losses directly or indirectly arising out of or in any way related to Optionable's performance under the Agreement, and all costs and expenses incurred by BMO as a result thereof, including attorneys' fees and court costs.

195. As a direct result of Optionable's breaches of the OPEX Analytics RealMarks Agreement, BMO suffered trading losses of millions of dollars.

196. Under the OPEX Analytics RealMarks Agreement, Optionable is liable to indemnify BMO for the legal fees and expenses it has incurred in responding to criminal and regulatory investigations of its commodities loss and in investigating and pursuing the instant litigation.

## **PRAYER FOR RELIEF**

WHEREFORE, BMO demands that judgment be entered as follows:

A.   On Counts I and II of the Complaint, awarding BMO damages against Optionable, MF Global, Cassidy, O'Connor, Woodgate, Connor, and Saab, jointly and severally, in an amount to be determined at trial;

B.   On Counts III and IV, awarding BMO damages against all defendants, jointly and severally, in an amount to be determined at trial;

C.   On Count V, awarding BMO damages against Optionable in an

amount to be determined at trial;

D.   Awarding BMO punitive damages against all defendants in an

amount to be determined at trial;

E.   Awarding BMO interest and costs; and

F.   Granting BMO such other and further relief as the Court deems

just and proper.

## JURY DEMAND

BMO demands a jury trial on all issues so triable.

Dated: New York, New York
      August 28, 2009

Robert J. Lack (rlack@fklaw.com)
Anne E. Beaumont
Sheela V. Pai
FRIEDMAN KAPLAN SEILER &
ADELMAN LLP
1633 Broadway
New York, NY 10019-6708
(212) 833-1100

*Attorneys for Plaintiff Bank of Montreal*