Exhibit B

# 13-2185-CR

IN THE



FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

v.

KEVIN CASSIDY,

*Defendant-Appellant.*

*On Appeal from the United States District Court
for The Southern District of New York*

# BRIEF FOR DEFENDANT-APPELLANT

Douglas R. Jensen
Eyal Dror
PARK & JENSEN, LLP
630 Third Avenue, 7th Floor
New York, NY 10017
(646) 200-6300

*Attorneys for Defendant-Appellant Kevin Cassidy*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ........................................................ iii

PRELIMINARY STATEMENT ....................................................1

JURISDICTIONAL STATEMENT ...............................................2

ISSUES PRESENTED ..................................................................3

STATEMENT OF THE CASE .....................................................4

STATEMENT OF FACTS ...........................................................6

    A. The Offense Conduct ...................................................6

        1. Cassidy's Brokerage Services to BMO ...............7

        2. Lee's Valuations of his Positions .......................7

        3. BMO's Verification Process and Optionable's Quotes ......................8

        4. Lee's Mismarking is Revealed .........................11

    B. Plea Agreement and Allocution ................................13

    C. Presentence Report and Sentencing ..........................15

    D. The Restitution Proceedings .....................................16

        1. BMO's Request for Restitution ........................16

        2. Cassidy's Opposition ........................................17

        3. BMO's Reply ....................................................20

        4. Proceedings before the District Court ...............21

SUMMARY OF ARGUMENT .....................................................24

ARGUMENT ..............................................................................27

POINT I - THE DISTRICT COURT ABUSED ITS DISCRETION BY
IMPOSING RESITUTION IN THE ABSENCE OF ANY EVIDENCE
SUPPORTING THE BANK OF MONTREAL'S LOSS THEORY ............27

    A. BMO's Failure of Proof ...........................................28

    B. Improper Reliance on Cassidy's Guilty Plea ............32

POINT II - THE DISTRICT COURT ABUSED ITS DISCRETION BY FAILING TO MAKE CLEAR THE APPLICABLE LEGAL STANDARD .................................................................35

POINT III - THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING CASSIDY AN EVIDENTIARY HEARING .............................38

POINT IV - THE DISTRICT COURT ABUSED ITS DISCRETION IN FAILING TO RULE THAT BMO'S CLAIM SHOULD BE RESOLVED IN THE PENDING CIVIL LITIGATION ..............................41

POINT V - THE DISTRICT COURT ABUSED ITS DISCRETION IN SUBSTITUTING OPTIONABLE'S AND LEE'S GAINS FOR THE BANK OF MONTREAL'S LOSSES ...........................................44

CONCLUSION ...................................................................47

CERTIFICATE OF COMPLIANCE WITH FRAP 32(A).....................................48

# TABLE OF AUTHORITIES

## Cases

*Burns v. United States*,
  501 U.S. 129 (1991) ................................................................................40

*Frederiksson v. HR Textron, Inc.*,
  484 F. App'x 610 (2d Cir. 2012) ...........................................................27

*Lyndonville Sav. Bank & Trust Co. v. Lussier*,
  211 F.3d 697 (2d Cir. 2000) ..................................................................40

*Neder v. United States*,
  527 U.S. 1 (1999) ...................................................................................34

*Sims v. Blot*,
  534 F.3d 117 (2d Cir. 2008) ..................................................................27

*United States v Gushlak*,
  728 F.3d 184 (2d Cir. 2013) ................................................... 27, 35, 42

*United States v Schwamborn*,
  467 Fed Appx 35 (2d Cir. 2012) ............................................................45

*United States v. Archer*,
  671 F.3d 149 (2d Cir. 2011) ..................................................................31

*United States v. Boccagna*,
  450 F.3d 107 (2d Cir. 2006) .......................................................... 27, 44

*United States v. D'Amato*,
  39 F.3d 1249 (2d Cir. 1994) ..................................................................33

*United States v. Donaghy*,
  570 F. Supp. 2d 411 (E.D.N.Y. 2008) ...................................................45

*United States v. Duran*,
  2013 WL 5434613 (S.D.N.Y. Sep. 20, 2013) ........................................40

*United States v. Gallant*,
  537 F.3d 1202 (10th Cir. 2008) .............................................................43

*United States v. Kones*,
  77 F.3d 66 (3d Cir. 1996) ......................................................................42

*United States v. Marino,*
  654 F.3d 310 (2d Cir. 2011) ......................................................... 27, 41

*United States v. McQuillan,*
  2007 WL 2827850 (S.D.N.Y. Sept. 26, 2007) ....................................43

*United States* v. *Reifler,*
  446 F.3d 65 (2d Cir. 2006) ...............................................................42

*United States v. Romano,*
  825 F.2d 725 (2d Cir. 1987) .............................................................41

*United States v. Salemo,*
  499 F. App'x 110 (2d Cir. 2012) ......................................................33

*United States v. Schwartz,*
  2006 WL 1662899 (D. Conn. May 25, 2006) ....................................42

*United States v. Silkowski,*
  32 F.3d 682 (2d Cir. 1994) ...............................................................27

*United States v. Tsosie,*
  639 F.3d 1213 (9th Cir. 2011) .................................................... 28, 35

*United States v. Zangari,*
  677 F.3d 86 (2d Cir. 2012) ....................................................... 26, 44, 45

## Statutes

18 U.S.C. § 371 .....................................................................................4

18 U.S.C. § 3231 ...................................................................................2

18 U.S.C. § 3663 .................................................................................16

18 U.S.C. § 3663A .......................................................................... passim

18 U.S.C. § 3664 ..................................................................... 21, 28, 35

18 U.S.C. § 3771 .................................................................................16

28 U.S.C. § 1291 ...................................................................................2

## Rules

Fed. R. App. P. 4 ...................................................................................2

Fed. R. Crim. P. Rule 32 .....................................................................40

## PRELIMINARY STATEMENT

This is an appeal of an $8.6 million order of restitution based on no evidence beyond the appellant's guilty plea. The government itself took the position that no loss could reasonably be determined, and made no effort to seek the imposition of restitution. The victim of the offense -- the Bank of Montreal -- disagreed and pursued a claim for restitution notwithstanding the government's position, but offered no evidence to support its theory of loss, relying instead on appellant's guilty plea. By contrast, the appellant proffered extensive evidence belying the bank's theory of recovery, but the District Court nevertheless imposed restitution of over $8.6 million.

In so doing, the District Court abused its discretion in multiple respects.

(1) The District Court's order was unsupported by evidence establishing by a preponderance that the bank sustained losses that were directly and proximately caused by the offense conduct.

(2) The District Court failed to make clear what legal standard it was applying, and its comments on the record suggested that it might well have applied a lesser standard than the preponderance of evidence required.

(3) The District Court declined to conduct an evidentiary hearing, even though Cassidy had proffered substantial evidence that belied the theory

of the bank's loss claim, and at a minimum raised a factual dispute between the parties.

    (4)  The District Court failed to recognize that the bank's claim, due to its complexity and the requirements of the restitution statute, should be resolved in the context of already pending civil litigation brought by the bank against Cassidy for the same losses.

    (5)  The District Court improperly imposed restitution based on gain to Cassidy's former company Optionable, Inc. and his co-conspirator David Lee rather than loss to the Bank.

For all of these reasons, the District Court's award of restitution should be reversed.

## JURISDICTIONAL STATEMENT

This is an appeal by Kevin Cassidy from a final Order of Restitution entered on May 20, 2013 (A306-09), in Case Number 08-cr-1101 (TPG), following a guilty plea and sentencing in the United States District Court for the Southern District of New York (Hon. Thomas P. Griesa, U.S.D.J.).  Cassidy timely filed a notice of appeal on May 31, 2013.  A310.  *See* Fed. R. App. P. 4(b).  The District Court had jurisdiction pursuant to 18 U.S.C. § 3231.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## <u>ISSUES PRESENTED</u>

1. Whether the District Court abused its discretion by imposing restitution of $8,635,059 notwithstanding: (i) the government's position that losses from the offense conduct could not be reasonably calculated; (ii) the lack of any evidence beyond the appellant's guilty plea offered by the bank to support its claim for restitution; and (iii) appellant's proffer of evidence belying the victim's unsupported loss theory.

2. Whether the District Court abused its discretion by applying the incorrect legal standard in making its determinations as to restitution.

3. Whether the District Court abused its discretion in denying Cassidy an evidentiary hearing concerning loss causation.

4. Whether the District Court abused its discretion in declining to hold that the bank's claim for restitution should be addressed in the context of pending civil litigation already brought by the bank against appellent seeking the same losses.

5. Whether the District Court abused its discretion in utilizing the gains of Cassidy's former brokerage firm Optionable, Inc. and co-conspirator David Lee as a proxy for the bank's loss.

## STATEMENT OF THE CASE

On August 15, 2011, appellant Cassidy pleaded guilty to a one count superseding Information charging him with conspiracy to commit wire fraud in violation of Title 18, United States Code, Section 371. *See* A45-59. The Information charged that Cassidy had conspired with David Lee to subvert the Bank of Montreal's (the "Bank" or "BMO") price verification process by providing market quotes to the Bank's risk management department without disclosing that the quotes had originated with the Bank's own trader, Lee. A26-27 (¶13).

On April 26, 2012, the District Court sentenced Cassidy to a term of 30 months' imprisonment, at the bottom of the Guidelines range of 30 to 37 months. A123-27. The District Court adopted the Guidelines analysis contained in the parties' plea agreement, and approved by the Probation Department in its Presentence Report, which provided that the "amount of the loss that resulted from the offense cannot reasonably be determined." A40. Instead of deriving the offense level from loss to the victim, the Guidelines analysis used the alternative measure of gain to Cassidy's company Optionable, Inc. *Id.* The District Court also entered a consent order of forfeiture obligating Cassidy to forfeit $200,000 to the government. A16 (Doc. No. 74); A127.

With respect to restitution, the District Court postponed any determination for a period of 90 days, or until July 25, 2012. A120 (Tr. 61:10-14). By letter dated July 13, 2012, the Bank submitted its claim for restitution in the amount of $14,190,068. A128. This sum consisted of two components: (i) short-term incentive bonuses paid by BMO to Lee between 2004-2006; and (ii) brokerage commissions paid by BMO to Optionable, Inc., the brokerage firm which Cassidy helped found and run, between 2004-2007. A132. BMO argued that it would not have made these payments had it known of the offense conduct, and therefore that they represented direct and proximate losses caused to it by the offense conduct. A132-33.

In order to address BMO's claim, the District Court granted an additional 90 day extension of the deadline for resolution of restitution. A17 (Doc. No. 79). On September 28, October 11, and October 16, 2012, the District Court held oral argument. During the course of that argument the government reaffirmed its position that a loss from the offense conduct could not reasonably be calculated. BMO argued to the contrary, placing principal reliance on Cassidy's guilty plea. Cassidy offered evidence rebutting BMO's loss theory and argued that BMO had failed to prove its claim and that, at a minimum, an evidentiary hearing was required.

On October 16, 2012, the District Court announced its decision from the bench, finding that BMO was entitled to $8,635,059 in restitution. A302 (Tr. 24:18-23). Although BMO sought restitution for payments made to Lee and Optionable during the period from 2004 through 2007, the District Court limited its award to the period covered by Cassidy's allocution, September 2006 through April 2007. *Id.* (Tr. 24:7-9). On May 20, 2013, the District Court issued a written Order of Restitution memorializing its rulings. A306-09.

Cassidy timely filed a notice of appeal of that order on March 30, 2012. A310.

## STATEMENT OF FACTS

### A.  The Offense Conduct

Appellant's description of the offense conduct is based on the Information to which Cassidy pled guilty on August 15, 2011, Cassidy's allocution and, in certain instances, on the argument of counsel before the District Court. Although Cassidy would prefer to describe the offense conduct based on a full evidentiary record, and not the argument of counsel, the District Court declined to conduct an evidentiary hearing. Thus, the only evidentiary material in the Record addressing the causation issue, beyond Cassidy's guilty plea, is the seven exhibits offered by Cassidy in support of his position.

6

### 1.  Cassidy's Brokerage Services to BMO

Cassidy was a broker and chief executive officer of Optionable, Inc., a commodities brokerage firm based in Westchester County.  A22-23 (¶¶1-2). Optionable brokered transactions in natural gas derivatives, including options (*id.*), earning commissions for any trades it assisted in executing (A27 (¶ 14)).  Among other clients, Optionable provided brokerage services to BMO, whose lead natural gas options trader was Cassidy's co-conspirator, David Lee.  A23 (¶4).

Lee was a market maker.  As such, Lee held himself out to other traders in the market as prepared to simultaneously buy and sell option contracts.  At any given time, then, Lee was on both the "bid" and "ask" side of the market.  A260 (Tr. 24:12-16).  Over time, he accumulated a substantial portfolio, or "book," that consisted predominantly of out-of-the-money options, or "positions," which were not widely traded in the market.  A25 (¶8).  As stated by BMO to the District Court, "the book that David Lee established was a very large book comprised of some exotic, out-of-the-money, illiquid, thinly-traded options that were very difficult to value."  A226 (Tr. 17:4-7).

### 2.  Lee's Valuations of his Positions

BMO required its traders, including Lee, to assign a fair market value to each open position in their book.  This process was known as "marking the book" and the value assigned to each position was known as a "mark."  A24 (¶5).  These

valuations were important not only in assessing the profitability of the trader's trading (*id.*), but also in determining the trader's compensation (A23 (¶4).

Although the Information makes no allegation that Cassidy knew this at the time, Lee was apparently mismarking his book. According to the Information, Lee began overstating the fair market value of certain of his positions as early as 2003, and continued through at least 2006 (A25 (¶10)) -- although Lee continued in the Bank's employment until May 2007 (A33 (¶27)). The Information charges that Lee's motivation for telling the Bank that certain of his positions were more profitable than they were was to enhance his job performance and therefore increase his bonus compensation. A25-26 (¶¶10-11).

### 3.  BMO's Verification Process and Optionable's Quotes

In order to ensure the accuracy of its trader's marks, BMO's Risk Management Department (the "Risk Department") would periodically conduct price verifications, typically at month-end, in a process known as Independent Price Verification or "IPV." A24 (¶6). Because the natural gas option market was a relatively small one, and certain of the options were thinly traded, it was not possible for the Risk Department to simply look up such prices on a publicly available computer screen, as would be possible for a NASDAQ listed stock. A25 (¶8); A83 (Tr. 24:20-25). Among other methods used, the Risk Department would request brokers to provide it with "quotes" -- statements of the bid and ask prices at

which market participants were prepared to buy and sell options.  The Risk

Department would then compare those quotes to the marks assigned by BMO's

traders.  A25 (¶8).

Optionable provided such quotes to BMO's Risk Department.  A25 (¶9).

During the critical period of September 2006 through March 2007, as to which

Cassidy allocuted, Optionable provided such quotes through a service called

RealMarks ("RealMarks").  A29 (¶19).[1]  The Information did not allege that the

quotes provided to BMO by Optionable were false or inaccurate.  Nor did it allege

that Cassidy knowingly provided such quotes in an intentional effort to conceal

Lee's mismarking.[2]  Rather, Cassidy's offense lay in failing to disclose the role of

Lee in generating the quotes.  A29 (¶20).[3]

The quotes were generated and provided to BMO as follows.  Prior to the

end of each month, BMO's Risk Department would prepare a grid listing the

---

[1]   BMO began receiving quotes from Optionable pursuant to the RealMarks service for the
month-end of September 2006.  It did not sign a contract for the service until late February of
2007 (A93 (Tr. 34:13-14)), and never paid Optionable any fees for the quotes it received (A94
(Tr. 35:7-8).

[2]   This omission was an intentional one: when Cassidy was initially indicted, the first two
charging instruments did contain allegations of inaccuracy and participation in a conspiracy to
mismark.  However, in response to defense motions, the government superseded the charges to
excise all allegations concerning Cassidy's provision of false or inaccurate pricing information or
knowing concealment of Lee's mismarking.

[3]   The Information alleged that Cassidy began subverting BMO's price verification process in
or about December 2004.  (S4 ¶13.)  However, as noted below, *infra* at 14, Cassidy's allocution
covered only the period between September 2006 through April 2007.

specific options for which the Risk Department sought price verification, leaving a blank space where quotes for those options could be filled in. A29 (¶19). Upon receipt of the grid from BMO, Cassidy would turn to Lee, at least in the first instance, in order to fill in the blanks in that grid.

Lee would send quotes to Cassidy, indicating the prices at which *he* was prepared to buy and sell the listed options. A29-30 (¶¶20-21). Upon receipt of Lee's quotes, Cassidy "instructed Optionable personnel to disseminate this pricing information . . . to various traders in the natural gas sector." A30 (¶21).[4] In practice, this rendered Lee's quotes "tradable," meaning that other traders could -- and, on occasion, did -- buy or sell the subject options from BMO at the prices listed by Lee. A79 (Tr. 20:3-20); A85 (Tr. 26:1-7); A87-88 (Tr. 28:18-29:5). If those other traders offered different prices for the options, Optionable's brokers were directed to report those different prices back to BMO. A99 (Tr. 40:4-21). If, however, no other traders reacted to the quotes -- which is what typically occurred -- Lee's quotes would be included on the grid as market quotes. A91-92 (Tr. 32:17-33:7); A99 (Tr. 40:19-21). In Cassidy's view, the quotes originating with Lee were "legitimate" since they had been exposed to the market and Lee had an obligation to trade on them. A54 (Tr. 10:5); A78-79 (Tr. 19:12-20:8). Cassidy did

---

[4]   Cassidy acknowledged at his sentencing that, notwithstanding his instruction as described in the Information, there were lapses in this practice. Although Optionable made an effort to show Lee's quotes to other traders, it did not do so every single time. A79 (Tr. 20:3-8).

not, however, disclose to the Risk Department that the process of generating them had begun with Lee.  A54 (Tr. 10:12-16.)

### 4.  Lee's Mismarking is Revealed

Commencing in October of 2006, BMO's Risk Department began comparing Lee's marks, as well as the quotes obtained from Optionable, with pricing information obtained from a third party (referred to in the Information as the "Multi-Contributor Service").  A31-32 (¶24).  The pricing information from the Multi-Contributor Service differed from Optionable's quotes, and also differed from Lee's marks, and indicated that Lee had overvalued his positions by millions of dollars.  A32 (¶24).  That disparity grew over the following months, according to the Information, until in April of 2007 BMO publicly announced that it was remarking Lee's positions and recognizing millions of dollars of losses.  A32 (¶26).

A fact not mentioned in the Information, but brought to the attention of the District Court, was that Optionable's quotes *also,* in addition to the pricing information from the Multi-Contributor Service, indicated that Lee's positions were overvalued by many millions of dollars.  Specifically, as reflected in a letter from Cassidy's counsel to the District Court (A152), in each month that Optionable provided RealMarks quotes to BMO, those quotes indicated that Lee's position was overvalued by millions of dollars:

| Month | Lee's Overvaluation As Indicated by Optionable's Quotes |
|---|---|
| September | $23,571,496 |
| October | $12,197,079 |
| November | $30,468,147 |
| December | $17,561,005 |
| January | $32,378,758 |
| February | $29,102,654 |
| March | $83,835,810 |
| TOTAL | $229,100,000 |

During this same time period, as noted, the pricing information from the Multi-Contributor Service also indicated that Lee was overvalued, and by significantly higher amounts.  A32 (¶25).[5]

Notwithstanding the disparity between Lee's marks and both sources of pricing information, BMO did not terminate Lee.  According to the Information, BMO first became aware of the disparity in October 2006 (A31-32 (¶24)), but BMO's response was to hire an outside consultant to assess BMO's independent price verification process -- a step that it did not take until February 2007 (A32 (¶25)).

---

[5]    The Information did not set forth the amounts by which the Multi-Contributor Service indicated that Lee's Positions were overvalued, and BMO offered no evidence to establish those amounts.  Moreover, neither the government nor BMO offered any evidence that the Multi-Contributor Service's pricing information was objectively more accurate than Optionable's quotes.

Later that year, in late April 2007, BMO publicly announced that it had sustained millions of dollars in commodities trading losses, which included losses attributable to remarking and liquidating Lee's positions.  A32 (¶26).  The Bank subsequently stated that these losses related to its first and second quarters of 2007, saying nothing about prior periods.  A141.  In early May, BMO announced that it was terminating its business relationship with Optionable.  A32 (¶26).  Even then, however, it appears that BMO did not terminate Lee.  The Information states only that "Lee's employment at BMO ended" in mid-May (A33 (¶27)), and the sworn statement submitted by BMO to establish the amount of its losses states only that Lee resigned at that time (A135).

## B.  Plea Agreement and Allocution

On August 12, 2011, on the eve of trial, Cassidy reached a plea agreement with the government.  In that agreement, the government stipulated for purposes of the Sentencing Guidelines that "the amount of loss that resulted from the offense cannot reasonably be determined" (A40), and Cassidy's Guidelines offense level was calculated based on that premise.  In the absence of a loss amount, the plea agreement calculated Cassidy's Guidelines level by reference to the alternative measure of gain to the defendant.  The number used for this gain was approximately $950,000, which represented the amount of brokerage commissions earned by Optionable in March and April of 2007, the last two months in which

Optionable brokered BMO transactions.  A241-42 (Tr. 5:17-6:3); A147 (n. 1).[6]

This Guidelines analysis resulted in a Guidelines range of 30-37 months.  A41.

Cassidy entered his plea pursuant to this agreement on August 15,

2011.  In describing his offense conduct, Cassidy allocuted as follows:

> In the fall of 2006, I arranged for my company Optionable to develop a service called RealMarks, which was designed to provide market quotes concerning natural gas option contracts. From September 2006 to April 2007, this service provided market quotes to the risk management department of the Bank of Montreal.
>
> While I believed that the RealMarks quotes provided to BMO were legitimate, most of the quotes that RealMarks provided to Bank of Montreal's risk management department originated with Bank of Montreal's own trader David Lee.  I agreed with Lee that on month end days he would provide Optionable with the quotes, Optionable would make an effort to show the quotes to other traders in the market, and then at the end of the day, Optionable would send quotes to Bank of Montreal's risk management department.  Although I understood that BMO's risk management department wanted quotes that were not contributed to RealMarks by Lee and felt it was an important factor, I did not tell the risk management department that many of the quotes had originated with Lee.

A53-54 (Tr. 9:23-10:16).  The District Court accepted Cassidy's plea and

scheduled the case for sentencing.

---

[6]    Notably, this gain figure was based on a gain to Optionable the corporation and not to Cassidy personally, since any commissions were paid to the corporation.  Further, these commissions were received by Optionable in exchange for the provision of actual brokerage services to BMO, which received fair value for those payments.  A214 (Tr. 5:7-17).

## C. Presentence Report and Sentencing

Following Cassidy's plea, the Probation Department conducted a presentence investigation and issued its Presentence Report. That Report adopted the Guidelines analysis contained in the parties' plea agreement, including the stipulation that no loss could be reasonably determined from the offense. On seven different occasions, the Presentence Report stated in words or substance that "the amount of loss that resulted from the offense cannot reasonably be determined." (PSR at ¶¶5(A)(3), 39, 44, 136 and pp. 33, 34, 36.) Using the same alternative gain analysis employed by the parties, the Probation Department arrived at a sentencing range of 30 to 37 months.

At sentencing, the District Court sentenced Cassidy to 30 months imprisonment and 3 years supervised release. In so doing, it applied the Guidelines range stipulated to by the parties and adopted by the Probation Department, which was based on the premise that no loss amount could reasonably be calculated. The offense level of 17 and criminal history category of II[7] yielded a Guidelines range of 30 to 37 months, and the District Court imposed a sentence at the bottom of that range. A119-20 (Tr. 60:21-61:4). The District Court also

---

[7] The criminal history category of II resulted from a November 15, 1996 conviction in the United States District Court for the Southern District of Florida for conspiracy to use unauthorized access devices and related conduct, yielding three criminal history points. Cassidy also had other criminal convictions dating from the late 1980s and early 1990s that did not result in criminal history points due to their age.

entered a consent order of forfeiture obligating Cassidy to forfeit $200,000 in cash

to the government.  A120 (Tr. 60:6-7); A127.  As to restitution, because BMO had

made known its intention to seek such restitution just prior to sentencing, the

parties jointly requested that the District Court adjourn any determination of that

issue for 90 days, or until July 25, 2012.  A120 (Tr. 61:10-14).  That deadline was

subsequently extended by an additional 90 days, following the submission of

BMO's claim for restitution.

## D.  The Restitution Proceedings

### 1.  BMO's Request for Restitution

By letter dated July 13, 2012, BMO submitted its claim for restitution

pursuant to 18 U.S.C. §§ 3663A, 3663 and 3771.  While asserting that Cassidy had

"caused [it] hundreds of millions of dollars in direct financial losses," BMO stated

that it was limiting its request to a smaller amount, saying that it did not want to

"unduly complicate or prolong the sentencing proceedings."  A132.  Instead, BMO

sought $14,190,068 in alleged losses, which consisted of two components: (a)

amounts paid as brokerage fees to Optionable during the period of the conspiracy;

and (b) amounts paid as short term incentive compensation to David Lee from

2004 through 2006.  *Id.*  The Bank's theory of loss was based on the premise that,

had it known of the offense conduct, it would have terminated Lee and ceased

doing business with Optionable and thus would not have incurred these expenses.
A132-33.

### 2. Cassidy's Opposition

In his opposition papers, Cassidy attacked the central premise of BMO's
argument.  Responding to BMO's claim that it would have terminated both Lee
and Optionable had it known of the offense conduct, Cassidy pointed out that it
was important to focus on the nature of the offense conduct.  While BMO's
submission suggested that Cassidy had participated in a conspiracy with Lee to
mismark his book, that was not the offense charged in the Information.  Rather,
Cassidy's offense consisted of failing to disclose that quotes provided to BMO by
Optionable had originated with its own trader, Lee.  As to this offense conduct,
however, BMO had submitted no evidence that knowledge of that fact would have
led to Optionable's or Lee's termination.  By contrast, evidence produced by the
government as pre-trial discovery and 3500 material indicated the opposite: that
BMO was aware that at least some of Optionable's quotes originated with Lee, and
yet took no action to terminate Lee or Optionable as a result of that knowledge.
A149.

Cassidy's opposition acknowledged that exhaustive examination of this
evidence would require a full evidentiary hearing with testimony from fact

witnesses and possibly experts.  Nevertheless, Cassidy's provided a summary and

attached copies of the supporting documents.  As set forth in that summary:

- In or about 2003, Lee told a BMO Risk Department employee that in order to obtain quotes for certain illiquid options he would need to "make up" the quotes himself.  The Risk Department employee responded that "they didn't care how he [Lee] got the [quotes]."  A158-59.

- In a *Brady* disclosure letter sent by the government, a former Risk Department employee suggested that the Bank may have understood prior to 2006 that quotes for certain illiquid options were being originated by BMO's own traders, who would "create two-way [quotes] for those particular options and expose them to the Market" -- exactly the practice that Cassidy described in his allocution.  A164

- In an April 2007 call transcript, a director in BMO's Risk Department, Murray McIntosh, stated that, given the significance to Optionable of BMO's business (as disclosed in Optionable's own public filings), he believed in early 2006 that Optionable could not be used for price verification purposes because a substantial percentage of Optionable's quotes would necessarily have to originate with BMO.  A177-78; A182.  McIntosh's colleague agreed, noting that, based on Optionable's SEC filings alone, "I don't see how we could call that [Optionable's quotes] independent."  A183.

- In a December 7, 2006 email from Risk Department employee Jeff Wang to his supervisor McIntosh, Wang acknowledged that some of the quotes BMO was receiving from Optionable, in particular those derived from Optionable's electronic trading platform, originated with BMO.  "There is no direct way to segregate[e] [the] BMO quotes from the non-BMO quotes," Wang informed McIntosh.  A186.

- On or about February 2, 2007, at a meeting among McIntosh, BMO's Chief Accountant Cally Hunt, and its Senior Market Risk Officer Penny Sommerville, it was acknowledged that "some of Optionable's quotes come from BMO since BMO [is] a big customer of Optionable." A188.

*See* A149-50. Although this summary could focus only on the highlights, Cassidy argued that it established BMO's knowledge, at a minimum, that some of Optionable's quotes originated with Lee. A150-51.

Additional evidence, Cassidy argued, established that BMO failed to take action not only when presented with evidence that Optionable's quotes originated with Lee, but also when presented with indications of actual mismarking by Lee. Specifically, Cassidy cited to a witness interview memorandum in which a BMO Risk Department director stated that he had informed his supervisor in July 2006 that "Lee was mismarking" but the supervisor took no action in response. A196. Further, as noted above, BMO became aware of the huge disparity between Lee's marks and both sources of pricing information by October 2006, and yet took no action until well into the following year. Even after its May 2007 announcement that some of Lee's positions were mismarked, BMO apparently did not terminate Lee. A151-52.

In addition to attacking the central premise of BMO's application, Cassidy also contended that an award of restitution would be inconsistent with his sentence,

since that sentence had been premised on the stipulation -- adopted by both the
District Court and the Probation Department -- that no loss could be reasonably
determined from Cassidy's offense. A148-49. Finally, Cassidy argued based on
the restitution statute that the issues raised by the Bank's claim were too complex
to be determined in the context of a restitution request, and should be addressed in
the already pending civil action brought by BMO against Cassidy seeking the same
losses. A152-153.[8]

### 3. BMO's Reply

By letter dated September 26, 2012, BMO replied to Cassidy's opposition.
With respect to the evidence offered by Cassidy, BMO argued that such evidence
showed only that "at some point, BMO risk personnel came to *suspect* that Lee's
book was misvalued to some extent, and/or that *some* of the quotes provided by
Optionable may not have been independent from Lee." A207-08 (emphasis in
original). Even if BMO were somehow remiss in not detecting the fraud, BMO
argued, Cassidy could not escape liability for restitution by blaming his victim.

---

[8]    BMO's civil action against Cassidy and others was commenced in 2009 in the United States
District Court for the Southern District of New York, and was assigned to Judge Daniels. *Bank
of Montreal v. Optionable, Inc. et al*, No. 09 Civ. 07557 (GBD). That action sought to recover
the same measure of damages sought by BMO in its restitution request, as well as additional
damages. A277 (Tr. 41:4-22). As of the time of the restitution proceedings, the action was "in
the middle of deposition discovery." A276 (Tr. 40:19-20).

Finally, BMO argued that Cassidy's contention was inconsistent with his allocution.

As with its principal submission, however, the Bank's reply did not include any evidence substantiating its theory of loss causation. It did not include any documents rebutting the evidence offered by Cassidy, or even an affidavit from an officer of BMO attesting that BMO would have terminated Lee and Optionable had it known that Optionable's quotes originated with Lee.

### 4. Proceedings before the District Court

The District Court held oral argument on BMO's request for restitution over the course of three dates: September 28, October 11, and October 16, 2012. The government continued to stand by its position that no loss could reasonably be determined from the offense of conviction,[9] while BMO pressed its own, different view. Thus, although the statute provided that the government had the burden of proof as to establishing the amount of any restitution imposed, 18 U.S.C. §3664(e),[10] and the government acknowledged that it had that burden (A215

---

[9]   *See*, *e.g.*, A239 (Tr. 3:10-11 ("The government's position is that loss cannot reasonably be calculated.")); A216-17 (Tr. 7:25-8:2 ("We are maintaining what we put in our plea agreement, which was that loss, specifically the amount of loss that resulted from the offense, cannot reasonably be determined.")).

[10]  Section 3664(e) of Title 18 provides that "any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." Although the statute suggests that the government, and only

(Tr. 6:1-3)), the District Court assumed that this burden had been shifted, stating "I will assume it is the Bank of Montreal's burden of proof." A283 (Tr. 5:17-18).

In oral argument, Cassidy framed the issue for the District Court as follows. Proceeding with the District Court's assumption that BMO had the burden of proof, Cassidy argued that BMO had failed to carry that burden. It had offered no evidence in support of its position that it would have terminated Lee and Optionable had it known that Optionable's quotes originated with Lee. By contrast, Cassidy had offered evidence showing the contrary -- that BMO in fact became aware that some of the quotes originated with Lee, and yet took no action as a result. Thus, Cassidy concluded, the District Court should deny BMO's claim, or at minimum conduct an evidentiary hearing to resolve the factual issue before the court. *See* A232-33 (Tr. 23:3-24:12).

In opposition, BMO argued that there was no relevant factual dispute before the court. BMO dismissed the evidence presented by Cassidy as irrelevant, and further argued that Cassidy's guilty plea alone was sufficient evidence of BMO's entitlement to restitution. BMO argued that Cassidy had pled guilty to deceiving

---

the government, has the burden of proof on this issue, the case law on whether a victim may shoulder this burden is admittedly undeveloped.

the Bank about the independence of the quotes,[11] and that his current position that

the Bank was aware of the quotes' lack of independence was inconsistent with that

allocution.  *See* A244-45 (Tr. 8:19-9:7).

The District Court accepted BMO's argument.  Commenting that "your

client has pleaded guilty in a criminal case," the District Court noted that "that plea

and the fact of that plea can be used by the Bank of Montreal to get restitution in a

criminal case."  A284 (Tr. 6:5-10).  With respect to the evidence proffered by

Cassidy, the District Court commented that "I don't know why he pled guilty if

what he did was just something known to the bank," continuing that "fraud . . . is

something that is conveyed to a victim and relied on."  A292 (Tr. 14:17-21).

While this was not a civil action, "there was a guilty plea and it seems to me what

you are trying to do is walk back the effect of the guilty plea that your client

entered into."  A292-93 (Tr. 14:22-15:1).  Accordingly, the District Court

concluded argument on the issue, and further ruled that there was no need for an

evidentiary hearing.

---

[11]   BMO also continued to characterize Cassidy's offense -- incorrectly -- as encompassing the concealment of Lee's mismarking and the provision of false pricing information to the Bank. *See*, *e.g.*, A291 (Tr. 13:6-9 ("The heart of this fraud was that Mr. Lee was mismarking his book and he used Optionable and Mr. Cassidy to cover that up, and the way he covered it up was by getting quotes that were used to value the book that were fictitious."); A226 (Tr. 17:7-14 ("[Lee] presented this book as very profitable through the complicity of Optionable . . . . Our position is if we would have known this we would have terminated him and would never have allowed this to take place.")).

As to the amount of restitution, the District Court limited BMO's claim to the amounts it had paid to Lee and Optionable during the period covered by Cassidy's allocution, September 2006 through April 2007 (A302 (Tr. 24:7-9)), although the Information charged that the conspiracy had begun as early as 2004. Accordingly, the District Court imposed restitution of $8,635,059, composed of Lee's 2006 bonus compensation ($3.6 million), and the brokerage commissions BMO paid to Optionable during the relevant period ($5,035,059).  *Id.* (Tr. 24:18-21).  On May 20, 2013, the District Court issued a written Order of Restitution memorializing its decision.  A306-309.

## **SUMMARY OF ARGUMENT**

The District Court's finding that BMO was entitled to $8,635,059 in restitution under the MVRA was erroneous and an abuse of discretion on five separate grounds:

I. The District Court's determination that amounts paid to Lee and Optionable by BMO were recoverable as restitution under the Mandatory Victim Recovery Act, 18 U.S.C. §3663A et seq. ("MVRA") lacked any evidentiary basis.  BMO's claim was premised on the unsubstantiated contention that, had it known of the offense conduct, it would have terminated Lee and Optionable, and thus avoided its payments to them.  BMO offered no evidence in support of that claim.  The government itself took the position

that no loss from the offense could reasonably be determined.  And Cassidy

proffered evidence demonstrating that the Bank became aware that at least

some of the quotes submitted by Optionable in fact originated with Lee, and

took no action to terminate Lee or Optionable as a result.  On this record, the

District Court's conclusion that BMO had satisfied the burden of proving its

claim was an abuse of discretion.

II.  The District Court failed to make clear what legal standard it was applying,

and its comments on the record suggested that it may well have applied a

lesser standard than a preponderance of the evidence.  The District Court

made no finding that BMO had succeeded in proving causation of its losses

by a preponderance of the evidence.  Certain of its comments, for example

the statement that "my understanding is that I don't think it really is terribly

difficult" to establish loss for purposes of restitution (A240 (Tr. 4:3-4)),

suggest the District Court may have thought a lower standard was

appropriate.

III.  The District Court's denial of an evidentiary hearing concerning the issue of

loss causation, given Cassidy's submission of relevant evidence and the

existence of a clear factual dispute, was erroneous and deprived Cassidy of

his rights under the Due Process Clause.  Absent an order rejecting BMO's

claim for restitution outright, the District Court's failure to order an evidentiary hearing was an abuse of discretion.

IV. The District Court's order failed to recognize that the Bank's claim, due to the complexity of the issues involved and the requirements of the MVRA, should be resolved in the context of the civil litigation already commenced by BMO against Cassidy. The MVRA itself recognizes that restitution should "not be imposed if the determination of complex issues of fact relating to causation would unduly complicate or prolong the sentencing process," § 3663A(c)(3)(B), and this is just such a case. The District Court's failure to apply this directive was an abuse of discretion.

V. The District Court erroneously based its award of restitution on gains to Optionable and Lee, without the necessary showing that these amounts resulted in a loss to BMO. This determination violated this Court's holding in *United States v. Zangari*, that an order of restitution must be based on a direct showing of loss, or, at the very least "a direct correlation between gain and loss, such that the defendant's gain can act as a *measure* of—as opposed to a *substitute* for—the victim's loss." 677 F.3d 86, 93 (2d Cir. 2012). The District Court's Order of Restitution was based on neither.

## **ARGUMENT**

The Second Circuit "review[s] a district court's order of restitution under the MVRA for abuse of discretion." *See United States v. Boccagna*, 450 F.3d 107, 113 (2d Cir. 2006). Under the law of this Court, "[a] district court has abused its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or rendered a decision that cannot be located within the range of permissible decisions." *Sims v. Blot*, 534 F.3d 117, 132 (2d Cir. 2008) (internal citation and quotations omitted). "Abuse of discretion is also shown when a district court applies the incorrect legal standard." *Frederiksson v. HR Textron, Inc.*, 484 F. App'x 610, 612 (2d Cir. 2012) (internal quotations omitted). As set forth below, the District Court's restitution decision constituted an abuse of discretion in several respects, both factual and legal.

## **POINT I**

### **THE DISTRICT COURT ABUSED ITS DISCRETION BY IMPOSING RESITUTION IN THE ABSENCE OFANY EVIDENCE SUPPORTING THE BANK OF MONTREAL'S LOSS THEORY**

Under the MVRA, "restitution is authorized only 'for losses that were directly caused by the conduct composing the offense of conviction.'" *United States v. Marino*, 654 F.3d 310, 319-20 (2d Cir. 2011) (citing *United States v. Silkowski*, 32 F.3d 682, 689 (2d Cir. 1994)) (brackets and ellipsis in original omitted); *United States v Gushlak*, 728 F.3d 184, 194-95 (2d Cir. 2013)

27

("[R]estitution may be awarded only in the amount of losses directly and
proximately caused by the defendant's conduct.").  Pursuant to 18 U.S.C.
§3664(e), loss causation (as well as loss amount) must be proven by a
preponderance of the evidence.  *See United States v. Tsosie*, 639 F.3d 1213, 1222
(9th Cir. 2011) (noting that §3664(e)'s "reference to a 'preponderance of the
evidence' requires that, when there is a dispute as to restitution, a restitution order
must be supported by evidence in the record showing that it is more likely than not
that the defendant's offense proximately caused the losses for which restitution
was awarded and that it did so in the amounts awarded").  Here, BMO failed to
satisfy this standard.

### A.  BMO's Failure of Proof

BMO failed to offer any evidence at all in support of its loss theory, with the
exception of Cassidy's guilty plea.  BMO's theory of loss was that it would have
immediately terminated Optionable and Lee had it known that Cassidy was
providing it with quotes that originated with Lee.  Yet BMO offered no evidence
whatsoever in proof of that theory -- no testimony, no documentary evidence, not
even an affidavit from a corporate officer attesting that the Bank would have
terminated Lee and Optionable had it known the facts.  Indeed, the declaration
submitted by BMO to establish the amount of its claimed losses -- which said
nothing about the *cause* of those losses -- itself acknowledged that Lee was *not*

terminated, even after BMO publicly announced its millions of dollars of trading losses.  Instead, it appears, BMO permitted Lee to resign.[12]

BMO's failure to offer any evidence was particularly egregious for two additional reasons.  First, the government itself had stipulated that no loss could reasonably be determined, and reaffirmed that position on multiple occasions during the course of the restitution proceedings. *See*, *e.g.*, A239 (Tr. 3:19-11 ("[T]he government's position is that loss cannot reasonably be calculated.")). Second, Cassidy offered extensive evidence rebutting BMO's theory of loss, and yet BMO offered no evidence in reply.

Cassidy's evidence fell into two categories.  First, in response to BMO's assertion that it would have terminated Optionable and Lee had it known of the offense conduct, Cassidy brought to the District Court's attention five separate instances in which BMO was made aware that at least some of Optionable's quotes came from Lee, and yet took no action to terminate him.  Cassidy provided the District Court with contemporaneous documents -- emails, transcripts of telephone conversations, witness interview memoranda -- supporting these assertions.  A150.

---

[12]  Consistent with this declaration, the Information makes no allegation that Lee was terminated after BMO became aware of his mismarking.  Instead, the Information alleges only that "in or about mid-May 2007," after BMO publicly announced that it had sustained millions of dollars in trading losses in part as a result of remarking Lee's positions, "Lee's employment at BMO ended."  A33 (¶27).

Second, Cassidy's evidence not only addressed BMO's awareness that some of the quotes came from Lee. His second category of evidence established that in at least two instances BMO was placed on notice of Lee's mismarking itself -- and yet took no action to terminate him. A151. Indeed, as noted above, even at the end of Lee's employment in May 2007, when BMO made a public announcement that his positions had been mismarked, BMO still did not terminate Lee, and instead apparently permitted him to resign. *See* A135.

In proffering this evidence, Cassidy was not seeking to blame the victim, as argued by BMO, nor was he refusing to accept responsibility for his own criminal conduct. Rather, he was simply holding BMO to its burden of proof. And this evidence that BMO knew that Optionable's quotes had originated with Lee -- even if limited to only some of the quotes -- undercut BMO's theory. For if the submission of non-independent quotes was as momentous and troubling as BMO claimed, then knowledge that even a few quotes lacked such independence would have set off alarms within the Bank.[13] It would have called Lee and Optionable onto the carpet, and at a minimum stopped relying on any quotes from Optionable

---

[13]  Indeed, as noted by Cassidy at his sentencing, had the case gone to trial he would have offered expert testimony that virtually the *only* way for a trader to obtain quotes for thinly traded out-of-the-money options would be to make such quotes himself and expose them to the market. In a small market with few market makers, a trader did not have the ability to pull up a particular option on his computer screen and learn the prices at which other traders were trading, because for thinly traded options there was a significant possibility that no one else was trading them. Rather, the trader would need to seed the market by creating his own quotes for such options and showing them to other traders in order to obtain their reaction. A84-85 (25:4-26:11).

from that point forward.  Instead, BMO did nothing of the sort.  It continued to

request quotes from Optionable, and accepted them for what they were -- one data

point among many, even if less than independent, for valuing its book.  A151-52.

Notwithstanding the above evidence proffered by Cassidy, BMO offered no

evidence of its own in reply.  Yet the Second Circuit has emphasized the critical

importance in such circumstances of specific proof of causation.  In *United States*

*v. Archer*, 671 F.3d 149 (2d Cir. 2011), defendant attorney was convicted of visa

fraud based on his submission to the government of false applications for visas on

behalf of approximately 234 clients.  The government sought restitution of over

$300,000, representing a refund of the fees paid by defendants' clients, on the

theory that the fees had been paid for a service -- helping the clients obtain legal

status -- that defendant did not provide.

On appeal the Second Circuit reversed the District Court's grant of

restitution, stressing that the government must establish by a preponderance of the

evidence that each individual claimant was in fact a victim who sustained a loss as

a result of the offense of conviction.  This "requirement of causation," the Court

noted, "is akin to the well-established requirement that there be 'loss caution' in

securities fraud cases and not merely transaction ('but for') causation" *id*. at 171, n.

16, and, where appropriate, required individualized proof:

> The showing required to satisfy the government's burden
> on this point varies depending on the circumstances of

> the fraud.   In some cases, it will be clear that no
> reasonable person would have given the defendant her
> money if she had known of his plan. . . . . In those cases,
> a generalized description of the fraudulent scheme is
> enough to support restitution.   But where it is plausible
> that some individuals would have paid the defendant
> even if they had been informed of his fraudulent plan,
> then the government must proffer some individualized
> evidence to meet its burden of showing that each alleged
> 'victim' was actually a victim.

*Id.* at 172.  Here, as discussed above, Cassidy's evidence indicated not only that it

was plausible that BMO would continue to use Optionable for brokerage services

notwithstanding its knowledge that Optionable's quotes originated with Lee, but in

fact that it did so.[14]  BMO had an obligation to offer individualized proof of its

claim, and simply failed to do so.

### B.  Improper Reliance on Cassidy's Guilty Plea

Rather than respond to Cassidy's evidence, BMO placed principal reliance

on Cassidy's guilty plea.  It argued that since Cassidy had admitted to "deceiving"

BMO as to the independence of the quotes (A245 (Tr. 8:25-9:2), he could not be

heard to argue at restitution that BMO had in fact been aware of that lack of

independence -- in other words, that BMO had not been deceived.  The Court

---

[14]   It is important to note here that BMO did not pay Optionable for the quotes that it received
from Optionable.  It did not sign a contract for the RealMarks service until late in the day --
February 2007 -- and even then did not pay the required fees.  A93 (Tr. 34:13-14); A94 (Tr.
35:7-8).  Had BMO paid such fees, it might have had a reasonable claim for restitution based on
their return, but that theory of recovery is inapplicable here.

appeared to accept this argument, commenting that Cassidy "pled guilty to fraud and fraud isn't something that you commit in the, you know, in your living room secretly. It is something that is conveyed to a victim and relied on and so forth." A292 (Tr. 14:18-21). This decision was erroneous.

First, while Cassidy admitted in his plea to participating in a scheme to defraud, he never addressed whether that scheme had *succeeded* or whether BMO had *in fact* been deceived. He allocuted only that he personally had failed to disclose Lee's role in originating Optionable's quotes, and said nothing about whether or not BMO had been aware of that role. Indeed, under well-established law, whether or not BMO actually was deceived was irrelevant to whether Cassidy committed the offense. *United States v. D'Amato*, 39 F.3d 1249, 1256-57 (2d Cir. 1994) (noting that while the mail fraud statute criminalizes a scheme to defraud a victim, "[t]he scheme to defraud need not . . . be[] successful or complete."); *United States v. Salemo*, 499 F. App'x 110, 113 (2d Cir. 2012) ("The government is not required to show that the intended victim was actually defrauded, but need only show that the defendants contemplated some actual harm or injury.") (internal quotations and brackets omitted). Thus, there was no inconsistency between Cassidy's allocution and the evidence offered to rebut BMO's theory.

In fact, Cassidy's allocution and plea simply did not address the elements that BMO was required to prove to sustain its claim. As noted above, to establish

that it was a victim of the offense, BMO must prove that its losses were directly

and proximately caused by the offense, in other words, that it relied on Cassidy's

conduct and sustained losses as a result.  Cassidy's allocution, however, was silent

as to these elements.[15]  He allocuted to his own failure to disclose, but said nothing

about whether BMO relied on this conduct or was harmed by such reliance.  Thus,

his allocution failed to address the critical elements that BMO was required to

prove.

To be sure, there are cases in which a defendant's guilty plea would be

sufficient to establish losses for purposes of restitution.  In a case of bank robbery,

for example, a defendant's plea that he robbed a bank would of necessity establish

the victim bank's losses as a result of that crime.  Here, however, Cassidy's offense

was quite different, and far more complex.  He admitted only to failing to disclose

Lee's role in generating the quotes provided to BMO, and such an offense does not

by its nature lead directly or inexorably to losses.  It was incumbent on the Bank to

establish causation for any alleged losses -- and to do so through evidence other

than Cassidy's guilty plea.  The District Court's failure to recognize this

constituted an abuse of discretion.

---

[15]   Reliance is not an element of the offense to which Cassidy plead guilty.  *See*, *e.g.*, *Neder v. United States*, 527 U.S. 1, 24-25 (1999) ("The common-law requirement[] of 'justifiable reliance' . . . ha[s] no place in the federal fraud statutes.").

## POINT II

## THE DISTRICT COURT ABUSED ITS
## DISCRETION BY FAILING TO MAKE CLEAR
## THE APPLICABLE LEGAL STANDARD

The District Court erred in failing to make clear the legal standard it was
applying in imposing restitution.  As noted above, under the MVRA, all losses
must be directly and proximately tied to the offense conduct, *United States v
Gushlak*, 728 F3d 184, 194-95 (2d Cir. 2013), and must be proven by a
preponderance of the evidence. 18 U.S.C. §3664(e); *see United States v. Tsosie*,
639 F.3d 1213, 1222 (9th Cir. 2011) (stating than restitution "must be supported by
evidence in the record showing that it is more likely than not that the defendant's
offense proximately caused the losses for which restitution was awarded and that it
did so in the amounts awarded").  From the record below, it is not clear that the
District Court applied this standard of proof.

Indeed, based on comments made by the District Court during the restitution
proceedings, it appears the District Court may have applied a significantly lower
standard.  During oral argument on October 11, 2012, the District Court initially
seemed to suggest that no showing of loss whatsoever was required.  In response to
the government's reaffirmation of its position that a loss "cannot reasonably be
demonstrated," the District Court commented "you talk about loss," but added
"this is not a damage action, this is restitution."  A239 (Tr. 3:12-13).  The District

Court drew a distinction between civil actions for damages, in which plaintiffs sought to recover their losses, and claims for restitution, reiterating that "we're talking here about restitution." *Id.* (Tr. 3:19-22).  The government cautioned that even in claims for restitution the law required a showing of loss, to which the District Court responded "my understanding is that I don't think it really is terribly difficult."  A240 (Tr. 4:3-4).  The District Court continued: "Here my understanding is we're talking about restitution, we're talking about something that Mr. Cassidy or his company gained that he has to restore.  And obviously the concept of loss is there . . . but it is not the same as a civil action for damages." *Id.* (Tr. 4:15-20).

During argument on October 16, 2012, the District Court further suggested that it might be applying a lower standard of proof.  In response to Cassidy's argument that BMO had failed to offer any evidence in support of its loss theory, the District Court stated: "I don't think you put that quite right.  Your client has pled guilty.  Certainly the fact of that plea can be used by the Bank of Montreal to get restitution in a criminal case," adding that the plea was "the essential factual predicate on which the bank is relying."  A284 (Tr. 6:5-18.)  The District Court elaborated that BMO's position was that it would not have engaged in trading with Optionable had it known of Cassidy's wrongdoing, "and it is difficult for the court to say there is anything wrong with that proposition.  . . . That to me is a reasonable

case for restitution."   A285 (Tr. 7:8-16).  The District Court added, "we are talking about restitution in a criminal case." *Id.* (Tr. 7:25).

The above comments suggest that the District Court may have assumed that restitution required a lower standard of proof than a preponderance of the evidence. In addition to its initial uncertainty as to whether restitution required any showing of loss at all, the District Court's repeated comments that "we're talking here about restitution," as distinguished from a civil action for damages, and its conclusion that Cassidy's guilty plea was enough to warrant "restitution in a criminal case" suggest that it was not applying a preponderance of the evidence standard.  At a minimum, the District Court did not clarify what standard it was applying, made no reference to the applicable preponderance of the evidence standard, and made no specific finding that that standard had been satisfied.[16]  Under these circumstances, the District Court's ultimate conclusion lacks adequate justification and must be reversed as an abuse of discretion.

---

[16]   The District Court did comment, in response to argument by Cassidy, that it considered the circumstantial evidence of BMO's case to be "overwhelming" (A287 (Tr. 9:1-2)) but it appears that the court was relying on Cassidy's guilty plea for this conclusion.

# POINT III

## THE DISTRICT COURT ABUSED ITS DISCRETION
## IN DENYING CASSIDY AN EVIDENTIARY HEARING

The District Court also abused its discretion in declining to conduct an evidentiary hearing on the issues before it.  While Cassidy's primary argument at the restitution proceedings was that BMO had simply failed to prove its case, at the very least the record reflected a factual dispute concerning BMO's theory of loss. BMO contended -- without offering any evidence -- that it would have terminated Optionable and Lee had it known that Optionable's quotes originated with Lee, yet Cassidy proffered evidence indicating that BMO had on numerous occasions become aware of that fact and still took no action to terminate either Optionable or Lee.  Limitations of time and space meant that Cassidy's written description of this evidence could only "scratch the surface" (A149) and offer the highlights of the pertinent evidence.  Further, Cassidy acknowledged that the issues involved were highly complex and difficult to understand in the absence of extensive testimony. At a minimum, though, the evidence was sufficient to raise an issue requiring an evidentiary hearing.

One example is illustrative.  As part of his proffer of evidence Cassidy cited to a *Brady* disclosure letter received from the government on the eve of trial. According to that letter, a former Risk Department employee of BMO, Christopher So, might testify that individuals within the Risk Department were aware that, in

order for the Bank's traders to obtain quotes for highly illiquid positions, the

traders would create the quotes (referred to as "two-way markets" in the letter)

themselves and expose them to the market.  A164.  That was exactly the process

that Cassidy had described in his allocution as undertaken by Optionable, and

accordingly suggested that BMO was aware of that process.

The Christopher So *Brady* letter was just one example.  Cassidy also set

forth a list of six other witnesses who, based on the documentary evidence, would

rebut or at a minimum cast doubt on BMO's theory of loss.  This list included the

following, with a description of their potential testimony based on the documentary

evidence:

- David Lee, who in 2003 apparently informed a Risk Department employee that to obtain quotes for certain illiquid options he would need to "make up" the quotes himself.  A159.

- Murray McIntosh, BMO's Director of Risk Management, who apparently understood by early 2006 that, because of the large percentage of business that BMO did with Optionable, a substantial percentage of Optionable's quotes must of necessity originate with BMO.  A170; A178-79.

- Jeff Wang, a Risk Management employee who acknowledged in an email to his supervisor that at least some of Optionable's quotes had originated with BMO.  A186.

- Penny Somerville, BMO's chief risk officer, who attended a meeting in February 2007 at which it was

39

> acknowledged that "some of Optionable's quotes come from BMO since BMO [is] a big customer of Optionable." A188.

- Cally Hunt, BMO's Chief Accountant, who attended the same February 2007 meeting. *Id.*

- Pat Cronin, a BMO employee who stated in an April 11, 2007 telephone conversation that "I don't see how we could call that [Optionable's quotes] independent." A182-83.

Notwithstanding this detailed proffer, the District Court declined to hold a hearing, stating that Cassidy had failed to raise "enough substance" to warrant a hearing. A293 (Tr. 15:16-18).

In light of the clear dispute presented to the District Court, its decision to deny Cassidy a factual hearing was an abuse of discretion which violated Cassidy's rights under the Due Process Clause and the Rules of Criminal Procedure. As this Court has recognized, restitution is part of the sentencing process. *Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 702 (2d Cir. 2000) ("Congress intended to make restitution an element of the criminal sentencing process."); *see also United States v. Duran*, 2013 WL 5434613 (S.D.N.Y. Sep. 20, 2013) ("[Restitution] is a component of a criminal sentence, as opposed to a civil proceeding."). Unquestionably, the sentencing process, as envisioned by the Federal Rules of Criminal Procedure, is adversarial in nature. *See Burns v. United States*, 501 U.S. 129, 138 (1991) (noting that Fed. R. Crim. P. Rule 32 provides for

"focused, adversarial development of the factual and legal issues relevant to determining the appropriate Guidelines sentence"). A defendant's due process rights are violated in that process where he is not "given an opportunity to assure the accurate presentation of reliable sentencing information to the district court." *United States v. Romano*, 825 F.2d 725, 728 (2d Cir. 1987). Cassidy was denied that opportunity here.

## POINT IV

### THE DISTRICT COURT ABUSED ITS DISCRETION IN FAILING TO RULE THAT BMO'S CLAIM SHOULD BE RESOLVED IN THE PENDING CIVIL LITIGATION

The District Court abused its discretion by issuing an order of restitution in a case as factually complex as the present one, where BMO seeks to recover the same losses from Cassidy in ongoing civil litigation. The MVRA itself acknowledges that its provisions authorizing restitution "shall not apply" where "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. §3663A(c)(3); *see also United States v. Marino*, 654 F.3d 310, 317 (2d Cir. 2011) ("[R]estitution may not be imposed if the determination of complex issues of fact relating to causation would unduly complicate or prolong the sentencing process.") (internal quotations omitted). As

the Second Circuit has recognized, § 3663A(c)(3) directs "sentencing courts not

[to] become embroiled in intricate issues of proof," *United States* v. *Reifler,* 446

F.3d 65, 136 (2d Cir. 2006), and reflects "Congress's intention that the process of

determining an appropriate order of restitution be 'streamlined,' [] that the

restitution 'determination be made quickly,'. . . [and] that cases 'in which the

victim's loss is *not clearly* causally linked to the offense, should not be subject to

mandatory restitution ... [so that] criminal trials do not become *fora* for the

determination of facts and issues *better suited to civil proceedings.'" Id.* at 136-137

(citing S.Rep. No. 104-179, at 18-21 (1995) reprinted in 1996 U.S.C.C.A.N. 924,

931- 34)) (emphasis in original); *see also United States v. Schwartz*, 2006 WL

1662899 (D. Conn. May 25, 2006) (*quoting United States v. Kones*, 77 F.3d 66, 69

(3d Cir. 1996) ("'The kind of case that Congress had in mind was one in which

liability is clear from the information provided by the government and the

defendant and all the sentencing court has to do is calculate damages.'").

The District Court did not abide by this legislative directive.  And while

generally the Second Circuit reviews a district court's determinations concerning

§ 3663A(c)(3) with a high degree of deference, the Court has stated that such

deference is only warranted "if the record indicates that the district court . . . [was]

aware of the difficulties involved in ordering restitution."  *United States v.*

*Gushlak*, 728 F.3d 184, 193 (2d Cir. 2013).  Here, the record demonstrates that the

District Court failed to appreciate the difficulties of establishing BMO's theory of

loss causation.  (*See supra*, Points I and II.)

As made clear by the conflicting assertions of the Bank and the government,

the question of whether BMO sustained any losses as a result of the offense

conduct was and is exceedingly complex.  *See United States v. McQuillan*, 2007

WL 2827850 (S.D.N.Y. Sept. 26, 2007) (denying restitution on complexity

grounds where, among other things, the government agreed with the defendant that

no restitution was warranted).  The evidence proffered by Cassidy only served to

underscore this complexity.  At a minimum, these facts demonstrated that any

attempt to determine a loss amount was highly complicated and would prolong the

sentencing process.  Nevertheless, the District Court proceeded as if loss causation

was established by the Record.

Moreover, BMO's request for restitution was already subsumed in a civil

complaint it had filed against Cassidy and others in August 2009.  As BMO

acknowledged, discovery in that action was already well underway at the time of

the restitution hearings.  A276 (Tr. 40:18-20 (stating that the parties were "in the

middle" of deposition discovery)).  In light of this fact, the District Court's denial

of BMO's request for restitution would have caused the Bank no prejudice.  *See*

*United States v. Gallant*, 537 F.3d 1202, 1254 (10th Cir. 2008) (upholding denial

of restitution based in part on fact that "a civil suit has not only been commenced

but has proceeded to the point where the parties have conducted extensive pretrial
motions practice, settlement negotiations, and discovery").  Indeed, BMO's civil
action represents a far better forum for resolution of this dispute.

**POINT V**

**THE DISTRICT COURT ABUSED ITS DISCRETION
IN SUBSTITUTING OPTIONABLE'S AND LEE'S
GAINS FOR THE BANK OF MONTREAL'S LOSSES**

The District Court based its award of restitution below on compensation
received by Lee and Optionable rather than a showing of direct and proximate loss
to the Bank.  This was clear error under the controlling law of this Circuit.  *See
United States v. Zangari*, 677 F.3d 86, 91 (2d Cir. 2012) (stating that, because the
MVRA "limits restitution to the full amount of each victim's loss, a restitution
order must be tied to the victim's actual, provable, loss"); *see also United States v.
Boccagna*, 450 F.3d 107, 117 (2d Cir. 2006) (noting that a district court "cannot
award the victim . . . more in restitution than [it] actually lost").  As this Court
made clear in *Zangari*,  an order of restitution must be based on a direct showing of
loss, or, at the very least "a direct correlation between gain and loss, such that the
defendant's gain can act as a *measure* of—as opposed to a *substitute* for—the
victim's loss."  677 F.3d at 93.  The District Court's order below failed to meet this
standard, either as to the commissions paid to Optionable or the compensation paid
to Lee.

With respect to the commissions paid to Optionable, BMO conceded that it obtained the full benefit of the brokerage services it had paid for. A223 (Tr. 14:17-20.) Having received fair value for those commissions, BMO could show that it sustained a loss only by proving that it would never have engaged in this trading in the first place. BMO made no such showing. It offered no evidence that it would have suspended its trading, or engaged in a different type of trading[17] or avoided paying the same amount of brokerage fees to a different broker. In the absence of such evidence, BMO's arguments regarding Optionable's allegedly ill-gotten gains bore no relevance to the Bank's own loss. The district court violated *Zangari* in awarding restitution based on those arguments.

With respect to the compensation paid to Lee, the District Court's $3.6 million restitution award was based on the declaration submitted by BMO to quantify its alleged losses, which asserted that that amount was paid to Lee based upon "individual performance and the profitability of the company" for the year

---

[17]   When asked whether the Bank might still have transacted in the same types of options had Lee not been its trader, BMO stated that it would not have done so to the same extent, but acknowledged that its response involved speculation. *See* A226-27 (Tr. 17:21-18:1 ("Obviously, that is in some respects some amount of speculation, and obviously it's informed somewhat by hindsight, and I can't unwind the clock to say what we would have done had we known.")). Yet, as made clear under MVRA precedent, restitution may not be based on speculation. *See United States v. Donaghy*, 570 F. Supp. 2d 411, 423 (E.D.N.Y. 2008); *see also United States v Schwamborn*, 467 Fed Appx 35, 38 (2d Cir. 2012) (remanding restitution award for reconsideration where government had presented only "rough estimates" of loss at sentencing).

2006.  A135.  In order to prove that this amount represented a loss, BMO was required to show whether and to what extent Lee's trading in that year was *not* profitable, such that the incentive bonus was unwarranted or overstated.  BMO made no such showing.  Indeed, the declaration submitted by BMO contains no indication that Lee's trading in 2006 was not profitable, and the document attached as Exhibit A to that declaration undercuts such an assertion.  That exhibit is a copy of BMO's second quarter 2007 report to shareholders in which it announced, among other things, the losses that resulted from its remarking of Lee's book.  Yet that report limits the Bank's trading losses to only "the first and second quarters of 2007" and says nothing about any losses in prior years.  A141.  Having failed to establish any trading losses in those prior years, in particular 2006, BMO also failed to establish that any bonuses paid to Lee based on his trading for such years constituted a loss.  The District Court therefore lacked any basis to equate Lee's 2006 bonus with an actual loss suffered by the Bank.

## **<u>CONCLUSION</u>**

For all the foregoing reasons, Appellant Kevin Cassidy respectfully requests that the Order of Restitution be reversed or, in the alternative, vacated and remanded to the District Court for the conduct of evidentiary hearings.

Respectfully submitted,

By:     */s/ Douglas R. Jensen*
Douglas R. Jensen
PARK & JENSEN LLP
630 Third Avenue
New York, New York 10017

*Counsel for Defendant-Appellant*
*Kevin Cassidy*

## <u>CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,043 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point, Times New Roman font.


    /s/ *Eyal Dror*                      November 6, 2013    
Eyal Dror                                   Date
*Attorney for Appellant-Defendant*