# Exhibit O

FD-302 (Rev. 10-6-95)

- 1 -

Murray McIntosh
3503-4

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription 07/23/2007

MURRAY MCINTOSH, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ was interviewed in the offices of the New York County District Attorney.

At the outset of each interview date MCINTOSH was advised by the Assistant United States Attorney (Mr. Reed Brodsky on 7/19/2007 and Ms. Helen Cantwell on 1/17/2008) that he must be truthful in his answers and statements and should not make any effort to shade his remarks or be less than candid in order to protect another person. MCINTOSH was additionally advised that his presence was entirely voluntary and he is not being compelled to make any answer or statement. MCINTOSH was advised that it is a crime to lie to a federal agent, which includes federal prosecutors, during the course of an investigation, and, that if he does so, he can be charged with a crime. MCINTOSH did not have any questions regarding the issues he was advised on and understood them fully. These statements were made in the presence of counsel for MCINTOSH.

After being advised of the identities of the interviewing parties and the nature of the interview, he provided the following information:

He began his career in the banking business in 1975. He was employed at Midland Securities, Citibank, Merrill Lynch, UBS, ABN-Amro and then Bank of Montreal (BMO). While at Citibank he worked in the marketing of commodity derivatives. BMO was his first job in the area of market risk. He began his employment on or around March 11, 2002. At that time Milo Rado was the senior vice president of market risk. Eventually Penny Somerville replaced Rado when he left BMO. Mike Mila was the chief risk officer and Ron Rogers was his boss. Michael Roseman and Chris So were responsible for monitoring the risk from operations in the New York office. During this time approximately 90 percent of the risk in the New York office was due to the commodities business. Bob Moore was managing director in the commodities trading group. Yvan Bordeau was the head of investment banking for BMO Nesbitt Burns, a subsidiary of BMO. Bordeaux reported to Bill Downe, the CEO of BMO. In November 2005 Eric Tripp was made the head of all trading floor operations. In general he had a confrontational

Investigation on  07/19/2007 & 01/17/2008  New York, NY

File # ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  Date dictated _____

by  William McGrogan

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Continuation of FD-302 of __Murray McIntosh__, On __07/19/2007__, Page __2__

relationship with Tripp. They got along personally but would have some type of conflict once a week.

Among McIntosh's responsibilities in market risk were the review of the daily flash report, examining new products, reviewing bank policy concerning risk and profit attribution analysis. A new analysis toll will soon be online at the bank to analyze profit and loss daily. He is certain that daily profit and loss reports were sent to Bob Moore for commodities trading activity. These reports would illustrate factors such as skew, theta and market moves.

A market risk committee would meet on Wednesday's at 4 p.m. These meetings were chaired by Tripp and were attended by all executive managing directors reporting to Tripp, McIntosh and other senior members of market risk. McIntosh's group would also make presentations at quarterly risk management meetings. BMO has a risk review committee that meets quarterly. Weekly meetings were held on Monday mornings to review the flash reports.

Market risk and the commodities group disagreed over many things. He recalled a conflict he had with Bob Moore over an agricultural product that Moore wanted his group to sell that market risk did not want the bank to get involved in. In January or February 2004 Moore wanted to trade ahead of a position that he was unwinding for a client, American Electric Power. This was in conflict with the clients interests and resulted in a lawsuit against the bank in the state of Ohio. Milo Rado may have resigned over this dispute. Moore felt there was nothing wrong with these trades. McIntosh did not like them. Bordeaux and Neil McMillen approved the trades. Moore conducted similar trades with Reliant and El Paso energy.

He would fight with Moore over VAR limits for the commodities group constantly. There were also disputes about the pricing of positions and the amount of reserves that should be taken by the bank.

Rabinder Kohl (phonetic) looked after the commodities book during Moores cancer treatments.

Olivio Bencich was close with Moore

Anne Fiddes, Jeff Wang and Mike Pullela were in the VPC. Wang would verify prices of contracts and products. Wang would

Continuation of FD-302 of __Murray McIntosh__, On __07/19/2007__, Page __3__

obtain quotes through instant messages from traders and brokers. The VPC developed the Official Rate Source Document (ORSD) for BMO.

During 2003 Pullela and Milo Rado were looking to obtain independent pricing of the month end positions for the commodities group. They were not comfortable with relying on broker quotes for this process. They realized the possibility that brokers and traders could effect the end of month quotes. They had no evidence that this was being done but were aware of the possibility. He recalled a situation at the bank that occurred in 2002 or 2003, where one of BMO's foreign currency traders were using fixed quotes from a broker at GFI to price his positions. This trader was fired from the bank. During a November 2003 trip to London McIntosh and Pullela discovered a pricing service called Totem that could be used to price commodity positions. He liked the service which cost approximately three to four thousand dollars per month. He and Pullela proposed to Rado that the bank use Totem. Moore was opposed to using Totem. One of Moore's objections to Totem was he felt it would reveal BMO's positions to others. This proposal to use Totem was quashed quickly.

He reviewed some of the instant messages that were being used by BMO as the source for pricing. No senior employees of BMO did so. He and others in market risk would ask Moore for additional quotes at month end to support the pricing. As the banks commodities trading grew he advised David Hyman that the bank should use Totem. Hyman was in a position to sign off on this and did so. Hyman left the bank before the use of Totem was initiated. He (McIntosh) then advised Tripp that the bank should use Totem as an independent pricing service in approximately January or February 2006, when Tripp took over for Hyman. Tripp was concerned about what Moore thought of Totem. In April or May of 2006 Tripp gave approval for the use of Totem. It subsequently took several months for this decision to be finalized.

BMO had a problem with its valuation of its commodities book as opposed to a risk measurement issue. If the prices in the book are not accurate the VAR can not accurately reflect the true risk in the book. As the book gets bigger the bank would need to take bigger reserves since a smaller movement in the market will result in larger losses. A bigger trading book should equal bigger reserves.

During 2002 through 2005 there were no disputes with counter parties to commodities trades regarding their valuation.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of __Murray McIntosh__, On 07/19/2007, Page 4

In late 2006 some disputes regarding the valuation placed on some trades began to occur.

During January 2006 there were discussions within BMO about the use of Totem. Moore did not support the use of Totem and wanted to know what other banks and firms used Totem. He (McIntosh) obtained a list of users and found that big banks like Goldman Sachs and JP Morgan used Totem. David Lee and Olivio Bencich supported Moore in these discussions. McIntosh had a meeting with Tripp and Danny Costa to discuss using Totem. Moore was still against Totem. Tripp wanted McIntosh to gain Moore's support and would tell McIntosh to keep working on Moore. Moore reported directly to Tripp.

By April 2006 he had answered every possible question that Moore had asked regarding Totem and was convinced he was being stonewalled by Moore. McIntosh or Wang would provide responses to Moore in e-mail or written form. At some point in April 2006 he (McIntosh) had an argument with Moore over the use of Totem by BMO. After this he went to Tripp and insisted on the use of Totem in pricing the commodities and natural gas books. Tripp agreed to its use. David Deveney was a trader at BMO who supported Moore's position. Deveney left BMO in December 2005. Moore continued to fight the use of Totem at BMO. He recalls Moore telling back office personnel that Goldman Sachs doesn't really use Totem.

Moore made arguments about the use of Totem that were not true. When Moore claimed that Goldman Sachs did not use Totem, he (McIntosh) spoke to people at Goldman Sachs who stated they used it. Moore responded to this fact by claiming he had just spoken to their trader and the trader said they don't use Totem. Moore also looked at a list of contributors to Totem and claimed that none of the companies on the list were players in the natural gas business when in fact they were (such as Total, for instance)

After Tripp agreed to use the Totem pricing service, McIntosh asked Pullela to get together the paperwork to begin the Totem service. He wanted to institute the use of Totem immediately to get control of the prices in the trading book.

Tripp has recently told him that he was unprepared to deal with a large commodities trading operation like BMO's.

Continuation of FD-302 of __Murray McIntosh__ , On __07/19/2007__ , Page __5__

Moore taught Lee how to trade. BMO was Lee's first trading job and he had worked in operations at the bank prior to trading.

Joe Adevai had lost money in the natural gas book at BMO prior to McIntosh working there. Jean Degagne (phonetic) was the employee at BMO who dealt with the losses resulting from Adevai's trading. Degagne is now at Toronto Dominion Bank in Toronto.

In one instance, when McIntosh returned from a vacation, he noticed that the VAR in the natural gas book was high. He talked with Wang about the size of the book and its growth, and discussed whether they should stop the growth of the book. He suggested to Tripp that they should stop any growth in the natural gas book because it was getting too big and too risky. Tripp wanted proof that the book was too big. Tripp was concerned that any move to limit the natural gas book would jeopardize the earnings that the book was generating. He believes that Tripp was told by the new CEO, Bill Downe, not to jeopardize the earnings in the trading books and to continue to grow revenue. McIntosh was told by Penny Somerville that the CEO wanted to grow revenues.

McIntosh described net notional value as a method of valuing a trading book by netting the long and short options contracts that have a strike price within $0.15 of each other and then counting the other contracts.

At approximately November 2005 he felt the book was manageable and had approximately 550,000 contracts. Subsequently natural gas prices spiked and BMO engaged in large trades with clients. By approximately April 2006 activity had slowed in the natural gas market but the book was still growing due to BMO's trading with hedge funds. He viewed this as proprietary trading by the bank and not on behalf of bank clients. As the trading book grew the Theta and Vega components of it were increasing. During approximately April 2006, Moore argued that the bank's VAR model was creating a problem and not the book's valuation method. Moore was successful at convincing management of his position. Moore did not tell Tripp, or other management at BMO, that a large portion of the natural gas book was proprietary trading. In approximately January or February 2007 the Deloitte and Touche report revealed that a large amount of trading in the natural gas book was proprietary trading, which surprised Tripp.

Case 1:09-cv-07557-GBD-JLC Document 254-161 Filed 12/02/13 Page 7 of 16

A195

FD-302a (Rev. 10-6-95)

[redacted]

Continuation of FD-302 of __Murray McIntosh__ , On __07/19/2007__ , Page __6__

In approximately July 2006 the implied volatility (or Vega) of the natural gas book was decreasing and the book was long volatility. The Theta was growing from $400,000 to $1 million. If a trading book is long Vega it is exposed if implied volatility decreases. The VAR of BMO's book was 13 million. Any VAR model is Gamma friendly (with Gamma being the rate of change of the underlying price). McIntosh began to see a large volume of 1 x 2 trades where Lee was selling two deep out of the money options and buys one close to the money option. The out of the money options were marked very aggressively. Lee engaged in hundreds of thousands of these contracts. The natural gas trading book grew from 550,000 contracts in November 2005 to 1.4 million contracts in January 2007. He confronted Moore and Lee about the number of contracts in the natural gas book. They replied that since McIntosh wanted them to bring down the VAR, this was how they were accomplishing it.

During July 2006 he and Jeff Wang both realized that the natural gas book was losing money and that the 1x2 trades were being done to generate profit and loss designed to offset the Theta and generate Gamma to offset the VAR. Tripp was advised of their concerns and they confronted Moore. Moore advised them that their analysis was wrong and this is a legitimate trading strategy.

The HSBC statements that reflected the trading were given to Moore and Bencich by junior back office people. No one at the bank was comparing the HSBC statements to the P&L statements from the commodities group. Mike Sunley in Toronto would receive the HSBC statements and was supposed to circulate them to finance and market risk personnel. Livio Bencich told Sunley that you don't have to circulate the statements to market risk but to give them to Bencich. Ann Fiddes was supposed to get these statements but did not. He believes that the HSBC statements were sent to Moore via e-mail.

The out of the money option contracts were the trades that gave the bank problems.

Lee would adjust his skew in times where he was losing money. By changing the skew it changed his P&L. In approximately July 2006 Jeff Wang noticed this pattern and began to track when Lee would change the skew. He told Danny Costa about this observation and Costa agreed. They also noticed a pattern that Lee did not change the skew when he was making money. McIntosh informed Tripp about these observations during a regularly

Continuation of FD-302 of __Murray McIntosh__ , On 07/19/2007 , Page 7

scheduled Friday morning meeting he had with Tripp. Costa was present when he did so. He told Tripp that he thinks Lee is mismarking the natural gas book and moving his skew. Tripp did not think it was that critical and figured that the bank would pick up any differences at month end with the use of Totem or other pricing. He disagreed with Tripp's assessment but did not push the issue. He informed Penny Somerville, who felt the issue needed to be investigated further. He was a little stronger in his communication of his opinion to Sommerville. Sommerville did not task him to take any specific further steps to resolve this. This issue was raised to the BMO Board of Directors in April 2007 after the April 23rd board meeting.

McIntosh had a similar conversation with Moore. Moore advised that there was nothing wrong with changing the skew and that it should be done to reflect changing market conditions.

The pattern of Lee's skew recalibration continued into 2007.

Through August 2006 he and Jeff Wang continue to notice and observe the pattern of Lee changing his skew. He had a conversation with Tripp about limiting the size of the natural gas trading book. Danny Costa was present for this meeting. Tripp was not in favor of limiting growth in the natural gas book. At the same time Moore was seeking a higher VAR limit for the book for 2007. He participated in a meeting, held in Toronto, with Somerville, Tripp, Bordeaux and possibly Moore, who would have participated via telephone. This meeting lasted approximately 30 minutes. His position was that the VAR limit was $8 million and should stay at that limit. Tripp advised he would look into the VAR limit. Tripp did not want to limit growth in the natural gas book because he did not want to limit P&L growth. The P&L at this time was probably close to $100 million.

The contract to use the Totem pricing service was signed by the end of August 2006 but could not be used for August 2006 month end pricing. In September 2006 Totem was used for month end pricing. By October 25, 2006 he had data which showed that the natural gas book had a valuation difference of approximately $100 million when comparing totem pricing to using the broker quotes. He, Jeff Wang and Anne Fiddes saw the report which illustrated this difference. This report was e-mailed to Tripp. After receiving the report Tripp called McIntosh into his office. Tripp slammed the door closed and asked if McIntosh was trying to get him fired.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of __Murray McIntosh__ , On __07/19/2007__ , Page __8__

Tripp wanted to know who else he sent the report to and told him not to send it to anyone else. Tripp told him not to deliver bad news like this via e-mail and in the future do it in person. They briefly discussed what they could do about this problem. They had a meeting with Penny Somerville concerning this difference. She stated they should look into the numbers to make sure they are accurate. They also discussed the fact that Lee would have been mismarking the book for some time in order for the difference to be this big.

He, Costa, Wang, Moore, Fiddes, Tripp and Somerville were in the universe of BMO people who received the results of the month end pricing discrepancy. He had conversations with Costa about the fact that Lee was mispricing the book. Costa supported this view and felt they were correct that the natural gas book was overvalued.

Shortly after the discrepancy came to light he took a trip to Chicago with Moore to meet with a senior member of the Chicago Federal Reserve. He had a conversation with Moore in a cab in Chicago. Moore was upset with McIntosh's report about the natural gas trading book differences and the way he communicated it. Moore felt that the way McIntosh represented the book as being mispriced and the impact it would have on Moore's reputation was terrible. He replied that the numbers are what they are.

He and Somerville raised the differences in value of the natural gas book to Yvan Bordeaux in early November 2006. He does not think that Tripp would have met with Bordeaux prior to this.

In early November 2006 there was a meeting to discuss what should be the final valuation of the natural gas book and what reserve the bank should take. He, Moore and Wang were present in New York and Tripp, Fiddes and Somerville were present in Toronto. the idea of using a 1 vol tolerance to value the book and reserve was discussed. Using this method brought the difference between Totem and the broker quotes to approximately $20 to 25 million. An average of approximately $13 million was decided on. He expressed that using the 1 vol tolerance was still very liberal. He believes that Jeff Wang had proposed using the 1 vol tolerance and he (McIntosh) had discussed this idea with Somerville prior to the meeting. It was also agreed that market risk was to continue its research to validate the Totem data and differences.

Case 1:09-cv-07557-GBD-JLC Document 254-11 Filed 12/02/13 Page 10 of 16
Case 1:03-cv-07557-GBD-JLC Document 161 Filed 02/01/13 Page 10 of 16

A198

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of __Murray McIntosh__ , On __07/19/2007__ , Page __9__

  Bob McGlashen, who was Somerville's boss, met with him and Somerville in the beginning of November 2006 to discuss the valuation differences. McGlashen agreed with the method that was being used to calculate the value and reserve. McGlashen reported to the CFO, Karen Maidment. McGlashen asked if he should tell Maidment about the issues with the natural gas book. Somerville stated probably not.

  In December 2006 at a BMO Christmas party, he told McGlashen that he felt Lee was mismarking the natural gas book. McGlashen replied that it was time to escalate this matter. He had done additional research to support his position. He took the prices of the biggest players on Totem (for example JP Morgan, UBS, etc) and BMO, and compared their prices for particular products. The other Totem participants were within 1/20th of a vol difference from each other while BMO wasn't close tho their prices. He also surveyed other market participants to get their opinions about the validity of Totem's prices and service.

  In approximately the end of October or early November 2006, Jeff Wang began to save instant messages directly from Lee's desk computer instead of relying on Lee to forward them to Wang.

  He and Somerville had bi-weekly meetings with Bordeaux. He had raised his concerns about Lee and his mispricing of the natural gas book with Bordeaux.

  Auditors from KPMG were informed what the bank was doing with regards the differences in the trading book pricing and the reserves for them. KPMG was told of the methodology using a 1 vol tolerance but was not told about any of the bank's suspicions of Lee mispricing his trading book. There were meetings attended by himself, Fiddes, Somerville, James Hughes. Scott Whitmore was the senior partner on the engagement for KPMG.

  In the months following October 2006 no additional reserves were taken above the $13 million, until January 2007. Tripp had instructed him and Somerville not to take any more reserves until the bank fully understood the nature of the differences between the Totem and broker data.

  Wang did an analysis of trade prices where Lee left the market or closed positions on trades. Wang found that Lee's trade prices on these trades were significantly lower than his marks.

FD-302a (Rev. 10-6-95)


318E-NY-297342

Continuation of FD-302 of __Murray McIntosh__ , On __07/19/2007__ , Page __10__

Wang undertook this to counter arguments made by Moore against Totem. This was after they began using Totem.

The idea to use Optionable's Real Marks pricing service originated around the same time that serious efforts were underway to use Totem. Real Marks was proposed by Moore, with Moore offering that his group would pay for it. Wang was introduced to Kevin Cassidy as a friend of Moore's who had the Real Marks pricing service. Optionable also offered OPEX trading platform. He had very little involvement with OPEX but felt it did not perform as it should have. There was only BMO and several other firms using the platform to trade.

In January 2007 he asked Olivio Bencich to provide data on how much business BMO did with its brokers. This was the first time he had requested this data. He recalls receiving it in approximately February 2007. Optionable was the biggest broker each month and there was a significant volume increase when Lee began putting on the EOO transactions.

Wang raised concerns about the EOO trades with him. Wang explained the structure of the EOO transactions to him. These trades did not seem to make sense from the bank's perspective. Wang didn't think BMO could make any money from them and their valuation was not in line with exchange prices. Several weeks later Wang told him that Lee was doing a lot more of the EOO trades. He had Wang send Moore an e-mail to stop entering into EOO trades. He also told Moore to stop doing these trades. Moore agreed but did not halt these type of trades. Wang was present when Moore agreed to stop these trades. He also raised issues concerning the P & L these trades brought to the book on their first day and why would a fund do these trades when they could be done more cheaply on the exchange. Moore argued that he did not know what the premium was and that the trades should be looked at by the value of the whole option and not the parts of it. He wanted Moore to tell him how much of a premium he had paid for the EOO trades. Moore said that the trades were marked to market in Lee's model. McIntosh was unaware of who the counter parties to the EOO transactions were, at the time.

In April 2007 he saw that additional EOO trades were done. He learned this when the guys from Toronto took over the book and realized the size and amount of the EOO transactions. After January 2007 he had not discussed the EOO trades with Moore.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of __Murray McIntosh__ , On __07/19/2007__ , Page __11__

    In the end of January 2007 BMO was given a presentation by Optionable on their OPEX platform. He, Moore, Costa, Bencich were present from BMO and, Cassidy and Ed O'Connor were present for Optionable. Albert Helmig was present via telephone. The meeting lasted approximately one to one and a half hours with Cassidy doing most of the talking. During the presentation Cassidy stated that NYMEX had agreed to buy 20 percent of Optionable and they would like to be fully bought out. Cassidy emphasized their connection to NYMEX. During the presentation there were listings of brokers and banks written on a blackboard in the room. He asked Cassidy if they did business with all the firms listed on the board. Cassidy replied yes. He followed by asking about Goldman Sachs to which Cassidy answered no, but everyone else. He told Cassidy that it was important that the bank received accurate marks for pricing because the bank was using Optionable's pricing to value its natural gas book, and that the CEO of BMO was signing off on the valuation, which affected the banks book and filings. Cassidy stated that he understood. He informed Cassidy that BMO was using their (Optionable's) quotes. Cassidy told him you should be using several quotes. When he relayed this to Moore, Moore said I guess we'll be getting more quotes.

    In January 2007, month end pricing at the bank using OPEX showed the biggest difference with Lee's book.

    Deloitte & Touche was hired to examine BMO's commodity group. This decision was made by a consensus of BMO executives. Deloitte had a short time frame to issue their report, which when issued, supported many of market risk's positions. Deloitte's report was sent to BMO upper management. Deloitte's review missed looking at the American options (EOO) transactions. Craig Brown was the contact for Deloitte. After the fact Deloitte stated that Moore told them that BMO didn't do any American options. Issues that were raised in the Deloitte report were valuation concerns, reserves, 1x2 trades and the conflict between trading and market risk.

    He issued a memo in January 2007 raising his concerns over the natural gas book. There was a meeting in Toronto to discuss this memo and the Tom Merrall report. Present for this meeting were Karen Maidment, Peter Graffe, McGlashen, Cally Hunt, Somerville and himself. He raised suspicions of fraud in the pricing of the natural gas book at this meeting.

Case 1:09-cv-07557-GBD-JLC Document 254-11 Filed 12/02/13 Page 13 of 16
Case 1:08-cv-07587-GBD-JLC Document 254-11 Filed 02/13/86 Page 13 of 16

A201

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of __Murray McIntosh__ , On _07/19/2007_ , Page __12__

      He and Jeff Poulson decided that Tom Merrall would help Poulson complete his analysis of the natural gas book. Poulson's conclusions confirmed market risk's position that the natural gas book was mismarked. Poulson included comments in the report that there was intentional mismarking in the natural gas book.

      He received draft copies of Tom Merrall's report concerning the natural gas book. He (McIntosh) did not edit the content of this report, but did ask Merrall to tone down the implications of fraud in the report. While he felt there was intentional mismarking and had expressed this to Sommerville, Poulson, Merrall and Costa, he did not want this to be expressed in the report. Prior to April 27, 2007 he had expressed his beliefs that Lee was intentionally mismarking the book to McGlashen, Sommerville, Costa, Merrall, the Deloitte & Touche team, Poulson, Mark Caplan and Pat Cronin.

      Mark O'Sullivan headed up a BMO internal audit of the commodities group. The commodities group came out clean on this audit. He does not think this report has been issued yet.

      Sometime in mid February or early March 2007 he had a meeting with Tripp and others where the 2006 bonuses were discussed. Moore was not present at this meeting. Tripp was upset that 2006 bonuses were already paid but they were based on bad figures.

      In March 2007 he had a meeting in Toronto with Sommerville and Bordeau. He expressed his concerns about the natural gas book to Bordeau but not as strongly as with others. He advised Bordeau that the natural gas book is being misvalued and there is a potential valuation problem. Bordeau advised him to speak with Moore about it as Moore is usually right about these kinds of things. McIntosh did not respond to this comment. Bordeau sent an e-mail to set up a meeting to cool tensions between trading and market risk. This communication suggested that market risk was on a witch hunt.

      By the mid to end of March 2007 it was decided that reserves at the bank would have to be increased due to the increase in pricing differences. Tripp sent Mark Caplan and Pat Cronin to New York to examine the natural gas trading book and the commodities group. Cronin, Tripp and other management at the bank decided they would use Totem to price the natural gas book for the end of the quarter. BMO was not going to use Optionable. They

Continuation of FD-302 of __Murray McIntosh__, On 07/19/2007, Page 13

began to focus on developing a methodology for end of the quarter pricing.

Bill Downe, Karen Maidment, Peter Graffe, Cally Hunt, Penny Somerville, Bob McGlashen and Vicki Lazaris were involved in the preparation for the 4/27/2007 investor conference call. He was not involved in this process. He was called to a 4/23/2007 board meeting in Chicago but did not participate. He was aware of that the agenda for the board meeting would include discussions of the losses in the commodities group. Each quarter he and Sommerville would go to a risk review committee (RRC) meeting. These meetings were usually held in Toronto but would occasionally be held in Chicago. This RRC meeting in April 2007 was held in Chicago. He can not recall who was in attendance and stayed only for the portion of the RRC meeting that concerned market risk. There was a pre meeting for which he was not present but believes Sommerville was. During this same trip to Chicago he attended other meetings. He met with Paul Regan, of BMO in house counsel, to discuss the commodity losses. He had a meeting with Dennis Dean, the Chicago branch manager. There was also a meeting with Bordeau, Regan, Sommerville, Ken McDonald and Chuck Jeffrey of the Chicago Federal Reserve, and himself.

Sommerville relayed to him that in the pre meeting the BMO directors were upset about the losses in the commodities group and were upset that they had not been told earlier.

It was Sommerville's idea to meet with the Federal Reserve in Chicago. He is not sure who set up the meeting. He did not have and does not recall any discussion about what they (BMO) would tell the Federal Reserve Board. They did plan on telling the Federal Reserve about the bank's losses. Bordeau and Sommerville did most of the talking at this meeting. They did not mention any wrongdoing by Lee or anyone else. He does not recall if the Federal Reserve was given the Merrall report. Chuck Jeffrey of the Federal Reserve asked if there was any problems or wrongdoing and what had caused the losses. He was told that the bank was investigating but had no proof of any wrongdoing. The Federal Reserve was told that the bank would keep them up to date but he does not know if the bank has done so. He recalls telling Chuck Jeffrey and Ken McDonald of the Chicago Federal Reserve that there was intentional mismarking in the natural gas book but does not recall when.

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of __Murray McIntosh__, On __07/19/2007__, Page __14__

    He gave a copy of the Merrall report to Bordeau outside of the board room in Chicago. He informed Bordeau that it was important for Bordeau to read the report and that he would be able to understand it.

    During the plane ride to Chicago he discussed the Merrall report with Sommerville. He highlighted the evidence of Lee's misconduct in the areas of skew adjustment and the boost being negative as opposed to positive. Sommerville was in agreement with him as he explained the report. He did not walk Tripp through the report because Costa told him that Cronin and Caplan had already done so. In May 2007 he walked the BMO board through the Merrall report.

    Talking points for the board meeting were created by market risk and distributed amongst BMO management. These talking points were to be used at the board meeting in Chicago. These did not include Merrall's findings but did include calculations of the losses to BMO, which were between $350 to 450 million. Sommerville, McGlashen and Bordeau did not want to get into issues of fraud at the bank.

    There were jumps in the banks estimates of the losses resulting from the natural gas trading. The initial jump to the $90 to 200 million range was due to accounting for the Theta component in Lee's trades and his positions were priced at month end. The next jump in estimates to the $400 to 600 million range was due to the American options being marked to the NYMEX. These positions had to be marked to the NYMEX due to GAP and FAS rules that state American options need to be marked to an exchange.

    BMO management had concerns about what should be disclosed concerning the losses. Management had to understand that events that had happened and ensure that there were no additional losses. They did not want to disclose any information that could enable someone to capitalize on positions in BMO's trading books and cause additional losses. There was a meeting on April 25 or 26, 2007 with in-house counsel on what information should be disclosed.

    After Moore read the Merrall report Moore told him that the report was empirical and was all true. Moore said he was disappointed in Lee and felt betrayed. Moore called him on April 23, 2007 while he (McIntosh) was in Chicago. Moore put the blame for the losses with Lee. Moore questioned whether this was

Case 1:09-cv-07557-GBD-JLC Document 254-11 Filed 12/02/13 Page 16 of 16
Case 1:09-cv-07557-GBD-JLC Document 264-11 Filed 02/13/86 Page 16 of 16
A204

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of __Murray McIntosh__, On __07/19/2007__, Page __15__

criminal. McIntosh stated it could be wire fraud if there were e-mails between Lee and Optionable. He feels that Moore was a hands on manager and would have known what positions were in the book and the quality of the valuation of the positions.

He was shown a copy of a document labeled BMO 139032, which is an e-mail from Sommerville. He does not recall receiving this e-mail from Sommerville.